USDC SCAN INDEX SHEET

















R1R   10/18/05   15:11

3:05-CV-00823   IN RE PETCO CORP V.

*16*

*CMP.*

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DANIEL S. DROSMAN (200643)
DAVID A. THORPE (216498)
TED MINAHAN (227969)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
   – and –
PATRICK J. COUGHLIN (111070)
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

Lead Counsel for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PETCO CORPORATION SECURITIES LITIGATION | Master File No. 05-CV-0823-H(RBB) |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 6

THE PARTIES ............................................................................................................... 7

BACKGROUND TO THE CLASS PERIOD AND SUMMARY OF THE ACTION ................ 23

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS
      DURING THE CLASS PERIOD ........................................................................ 31

      August 2004 – October 2004 ......................................................................... 31

      November 2004 – January 2005 .................................................................... 41

      February 2005 – April 2005 .......................................................................... 47

      May 2005 – August 2005 .............................................................................. 54

CONFIDENTIAL SOURCES ...................................................................................... 73

PETCO'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD ................. 76

      GAAP and SEC Violations ............................................................................ 78

ACCOUNTING SCHEME ........................................................................................... 80

      Distribution Centers' Expense Procedures ................................................... 81

PETCO'S GAAP VIOLATIONS WERE MATERIAL ................................................ 84

DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS ............ 85

PETCO FAILED TO MAKE REQUIRED DISCLOSURES ....................................... 86

PETCO LACKED ADEQUATE INTERNAL CONTROLS ........................................ 88

PETCO SHOULD HAVE RESTATED ITS FINANCIAL STATEMENTS ................. 89

ADDITIONAL GAAP AND SEC VIOLATIONS ....................................................... 90

CONFIDENTIAL SOURCES CONFIRM DEFENDANTS' SCIENTER ................... 92

DEFENDANTS' PARTICIPATION IN A SCHEME TO DEFRAUD SHAREHOLDERS ....... 96

DEFENDANTS INSIST THAT PETCO'S DISTRIBUTION CENTERS OPERATE
      UNDER UNREASONABLE COST CONSTRAINTS ...................................... 97

DEFENDANTS ORDER DISTRIBUTION CENTER DIRECTORS AND MANGERS
      TO WITHHOLD INVOICES IN ORDER TO STAY WITHIN THE BUDGET ........... 99

05-CV-0823-H(RBB)

| | Page |
|---|---|
| Distribution Department | 100 |
| Traffic and Transportation Department | 106 |
| PETCO'S OCTOBER 2004 EMPLOYEE SURVEY | 108 |
| PETCO'S DECLINING SAME-STORE SALES | 110 |
| DEFENDANTS' INSIDER SALES DURING THE CLASS PERIOD | 112 |
| LOSS CAUSATION/ECONOMIC LOSS | 118 |
| CLASS ACTION ALLEGATIONS | 120 |
| NO SAFE HARBOR | 122 |
| FIRST CLAIM FOR RELIEF | 123 |
| SECOND CLAIM FOR RELIEF | 124 |
| THIRD CLAIM FOR RELIEF | 125 |
| PRAYER | 127 |
| JURY DEMAND | 127 |

05-CV-0823-H(RBB)

## INTRODUCTION

1.      This is an action on behalf of purchasers of PETCO Animal Supplies, Inc. ("PETCO" or the "Company") common stock during the period from August 18, 2004 to August 25, 2005 (the "Class Period") for violations of §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "1934 Act" or "Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC"). Defendants are PETCO and its top officers, directors, and controlling shareholders during the Class Period, who made or are otherwise responsible for false and misleading statements and omissions regarding PETCO's financial forecasts and results with respect to earnings per share ("EPS"), net earnings and same-store sales, which had the effect of artificially inflating PETCO's stock price during the Class Period and allowed defendants to sell approximately *$270 million* worth of inflated PETCO common stock in less than one year.

2.      For the two years before the Class Period, PETCO, which was under the control of shareholders Texas Pacific Group ("TPG") and Leonard Green & Partners ("LGP"), told the market how its aggressive growth strategy, *i.e.*, more PETCO stores nationwide, would translate into greater shareholder returns. While defendants told investors that PETCO effectively executed its nationwide store expansion strategy, they failed to inform investors during the Class Period that defendants were unwilling to expend extra money on distribution infrastructure to support this expansion. According to a former manager at PETCO, at the beginning of the Class Period the Company was internally discussing the need to open additional distribution centers in the West and South to address the increasing distribution costs. Defendants, however, failed to open additional distribution centers where they were greatly needed, especially in Georgia and Florida, where PETCO had expanded exponentially. In addition, defendants only approved distribution center budgets that were unrealistically low and had no reasonable chance at being achieved.

3.      Over the course of the Class Period, defendants consistently forced operational divisions of the Company to accept unrealistic budgets far below actual operating costs. This under-budgeting resulted in the under-accrual of expenses from operations through the failure to record expenses, which defendants were forced to admit took place during the Class Period. *See* ¶¶218-279.

4.      According to former employees of PETCO, beginning in 2004, defendants rejected an already bare-bones operational budget and required additional cuts of up to $1.5 million.  Under these extreme budgeting pressures imposed by defendants, costs naturally exceeded budgeted amounts.  *See* ¶¶226-234.  Former Company employees specifically relayed this information to senior management as early as October 7, 2004, as part of PETCO's Employee Survey.  *See* ¶¶275-279.

5.      In order to meet quarterly expectations given these unrealistic budgets, defendants instructed PETCO employees to hold back the recording of incurred expenses and liabilities.  *See* ¶¶235-279.  For example, in the beginning of October 2004, defendant Razia Richter ("Richter"), Senior Vice President, Supply Chain for PETCO, began participating in weekly forecasting calls with logistics and operations employees, including the directors of the three central distribution centers.  During one of these calls, in October 2004, defendant Richter told the distribution directors to "*hold onto any invoices because we gotta make the quarter.*"[1]  At the same time, defendant Richter instructed the distribution directors to "*do whatever it takes to be on budget.*"  This under-accrual resulted in millions of dollars worth of unrecorded expenses and liabilities in order to "make" the quarterly results.

6.      Furthermore, *in the second week of January 2005, defendant Richter sent an email to distribution center directors stating that she wanted to schedule a conference call with the directors in reference to accruals and invoices being held back to make budget.  Attached to defendant Richter's email was a selected compilation of responses from the early October 2004 Employee Survey which showed that management was forcing unrealistic budgets on the distribution centers and invoices and expenses were being improperly unrecorded in an effort to*

---

[1]      Unless otherwise noted, all emphasis is added.

*reduce expenses and increase net earnings. See* Exhibit 1. One day later, however, defendant Richter cancelled the conference call with no explanation and never rescheduled for a new date. If defendants recorded these expenses and liabilities as required by GAAP, PETCO's reported financial results would have been materially different.

7.     Defendants falsely reported PETCO's financial results, which materially overstated PETCO's net earnings before taxes by $3.2 million, $5.6 million, and $5.6 million for Q3 2004, Q4 2004, and fiscal year 2004, respectively. Furthermore, EPS was overstated by $0.03, $0.06 and $0.06 for Q3 2004, Q4 2004, and fiscal year 2004, respectively. *See* ¶¶168-192.

8.     Former PETCO employees have provided plaintiff with a detailed list of over $3.1 million worth of unrecorded freight and fuel invoices incurred at the distribution centers. A copy of PETCO's general ledger detailing these unrecorded distribution costs is attached hereto as Exhibit 2. In addition, PETCO erroneously accounted for tenant improvement allowances associated with its leases. PETCO understated its cost of sales by improperly amortizing its tenant improvement allowances as a reduction to depreciation and amortization in violation of Generally Accepted Accounting Principles ("GAAP") in the amount of $1.2 million through Q3 2004. *See* ¶¶168-192. PETCO's fraud is shown graphically in the following stock chart:

# PETCO Animal Sup·

## Daily Share Pricing: August 2, 2'



8/18/04: PETCO reports 2Q04 financial results with comparable store sales of 6.7%, EPS of $0.33, and net earnings of $19.3M. PETCO provides 3Q04 financial guidance with comparable store sales of 5%-6% and EPS of $0.33-$0.34. PETCO CFO, Rodney Carter, announces "strong operating margins" and "successful execution of [its] long-term growth strategies . . . will enhance shareholder value well into the future."

10/12/04: PETCO meets with financial analysts and investors in Philadelphia, PA in which they reaffirmed third quarter guidance and full-fiscal year guidance. PETCO states its exceptional financial performance will continue.

9/8/04: PETCO announces the opening of its 700th store.

10/1/04 - 11/1/04: Insiders sell 7,106,010 shares for $252,621,921.
• Green: 3,355,954 shares for $119,400,000
• TPG: 3,305,955 shares for $117,600,000.
• Insiders: 444,101 shares for $15,621,921.

12/1/04: Insiders sell 67,600 shares for $2,492,304

### Class Period Sales

Shares Sold: 7,662,534
Proceeds: $271.8 million

Green Shares Sold: 3,355,954
Green Proceeds: $119.4 million

TPG Shares Sold: 3,305,955
TPG Proceeds: $117.6 million

Y-axis: Dollars Per Share — $45, $40, $35, $30, $25, $20

X-axis: 08/02/2004 · 08/3

9.      Ultimately, after a whistleblower notified the defendants of the accounting fraud, PETCO was forced to reveal that it had failed to accrue $5.6 million in expenses during 2004, and KPMG, PETCO's independent auditors, concluded that PETCO had material weaknesses relating to accruals for vendor invoices.

10.     Defendants also issued false forecasts concerning PETCO's same-store sales, consistently projecting growth in the 5% to 6% range, despite knowing that stores around the country were reporting decreased customer traffic, that PETCO did not have a cost-effective distribution chain to service new stores in parts of the Southeast and that the new store format that defendants represented as the model for future growth and distinction from its competitors actually afforded less shelf space and sales potential than previous models. *See* ¶¶280-287. Additionally, in announcing PETCO's net sales figures to the market, defendants concealed that net sales growth throughout the Class Period was primarily due to increased pricing, rather than increased customer traffic as reported. *See* ¶¶280-287.

11.     By issuing false and misleading statements and omitting the true facts regarding the costs of operations at PETCO, the Company's same-store sales, and customer traffic and sales based on a new store format, PETCO stock was artificially inflated throughout the Class Period. Through their false and misleading statements, defendants artificially inflated PETCO's stock price to over $39 per share. At the end of the Class Period, PETCO's stock collapsed to approximately $21 per share. Thus, PETCO stock fell dramatically in price as the state of the Company's financial and operational condition came to light.

12.     This inflation, caused by defendants' false and misleading statements, allowed PETCO's insiders to reap *over $4.7 million* in proceeds from the sale of PETCO common stock between August 18, 2004 and October 1, 2004. But defendants sought to profit even more. Faced with the serious obstacle to selling off additional holdings of their PETCO stock because of negative market reaction to large blocks of insider stock sales, and the resulting price instability, defendants decided to undertake a public offering of millions of shares of PETCO stock.

13.     On October 22, 2004 – weeks after defendants learned through an employee that PETCO was violating accounting rules by systematically withholding payment for invoices –

1   PETCO filed a prospectus for a public offering of approximately 6.9 million shares of common stock

2   (the "Public Offering") with a proposed maximum aggregate value of *over $247 million* to be

3   received by the selling shareholders. *The Public Offering not only allowed PETCO insiders the*

4   *opportunity to sell vast sums of common stock, but it also afforded PETCO's two largest and*

5   *controlling shareholders, Texas Pacific Group and Leonard Green & Partners, the opportunity to*

6   *sell-off 100% of their remaining shares of PETCO common stock.* PETCO received no financial

7   benefit from the Public Offering, and indeed, paid the expenses of the Public Offering.

8       14.     Defendants' sales in the October 2004 Public Offering occurred *after* PETCO's

9   senior management, including defendant Razia Richter, PETCO's Senior Vice President of Supply

10  Chain, instructed distribution center managers to withhold invoices and falsify distribution center

11  budgets, which caused PETCO to report false financial results. *See* ¶288.

12      15.     From the Public Offering through April 1, 2005, defendants sold over *$15.5 million*

13  worth of PETCO common stock at inflated prices. Then, in April 2005, defendants were forced to

14  publicly disclose that PETCO failed to record or accrue known distribution expenses and would

15  delay filing its annual report. On April 15, 2005, before the market opened, the Company issued a

16  press release entitled "*PETCO to Delay Filing of Form 10-K.*" The release stated that PETCO

17  would delay the filing of its Form 10-K with the Securities and Exchange Commission, for the year

18  ended January 29, 2005, and that it had requested a 15-day extension after it discovered accounting

19  errors related to certain under-accrued expenses in its distribution operations.  The Company

20  anticipated its Q4 2004 earnings would be reduced by *$3.0-$4.5 million* and that fiscal year 2005

21  earnings would be reduced by a similar amount, as it took into consideration the nature of the under-

22  accrual of distribution expenses. *Despite admitting that they were aware of this accounting fraud*

23  *on April 1, 2005, defendants sold over $2.5 million worth of inflated common stock on that very*

24  *day.*

25      16.     In fact, defendants were told of this systematic under-accrual of distribution expenses

26  as early as October 2004, and again on March 25, 2005, in an email to defendants James Myers

27  ("Myers"), Chief Executive Officer of PETCO, and Rodney Carter ("Carter"), Chief Financial

28  Officer of PETCO. *See* ¶¶235-274. As part of this email, a former PETCO employee also attached

portions of the Company's general ledger stating: *"[a]ttached is information concerning 2004 expenses carried over into 2005 which were not accrued for in 2004. This information is not meant to be 100% accurate but I feel further examination is in order. I think you will find this is a substantial amount worthy of your concern and attention."* The total amount of invoices just for 2004 freight and fuel ("freight out") costs that had neither been recorded as an accrued expense nor paid by the end of fiscal 2004 (January 29, 2005) totaled *over $3 million*. *See* Exhibit 2.

17.     Defendants continued, however, to publicly represent to investors that same-store sales were on track to meet guidance and that the new store format and customer traffic were driving improvement, which further inflated the price of PETCO's common stock to an all-time high of over $39 per share in December 2004.

18.     As investors and the market became aware that PETCO's prior statements and financial results had been false and that PETCO's actual business prospects were far worse than it had led investors to believe, the stock began to free-fall. *But before they released their final bombshell, defendants quickly sold approximately $3.8 million worth of additional inflated PETCO common stock between July 1, 2005 and August 1, 2005.*

19.     Finally, on August 25, 2005, PETCO announced that its Q2 2005 same-store sales increase was only 2.5%, missing its prior estimates. PETCO also lowered guidance for same-store sales in Q3 2005 to *0% to 2%*. The price of PETCO's stock plummeted to $21.99 per share on this news, *a one-day drop in price at 13%.*

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the 1934 Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240. 10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the 1934 Act, 15 U.S.C. §78aa.

22.     Venue is proper pursuant to §27 of the 1934 Act as defendant PETCO, TPG, LGP and/or the Individual Defendants conduct business in and the wrongful conduct alleged herein took

place in this District. PETCO's executive offices are located at 9125 Rehco Road, San Diego, California where the day-to-day operations of the Company are directed and managed.

23.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

24.     As detailed in the attached certification, Lead Plaintiff Plumbers and Pipefitters Local 51 Pension Fund purchased or otherwise acquired PETCO common stock at artificially inflated prices during the Class Period and suffered damages when revelation of the true facts caused a decline in the value of plaintiff's investment. *See* Exhibit 4.

25.     Additional plaintiff members of the Class that have standing under §20A of the 1934 Act are set forth in the section of this complaint detailing defendants' insider sales during the Class Period. *See* ¶¶288-298, *infra*.

26.     Defendant PETCO Animal Supplies, Inc. is a holding company for defendant PETCO Animal Supplies Stores, which is the second largest specialty pet supplies retailer in the United States. PETCO maintains its headquarters in San Diego, California. PETCO Animal Supplies holding company was formed in January 2005 to create legal efficiencies for the Company's growth strategies. The certificate of incorporation and bylaws of the holding company are substantially the same as the certificate of incorporation and bylaws of PETCO Animal Supplies, Inc. and the officers and directors of PETCO Animal Supplies, Inc. are also the officers and directors of the holding company. PETCO Animal Supplies, Inc.'s stockholders were not required to take any action in connection with the corporate restructuring. All outstanding shares were converted into shares of the new holding company in a non-taxable transaction with the same rights, privileges and interests as the shares of PETCO Animal Supplies, Inc. previously held by such stockholders. The shares of the holding company continue to be represented by the same stock certificates that previously represented shares of PETCO Animal Supplies, Inc. capital stock. As of July 30, 2005, PETCO operated 752 stores in 48 states and the District of Columbia. The Company's products include pet food, supplies, grooming products, toys, novelty items, vitamins and veterinary supplies. PETCO

1   also offers for sale small pets such as fish, birds and other small animals.  In addition, the stores

2   provide grooming, obedience training, and veterinary services.

3          27.       Defendant Texas Pacific Group refers to and includes defendants Texas Pacific

4   Group, Inc., TPG Advisors III, TPG Partners III, L.P., TPG Parallel III, L.P., TPG Dutch Parallel III,

5   C.V., TPG Investors III, L.P., FOF Partners III, L.P., FOF Partners III-B, L.P., David Bonderman,

6   James G. Coulter and William S. Price, III.  Defendant TPG Advisors III is the sole general partner

7   of defendant TPG GenPar III.  Defendant TPG GenPar III is the sole general partner of each of

8   defendants TPG Partners III, TPG Parallel III, TPG Investors III, FOF Partners III and FOF Partners

9   III-B, and is the sole member of TPG GenPar Dutch.  Defendant TPG GenPar Dutch is the sole

10  general partner of TPG Dutch Parallel III.  Defendants David Bonderman, James G. Coulter and

11  William S. Price, III are officers, directors and sole shareholders of TPG Advisors III as well as the

12  managing partners of defendant Texas Pacific Group, Inc.  Founded in 1993 and based in Fort

13  Worth, Texas, San Francisco, California, and London, Texas Pacific Group, Inc. is a private

14  investment partnership with capital of over $20 billion under its management.  Defendant TPG

15  enjoyed a special relationship with PETCO because: (1) TPG and LGP acquired PETCO in 2000,

16  and then led the company through an IPO in 2002; (2) between 2000 and 2004, TPG was a majority

17  shareholder of PETCO, owning 39.8% of PETCO's common stock in 2000, 26.5% of PETCO's

18  common stock in 2002 (after PETCO's IPO) and owning 5.7% of PETCO's common stock at the

19  start of the Class Period; (3) between 2000 and 2005, TPG and LGP were parties to an agreement,

20  pursuant to which, among other things, they agreed to vote for nominees of each of TPG and LGP to

21  serve on PETCO's Board of Directors; and (4) between 2000 and 2004, TPG partners William S.

22  Price, III and Jonathan Coslet served on PETCO's Board of Directors.  TPG Partner and defendant

23  Jonathan Coslet is currently a director of PETCO.  During the Class Period, while in possession of

24  material non-public, adverse information about PETCO, TPG sold 3,305,955 shares of PETCO

25  common stock for proceeds of $117,600,000.

26

27

28



**Petco Inc.**
**TPG Advisors - Insider Sales Dollar Volume**
**August 2, 2004 to August 31, 2005**

28.    Defendant Leonard Green & Partners refers to and includes defendants Leonard Green & Partners, L.P., Green Equity Investors III, L.P., John Danhakl, Peter J. Nolan, Jonathan D. Sokoloff and John M. Baumer.  Defendant Leonard Green & Partners, L.P., is an affiliate of defendant Green Equity Investors III, L.P.  Formed in 1989, Leonard Green & Partners, L.P. has invested more than $3.7 billion.  Defendants John Danhakl, Peter Nolan and Jonathan D. Sokoloff are managing partners of defendant Leonard Green & Partners, L.P.  Defendant John M. Baumer is a partner at defendant Leonard Green & Partners, L.P.  Defendant LGP enjoyed a special relationship with PETCO because: (1) LGP and TPG acquired PETCO in 2000, and then led the company through an IPO in 2002; (2) between 2000 and 2004, LGP was a majority shareholder of PETCO, owning 39.8% of PETCO's common stock in 2000, 26.5% of PETCO's common stock in 2002 (after PETCO's IPO) and owning 5.8% of PETCO's common stock at the start of the Class Period; (3) between 2000 and 2005, LGP and TPG were parties to an agreement, pursuant to which, among

other things, they agreed to vote for nominees of each of LGP and TPG to serve on PETCO's Board of Directors; (4) between 2000 and 2004, LGP partners John Danhakl and John M. Baumer both served as directors of PETCO.  During the Class Period, LGP sold 3,355,954 shares of PETCO common stock for proceeds of $119,400,000.



**Petco Inc.**
**Green Equity Investors - Insider Sales Dollar Volume**
**August 2, 2004 to August 31, 2005**

29.     Defendant James M. Myers is the Chief Executive Officer and a director of PETCO. Myers joined PETCO in May 1990 and was named CEO in February 2004. From 1998 to 2004, Myers served as Executive Vice President and Chief Financial Officer of PETCO.  From 1996 to 1998, Myers served as Senior Vice President, Finance and before that as Vice President, Finance and as Vice President and Controller of PETCO. From 1980 to 1990, Myers held various positions at the accounting firm of KPMG LLP ("KPMG"), including Senior Audit Manager.  Myers has served as a director of PETCO since October 2000.  Myers is a CPA and received an accounting degree from John Carroll University.  During the Class Period, while in possession of material non-public,

1   adverse information about PETCO, Myers sold 112,000 shares of PETCO common stock for

2   proceeds of $3,892,322.

3



**Petco Inc.**
**James Myers - Insider Sales Dollar Volume**
**August 2, 2004 to August 31, 2005**

18   30.   Defendant Rodney Carter is a Senior Vice President and Chief Financial Officer of

19   PETCO.  Carter joined PETCO in February 2004.

20   31.   Defendant Brian Devine ("Devine") is the Executive Chairman of PETCO's Board of

21   Directors and Executive Management member.  Devine joined PETCO in August 1990.  Devine

22   served as President and Chief Executive Officer until February 2004 and has served as Chairman of

23   the Board since January 1994.  At the start of the Class Period, Devine owned 4.0% of PETCO's

24   outstanding common stock.  During the Class Period, while in possession of material non-public,

25   adverse information about PETCO, Devine sold 529,000 shares of PETCO common stock for

26   proceeds of $18,386,472.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Petco Inc.
Brian Devine - Insider Sales Dollar Volume
August 2, 2004 to August 31, 2005

16    32.    Defendant Bruce Hall ("Hall") is the President and Chief Operating Officer of

17  PETCO.  Hall joined PETCO in April 1997.  Hall was named President in February 2004 and has

18  served as Chief Operating Officer since 2001.  During the Class Period, while in possession of

19  material non-public, adverse information about PETCO, Hall sold 112,000 shares of PETCO

20  common stock for proceeds of $3,892,330.

21
22
23
24
25
26
27
28

- 12 -                          05-CV-0823-H(RBB)



33.     Defendant Robert E. Brann ("Brann") was the Senior Vice President, Merchandising for PETCO.  Brann joined PETCO in September 2000, and left PETCO on February 15, 2005. During the Class Period, while in possession of material non-public, adverse information about PETCO, Brann sold 28,000 shares of PETCO common stock for proceeds of $976,581.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



Petco Inc.
Robert Brann - Insider Sales Dollar Volume
August 2, 2004 to August 31, 2005

16    34.    Defendant Fredrick Major ("Major") is the Senior Vice President, Information

17  Systems for PETCO.  Major joined PETCO in April 1988 and became Senior Vice President,

18  Information Systems in March 2002.  Major initially served as Management Information Systems

19  Manager and then as Director of Information Systems and most recently as Vice President of

20  Information Systems.  During the Class Period, while in possession of material non-public, adverse

21  information about PETCO, Major sold 14,000 shares of common stock for proceeds of $486,540.

22

23

24

25

26

27

28





35.     Defendant Keith Martin ("Martin") is the Senior Vice President, Operations for PETCO.  Martin joined PETCO in July 2001.  During the Class Period, while in possession of material non-public, adverse information about PETCO, Martin sold 56,000 shares of PETCO common stock for proceeds of $1,946,161.





**Petco Inc.**
Keith Martin - Insider Sales Dollar Volume
August 2, 2004 to August 31, 2005

36.     Defendant Janet Mitchell ("Mitchell") is the Senior Vice President, Human Resources and Administration for PETCO.  Mitchell joined PETCO in February 1989.  From 1989 to 1998, Mitchell served as Vice President, Human Resources for PETCO.  During the Class Period, while in possession of material non-public, adverse information about PETCO, Mitchell sold 56,000 shares of PETCO common stock for proceeds of $1,946,153.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



**Petco Inc.**
Janet Mitchell - Insider Sales Dollar Volume
August 2, 2004 to August 31, 2005

16      37.     Defendant Razia Richter is the Senior Vice President, Supply Chain for PETCO.

17   Richter joined PETCO in 1991 and became Senior Vice President, Supply Chain in February 2004.

18   Previously, Richter worked as Vice President of Southwest Store Operations; Vice President,

19   Inventory Management and Analytical Services; Vice President, Business Development; and

20   Controller. Prior to joining PETCO, Richter held various accounting positions at the accounting

21   firm KPMG. Richter is a CPA and has an accounting degree from San Diego State University and

22   an M.B.A. from the University of San Diego. During the Class Period, while in possession of

23   material non-public, adverse information about PETCO, Richter sold 6,724 shares of PETCO

24   common stock for proceeds of $231,923.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    38.    Defendant William Woodard ("Woodard") is the Senior Vice President, Business

17 Development for PETCO. Woodard joined PETCO in January 1991. From 1991 to 1999, Woodard

18 served as Senior Vice President, Store Operations. During the Class Period, while in possession of

19 material non-public, adverse information about PETCO, Woodard sold 56,000 shares of PETCO

20 common stock for proceeds of $1,946,157.

21
22
23
24
25
26
27
28



**Petco Inc.**
**William Woodard - Insider Sales Dollar Volume**
**August 2, 2004 to August 31, 2005**

39.     Defendant Jonathan Coslet ("Coslet") has served as a director of PETCO since October 2000.  Coslet has also been a partner of defendant Texas Pacific Group, Inc. since 1993 and is currently a senior partner and member of TPG's Executive, Management, and Investment Committees.  Prior to joining TPG, Coslet worked at Donaldson, Lufkin & Jenrette, specializing in leveraged acquisitions from 1991 to 1993.

40.     Defendant John Danhakl ("Danhakl") has served as a director of PETCO since October 2000.  Danhakl was a member of the Compensation Committee of PETCO's Board of Directors until April 2004.  Danhakl has also been a partner at defendant Leonard Green and Partners, L.P. since 1995, which is an affiliate of defendant LGP.

41.     Defendant Julian Day ("Day") has served as a director of PETCO since November 2000.  Day was a member of the Audit Committee of PETCO's Board of Directors until April 2004.  Day is currently a member of the Compensation Committee and the Nominating and Corporate Governance Committee of PETCO's Board of Directors.  Prior to the IPO, Day was the only listed

1 | non-executive at PETCO to hold PETCO common stock. Day also was the only person other than

2 | TPG and LGP to hold PETCO preferred shares. Day's preferred shares were redeemed in the IPO

3 | for $100,000 in proceeds. During the Class Period, while in the possession of material non-public,

4 | adverse information about PETCO, Day sold 30,901 shares of PETCO common stock for proceeds

5 | of $1,128,870.



**Petco Inc.**
**Julian Day - Insider Sales Dollar Volume**
**August 2, 2004 to August 31, 2005**

22 | 42.    Defendant David Bonderman ("Bonderman") serves as a managing partner of

23 | defendant Texas Pacific Group, Inc. Bonderman, along with defendants James G. Coulter and

24 | William S. Price, III, are officers, directors and sole shareholders of defendant TPG Advisors III.

25 | 43.    Defendant William S. Price, III ("Price") served as a director of PETCO from 2000 to

26 | April 2004. Price was also a member of the Compensation Committee of PETCO's Board of

27 | Directors until April 2004. Price is a managing partner of defendant Texas Pacific Group, Inc.

1   Price, along with Bonderman and James G. Coulter, are officers, directors and sole shareholders of

2   defendant TPG Advisors III, an affiliate of defendant TPG.

3        44.    Defendant James G. Coulter ("Coulter") serves as managing partner of defendant

4   Texas Pacific Group, Inc. Coulter, along with Bonderman and Price, are officers, directors and sole

5   shareholders of defendant TPG Advisors III, an affiliate of defendant TPG.

6        45.    Defendant John M. Baumer ("Baumer") served as a director of PETCO from October

7   2000 to April 2004.  Baumer is also a partner of defendant Leonard Green & Partners, L.P.

8   Defendant Leonard Green & Partners, L.P., is an affiliate of defendant Green Equity Investors III,

9   L.P. Baumer had previously been a Vice President at defendant Leonard Green and Partners, L.P.

10   since May 1999.  Prior to joining defendant Leonard Green and Partners, L.P., Baumer was a Vice

11   President in the Corporate Finance Division of Donaldson, Lufkin & Jenrette Securities Corporation,

12   or DLJ, in Los Angeles.

13        46.    Defendant Jonathan D. Sokoloff ("Sokoloff") serves as a managing partner of

14   defendant Leonard Green and Partners, L.P.  Defendant Leonard Green & Partners, L.P., is an

15   affiliate of defendant Green Equity Investors III, L.P.

16        47.    Defendant Peter J. Nolan ("Nolan") serves as a managing partner of defendant

17   Leonard Green and Partners, L.P.  Defendant Leonard Green & Partners, L.P., is an affiliate of

18   defendant Green Equity Investors III, L.P.

19        48.    The individuals named as defendants in ¶¶29-47 are referred to herein as the

20   "Individual Defendants." Because of their positions and access to material non-public information

21   available to them but not to the public, the Individual Defendants knew that the adverse facts

22   specified herein had not been disclosed to and were being concealed from the public and that the

23   positive representations which were being made were materially false and misleading.

24        49.    TPG, LGP and the Individual Defendants, by reason of their stock ownership or

25   positions with PETCO or representation on PETCO's Board, were controlling persons of PETCO.

26   These controlling persons are each liable under §20(a) of the Exchange Act.

27        50.    Defendants, because of their positions with the Company, possessed the power and

28   authority to control the contents of PETCO's quarterly reports, press releases and/or presentations to

1   securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

2   Defendants were provided with copies of the Company's reports and press releases alleged herein to

3   be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

4   their issuance or cause them to be corrected.  Defendants are liable for those false statements, as

5   those statements were each "group-published" information, the result of the collective actions of the

6   officers and directors.

7        51.    During the Class Period, defendants knew the adverse material facts specified herein

8   because they reviewed daily, weekly and monthly operating and sales reports generated from the

9   Company's general ledger and POLARIS computer information system, attended regularly

10  scheduled meetings, including meetings of PETCO's Board of Directors, with the executive officers

11  and their direct reports.  For example, PETCO's general ledger (portions of which are attached

12  hereto as Exhibit 2) clearly shows the under-accrual of "freight out" costs (the cost of outside

13  trucking companies used to transport PETCO products) incurred by PETCO.  Additionally,

14  PETCO's POLARIS system collected and archived same-store sales data and calculated same-store

15  sales goals. Defendant Coslet conveyed the adverse material non-public information to defendants

16  TPG, Bonderman, Price and Coulter. Defendant Danhakl conveyed the adverse material non-public

17  information to defendants LGP, Baumer, Sokoloff and Nolan.

18       52.    Each of the defendants is liable for making false and misleading statements, and/or

19  for willfully participating in a scheme and course of business that operated as a fraud on purchasers

20  of PETCO stock and damaged Class members in violation of the federal securities laws.  All of the

21  defendants pursued a common goal, *i.e.*, inflating the price of PETCO stock, by making false and

22  misleading statements and concealing material adverse information.  The scheme and course of

23  business was designed to and did: (i) deceive the investing public, including plaintiff and other Class

24  members; (ii) artificially inflate the price of PETCO common stock during the Class Period; and

25  (iii) cause plaintiff and the other members of the Class to purchase PETCO common stock at inflated

26  prices and to sustain damages.

27

28

## BACKGROUND TO THE CLASS PERIOD AND SUMMARY OF THE ACTION

53.     In 1965, Walter Evans founded PETCO as a mail order veterinary supplies business. The original name was UPCO, United Pharmacal Co.   In 1976, the Company's first retail store opened in La Mesa, California.   Originally, the Company's business involved buying quality pet and veterinary supplies and selling them directly to animal professionals and the public at discount prices. In 1979, UPCO became PETCO.   Throughout the 1980s, PETCO expanded its business and retail focus by acquiring additional stores and by presenting various new products and services to consumers.

54.     By early 2000, however, PETCO's stock price was languishing, despite good results. "We've been putting up great numbers, quarter after quarter, and it just wasn't appreciated by the public market," stated Myers, then PETCO's Chief Financial Officer, in May 2000.   Then, that same month, long-suffering shares of PETCO jumped 31%, on the announcement of a $600 million buyout deal from TPG and LGP to take PETCO private.   At the time, the market valued PETCO, which had sales of $990 million in 1999, at just $315 million.

55.     As part of the negotiations prior to the buyout, PETCO provided to TPG an income statement forecast through 2005. TPG, along with LGP, agreed to provide equal equity investments of $92.5 million.   Thus, the total investment by TPG and LGP was $185 million.   This equity investment consisted of preferred and common stock.   The preferred shares cost TPG and LGP $169 million, while the common stock cost $16 million. TPG and LGP structured the investment so that the preferred shares would be redeemed by PETCO upon the completion of an initial public offering. This allowed TPG and LGP to recapture its total investment in PETCO.   Thus, the common stock holdings of TPG and LGP were virtually risk-free assets.

56.     With this investment, TPG and LGP owned *75%* of the outstanding shares of PETCO. TPG and LGP conditioned their purchase on five PETCO executives having a 20% equity interest in PETCO.   Those original five executives were Devine (CEO), Hall (Exec. VP, Operations), Myers (CFO), Woodard (Sr. VP, Business Development), and Mitchell (Sr. VP, Human Resources and Administration).   Furthermore, TPG structured its investment to be heavily debt-loaded – over

1   $400 million – double the total equity.  Two weeks after this investment, PETCO made a 22-for-1

2   stock split.

3        57.    In  October  2000,  the  Company  completed  its  recapitalization  with  BD

4   Recapitalization Holdings LLC, an entity controlled by TPG and LGP.  In the recapitalization, each

5   outstanding share of the Company's common stock was cancelled and converted into the right to

6   receive $22.00 per share in cash, with the exception of an aggregate of 134,351 shares retained by

7   five members of the Company's management. The Company also issued $195 million of common

8   stock and preferred stock and $120 million in senior subordinated debt, entered into a $350 million

9   senior credit facility, retired debt under the Company's then existing credit facility and repurchased

10  all of the Company's outstanding common stock other than the 134,351 shares retained by Company

11  management for an aggregate price of approximately $463.4 million.

12       58.    As part of the buyout transaction, PETCO also entered into a ten-year management

13  services agreement with TPG and LGP, who acted as the managers under the agreement.  Under the

14  management services agreement, TPG and LGP provided management, consulting and financial

15  planning services and transaction-related financial advisory and investment banking services to the

16  Company and its subsidiaries.  The Company paid a one-time structuring fee of $8 million to TPG

17  and LGP in October 2000 under the agreement.  TPG and LGP received an annual fee of

18  approximately $3.1 million as compensation for the general services they provided under the

19  management services agreement and fees for transaction-related services, and were reimbursed for

20  out-of-pocket expenses.

21       59.    In connection with the recapitalization transaction, PETCO also entered into a

22  stockholders agreement with certain of its stockholders, including TPG, LGP, Devine, Hall, Myers

23  Woodard and Mitchell.  The stockholders agreement was amended and restated in connection with

24  PETCO's initial public offering in February 2002.  Under the amended and restated stockholders

25  agreement, these same stockholders could demand that PETCO file a registration statement with the

26  SEC covering some or all of the stockholder's registerable securities.  This agreement allowed these

27  defendants to require PETCO to file a registration statement for over 12 million shares of PETCO

28

1  common stock in February 2004, which later allowed for the secondary offering of over 6.9 million

2  shares of PETCO common stock at inflated prices in October 2004. *See* ¶¶288-298, *infra*.

3        60.      Between 2000 and 2002, TGP and LGP directed the aggressive growth strategy for

4  PETCO. By 2000, PETCO's sales increased to over $1 billion, and the Company operated 500

5  stores. In 2001, PETCO announced a new and distinct store format known as the Millennium. This

6  new store format incorporated a more dramatic presentation of animals and emphasized higher-

7  margin supplies categories. From 2001 onward, PETCO's new stores would be based on this

8  format. By the end of 2001, defendants positioned PETCO to go public once again.

9        61.      On February 27, 2002, PETCO completed an initial public offering. PETCO received

10  net proceeds of approximately $272.5 million from the offering of 15,500,000 shares of common

11  stock, including 1 million shares of common stock pursuant to the subsequent exercise of the

12  underwriters' option to purchase additional shares. PETCO used approximately *$239.8 million* of

13  the net proceeds of the IPO to redeem in full all of its then outstanding shares of series A and series

14  B preferred stock from TPG and LGP. The redemption netted TPG and LGP *$110.8 million* each.

15        62.      PETCO also paid Julian Day $100,000 for his preferred shares. Besides TPG and

16  LGP, Julian Day was the only listed person to receive and redeem PETCO preferred shares.

17        63.      Even after the IPO, TPG and LGP still held enough shares to control PETCO. Each

18  held 15.5 million shares, which represented *27.9%* of the outstanding common stock of PETCO.

19        64.      TPG and LGP also each had two nominees to PETCO's Board of Directors. Pursuant

20  to an agreement between TPG and LGP, each voted in favor of the other's nominees. TPG's director

21  appointees were Jonathan Coslet and William Price, both partners at TPG. LGP's director

22  appointees were John Baumer and John Danhakl, both partners at LGP.

23        65.      After the IPO, PETCO reiterated its aggressive long-term growth strategy, which

24  TPG and LGP had initiated. Throughout 2002, PETCO announced that it intended to continue to

25  pursue this strategy by: (1) continuing to increase sales and profitability by generating continuous

26  comparable store net sales growth, expanding strategically in existing and new markets, targeting

27  sales of higher-margin supplies and services, delivering economies of scale and purchasing

28  efficiencies from an expanding store base, and continuing to offer over 10,000 high quality products

not typically found in supermarkets or mass merchants; (2) capitalizing upon PETCO's maturing store base to increase net sales and store-level operating performance; (3) expanding the use of PETCO's new store Millennium model; (4) leveraging industry leading information systems and logistics expertise through investment in its information systems infrastructure and integrated distribution network to increase sales, enhancing customer service and improving inventory turns; (5) capitalizing upon PETCO's brand awareness and customer loyalty program; and (6) continuing to provide knowledge-based customer service.

66.    Coming out of the IPO, PETCO, with the assistance of TPG and LGP, put their store expansion plans in full gear, particularly in the states in the Southeast. These states were Alabama, Florida, Georgia, Louisiana, and Mississippi (hereinafter "Southeast States").

67.    As of February 2, 2002, PETCO had 561 stores nationwide. Fourteen of the stores were located in the Southeast States.

68.    At that time, PETCO had three central distribution centers and five regional distribution centers. It was these eight distribution centers that PETCO used to distribute its products to its stores nationwide. The Southeast States stores were primarily serviced by the distribution center located in the Northeast, in New Jersey. PETCO represented that its distribution centers were cost effective and efficient:

> Our centralized purchasing and distribution system minimizes the delivered cost of merchandise and maximizes the in-stock position of our stores. We currently operate three central and five regional distribution centers. . . . We believe that our centralized distribution system enables our stores to maximize selling space by reducing necessary levels of safety stock carried in each store.

69.    From the time of the IPO to the beginning of 2004, PETCO dramatically expanded its store presence, particularly in the Southeast states.

70.    By January 31, 2004, PETCO had expanded its store base to 654 stores, a total of 93 stores in two years. A majority of these new stores were located in the Southeast States where PETCO jumped from 14 stores in February 2002 to 41 stores by January 31, 2004. Georgia and Florida had the greatest expansion. Georgia increased its store base by 4 stores from February 2, 2002 to January 31, 2004. Florida expanded from zero stores to 15 in the same time period.

71.     PETCO reinforced to investors that this store expansion was responsible for its improved financial performance:

> The principal contributors to this improvement in our financial performance include . . . (2) strategic expansion in both existing and new markets; . . . (4) our expanding store base that offers economies of scale and purchasing efficiencies . . . .

72.     Though PETCO had, and still was greatly expanding, particularly in the Southeast States, it did not similarly expand its distribution centers infrastructure to support its store expansion.

73.     By January 31, 2004, PETCO had done nothing more than transfer its central distribution center in Dayton, New Jersey to Monroe, New Jersey. PETCO failed to open a regional distribution center to efficiently serve the Southeast States when the Class Period began.

74.     In 2004, PETCO began noticing that its store expansion was greater than its distribution infrastructure could support. Due to the recent increase in stores nationwide, particularly the Southeast States, PETCO was spending more money delivering its products than projected. Indeed, by the start of the Class Period, the Company was aware that it needed to add additional distribution centers in Florida and Colorado to address escalating distribution costs. The Company, including the Director of Traffic and Transportation, was discussing how to expand the distribution infrastructure to meet PETCO's store base by opening additional distribution centers in the West and South. As a result, defendants exerted significant pressure on the distribution centers to stay within budget. These budgets, when approved, were ridiculously low and were unrealistic estimations of actual distribution center expenditures.

75.     Defendants, however, continued to promote PETCO's store expansion. On September 9, 2004, PETCO announced that it had opened its 700th store.

76.     Defendants, however, failed to expand PETCO's distribution infrastructure to meet the store expansion. Defendants knew they needed to add distribution centers. But defendants wanted to avoid telling investors that distribution centers were needed. Such a disclosure would signal that PETCO's current distribution infrastructure was inadequate and that PETCO would need to expend large sums of money restructuring itself.

77.     As a result, defendants failed to tell investors that plans were in the works to open distribution centers in Florida and Denver, Colorado.

78.     It was not until March 10, 2005, that the Company began to reveal the truth about its distribution infrastructure. On that day, PETCO told investors that it had incurred higher distribution costs "primarily related to recent penetration into new markets, such as South Florida, where initial entry costs have been high."

79.     These high distribution costs, stemming from the new South Florida stores was not new news to PETCO. From the IPO to January 31, 2004, PETCO opened most of its stores in Florida – 15 stores total. For all of 2004, the Company only added six additional stores in Florida. Thus, the majority of these higher distribution costs related back to the store openings in 2002 and 2003.

80.     Not until May 25, 2005, did defendants disclose to the market something they had known since the beginning of the Class Period – *PETCO was planning to open two additional regional distribution centers – one in Denver, Colorado and one in Orlando, Florida*.

81.     Further, by the start of the Class Period (August 2004), PETCO was suffering severe operational difficulties and had material weaknesses in its internal controls over its business and finances. Indeed, while defendants' expansion plan appeared to be a drive for success, it was clear that PETCO lacked the infrastructure to support the levels of growth reported. With remaining holdings of over three million shares each, however, defendants TPG and LGP and the Individual Defendants embarked on a scheme to inflate the price of PETCO's stock so that they could liquidate their remaining PETCO holdings before being forced to disclose PETCO's operational and financial shortcomings. Defendants knew that once they had inflated the price of PETCO's stock they could begin selling via open market sales, through an established Rule 10b5-1 plan, and most importantly for TPG and LGP, through a secondary offering of common stock. To ignite this inflationary drive, defendants relied on expanding the six long-term growth strategy points announced in 2002, but now with increased fervor and without disclosing PETCO's severe operational issues.

82.     On August 18, 2004, PETCO announced strong operating margins and a "successful execution of ... long-term growth strategies" in connection with its Q2 2005 results. On the same day, PETCO unveiled its new store format known as Pisces, and represented that this design would provide the next catalyst to accelerate comparable store sales growth. The Pisces format was said to

incorporate PETCO's latest focus on customer centricity and was designed with a theatrical display of aquatics in the center of the store. PETCO assured investors that the Pisces format would provide a lift to same-store sales in the remodeled stores.

83.     Three months later, on November 18, 2004, PETCO announced Q3 2004 results and raised its guidance for fiscal year 2004. The Company also issued very favorable guidance for fiscal year 2005. As a result, by April 2005, the Company's stock was trading above $37 per share.

84.     On January 11, 2005, defendants announced that "a sluggish start may render fourth-quarter same-store sales growth weaker than expected, though not enough to force a paring of its profit forecasts." Defendants continued to conceal from investors, however, the serious nature and extent of the problems surrounding PETCO's finances and operations, including the systematic withholding of invoices at its distribution centers in an effort to increase earnings.

85.     Then, on April 15, 2005, before the market opened, the Company issued a press release entitled "PETCO to Delay Filing of Form 10-K." PETCO announced that it would delay the filing of its Form 10-K with the SEC and that it had requested a 15-day extension after it discovered "accounting errors" related to certain under-accrued expenses in its distribution operations. The Company anticipated its Q4 2004 earnings would be reduced by $4.5 million and that fiscal year 2005 earnings would be reduced by a similar amount, as it took into consideration the extent and impact of the under-accrual of expenses.

86.     Concealed from the investing public, however, was the fact that PETCO's financial position and results were falsified through the use of an accounting scheme of unrecorded expenses and liabilities, which materially overstated PETCO's net earnings and EPS. At the same time, defendants knew or recklessly disregarded that PETCO's same-store sales were declining and unsustainable because stores in the Southeast States were receiving less customer traffic, PETCO did not have a cost-effective distribution chain to service new stores in parts of the Southeast States and the new store format that defendants represented as the model for future growth and distinction from its competitors actually afforded less shelf space than previous models.

87.     Ultimately, after a whistleblower notified the defendants of the accounting fraud, PETCO was forced to reveal that it had failed to accrue $5.6 million in expenses during 2004, and

1  KPMG, PETCO's independent auditors, concluded that PETCO had material weaknesses relating to

2  accruals for vendor invoices.

3       88.    Between August 18, 2004 and October 1, 2004, PETCO's insiders reaped *over $4*

4  *million* in proceeds from the sale of PETCO common stock despite being in possession of adverse

5  material non-public information.  An then, on October 22, 2004, defendants sold *more than $247*

6  *million* via Public Offering.  From the date of the Public Offering through April 1, 2005, defendants

7  sold over *$15.5 million* worth of additional PETCO common stock at the inflated prices.

8       89.    Later, on May 25, 2005, PETCO belatedly revealed that its Q1 2005 results would be

9  much worse than it had previously told investors and also that it was lowering its same-store sales

10  guidance and EPS guidance for the full year.  PETCO also announced it would be opening two

11  additional regional distribution centers.

12       90.    On June 28, 2005, PETCO revealed that its Q2 2005 results would be much worse

13  than it had previously represented and also that it was lowering its same-store sales guidance and

14  EPS guidance for the full year.  However, the stock continued to remain inflated, and defendants

15  took advantage of this by selling approximately *$3.8 million* worth of additional inflated PETCO

16  common stock between July 1, 2005 and August 1, 2005.

17       91.    Ultimately, on August 25, 2005, PETCO announced that its Q2 2005 same-store sales

18  increase was only 2.5%, which was below its prior estimates.  PETCO also lowered guidance for

19  same-store sales in Q3 2005 to *0% to 2%*.  The stock fell to $21.99 per share on this news, a one day

20  13% drop in price.

21       92.    All told, defendants' scheme allowed them to sell approximately *$270 million* worth

22  of PETCO common stock at inflated prices during the Class Period.

23       93.    The chart at ¶8 graphically demonstrates defendants' statements, sales and the

24  corresponding stock price.

25

26

27

28

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### August 2004 – October 2004

94.     On August 18, 2004, the Company reported its financial results for Q2 2004, ended July 31, 2004.  The Company also provided its guidance for Q3 and fiscal 2004.  The press release stated in part:

<div align="center">PETCO Reports Second Quarter Fiscal 2004 Results</div>

*     Net Earnings Increase 34% to $0.33 Per Diluted Share over the Prior Year Pro Forma

*     Comparable Store Sales Increase 6.7%

*     Raising 2004 Earnings Outlook to $1.48 - $1.49 per Diluted Share

SAN DIEGO – August 18, 2004 – PETCO Animal Supplies, Inc. (Nasdaq: PETC) today reported financial results for the second quarter ended July 31, 2004.  The Company also provided its guidance for the third quarter and full fiscal year 2004.

Second Quarter Results

*Net sales in the second quarter of 2004 were $438.5 million with a comparable store net sales increase of 6.7%.  The comparable store net sales increase in the period comes on top of a 6.1% increase in the prior year's second quarter.  Overall, net sales increased 12.9% over the second quarter of fiscal 2003.*

*Net earnings for the second quarter increased to $19.3 million, or $0.33 per diluted share, compared with net earnings of $13.5 million, or $0.23 per diluted share, in the prior year second quarter.*

<div align="center">*     *     *</div>

*"The 6.7% comparable store net sales increase we achieved in the second quarter again highlights the consistency and resilience of our business and continues our strong comparable store sales growth trend, now in its twelfth year," commented PETCO's Chairman, Brian K. Devine.*

*"Our strong comp sales drove a 34% increase in quarterly net earnings to $0.33 per diluted share," commented PETCO's Chief Executive Officer, James M. Myers.  "We will continue to execute our industry leading growth strategies delivering innovative solutions to our pet-loving customers."*

First Half Results

Net sales in the first half of 2004 were $864.4 million with a comparable store net sales increase of 6.5%.  The comparable store net sales increased comes on top of a 5.3% increase in the prior year period.  Overall, net sales increased 13.3% year to date.

*Net earnings for the first half of 2004 were $35.1 million, or $0.60 per diluted share compared with net earnings of $24.6 million, or $0.42 per diluted share, in the prior year period.*

The first half of 2003 included $1.6 million of non-cash debt retirement costs resulting form an early repayment of a portion of the Company's long-term senior credit facility.

*Excluding this item and related tax effects, pro forma net earnings for the first half of fiscal 2003 were $25.5 million, or $0.44 per diluted share. On a comparable basis, net earnings for the first half of 2004 increased 38% over the prior year period pro forma net earnings.*

Rising Gross Profit and Operating Margins

Gross profit margin improved 120 basis points to 34.6% in the second quarter of 2004. Continued change in mix from lower-margin pet food sales to higher margin categories and improvements in pet food margins, contributed to margin growth. Offsetting margin gains were store closing costs for planned store closures, as well as distribution costs related to higher fuel prices and increased transportation costs. These factors combined to produce a 30 basis point improvement in gross profit margin. In addition, this margin performance includes the effects of the adoption of EITF 02-16, which resulted in a 90 basis point increase, as described below.

Operating income for the second quarter increased 22% to $36.8 million, compared with $30.2 million in the prior year second quarter. Operating income as a percentage of sales increased 60 basis points to 8.4% in the second quarter of 2004 compared to 7.8% in the second quarter of 2003.

*"PETCO's strong operating margins reflect the successful execution of our long-term growth strategies and further enable us to reinvest in our business and implement such initiatives as our remodel program and the opportunistic acquisition of selected locations," commented Rodney Carter, Senior Vice President and Chief Financial Officer. "During the second quarter, we were active on both of these fronts, and we believe they will generate competitive advantages that will enhance shareholder value well into the future."*

\*      \*      \*

Store Expansion Program

PETCO opened 21 new stores during the second quarter of fiscal 2004. The addition of 16 new stores during the period, net of relocations and closings, increased the store base for 685 locations. PETCO will continue to advance its national brand presence in 2004 by opening approximately 90 new stores, or 70 new stores net of relocations and closings, with approximately 40 openings planned for the third quarter.

In the second quarter of 2004, PETCO completed 16 remodels of existing stores and now has 265 stores in its latest store format. The Company plans to continue with this strategic initiative in the second half of fiscal 2004 by remodeling up to an additional 25 existing stores.

Outlook for the Third Quarter and Full Fiscal Year 2004

*The Company currently expects a comparable store net sales increase of approximately 5%-6% in the third quarter of fiscal 2004. This anticipated increase in comparable store net sales would come on top of the 6.0% increase achieved in the third quarter of fiscal 2003. Due primarily to the strong sales results it is achieving, the Company currently expects third quarter earnings per diluted share in the range of $0.33 - $0.34. The Company now expects diluted earnings per share in the range of $1.48-$1.49 for the full fiscal year 2004, representing an increase of more than 25% over the prior year and up from previous guidance of $1.43-$1.44 per diluted share.*

95.     On the same day that defendants released PETCO's Q2 2004 earnings announcement, defendants also held a teleconference for investors and analysts during which they stated:

Brian Devine, Chairman of the Board, PETCO:   *Comparable   store   sales increased 6.7% in the second quarter. This period marks the 46th consecutive quarter of comp sales increases of 4.6% or greater.*

\*          \*          \*

Jim Myers, CEO, PETCO:   *Net sales for the second quarter increased 13% to 438 million with a comparable store sales increase of 6.7%. And this increase comes on top of the 6.1% increase in comp store sales in the prior year. This acceleration in comp sales performance builds on the now 12-year long track record that demonstrates both the success of our business strategies and the underlying strength of the pet industry. Our second-quarter comp performance was strong and it powered our financial results. Net earnings increased 34% over the prior year to 33 cents per diluted share.*

\*          \*          \*

Rodney Carter, PETCO SVP & CFO:  PETCO's second-quarter results reflect a continued successful execution of our long-term growth strategy.

\*          \*          \*

Bruce Hall, PETCO President & COO: Our 6.7% comp sales increase was achieved on top of the 6.1% comp in the prior-year's second quarter.

\*          \*          \*

Jim Myers, PETCO CEO: Our second-quarter results with 6.7% comparable store sales gains, operating income growth over 22%, 8.4% of sales, and 34% growth in net earnings reflects the strength of the execution of PETCO's long-term growth strategy and positions us well for future success.

\*          \*          \*

Bill Sims, Smith Barney analyst:  *Your 5 to 6% comp guidance for the third quarter, could we interpret that as your standard conservatism, if – presumably comps were somewhere closer to 7%, at the – 7% or higher at the end of the second quarter, presumably, given that you're up against the same comparisons, we potentially could maintain that rate going forward unless your guidance would imply a deceleration.*

- 33 -

05-CV-0823-H(RBB)

Jim Myers, PETCO CEO:  *But I think, Bill, from our perspective, our long-term model, you know, calling for the 20% earnings growth is based around the mid-single-digit comp and we're quite comfortable with the 5%-6% range, we're able to deliver the results we're expecting and, yes, we have long-term been on the conservative side.  I would not say anyone mentioned 7 but, you know, I think we're feeling very good that we had a good, solid quarter this time.  And, and a longer term basis, five to six will properly be our guidance for the foreseeable future.*

\*     \*     \*

Jim Myers: PETCO CEO:  *our expectation is that we'll continue to resume, you know, the same strong level of growth we've experienced in the past.*

David Mann, Johnson Rice analyst:   In terms of the guidance you gave, it sounded like the amount you beat the second quarter, some of that, a couple cents, came from the shift in this cost, Rodney you were talking about, so implicitly I guess you're a little more bullish about the third quarter or back half, what would behind that bullishness?

Rodney Carter, PETCO SVR & CFO:  I just think the overall solid performance, solid sales, execution, new stores coming on-line, etc.  I think certainly we did try to be clear that the beat was exciting and was a tremendous performance, but roughly two cents of that was in fact due to the timing delay and shift of those expenses on a go-forward basis so we're excited about Q3, excited about the year and just there's no one driving factor, just a lot of the continued innovation and execution that's been underway for many months continues to deliver results.

\*     \*     \*

Joe Feldman, SG Cowen Analyst:     I was just wondering if you could talk a little bit about the current competitive environment and if you have seen things more or less promotional this year relative to last year and if that had any factor in helping to drive the comps at all?

Brian Devine, PETCO Chairman of the Board:     *I would say that it's about the same.  You know, it really was not that we saw no change last year in competitive situation, we still don't this year.  I think, in general, you know, the prices are inching slightly higher, as we say in our case it went up about 1%.  So that was the same as last year, so we really have not really seen price increased as any part of – of the comp increase in our particular case was the same exact question.*

Jim Myers, PETCO CEO:     I think specialty retail continues to – you know, be the big performer and continues to steal market share from everybody else, but that's a long-term phenomenon not something that's, you know, unique to this period.

96.     In response to the Q2 2004 release and defendants' conference call, analysts raised their estimates for PETCO.  On August 19, 2004 Michael E. Cox, Senior Research Analyst for Piper Jaffray issued a report entitled "Raising Estimates On A Upbeat 2H04 Outlook," stating:

2Q EPS of $0.33 beat our estimate by $0.04 and came in ahead of company guidance.  Outperformance relative to our model was driven by stronger-than-expected same-store sales trends (+$0.01) and margins (+$0.03).  Same-store sales

rose +6.7% in 2Q, which beat our forecast of +5.5% – recall, the Company indicated that comp trends were tracking at the high end of guidance (5%-6%) in mid-July. Based on this outperformance, we believe sales trends have accelerated in recent weeks, which gives us early confidence in 3Q trends. Services revenue rose in the high teens y/y in 2Q as under-staffing in canine education offset continued strength in grooming. We believe improvements in staffing levels through 2H04 will lift service revenue growth back to the 20%+ level. The Company plans to test 4 "doggy day care" programs this quarter. The operating margin expanded by +60 bps (+30 bps ex. EITF 02-16), beating our forecast by a flat margin y/y. The delay in the acquisition of the Kids'R'Us stores added $0.02 to 2Q EPS and this shift of expenses into 3Q is incorporated into our forward estimates.

97.     Also on August 19, 2004, Gary J. Holdsworth, CFA and Mariela I. Clark of Wedbush Morgan Securities issued an Analyst Estimate which stated:

•       *Consumers demonstrate a high propensity to spend money on their pets regardless of broader economic environment, which trend we believe will persist in the face of higher interest rates and energy prices. We also expect the company's growth in pet services (forecast at north of 20% this year) to continue to propel earnings growth. We believe PETCO's stock price does not fully reflect its above-20% sustainable earnings growth rate.*

98.     On August 19, 2004, Bill Sims of Smith Barney Citigroup issued a report entitled "PETC: 2Q Review Unleashed New Growth Engine," stating:

We would be strong buyers of PETCO's stock following their 2Q earnings report. While both comps of +6.7% and EPS of $0.33 both exceeded expectations of 6% and $0.29 respectively, our more optimistic outlook is driven by our expectation that *PETCO's new store format, called "pisces," will provided [sic] the next catalyst to accelerate comp store sales growth.*

*                *                *

*PETCO's conference call was one of the most positive and upbeat calls we have heard in a long time.* We believe the stock had come under pressure earlier this summer on concerns that PETCO's remodels were costing more and taking longer to complete, along with fear that PETCO would have to lower guidance in the back-half of the year. In reality, the cost of remodels remains in-line with expectations, and previous remodel efforts are driving enough productivity enhancements such that PETCO was able to raise guidance in the back-half of the year.

*We believe a new catalyst has emerged to break PETCO's stock out of its current trading range. On last night's call, PETCO announced that it is rolling out fits next store prototype, called "Pisces." The Pisces format incorporates PETCO's latest focus on customer centricity and is designed with a theatrical display of aquatics in the center of the store (see more detail below). In addition to costing the equivalent of the existing "Millennium" format, Pisces will likely provide at least a mid-single digit lift to comps in the remodeled stores and 50bps to 100bps lift to overall comps by early next year. PETCO has always been a story about consistent sales and earnings growth, reporting 46 consecutive quarters of +4.6% comp-store sales growth or better, but may become an accelerating top-line growth story as the Pisces format begins to provide a larger contribution to sales next year.*

*We continue to view PETCO as one of the fastest growth stories in our coverage universe. PETCO is operating in a 6% growth industry with very little exposure to the discount channel. The industry continues to experience a market share shift from the independent pet stores and supermarkets to the pet superstores and the mass merchants. PETCO currently has 685 stores, and there is room for close to 1,300, by our estimates. As a result, we believe PETCO can sustain 10% footage growth for the next several years and produce mid-single-digit comp growth. This would imply low- to mid-teen sales growth. PETCO is a margin improvement story as well. With a 1% to 2% mix shift from sales of food to sales of higher margin supplies and services, PETCO has been experiencing approximately 50bps lift in gross margins for the last several years – we expect that trend to continue into the foreseeable future. Low- to mid-teen sales growth, combined with healthy margin improvement, is driving high-teen operating income growth. PETCO continues to use part of its free cash flow to de-leverage its balance sheet, driving further interest expense savings. As a result, we believe PETCO can grow earnings by at least 22% for the foreseeable future.*

*Therefore, we are strongly re-iterating our Buy recommendation and are raising our price target to $42. Our new price target is derived from a 1.11x PEG ratio, our 22% long-term growth forecast, and our 2005 EPS estimate of $1.84. With the stock trading at $29.72, or a 48% discount to our target, we view PETCO's shares as significantly undervalued.*

99.     Lehman Brothers also issued a report by Alan Kificia entitled "PETCO Animal Supplies: 2Q Beats Expectations – Raising Est" which stated:

*Same-store sales rose 6.7%, above our 6% expectation, and management's guidance of 5%-6%. A more favorable mix drove over half of the same-store sales gain, while pricing contributed 1%, with increased traffic accounting for the remainder. We believe ongoing inflation in wholesales prices of raw materials can benefit PETCO into 2H04, as the company is able to pass along higher prices to the consumer. The 6.7% same-store sales gain in the second quarter, compared to 6.1% last year, marked the company's 46th consecutive quarter of comps of 4% or greater. Services sales rose in the high-teens range. In stores where services such as grooming are provided, revenue from services accounted for 5% of sales in the quarter. PETCO opened 21 new stores and closed five stores during the quarter, for a total of 16 net new stores, versus 19 net openings in 2A0, ending the period with 685 stores in 44 states.*

100.     On August 30, 2004, the Company issued its Q2 2004 Form 10-Q for the quarterly period ended July 31, 2004, which reiterated and contained the same the information as in the Q2 2004 earnings release. The Form 10-Q for Q2 2004 was signed by defendants Myers and Carter.

101.     On September 9, 2004, defendants Myers and Carter attended and presented at the Goldman Sachs Eleventh Annual Global Retailing Conference. Myers and Carter represented that PETCO would achieve gains in comparable store sales for the third quarter as well as the full year 2004 in the range of 5%-6%. Further, they represented that for the third quarter ending October 30, 2004, PETCO's earnings would be in the range of $0.33-$0.34 per diluted share and that for the full

- 36 -

05-CV-0823-H(RBB)

year 2004, diluted earnings would be in the range of $1.48-1.49, up more than 25% from the earnings in the prior year.

102. On the same day, PETCO announced the opening of its 700th store location.

103. A month later, on October 12, 2004, defendants caused PETCO to issue a press release through *Dow Jones News Service* reaffirming earlier guidance for Q3 2004, with PETCO expecting gains in same-store sales to top the high end of its August guidance of 5% to 6%.

104. Also on October 12, 2004, defendants held an investor and analyst meeting in Philadelphia, Pennsylvania. The event included presentations by several members of senior management and a tour of a store with the new Pisces format. ***Defendants told analysts that PETCO expected to open 75 new Pisces format stores by its fiscal year ending January 2005.***

105. Throughout this period, the market price of PETCO stock was inflated, reflecting the Company's false statements that it had been successful in its growth strategy and was on its way to ever-increasing same-store sales. On October 13, 2004, Baird U.S. Equity Research issued an analyst report, based upon information provided by defendants, reflecting that the market was optimistic about PETCO's continued sales growth.

- PETCO updated guidance in advance of the meeting. PETC continues to project Q3 (October) EPS of $0.33-0.34 (consensus $0.34; half of estimates $0.33) and 2004 EPS of $1.48-1.49 (consensus $1.49). We note that PETC at times has exceeded quarterly guidance that was updated late in the quarter.

- The company now expects Q3 comps above guidance of 5-6% (vs. 6.0%). We believe Q3 comps drivers have included continued growth in services, marketing (e.g., P.A.L.S., PETCO Park), upgraded signage, inflation in pet food, more reformatted stores (83 at start of Q3 vs. 41), and a younger comp base (29% of Q3 comp stores in 1-4 years-old range vs. 27% in Q3-03).

*         *         *

- PETC sees long-term potential for over 1,250 stores (currently about 700) through 8-10% square-footage growth. Smaller sites in urban locations and stores in outlying areas (currently being evaluated) may prove incremental to the 1,250+ target.

- ***Over the past several years, newer stores have consistently exceeded modeled performance in terms of sales and margin contribution. Management indicated stores opened in 2004 have performed well.***

1    106.    On October 13, 2004, PETCO stock closed at $36.02, up $2 from the previous day's

2    close.

3    107.    Then, on October 22, 2004, defendants caused PETCO to issue a press release

4    announcing the Public Offering of 6.9 million shares of common stock through a "firm commitment"

5    offering underwritten by Lehman Brothers:

> PETCO Animal Supplies, Inc. (Nasdaq: PETC) today announced a public offering of
> 6,946,909 shares of its common stock by affiliates of Leonard Green & Partners and
> Texas Pacific Group, and other selling stockholders. After giving effect to the sale,
> affiliates of Leonard Green & Partners and Texas Pacific Group will no longer own
> any shares of PETCO common stock. This completes the sale of all shares of PETCO
> common stock registered for sale under the existing shelf registration statement
> previously filed by the Company with the Securities and Exchange Commission.
> Lehman Brothers Inc. is the underwriter of the offering. PETCO will not receive any
> of the proceeds from the offering.

11    108.    In connection with the Public Offering, defendants caused PETCO to file with the

12    SEC a Prospectus Supplement dated October 22, 2004.

13    109.    The next day, on October 23, 2004, defendant Myers noted that the sales by TPG and

14    LGP constituted *"the final step in PETCO being a fully public company."*

15    110.    On October 22, 2004, Citigroup/Smith Barney issued the following report on PETCO

16    concerning the Public Offering:

> We view today's announcement that they are selling their remaining 6.6mm shares,
> in addition to roughly 300K shares sold by other insiders, as another opportunity for
> investors who want to add to or build positions. *We believe PETCO has a very
> strong growth opportunity ahead of it and with their new Pisces store format just
> starting to roll out, we believe a new catalyst for PETCO's stock and growth is just
> starting to emerge. In our view the Pisces format is going to help accelerate comps
> closer to the 7% range over the next several quarters and help to drive average
> ticket and margin expansion. Given that PETCO 90-day average trading volume is
> around 422.5K shares, we wouldn't be surprised if today's 6.9mm block sale
> through a competitor creates modest pricing pressure. However, with the last of
> TPG and Green Equity Partners shares being sold we think it also removes an
> overhang on the stock. We reiterate our Buy rating and $42 target price.*

23    111.    Defendants' foregoing statements in ¶¶94-110 above were false or misleading when

24    made because:

25    (a)    Defendants falsely reported PETCO's financial results through the use of

26    unrecorded expenses and liabilities, which materially overstated PETCO's net earnings before taxes

1   by $3.2 million for Q3 2004. Furthermore, EPS was overstated by $0.03 for Q3 2004. *See* ¶¶168-

2   192.

3            (b)      Defendants failed to record and recognize known unrecorded distribution

4   costs and temporary labor costs of over $2.0 million for Q3 2004. *See* ¶¶168-192; Exhibit 2.

5            (c)      Defendants erroneously accounted for tenant improvement allowances

6   associated with PETCO's leases and understated its cost of sales by improperly amortizing its tenant

7   improvement allowances as a reduction to depreciation and amortization in violation of GAAP in the

8   amount of $1.2 million through Q3 2004. *See* ¶¶168-192.

9            (d)      PETCO was not executing successfully on its long-term growth strategy,

10  rather defendants had embarked upon a scheme to superficially report increased same-store sales

11  growth, concealing operational problems that undermined the publicly announced growth forecasts

12  and results. Defendants were aware that PETCO did not have a cost-effective distribution chain to

13  service stores in parts of the Southeast States, PETCO required additional regional distribution

14  centers to support its expanded and expanding store base, and that the "Pisces" new store format that

15  defendants represented as the model for future growth and distinction from its competitors actually

16  afforded less shelf space than previous models, which would reduce sales. Indeed, PETCO only had

17  three main, and five regional, distribution centers to for all of its stores nationwide, as shown below:

18

19

20

21

22

23

24

25

26

27

28

1

## DISTRIBUTION CENTER LOCATIONS

2

3

4

5

6

7

8

9



10

## STORE LOCATIONS

11

12

13

14

15

16

17

18

19

20

21

22    As such, stores in the Southeast States were primarily serviced at considerably higher costs by the

23    distribution center in New Jersey, thousands of miles away.  *See* ¶¶65-92, 280-287.

24              (e)      In announcing PETCO's same-store sales results to the market, defendants

25    failed to disclose that sales growth throughout the Class Period was primarily due to increased

26    pricing, rather than increased customer traffic as reported.  *See* ¶¶280-287.  In fact, PETCO stores

27    throughout the country were recording reduced customer traffic and sales.  *See* ¶¶280-287.

28

(f)     As a result of the foregoing, there was no basis in fact for defendants'
forecasts that PETCO would continue to achieve same-store sales above 0%-2% during the Class
Period, and defendants knew those forecasts were false and misleading when made.

**November 2004 – January 2005**

112.    On November 18, 2004, the Company reported financial results for Q3 2004, ended
October 30, 2004.  The Company also provided its guidance for Q4 and fiscal year 2004, ended
January 31, 2005, and provided its initial outlook for fiscal year 2005.  The press release stated in
part:

> **PETCO Reports Third Quarter Fiscal 2004 Results**
>
> *    *Comparable Store Net Sales Increase 7.0% on Top of 6.0% in the Prior
>      Year Period*
>
> *    *Net Earnings Increase 33% to $0.36 per Diluted Share over the Prior Year
>      Pro Forma*
>
> *    *Raising 2004 Earnings Guidance to $1.50 to $1.51 per Diluted Share*
>
> *    *Company Offers Outlook for 2005 Earnings of $1.80 to $1.82 per Diluted
>      Share*
>
> <p align="center">*     *     *</p>
>
> Third Quarter Results
>
> *Net sales in the third quarter of 2004 were $455.5 million with a
> comparable store net sales increase of 7.0%. The comparable store net sales
> increase in the period comes on top of a 6.0% increase in the prior year's third
> quarter. Overall, net sales increased 12.9% over the third quarter of fiscal 2003.*
>
> *Net earnings for the third quarter increased to $21.0 million, or $0.36 per
> diluted share, compared to net earnings of $19.2 million, or $0.33 per diluted
> share, in the prior year third quarter.*
>
> The third quarter of 2003 results included a $3.4 million favorable resolution
> of an income tax accrual. Excluding this amount, pro forma net earnings for the third
> quarter of 2003 were $15.8 million, or $0.27 per diluted share. On a comparable
> basis, net earnings for the third quarter of 2004 increased 33% over the prior year
> period pro forma net earnings.
>
> *"PETCO's track record of outstanding comp sales gains continued in the
> third quarter, reaching 7.0%, reflecting the strength of our business and the
> industry in which we operate," commented PETCO's Chairman, Brian K. Devine.*
>
> "Our strong comp sales drove a 33% increase in quarterly net earnings to
> $0.36 per diluted share," commented PETCO's Chief Executive Officer, James M.

Myers. "We will continue to focus on driving top-line growth while we execute our strategies to deliver a shopping experience that delights our pet-loving customers."

Thirty-Nine Weeks Year-to-Date Results

Net sales year-to-date were $1.3 billion with a comparable store net sales increase of 6.7%. The comparable store net sales increase comes on top of a 5.6% increase in the prior year period. Overall, net sales increased 13.1% year-to-date.

*Net earnings year-to-date were $56.1 million, or $0.96 per diluted share, compared to net earnings of $43.8 million, or $0.75 per diluted share, in the prior year period.*

\*   \*   \*

Rising Gross Profit and Operating Margins

Gross profit margin improved 140 basis points to 35.4% in the third quarter of 2004. Continued change in mix from lower-margin pet food to higher margin categories, improvements in pet food margins, and favorable shrink results contributed to margin growth. Offsetting margin gains were higher fuel prices and overall distribution costs. In addition, this margin performance includes the effects of the adoption of EITF 02-16 in fiscal 2003, which resulted in a 60 basis point increase, as described below.

Operating income for the third quarter increased 22% to $39.5 million, compared to $32.3 million in the prior year third quarter. Operating income as a percentage of sales increased 70 basis points to 8.7% in the third quarter of 2004 compared to 8.0% in the third quarter of 2003.

\*   \*   \*

Outlook for the Full Fiscal Years 2004 and 2005

*The Company currently expects a comparable store net sales increase of approximately 6% for the fourth quarter of 2004. This increase in comparable store net sales would come on top of the 5.6% increase achieved in the fourth quarter of 2003. The Company is raising its outlook for fiscal 2004 earnings per diluted share to a range of $1.50-$1.51. The Company currently expects fourth quarter diluted earnings per share in the range of $0.54-$0.55. The Company's commitment to achieving its long-term objective of 20% net earnings growth would indicate fiscal 2005 earnings per diluted share would be in the range of $1.80-$1.82.*

113. Also on November 18, 2004, defendants held a teleconference for investors and analysts, during which they stated:

Jim Myers

We are ready for the exciting Christmas season. We're also well on the way with our store development efforts for 2005. We have a high quality pipeline of new store locations and we are finalizing our plans for 80-90 new stores next year, consistent with our long-term strategy of increasing square footage 8-10% annually. Our remodel program is strong and getting stronger. With each remodel, we refine and

- 42 -

enhance our approach to delighting customers and by constantly evolving we are confident that we'll keep our customers excited about shopping with us while attracting new customers as well. By the end of this year, nearly half of our stores will be in the Millennium or Pisces formats. Included in this total will be approximately 70 Pisces stores. Pursuing our strategies for new store openings, and refreshing the existing stores will result in nearly two-thirds of the store base being in our latest formats by the end of next year our oldest stores were ground breaking and are still successful today. Our existing Millennium stores both remodels and new locations will continue to be great contributors in that format for years to come. And we formally unveiled our Pisces store last month to the investment community.

*Pisces is "the" most customer-centric and pet-centric store design in our industry. Our Pisces stores include wide, circular racetrack aisles to encourage and facilitate customer traffic throughout all companion animal categories. An open environment, with vibrant signage exposes every customer to every aisle throughout every category in the store. This creates theater and encourages customers to walk around the store at a leisurely pace. The warmth and the fun generated by the Pisces store establishes a new standard for delighting pet parents. Pisces represents the ongoing evolution of our store design as we capitalize on our success will Millennium. Feedback has been overwhelmingly positive from our customers, our associates, and the investors after experiencing the new Pisces store. Our commitment to innovation and constant improvement extends to our leadership position in animal care. Our Think Adoption First program spreads PETCO's animal care philosophies into communities across the country. With Think Adoption First, we recommend to customers the adoption of all kinds of companion animals, not just dogs and cats as an alternative to purchasing them. This program reaches out to animal welfare groups across the nation and taps into a broad network of adoption providers. This greatly expands PETCO's ability to connect customers with adoptable animals beyond those regularly available in stores.*

Rodney Carter

PETCO's third quarter results reflect a continued successful execution of our long-term growth strategy. Growth in all of our long-term metrics is reflected in the financial results I'm about to share. PETCO generated net sales of greater than 455 million during the third quarter, representing a 12.9% increase over the prior year. While also delivering solid margin performance.

Bruce Hall

*Our 7% comp sales increase was achieved on top of the 6% comp in prior year's third quarter. In looking at the three drivers of our comp performance, product mix contributed about half of the overall increase. Higher prices added a consistent 1% and customer traffic represented the balance.*

Bill Sims

Good afternoon. Congratulations on another excellent quarter. Jim, earlier this year you suggested to the investment community that we should come to expect 5 to 6% comp store sales growth because of an aging store base. Clearly over the last three quarters you have significantly exceeded those expectations. Your guidance for the fourth quarter 6% comp would suggest a slowdown on the two-year basis from the previous two quarters. Can you give us a feel how are comps trending quarter to

date and again as I think I've asked in the past are you trying to just be cautious or what trends should be look for in the fourth quarter?  Thank you.

Jim Myers

*I think what we're really trying to say on a longer term basis at least in the near future, sort of comps in that 5 to 6% range is a pretty good guide to performance.  When we have pretty good quarters and some of the things we're doing are working we're on the high end of that range and – but I think from an overall perspective, you know that we're very pleased with that mid single digit comp as being something we can count on as we build our plans for the future.*

Brian Devine

This is Brian.  We don't really see it, you know, a change in what the fourth quarter is going to be from the point of view of the first three quarters so hopefully we'll continue at the rate we have been, but as in all of these quarters we try to, you know – as Jim says, come to a number that we're very satisfied with, that will guarantee that we'll hit our earnings results.

Sean McGowan, Harris Nesbitt, Analyst

Were there any meaningful geographic trends, you know sales wise throughout the quarter, you know, different markets around the county?

Jim Myers

*I think just consistent strength everywhere.  We, like, everyone had sort of ups and downs during the hurricane period in the southeast.  That disrupted move sales around and hurt certain days and people stocked up before and then had down days during.  But from an overall perspective, I think the important thing is, this is just a great category.  It's performing strongly across the country and our stores are performing well everywhere as well.*

114.   On November 19, 2004, Wedbush Morgan Securities issued a report stating:

Q3 Results Beat Expectations By $0.02; Raising EPS estimates And Increasing Price Target To $49

•   *Petco beats again.  PETCO reported EPS of $0.36 vs. $0.27 LY, +33%, exceeding guidance, consensus and our estimate of $0.34.  Same-store sales continued to accelerate over recent trends coming in at 7.0% vs. 6.0% LY, which was ahead of our estimate of 6.0% and guidance of 5-6%.  Total sales increased 13.3% to $445 million.*

•   *Good visibility for future comp and earnings momentum.  Petco reported a solid quarter led by a 7% comp, a continuation of a shift to higher margin products, increases in the company's services business, and overall successful execution of its business strategies.  Future comps and earnings should be driven by a fresh look for the existing stores with either the Millennium or new Pisces format, which will encompass about two-thirds of the chain by the end of 2005.  In addition, Petco is making good progress with its service initiatives, including the rollout of canine education and the Day Camp test.  Finally, we believe the*

*company is well positioned for holiday with a strong gift assortment and marketing campaign.*

• *We are raising price target from $38 to $49 based upon continued consistent performance.* Once again, Petco has delivered better than expected sales and earnings despite the impacts from the hurricane and the resulting back-end loaded store openings. Longer-term, we are optimistic for PETC to continue to drive solid comps (+msd), opportunities for operating margin expansion, and deliver 20-25% earnings growth. For these reasons, we see further upside to the stock despite the appreciation in the year-to-date (+23%). Our new price target of $49 assumes PETC should trade at 27x our 2005E of $1.81 or at a 20% premium to the midpoint of our 20-25% projected growth rate. We have also assigned a similar premium to PETM based upon strong growth prospects and the notion that the pet retailers should be somewhat insulated from an overall weak macro environment because of their customers' emotional connection with their pets.

115.    On December 7, 2004, PETCO issued its Q3 2004 Form 10-Q for the quarter ended October 30, 2004, which repeated the false and misleading statements in the earnings release. Defendants Myers and Carter signed the Form 10-Q for Q3 2004.

116.    On December 30, 2004, ThinkEquity Partners initiated coverage of PETCO and issued a report stating:

We are initiating coverage of PETCO (PETC) with an Accumulate rating and a 12-month price target of $45 based on our 2005 earnings per share estimate of $1.81 and our longer-term earnings per share growth rate of 20%. PETCO has a solid record of profitable growth as sales have increased by a CAGR of 14% over the past five years and pro-forma operating income has improved by a CAGR of 30%. Given compelling industry fundamentals, consistent financial performance, a focus on innovation and execution, ample unit expansion opportunities and cash flow that is funding debt reduction, we anticipate profitable growth to continue. . . .

117.    On December 31, 2004, as a result of defendants' false and misleading statements, PETCO's common stock reached an all-time high of *$39.91* per share.

118.    On January 11, 2005, defendants caused PETCO to issue a press release through *Dow Jones News Service*, which gave investors their first inkling that there might potentially be a reduction in same-store sales. But defendants continued to conceal from investors the serious nature and extent of the problems surrounding PETCO's operations, which were known to them internally, but not to the investing public:

PETCO Animal Supplies Inc. (PETC) warned that a sluggish start may render fourth-quarter same-store sales growth weaker than expected, though not enough to force a paring of its profit forecasts.

The pet-supplies retailer, outlining comments planned for an investor presentation Wednesday, said in a press release Tuesday that it expects same-store sales to increase 5% to 6% for its fiscal fourth quarter. PETCO predicted Nov. 18 that sales growth at stores open at least a year would total 6%.

The quarter, which ends Jan. 29, showed a "relatively slow start," PETCO said.

The company still expects to earn 54 cents to 55 cents a share before debt-retirement costs that are expected to total 6 cents a share.

119.    On January 12, 2005, Citigroup/Smith Barney issued a report stating:

PETC: FLASH: Mgmt to Lower 4Q Comp Guidance; Reiterate 4Q EPS Guidance

* PETCO announced in a press release that management will be lowering its 4Q comp-store sales guidance to the range of +5% to +6%, from +6% previously, at a competitor's conference today at 2:30 p.m. EST.

* The company attributed the weaker comp guidance to a slow start to its fourth quarter, which ends on January 29, 2005. PETCO's earnings guidance remains unchanged, with 4Q04 at $0.54 to $0.55 and full year 2004 at $1.50 to 1.51.

                    *       *       *

* *At this time, we reiterate our Buy recommendation and $42 target price. We will provide an update following the PETCO's presentation this afternoon.*

120.    Defendants' foregoing statements in ¶¶112-119 above were false or misleading when made because:

(a)    Defendants falsely reported PETCO's financial results through the use of unrecorded expenses and liabilities, which materially overstated PETCO's net earnings before taxes by $3.2 million and $5.6 million for Q3 2004 and Q4 2004, respectively. Furthermore, EPS was overstated by $0.03 and $0.06 for Q3 2004 and Q4 2004, respectively. *See* ¶¶168-192.

(b)    Defendants failed to record and recognize known unrecorded distribution costs and temporary labor costs of over $2.0 million and $5.6 million for Q3 2004 and Q4 2004, respectively. *See* ¶¶168-192; Exhibit 2.

(c)    Defendants erroneously accounted for tenant improvement allowances associated with PETCO's leases and understated its cost of sales by improperly amortizing its tenant

1  improvement allowances as a reduction to depreciation and amortization in violation of GAAP in the

2  amount of $1.2 million through Q3 2004.  *See* ¶¶168-192.

3          (d)      PETCO was not executing successfully on its long-term growth strategy,

4  rather defendants had embarked upon a scheme to superficially report increased same-store sales

5  growth, concealing operational problems that undermined the publicly announced growth forecasts

6  and results.  Defendants were aware that PETCO did not have a cost-effective distribution chain to

7  service stores in parts of the Southeast States, PETCO required additional regional distribution

8  centers to support its expanded and expanding store base, and that the "Pisces" new store format that

9  defendants represented as the model for future growth and distinction from its competitors actually

10  afforded less shelf space than previous models, which would reduce sales.  Indeed, PETCO only had

11  three main, and five regional, distribution centers to for all of its stores nationwide.  As such, stores

12  in the Southeast States were primarily serviced at considerably higher costs by the distribution center

13  in New Jersey, thousands of miles away.  *See* ¶¶65-92; 280-287.

14          (e)      In announcing PETCO's same-store sales results to the market, defendants

15  failed to disclose that sales growth throughout the Class Period was primarily due to increased

16  pricing, rather than increased customer traffic as reported.  *See* ¶¶280-287.  In fact, PETCO stores

17  throughout the country were recording reduced customer traffic and sales.  *See* ¶¶280-287.

18          (f)      As a result of the foregoing, there was no basis in fact for defendants'

19  forecasts that PETCO would continue to achieve same-store sales above 0%-2% during the Class

20  Period, and defendants knew those forecasts were false and misleading when made.

21  **February 2005 – April 2005**

22          121.      On March 10, 2005, defendants caused PETCO to issue a press release entitled

23  "PETCO Reports Results for the Fourth Quarter and Fiscal Year 2004."  The release stated in part:

24      *      ***Fourth Quarter Comparable Store Net Sales Increase 5.1% on Top of 5.6%
            in the Prior Year Period***

25      *      ***Fourth Quarter Pro Forma Net Earnings Increase to $0.55 Per Diluted
26          Share***

27      *      ***Fourth Quarter Net Earnings Increase 32% to $0.47 Per Diluted Share***

28                              *        *        *

Net sales in the fourth quarter of 2004 were $492.3 million with a comparable store net sales increase of 5.1%. The comparable store net sales increase in the period comes on top of a 5.6% increase in the prior year's fourth quarter. Overall, net sales increased 10.9% over the fourth quarter of fiscal 2003.

*Net earnings for the fourth quarter increased to $27.6 million, or $0.47 per diluted share. This included after-tax charges of $4.1 million, or $0.07 per diluted share, for debt retirement costs associated with the refinancing of the Company's senior credit facilities and the repurchase of $16.0 million of senior subordinated notes, and $0.8 million, or $0.01 per diluted share, for lease accounting corrections, as described below. These results compared to net earnings of $20.9 million, or $0.36 per diluted share, in the prior year fourth quarter. The fourth quarter 2003 results included an after-tax charge of $6.5 million for debt retirement costs.*

Excluding the previously mentioned items, pro forma net earnings for the fourth quarter of 2004 increased 18.6% to $32.5 million, or $0.55 per diluted share, compared to pro forma net earnings for the fourth quarter of fiscal 2003 of $27.4 million, or $0.47 per diluted share.

*"The comparable store sales increase of 5.1% in the fourth quarter extends our record of strong comp sales increases to 48 consecutive quarters of 4.6% or greater," commented PETCO's Chairman, Brian K. Devine.*

When reviewing the Company's sales for the fourth quarter, PETCO's Chief Executive Officer, James M. Myers commented, "As we reported previously, we had a relatively slow start to the fourth quarter in the election doldrums of November. Solid holiday sales in December accelerated into January. However, in the second half of January, harsh winter storms in the northeast and unusually rainy weather on the west coast negatively affected customer traffic and diluted comp sales for the quarter. *Our sales performance to date in the first quarter of fiscal 2005 resumed to levels consistent with our experience and expectations."*

Full Year 2004 Results

*Net sales in fiscal 2004 were $1.81 billion with a comparable store net sales increase of 6.2%. The comparable store net sales increase comes on top of a 5.6% increase in the prior-year period. Overall, net sales increased 12.5% over fiscal 2003.*

*Net earnings in fiscal 2004 were $83.7 million, or $1.43 per diluted share, compared to net earnings of $64.7 million, or $1.11 per diluted share, in the prior year period.*

*Fiscal 2004 included after-tax charges of $4.1 million, or $0.07 per diluted share, for debt retirement costs, and $0.8 million, or $0.01 per diluted share, for the lease accounting corrections. Fiscal 2003 included an after-tax charge of $7.4 million for debt retirement costs and a favorable resolution of an income tax accrual of $3.4 million.*

*Excluding the previously mentioned items, pro forma net earnings for fiscal 2004 increased 28.8% to $88.6 million, or $1.51 per diluted share from $68.8 million, or $1.18 per diluted share, in the prior year.*

Improved Operating Margins

Operating income was $56.3 million in the fourth quarter of 2004. This included a charge of $1.3 million for the lease accounting corrections. Excluding this item, pro forma operating margin was 11.7%, an increase of approximately 40 basis points over the prior year period. A 90 basis point decrease in selling, general and administrative expenses as a percentage of sales was offset by a 50 basis point decrease in gross profit margin to produce the overall increase in pro forma operating margin.

Gross profit margin was 36.0% for the fourth quarter of 2004. Excluding the lease accounting corrections, pro forma gross profit margin was 36.3%. Initial gross margin improved 70 basis points from the continued change in mix from lower margin pet food to higher margin categories. Higher distribution costs decreased gross margin by 55 basis points primarily related to recent penetration into new markets, such as South Florida, where initial entry costs have been high. Occupancy costs associated with the delay in new store openings and increased store closing costs decreased gross margin by 75 basis points.

* * *

Store Expansion Program

PETCO opened 17 new stores during the fourth quarter of fiscal 2004. The addition of 11 new stores during the period, net of relocations and closings, increased the store base to 716 locations. During this same period, PETCO completed 10 remodels of existing stores and now has over 335 stores in its latest store formats.

The Company opened 81 new stores during fiscal 2004, or 62 new stores net of relocations and closings. During this same period, the Company completed 50 remodels of existing stores.

PETCO will continue to advance its national presence in 2005 by opening approximately 90 new stores, or approximately 70 new stores net of relocations and closings, while continuing with its strategic initiative of remodeling up to 50 existing stores.

In commenting on PETCO's expansion plans, Mr. Myers stated, "We now believe that there is the potential for 1,500-1,600 PETCO stores nationwide. Recent analysis of our targeted demographics, including population growth and density, income levels, market share, and overall spending on pets supports this opportunity."

Outlook

*The Company currently expects a comparable store net sales increase of approximately 5%-6% for the first quarter of fiscal 2005. This increase in comparable store net sales would come on top of the 6.3% increase achieved in the first quarter of 2004. Accordingly, the Company currently expects earnings per diluted share in the range of $0.33-$0.34 for the first quarter of fiscal 2005.*

For the full fiscal year of 2005, the Company currently expects a comparable store net sales increase of approximately 5%-6%. The Company currently expects earnings per diluted share in the range of $1.80-$1.81 for the full fiscal year 2005, which would represent an increase of approximately 20% over the pro forma net earnings of $1.51 per diluted share the Company is reporting today for the full fiscal year 2004.

1     This outlook includes the effect of the recent lease accounting clarification by
the SEC, as well as a higher effective tax rate of 39.7%. Their combined effect
2 reduces earnings by $0.01-$0.02 per diluted share for fiscal 2005.

3     The outlook for the first quarter and full fiscal year of 2005 excludes an after-
tax charge of approximately $1.5 million, or $0.03 per diluted share, for debt
4 retirement costs associated with the $14.7 million of senior subordinated notes
repurchased during the first quarter of fiscal 2005.

5

6   122. Also, on March 10, 2005, defendants hosted a teleconference with investors and

analysts to discuss the results of Q4 2004 and fiscal year 2004.

7

8   123. On this news, PETCO's stock price increased from $34.99 per share to $37.29 per

share.

9

10   124. On March 22, 2005, in a press release which defendants caused PETCO to

disseminate through *Dow Jones News Service*, the Company backed its earnings and same-store

11

sales guidance for Q1 2005 and fiscal 2005, with same-store sales growth pegged at 5%-6%.

12

   125. On March 23, 2005, defendants Myers, Hall and Carter spoke at the Merrill Lynch

13

Retailing Leaders and Household Products & Cosmetics Conference.  Defendant Carter stated:

14

15 Our revenue has grown at an average annual rate of 12% since 2000 driven by strong
comps and continued square footage growth. Operating income over the same period
grew at twice the rate of our revenue growth demonstrating our ability to grow
16 profitably and validating the strategies that we've been discussing.  These strong
trends continued during the fourth quarter of 2004 as revenue grew 12.5% and
17 operating income increased to 19.8% year-over-year.

18   *... During the fourth quarter solid comp store sales growth of 5.1% drove a
14.3% increase in operating income to 57.6 million or 11.7% of sales.  This*
19 *represents an improvement of 35 basis points over the fourth quarter of the prior*
*year.  Earnings per share in the fourth quarter increased 18.1% to $0.55 per*
20 *diluted share; overall 2004 earnings per share increased 28.3% to $1.51 per diluted*
*share.*

21

   *With respect to our outlook, we expect to achieve gains in comparable store*
22 *net sales for the first quarter as well as for the full year of 2005 in the range of 5 to*
*6%.  For the first quarter ending April 30, 2005 we expect earnings in the range of*
23 *$0.33 to $0.34 per diluted share.  For the full fiscal year of 2005 we expect diluted*
*earnings per share in the range of $1.80 to $1.81.  These expectations are*
24 *consistent with the guidance we provided on March 10, 2005 in our reported*
*fourth-quarter and fiscal 2004 results.*

25

26   126. On April 15, 2005, before the market opened, the defendants caused the Company to

issue a press release entitled *"PETCO to Delay Filing of Form 10-K,"* which stated in part:

27

28

1   PETCO Animal Supplies, Inc. today announced that it is filing a Form 12b-25 with
    the Securities and Exchange Commission for a 15-day extension-filing deadline for
2   its Annual Report on Form 10-K for the year ended January 29, 2005.

3         *On April 1, 2005, subsequent to its announcement of unaudited results for*
    *the fourth quarter and full fiscal year 2004, PETCO discovered within its*
    *Distribution Operation instances of errors in which certain expenses were under-*
4   *accrued. Immediately upon identification of these errors within the Distribution*
    *Operation, PETCO took action to strengthen its internal controls, including*
5   *policies, responsibilities and practices.*

6         PETCO is reviewing changes to its financial results for the fourth quarter and
7   full fiscal 2004 ended January 29, 2005, and is working with its independent
    registered public accounting firm to determine whether it will be necessary to restate
8   its financial results. Based on the review to date, the Company anticipates reporting
    a reduction in its fourth quarter 2004 net earnings of $3.0 million to $4.5 million, or
9   approximately $0.05 to $0.07 per diluted share.

10        Further, the Company expects that earnings for fiscal 2005 would be reduced
    by approximately $0.05 to $0.07 per diluted share, after taking into consideration the
11  nature of the under-accrual of expenses that are anticipated to result in changes to
    previously announced financial results.

12
          PETCO's Chief Executive Officer, James M. Myers, said, "We have devoted
13  significant resources to address and strengthen our processes and controls in our
    Distribution Operation. While it is very disappointing to identify control deficiencies
14  in any part of our Company, it is worth emphasizing that, based on the initial results
    of our review, these errors have been limited to our Distribution Operation, and
15  processes have been put in place to ensure these errors do not occur in the future."

16  127.   The April 15, 2005 announcement continued to conceal from investors the serious

17  nature and extent of the problems surrounding PETCO's operations, which were known to

18  defendants internally, but not to the investing public. The stock price continued to remain inflated.

19  128.   Also on April 15, 2005, CIBC World Markets issued a report on PETCO, entitled

20  "Expense Errors Reveal Lower Profitability," which stated:

21        *PETCO's discovery of errors related to under-accrual of distribution*
    *expenses not only reveals lower profitability in its business but also increases the*
22  *perception of risk. There could likely be a credibility issue with investors that may*
    *be difficult to recover from in the short term.*

23
          The errors represent a $0.05-$0.07 reduction in earnings per share; FY04 will
24  decline to $1.43 from $1.50. Incidentally, we'd point out that in 2004 Petco beat our
    . estimates by $0.07 in aggregate during the first three quarters of the year.
25
          Distribution cost pressures (particularly transport costs) are higher going
26  forward as well. We have lowered our FY05 EPS estimate to $1.73 (or $1.66 incl.
    options) from $1.80; this compares with the revised FY04 EPS of $1.43. Our FY06
27  declines to $2.10 (or $1.93 incl options) from $2.15.

28                            *       *       *

Expenses at PETCO's distribution operations were erroneously under-accrued. This problem appears to have occurred throughout 2004. We understand that the problems were discovered during the company's year-end processes. In association with this issue, P is delaying the filing of its 10K by 15 days. The internal investigations are still ongoing.

\*   \*   \*

We had previously noted that distribution costs (particularly transport costs) would be a persistent source of gross margin pressure throughout 2005. Obviously, the magnitude of distribution costs is even greater than previously thought and we see the impact extending to future periods.

129.  ***PETCO's stock collapsed to $30.36 per share, on April 15, 2005, a one day drop of 13.6% on volume of 8.8 million shares, 20 times the average daily volume.***

130.  On April 29, 2005, defendants caused PETCO to issue press release entitled "PETCO Provides Update on Internal Review," which stated in part:

SAN DIEGO, April 29, 2005 — PETCO Animal Supplies, Inc. (NASDAQ: PETC) today provided an update on the internal review, first announced on April 15, 2005, into errors involving the under-accrual of expenses in the Company's Distribution Operation:

- PETCO and its independent professional advisors are finalizing their review, in connection with the preparation of its consolidated financial statements for 2004 and the audit of those statements. In addition, the Company is completing its evaluation of internal control deficiencies under the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002.

- While this comprehensive review is being completed, PETCO will require additional time to file its annual report on Form 10-K for the fiscal year ended January 29, 2005 (the "2004 Form 10-K"). The Company expects to file the 2004 Form 10-K within the next few weeks.

- Based upon its internal analysis and the adjustments identified to date with its independent registered public accounting firm, the Company believes that a restatement of its prior period financial results will not be necessary, and that these adjustments will be recorded in the fourth quarter of fiscal 2004.

PETCO noted that while the comprehensive review is not yet complete, at this time, the previously communicated aspects of the internal review remain unchanged:

- The review to date continues to reflect that the errors in under-accruals remain limited to the Company's Distribution Operation. Internal controls, including policies, responsibilities and practices regarding Distribution Operation expenses, have been changed and strengthened to address these issues.

- The Company's previous estimates regarding the anticipated reduction of net earnings for the fourth quarter 2004 and fiscal 2005 remain unchanged.

131.   Defendants' foregoing statements in ¶¶121-130 above were false or misleading when made because:

(a)   Defendants falsely reported PETCO's financial results through the use of unrecorded expenses and liabilities, which materially overstated PETCO's net earnings before taxes by $3.2 million, $5.6 million, and $5.6 million for Q3 2004, Q4 2004, and fiscal year 2004, respectively.   Furthermore, EPS was overstated by $0.03, $0.06, and $0.06 for Q3 2004, Q4 2004 and fiscal year 2004, respectively.  *See* ¶¶168-192.

(b)   Defendants failed to record and recognize known unrecorded distribution costs and temporary labor costs of over $2.0 million, $5.6 million, and $5.6 million for Q3 2004, Q4 2004 and fiscal year 2004, respectively.  *See* ¶¶168-192; Exhibit 2.

(c)   Defendants erroneously accounted for tenant improvement allowances associated with PETCO's leases and understated its costs of sales by improperly amortizing its tenant improvements allowances as a reduction to depreciation and amortization in violation of GAAP in the amount of $1.2 million through Q3 2004.  *See* ¶¶168-192.

(d)   PETCO was not executing successfully on its long-term growth strategy, rather defendants had embarked upon a scheme to superficially report increased same-store sales growth, concealing operational problems that undermined the publicly announced growth forecasts and results.  Defendants were aware that PETCO did not have a cost-effective distribution chain to service stores in parts of the Southeast States, PETCO required additional regional distribution centers to support its expanded and expanding store base, and that the "Pisces" new store format that defendants represented as the model for future growth and distinction from its competitors actually afforded less shelf space than previous models, which would reduce sales.  Indeed, PETCO only had three main, and five regional, distribution centers to for all of its stores nationwide.  As such, stores in the Southeast States were primarily serviced at considerably higher costs by the distribution center in New Jersey, thousands of miles away.  *See* ¶¶65-92; 280-287.

(e)     In announcing PETCO's same-store sales results to the market, defendants failed to disclose that sales growth throughout the Class Period was primarily due to increased pricing, rather than increased customer traffic as reported. *See* ¶¶280-287. In fact, PETCO stores throughout the country were recording reduced customer traffic and sales. *See* ¶¶280-287.

(f)     As a result of the foregoing, there was no basis in fact for defendants' forecasts that PETCO would continue to achieve same-store sales above 0%-2% during the Class Period, and defendants knew those forecasts were false and misleading when made.

**May 2005 – August 2005**

132.    On May 23, 2005, defendants caused PETCO to issue a press release entitled "PETCO Receives Notice of Potential Delisting From Nasdaq Due to Late Filing of Form 10-K," which stated in part:

> SAN DIEGO, May 23, 2005 — PETCO Animal Supplies, Inc. (NASDAQ: PETCE) today announced that on May 19, 2005, the Company received notice from The Nasdaq Stock Market, Inc. Listing Qualifications Staff that the Company's securities are subject to potential delisting as of May 31, 2005 due to the Company's failure to file its annual report on Form 10-K for the fiscal year ended January 29, 2005 (the "2004 Form 10-K") on a timely basis.
>
> On April 29, 2005, the Company had previously announced a delay in the filing of its 2004 Form 10-K pending the completion of its internal review, first announced on April 15, 2005, into errors involving the under-accrual of expenses in the Company's Distribution Operation. The Company expects to file its 2004 Form 10-K within the next couple weeks.
>
> Because of this delay, the Company is not in compliance with NASDAQ Marketplace Rule 4310(c)(14), which requires the timely filing with NASDAQ of all reports and other documents filed or required to be filed with the SEC. Also, as a result of the filing delinquency, NASDAQ changed the Company's trading symbol for its securities from "PETC" to "PETCE" at the opening of business today, May 23, 2005.
>
> The Company plans to request a hearing before a NASDAQ Listing Qualifications Panel to review the Staff determination and request continued listing on NASDAQ until the Company files its 2004 Form 10-K. In its notification letter, the NASDAQ staff informed the Company that this request will result in a postponement of the delisting pending the Panel's decision. However, the Company can provide no assurance that the Panel will grant its request for continued listing.

133.    On May 25, 2005, defendants announced PETCO's Q1 2005 financial results, which totaled:

First Quarter Results

*Net sales in the first quarter of 2005 were $479.6 million with a comparable store net sales increase of 5.2%. The comparable store net sales increase in the period comes on top of a 6.3% increase in the prior year's first quarter. Overall, net sales increased 12.6% over the first quarter of fiscal 2004.*

*Net earnings for the first quarter increased to $17.2 million, or $0.29 per diluted share. This included an after-tax charge of $1.5 million, or $0.03 per diluted share, for debt retirement costs associated with the repurchase of $14.7 million of the Company's 10.75% senior subordinated notes during the quarter. These results compared to net earnings of $15.8 million, or $0.27 per diluted share, in the prior year first quarter.*

Excluding the debt retirement costs, pro forma net earnings for the first quarter of 2005 increased 18.8% to $18.7 million, or $0.32 per diluted share, compared to net earnings for the first quarter of fiscal 2004 of $15.8 million, or $0.27 per diluted share.

*"The comparable store sales increase of 5.2% in the first quarter extends our record of strong comp sales increases to 49 consecutive quarters of 4.6% or greater," commented PETCO's Chairman, Brian K. Devine.*

"We are excited about the strength of services in the first quarter, with services sales increasing 24.1%. Our service offerings are designed to meet the needs and exceed the expectations of our best customers and further differentiate PETCO as a leader in the pet industry," commented PETCO's Chief Executive Officer, James M. Myers.

Gross Profit and Operating Margins

Gross profit margin was 33.8% for the first quarter of fiscal 2005. Initial gross margin improved 40 basis points as a percentage of sales from the continued change in mix from lower margin pet food to higher margin categories. Occupancy costs as a percentage of sales increased 20 basis points as a result of a larger number of new store openings and higher store closing costs, as well as from the effect of the recent lease accounting clarification by the SEC. Distribution related costs increased 70 basis points as a percentage of sales primarily due to the Company's initial entry into a number of new markets, such as South Florida, as well as more remote markets. Distribution expenses overall were further impacted by higher fuel costs. These higher distribution and occupancy costs resulted in an overall net decrease of 50 basis points in gross margin.

The Company realized 40 basis points of leverage in selling, general and administrative expenses primarily through savings in personnel costs, store operations, and the planned timing of advertising. Included in selling, general and administrative expenses were higher pre-opening costs related to opening 15 more stores than in the prior-year period.

Overall, operating income increased 12% to $34.6 million, or 7.2% of net sales, in the first quarter of 2005.

Store Expansion Program

PETCO opened 34 new stores during the first quarter of fiscal 2005. The addition of 25 new stores during the period, net of relocations and closings, increased the Company's store base to 741 locations. PETCO continued with its ongoing

program to refresh its store base, completing the remodels of 15 stores to its Pisces format in the first quarter, and now has over 385 stores in its newer store formats.

"The addition of nearly 50 Pisces format stores made this quarter one of our most active store development periods. More than half of our store base is now in one of our newer, exciting store formats," stated Mr. Myers.

In 2005, PETCO plans to advance its national presence by opening approximately 90 new stores, or approximately 70 new stores net of relocations and closings, while continuing with its strategic initiative of remodeling up to 50 existing stores.

The Company plans to open two additional regional distribution centers — one in Denver, CO and the other in Orlando, FL — later in fiscal 2005. These new facilities will be of similar size to the five existing regional distribution centers, using the same systems and infrastructure. The Company believes that the new facilities will help mitigate the rising costs in its Distribution Operation noted above.

Outlook

*"There are several factors to be considered as part of our financial guidance for the second quarter and fiscal year 2005 including costs associated with the Distribution Operation; the continuing costs of the independent, external review of that Operation; investments in our remerchandising initiative; refinements to our marketing program; and the effects of the generally sluggish macro-economic environment," commented Rodney Carter, PETCO's Senior Vice President and Chief Financial Officer. "As a result, we are changing our earnings guidance range to reflect these factors."*

The Company currently expects a comparable store net sales increase of approximately 4% - 5% for the second quarter, and approximately 5% for the full year of fiscal 2005. Accordingly, the Company expects earnings per diluted share in the range of $0.33 - $0.35 for the second quarter and pro forma net earnings of $1.66 - $1.72 per diluted share, which excludes the effects of the debt retirement costs noted above, for the full fiscal year 2005.

Filing of Fiscal 2004 Form 10-K and Certain Balance Sheet Data

The Company previously announced a delay in the filing of its 2004 Form 10-K pending the completion of its internal review into errors involving the under-accrual of expenses in the Company's Distribution Operation. The Company expects to file its 2004 Form 10-K within the next couple of weeks; as such, a condensed consolidated balance sheet has not been presented in this release pending the filing of the Form 10-K. However, certain key balance sheet data as of the first quarter ended April 30, 2005 includes: cash and cash equivalents of $43.6 million, inventories of $171.6 million, and long-term debt of $184.3 million.

134.    On May 25, 2005, Devine, Myers, Carter, Hall and Martin also held a teleconference for investors and analysts and reiterated the guidance for Q1 2005, but defendants continued to conceal from investors the serious nature and extent of the problems surrounding PETCO's operations.

135.    On June 6, 2005, Wedbush Morgan Securities issued a report entitled "Strip Search – Hardlines Weekend Store Visits" which stated:

> Petco (PETC – BUY) . . . . Management lowered Q2 comp expectations from 5-6% to 4-5% based upon current sales trends. Q2 EPS is guided to $0.33-$0.35, which was below the consensus. *The company admitted to allocating too many advertising dollars to "branded" advertising compared to "call to action" advertising in Q1 and early Q2, which resulted in lower traffic. . . .*

136.    On June 16, 2005, J.P. Morgan issued a report entitled "Emerging from the Dog House w/NT Catalysts," which stated:

> On sales, 11%-13% growth is realistic, supported by 5% comps (49 straight quarters of SSS > 4.6%) and 11.3% sq. ft. expansion. Current DC capacity is for 1,000 stores vs. only 741 today ('08 modeling 1,061 stores).

> *                *                *

> *In the process, we think the company's reset numbers allow for possible upside should comps improve beyond the company's 5% outlook.*

> *                *                *

> Continued Strong Comp Story at 5.0% Clip Through 2008 PETCO's premium product focus, constant store reinvigoration, and long-standing loyalty program (P.A.L.S.) has translated into industry-leading productivity metrics. Specifically, the company's same-store sales, have not only outpaced its top competitor PETsMART over the long-term, but have exceeded most of hardline retail. Said differently, we estimate that PETC's SSS have averaged roughly 7.0% over the past five years compared with 6.2% at PETM and the 5.0% average of our Tier I Hardline Retail Composite (including DKS, WSM, BBBY, and PTM). Looking forward, we are modeling 4.8% same-store-sales growth in 2005 against a 6.2% comp in 2004.

> *                *                *

> *Second, we see little earnings risk after the company reset numbers on May 25th.*

> *                *                *

> We see total sales rising roughly 12.5% supported by comp growth of 4.8% and square footage expansion of 11.8% (75 net store openings).

137.    On June 24, 2005, defendants caused PETCO to issue a press release entitled "PETCO Reports on Nasdaq Listing Status," which stated:

> SAN DIEGO, June 24, 2005 — PETCO Animal Supplies, Inc. (NASDAQ: PETCE) today announced that on June 20, 2005, the Company received a notice from the NASDAQ Stock Market, Inc. Listing Qualifications Staff that the Company failed to timely file its Report on Form 10-Q for the quarterly period ended April 30, 2005 (the "First Quarter 10-Q") with the Securities and Exchange Commission (the "SEC") as required by NASDAQ Marketplace Rule 4310(c)(14) and that this

deficiency is an additional basis for delisting its securities from the NASDAQ National Market.

The Company had previously reported that it received a notice of a determination by NASDAQ's Listing Qualifications Staff that it failed to comply with NASDAQ listing standards set forth in NASDAQ Marketplace Rule 4310(c)(14) due to the delayed filing of the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2005 (the "2004 Form 10-K") with the SEC and that its securities were therefore subject to delisting from the NASDAQ National Market. The Company requested a hearing before the NASDAQ Listing Qualifications Panel and was granted a hearing date of June 30, 2005, thus staying the delisting action pending the hearing. The failure to file the First Quarter 10-Q will also be considered during the hearing.

As a result of errors involving the under-accrual of expenses in the Company's Distribution Operation, the Company commenced an internal review of its financial results for the fourth quarter and fiscal year ended January 29, 2005. Until this review is complete, the Company cannot finalize its financial statements for the period ended January 29, 2005 or file its 2004 Form 10-K and First Quarter 10-Q. The Company is endeavoring to facilitate the completion of the review as soon as possible so as to permit the filing of the 2004 Form 10-K and First Quarter 10-Q. Until the Company is current with its periodic reporting requirements with the SEC, the Company's trading symbol will remain PETCE.

138.   On June 27, 2005, Wedbush Morgan Securities issued a report entitled "PETCE – Additional Delisting Notice on Late Filings; Expect Company to File Before Hearing," which stated:

- In speaking with management this morning, the company is expected to file both the 10K and 10Q prior to the day of the hearing, and therefore making it a non-issue. If the company does not file this week, it is expected to file next week.

- We believe the errors, first announced April 15, continue to be limited to under-accruals relating to its DC operation. Internal controls, policies, responsibilities and practices have been changed and strengthened to address these issues. . . .

\*     \*     \*

- Risks to attainment of our share price target include the ability to file 10K in a timely manner, ability to address current softer sales trends, ability to execute many investment initiatives, including 10% square footage growth. . . .

139.   On June 28, 2005, defendants belatedly announced PETCO's 2004 audited results, that PETCO filed its Form 10-K for the year ended January 29, 2004, and PETCO's results for Q1 2005:

PETCO Files Annual Report on Form 10-K

- 58 -                                    05-CV-0823-H(RBB)

-    Internal Review of Distribution Operation is Complete

-    PETCO Also Files First Quarter 2005 Form 10-Q

SAN DIEGO—June 28, 2005 — PETCO Animal Supplies, Inc. (NASDAQ: PETCE) today announced that it has filed with the Securities and Exchange Commission its annual report on Form 10-K for the fiscal year ended January 29, 2005, as well as its quarterly report on Form 10-Q for the first quarter of fiscal 2005.

The fourth quarter and fiscal year 2004 audited results reflect the following changes:

- An after-tax charge of $3.6 million, or $0.06 per diluted share, related to the conclusions of an internal review. As previously announced on April 15, 2005, subsequent to the Company's March 10, 2005 earnings release, PETCO discovered within its Distribution Operation instances of errors in which certain expenses were under-accrued. Upon identification of these errors, the Company commenced a comprehensive internal review, which is now complete. The internal review concluded that the errors were limited to the Distribution Operation. In addition, the internal review confirmed that a restatement of prior financial statements would not be necessary.

- An income tax benefit of $2.3 million, or $0.04 per diluted share, reflecting a one-time favorable adjustment of an income tax accrual. Subsequent to the Company's March 10, 2005 earnings release, PETCO identified a one-time favorable adjustment of an income tax accrual related to certain franchise taxes. This favorable income tax adjustment has been recorded in the fourth quarter of fiscal 2004.

Reflecting these adjustments, net earnings in fiscal 2004 were $82.4 million, or $1.41 per diluted share. Pro forma net earnings for fiscal 2004, as adjusted, were $84.9 million, or $1.45 per diluted share, excluding the one-time income tax benefit, compared to pro forma net earnings previously reported on March 10, 2005 of $88.6 million, or $1.51 per diluted share.

In the following pages of this news release, PETCO provides tables illustrating its condensed consolidated statements of operations and balance sheet, with comparisons of results "as reported" on March 10, 2005 with the "as adjusted" results reported today, on both a GAAP and pro forma basis, for the fourth quarter and full fiscal year ended January 29, 2005.

*"We are pleased to file our Form 10-K, which represents the final step in a process that included a comprehensive internal review," commented PETCO's Chief Executive Officer, James M. Myers. "While it was very disappointing to identify a control deficiency in any part of our Company, it is important to note that the comprehensive review, which included the participation of independent, external experts, concluded that the errors in under-accruals were limited to our Distribution Operation. We acted quickly and decisively to strengthen our controls, processes and oversight responsibilities to prevent such errors in the future."*

The filing of PETCO's 10-K and first quarter 2005 10-Q will bring the Company back in compliance with SEC filing requirements, and is expected to result in the cancellation of the NASDAQ review process with respect to the delisting of PETCO stock and the restoration of the stock symbol to "PETC."

Outlook

> *In conjunction with its May 25, 2005 report of earnings for the first quarter of fiscal 2005, PETCO had provided financial guidance for its second fiscal quarter. That prior outlook indicated earnings of $0.33 - $0.35 per diluted share, reflecting the expectation that costs associated with the now-completed review of the Company's Distribution Operation would approximate $0.01 per share. Those second quarter costs are now estimated to be $0.02 per share.*

> In its report of results for the first fiscal quarter, PETCO also discussed refinements to its marketing plans to more effectively communicate with its customers. These refinements are being implemented and, as previously discussed, will be in effect during the latter part of the second fiscal quarter.

> *The Company currently expects to report a comparable store net sales increase of approximately 3% - 4% for the second fiscal quarter. In view of this anticipated comparable store sales gain, as well as the additional $0.01 per share in costs associated with the Distribution-related review, the Company now expects to report earnings at the lower end of a revised range of $0.31 - $0.33 per diluted share. PETCO intends to provide an update to its outlook for fiscal 2005 when it reports its earnings for the second fiscal quarter in August.*

140.   The June 28, 2005 Form 10-Q for the quarter ended April 30, 2005 repeated the information presented in the earnings release. Defendants Myers and Carter signed the Form 10-Q for Q1 2005.

141.   On June 28, 2005, PETCO also belatedly filed with the SEC its Form 10-K for the year ended January 29, 2005, which defendants Devine, Myers, Carter, Coslet, Danhakl and Day signed and which contained materially false and misleading statements regarding the purported correction of internal controls:

1. Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file pursuant to the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and that such information is accumulated and communicated to our management, including our Chief Executive Officer, or CEO, and Chief Financial Officer, or CFO, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and in reaching a reasonable level of assurance, management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

> We carried out an evaluation, under the supervision and with the participation of our management, including our CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period

covered by this Annual Report. Based on this evaluation, our CEO and CFO concluded that, as a result of the material weakness in internal control over financial reporting discussed below, our disclosure controls and procedures were not effective as of January 29, 2005.

We believe our financial statements fairly present in all material respects the financial position, results of operations and cash flows for the interim and annual periods presented in our annual report on Form 10-K and quarterly reports on Form 10-Q. The unqualified opinion of our independent registered public accounting firm on our financial statements as of and for each of the years in the three year period ended January 29, 2005 is included in Part IV, Item 15 of this Form 10-K.

2. Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Internal control over financial reporting refers to the process designed by, or under the supervision of, our CEO and CFO, and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

(1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

(2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with the authorization of our management and directors; and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Management has used the framework set forth in the report entitled *Internal Control—Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission, known as COSO, to evaluate the effectiveness of the Company's internal control over financial reporting as of January 29, 2005.

*As a result of our assessment, management identified a material weakness in internal control over financial reporting as of January 29, 2005. A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.*

*As of January 29, 2005, we did not have appropriate policies and procedures relating to the review of the inventory warehousing and distribution function ("Distribution") accruals for vendor invoices and the performance of Distribution vendor statement reconciliations. Specifically, Distribution accruals were prepared and reviewed by the same Distribution personnel, and Distribution vendor statement reconciliations were also performed by these same Distribution personnel, resulting in inadequate segregation of duties. As a result of this*

*deficiency, certain Distribution vendor invoices were not processed in a timely manner which caused errors in which expenses were under-accrued during fiscal 2004 and during prior interim and annual periods. These errors were corrected in the 2004 consolidated financial statements prior to their issuance. This deficiency results in a more than remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected on a timely basis by employees during the normal course of performing their assigned functions. Therefore, management has concluded that our internal control over financial reporting was not effective as of January 29, 2005.*

Our independent registered public accounting firm, KPMG, LLP, has issued an audit report on management's assessment of our internal control over financial reporting. That report appears below.

3. Management's Remediation Efforts

Subsequent to our fiscal year ended January 29, 2005, management remediated the control deficiency in Distribution described above. Specifically, we have revised our policies and practices with respect to Distribution accruals and vendor statement reconciliations by implementing proper segregation of duties and requiring that all such accruals and vendor statement reconciliations be performed by accounting personnel independent of Distribution. Management believes that the deficiency noted above has been remediated by these new procedures, and that the implementation of these new procedures will result in improved control over financial reporting in subsequent periods.

4. Changes in Internal Control Over Financial Reporting

In our Quarterly Report on Form 10-Q for the fiscal period ended October 30, 2004, we reported that we had identified certain deficiencies in general controls over our information systems, including segregation of duties and access to data and applications by program developers. We tested our significant financial reporting systems to ensure that the key application controls that are dependent on these systems are operating effectively. We have designed and are currently implementing improvements that we believe will adequately mitigate these deficiencies in the future. We do not believe that these deficiencies have had or will have a material impact on our financial statements. In addition, these deficiencies did not adversely affect our assessment of our internal control over financial reporting as part of our compliance with Section 404 of the Sarbanes-Oxley Act of 2002 as of our fiscal year end on January 29, 2005.

There has been no change in our internal control over financial reporting during the fourth quarter of fiscal 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

5. Inherent Limitation on the Effectiveness of Internal Control

Because of its inherent limitations, internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives and may not prevent or detect all misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become ineffective because of changes in conditions or that the degree of compliance with established policies or procedures may deteriorate.

142.    PETCO's Form 10-K, for fiscal year 2004 ended January 29, 2005, also stated:

Business Strategy

Our strategy is to strengthen our position as a leading specialty retailer of premium pet food, supplies and services by offering our customers a complete assortment of pet-related products and services at competitive prices with superior levels of customer service at convenient locations. We intend to continue to pursue the following elements of our strategy:

• Continue To Increase Sales and Profitability. We have increased our net sales from $1.15 billion in fiscal 2000 to $1.81 billion in fiscal 2004. We also increased our operating income from $13.4 million in fiscal 2000, which includes unusual charges and expenses totaling $57.0 million, to $158.0 million in fiscal 2004. The principal contributors to this improvement in our financial performance include: (1) our ability to generate continuous comparable store net sales growth, driven partly by our continuing initiative of remodeling certain stores to our newer store formats; (2) strategic expansion in both existing and new markets; (3) innovative store formats that offer superior customer service, convenience and a fun and exciting shopping environment; (4) targeted merchandising efforts to drive greater sales of higher-margin pet accessories, supplies and services, which have grown to approximately 71% of net sales in fiscal 2004, up from approximately 66% of net sales in fiscal 2000; (5) our expanding store base, which offers economies of scale and purchasing efficiencies; and (6) a broad product offering of over 10,000 high quality pet-related products, most of which are not found in typical supermarkets or mass merchants.

• Capitalize Upon Our Maturing Store Base. We have historically found that the most dramatic growth in a store's net sales and operating income occurs in the first five years following a store's opening. During this store maturation phase, we have historically experienced an increase in store-level contribution from an approximate average of 6% of net sales in the store's first year to an approximate average of over 15% of net sales in year five. More than 40% of our stores were opened in the past five years and to date our newly opened stores have been maturing in accordance with historical rates. We believe that our maturing store base provides us with an opportunity to significantly increase our net sales and store-level operating income with only modest incremental capital expenditures for these stores.

• Expand Using Our Proven New Store Model. We believe that the highly fragmented pet food, supplies and services market offers compelling opportunities for us to increase our presence and gain market share. To capitalize on these opportunities and consistent with our existing strategy, we plan to increase our aggregate store square footage by approximately 10% per year on a long-term basis, both by focusing on existing markets and by targeting one or two new geographic markets per year. Our year-over-year increase in square footage in fiscal 2004 was 12.2%, and our total store square footage at January 29, 2005 was approximately 10.1 million square feet. We plan to open approximately 90 new stores in fiscal 2005, or approximately 70 stores net of relocations and closings. We carefully measure each proposed store opening against demographic, economic and competitive factors. Historically, our new stores generally have become profitable by the end of their first year of operation, and we target for each store a five-year return on investment of more than 20%. In fiscal 2005, we intend to remodel up to 50 of our existing stores into our latest format, and we plan to remodel additional existing stores in the future.

• Continue Our Focus on Expanding Our Services Business. We continue to expand our offerings of services to our customers, including grooming, canine

education, day care and vaccinations. These services broaden our relationship with customers and encourage more frequent visits to our stores, which result in additional sales of pet food, supplies and small animals (other than cats and dogs). As such, the growing services portion of our business complements our overall customer relationship initiatives.

• Utilize Our Logistics Expertise. Our distribution system has over one million square feet of distribution capacity, including an integrated network of three national and five regional distribution centers. This network enables us to reduce our costs by reducing the delivered cost of merchandise and limiting the need to carry excess inventory in our stores. Our inventory control systems provide for effective replenishment of inventory and allow us to improve in-stock levels at our stores. Our logistics expertise has enabled us to increase inventory turns from 6.7x for fiscal 2000 to 7.7x for fiscal 2004.

• Capitalize Upon Our Brand Awareness and Highly Successful Customer Loyalty Program. The "PETCO" brand name and our slogan "PETCO, where the pets go" are well known by pet owners. We believe that this awareness reinforces the fun and enjoyable shopping experience that we seek to create for our customers and their pets. P.A.L.S., our highly successful customer loyalty program, further enhances and reinforces the loyalty, brand awareness and satisfaction of our customers. Our customers have recently been signing up for approximately one million new P.A.L.S. cards per quarter. Our P.A.L.S. members account for over 75% of our net sales. Our program fosters a long-term, one-on-one relationship with the customer and builds brand loyalty and customer retention. Our program also provides us with one of the largest databases of customer information in the industry. Information on our customers' buying preferences allows us to more precisely deliver targeted marketing efforts and assists us in more effectively catering to our customers' needs.

• Continue to Provide Superior, Knowledge-Based Customer Service. We seek to enhance our customers' shopping experience by providing knowledgeable and friendly customer service and creating a fun and exciting shopping environment. We seek to hire store managers and sales associates who themselves are pet owners and enthusiasts and, therefore, are more eager and better able to assist customers with their needs. We believe it is better to hire animal lovers and train them in retail rather than hire experienced retailers and hope they like animals. We believe that our customer service differentiates us from our competitors, leading to increased sales, attracting new customers and building customer loyalty.

143.    PETCO's June 28, 2005 announcements continued to conceal from investors the serious nature and extent of the problems surrounding PETCO's operations.

144.    On June 29, 2005, J.P. Morgan issued a report entitled "2Q Outlook Lowered but 10-K Filing Removes Overhang; Stay OW" which stated:

After the close, PETCO filed both its FY04 10-K and 1Q05 10-Q with the SEC, but also lowered its 2Q comp and EPS outlook. . . .

*    *    *

On the negative side, additional legal/accounting costs associated with the review will result in a $0.01 hit to EPS in 2Q. This expense, coupled with weaker-

than-expected comps ($0.01), resulted in a revised outlook of $0.31-$0.33 (from $0.33-$0.35). With regards to the lower comp, PETC now see 2Q SSS of 3.0%-4.0%, down from its former outlook of 4.0%-5.0% (JPM former est. of 4.5%). We believe quarter-to-date trends are tracking closer to the high-end of its revised forecast.

*Importantly, in our opinion, the company's 2Q comp issue is not systemic and we still believe the pet retail sector is an attractive spot in retail. With that said, the company's issues are a bit disconcerting, but we do expect SSS trends to improve in 3Q and beyond. To this end, the issue appears to reflect an ineffective ad campaign that was not creating a sense of urgency at the consumer level. Moreover, we think the company has probably taken its "eyes-off-the-ball" over the past 90 days as it contended with the aforementioned internal control issue/10-K filing.*

*In sum, while the lowered comp guidance was disappointing and will likely negate the positive catalyst (10-K filing) we were expecting upon our initiation (6/16), we still have the same level of conviction with our positive view on the stock. Looking ahead, with the 10-K/delistment overhang now in the company's rearview mirror, we expect management to re-focus on its business and drive same-store-sales higher in 2H05.*

*Finally, on valuation the stock remains attractive, with shares now trading at 17.5x our 2006EPS (incl. stock options), a 10.0% discount to historical levels and 7.0x EV/EBITDA. Also, the valuation delta with PETM is roughly 4x, the highest gap in the past 5+ years.*

\*   \*   \*

*The recent weakness in the stock is overdone, in our opinion, and we see the company's 10-K filing a positive catalyst for the stock. Overall, PETC is the top pet retail operator in the industry, with solid productivity metrics, led by strong comps, which have outperformed PETsSMART same-store-sales by roughly 80 basis points, on average, since 1999.*

145. On June 29, 2005, Wedbush Morgan Securities issued a report entitled "10K and 10Q Adjustments In-Line With Expectations and Back In Compliance; Lowers Q2 EPS Guidance or Slightly Lower Comps and Incremental Accounting Review Costs," which stated:

*Lower comp outlook due to timeliness of executing new "call to action" advertising. Management noted that the comps have not decelerated since its May 25 earnings release last month, however the inability to change over its advertising fast enough from "branded" to more "call to action" ads to drive traffic has led to the lower comp guidance. Next month, the company will be transitioning more of its advertising to "call to action" and expects to build more traffic momentum going into Q3.*

\*   \*   \*

*Regarding the lower comp guidance for Q2, we view this as a temporary hiccup to the company's solid historical comp performance.*

05-CV-0823-H(RBB)

146.    Also on June 29, 2005, defendants caused PETCO to issue a press release entitled "PETCO Receives Notice of Compliance from Nasdaq; Trading Symbol to be Restored to 'PETC' Effective July 1, 2005," which stated:

> SAN DIEGO, June 29, 2005 — PETCO Animal Supplies, Inc. (NASDAQ: PETCE) today announced that it received notice from The Nasdaq Stock Market that the Company has evidenced compliance with all requirements for continued listing on The Nasdaq National Market and that effective at the market open on Friday, July 1, 2005, the Company's trading symbol will be restored to "PETC."
>
> The Company had previously announced that it received notices of potential delisting due to the Company's failure to file its fiscal 2004 Annual Report on Form 10-K (the "2004 Form 10-K") and its Quarterly Report on Form 10-Q for the first quarter of fiscal 2005 (the "First Quarter 10-Q") on a timely basis. The Company has filed the 2004 Form 10-K and the First Quarter 10-Q and is now current with respect to its required Securities and Exchange Commission filings. Accordingly, Nasdaq has determined that the hearing scheduled for June 30, 2005 is unnecessary and the hearing file has been closed.

147.    On July 29, 2005, Wedbush Morgan Securities issued a report entitled "The Retail Countdown: July 2005 Hardlines Sales Preview," which stated:

> Forecast: July represents the third month of the second quarter for PETCO. On our channel checks we noted busier traffic than we have seen in a while. There was more "call to action" advertising in the stores and on inserts we received. . . . Regarding the lower comp guidance for Q2, *we view this as a temporary hiccup to the company's solid historical comp performance and remain comfortable with our Q2 forecast for 3.5% comps.*

148.    On August 1, 2005, Wedbush Morgan Securities issues a report entitled "Strip Search – Hardlines: Late Week and Weekend Store Visits" which stated:

> *Disappointing traffic and store appearance following a couple of strong weeks. The store we visited over the weekend had very light traffic, low in-stocks and was messy. The light traffic could have been due to a Farmer's Market going on nearby. However, that doesn't impact the store appearance. We are waiting for more "call to action" advertising to drive comps back to the 5% level, which we expect the company to be able to do in 2H. For Q2, comps should be in the 3-4% range. We are pleased the overhang and uncertainty of not filing its 10K and 10Q is now over. Importantly, internal controls, policies, responsibilities and practices have been changed and strengthened to address these issues. Regarding the lower comp guidance for Q2, we view this as a temporary hiccup to the company's solid historical comp performance.*

149.    On August 19, 2005, Wedbush Morgan Securities issued a report entitled "Hardlines Earnings Preview: Week of August 22" which stated:

> *Petco (PETC-BUY);*

*Expect company to report EPS in line with our estimate of $0.32. For Q2, comps should be in the 3-4% range, which we view as a temporary hiccup to the company's solid historical comp performance. We also expect company to provide updated guidance for 2H, which should be in-line with our expectations for a 5.0% comp and 13% EPS growth. We do not expect any incremental accounting review expenses and comps should regain traction with the new "call to action" ads fully being implemented. Clearly, management was distracted by the accounting issues it uncovered late last year, but now is more focused on the business.*

150.     Defendants' foregoing statements in ¶¶132-149 above were false or misleading when made because:

(a)     Until PETCO's Form 10-K filing on June 28, 2005, defendants falsely reported PETCO's financial results through the use of unrecorded expenses and liabilities, which materially overstated PETCO's net earnings before taxes by $3.2 million, $5.6 million, and $5.6 million for Q3 2004, Q4 2004, and fiscal year 2004, respectively. Furthermore, EPS was overstated by $0.03, $0.06, and $0.06 for Q3 2004, Q4 2004 and fiscal year 2004, respectively. *See* ¶¶168-192.

(b)     Until PETCO's Form 10-K filing on June 28, 2005, defendants failed to record and recognize known unrecorded distribution costs and temporary labor costs of over $2.0 million, $5.6 million, and $5.6 million for Q3 2004, Q4 2004 and fiscal year 2004, respectively. *See* ¶¶168-192; Exhibit 2.

(c)     Until PETCO's Form 10-K filing on June 28, 2005, defendants erroneously accounted for tenant improvement allowances associated with PETCO's leases and understated its cost of sales by improperly amortizing its tenant improvement allowances as a reduction to depreciation and amortization in violation of GAAP in the amount of $1.2 million through Q3 2004. *See* ¶¶168-192.

(d)     PETCO was not executing successfully on its long-term growth strategy, rather defendants had embarked upon a scheme to superficially report increased same-store sales growth, concealing operational problems that undermined the publicly announced growth forecasts and results. Defendants were aware that PETCO did not have a cost-effective distribution chain to service stores in parts of the Southeast States, and that the "Pisces" new store format that defendants represented as the model for future growth and distinction from its competitors actually afforded less shelf space than previous models, which would reduce sales. Indeed, PETCO only had three main,

1 and five regional, distribution centers to for all of its stores nationwide.  As such, stores in the

2 Southeast States were primarily serviced at considerably higher costs by the distribution center in

3 New Jersey, thousands of miles away.  *See* ¶¶65-92; 280-287.

4       (e)    In announcing PETCO's same-store sales results to the market, defendants

5 failed to disclose that sales growth throughout the Class Period was primarily due to increased

6 pricing, rather than increased customer traffic as reported.  *See* ¶¶280-287.  In fact, PETCO stores

7 throughout the country were recording reduced customer traffic and sales.  *See* ¶¶280-287.

8       (f)    As a result of the foregoing, there was no basis in fact for defendants'

9 forecasts that PETCO would continue to achieve same-store sales above 0%-2% during the Class

10 Period, and defendants knew those forecasts were false and misleading when made.

11     151.   Finally, on August 25, 2005, defendants announced PETCO's dismal Q2 2005

12 financial results:

13   •  Net sales grow 10% to $483 million

14   •  Net earnings of $0.31 per diluted share, in line with previous guidance

15   •  Services sales increase 22%

16       SAN DIEGO—August 25, 2005—PETCO Animal Supplies, Inc. (NASDAQ:
PETC) today reported financial results for the second quarter ended July 30, 2005.

17 The Company also provided guidance for the third quarter and full fiscal year 2005.

18 Second-Quarter Results

19       Net sales in the second quarter of fiscal 2005 were $482.7 million with a
comparable store net sales increase of 2.5%. The comparable store net sales increase

20 in the period comes on top of a 6.7% increase in the prior year's second quarter.
Sales in the Company's services business increased 22% over the same period last

21 year. Overall, net sales increased 10.1% over the second quarter of fiscal 2004.

22       Gross profit margin declined approximately 150 basis points to 33.1% in the
second quarter of fiscal 2005. Slower growth in sales, particularly in higher-margin

23 supplies, was a key factor in this decline. Increased distribution-related costs and
higher year-over-year occupancy costs due to the greater number of store openings in

24 the last few quarters were other noteworthy factors.

25       Operating income for the second quarter of fiscal 2005 was $33.5 million or
6.9% of sales, compared with $36.8 million in the prior-year period.

26

27       Net earnings for the second quarter of fiscal 2005 were $18.0 million, or
$0.31 per diluted share, compared with net earnings of $19.3 million, or $0.33 per
diluted share, in the year-earlier period.

28

*"Weaker customer traffic led to second-quarter sales and results that did not meet our expectations,"* said PETCO Chief Executive Officer James M. Myers. "By focusing on improving the customer experience, implementing a series of actions to generate traffic and completing an important remerchandising initiative, we believe we are positioning the Company to improve its performance progressively as we move through the second half of fiscal 2005."

First-Half Results

Net sales in the first half of fiscal 2005 were $962.3 million, an increase of 11.3% from the same period last year. Comparable store net sales increased 3.8% on top of a 6.5% increase in the prior year.

Net earnings for the first half of fiscal 2005 were $35.3 million, or $0.60 per diluted share, compared with net earnings of $35.1 million, or $0.60 per diluted share, in the prior-year period.

The first half of fiscal 2005 included an after-tax charge of $1.5 million, or $0.03 per diluted share, for debt retirement costs associated with the repurchase of $14.7 million of the Company's 10.75% senior subordinated notes in the first quarter.

Excluding this item, pro forma net earnings for the first half of fiscal 2005 were $36.7 million, or $0.63 per diluted share.

The Company generated $77.8 million in operating cash flow in the first half of the year, funding $68.8 million of capital expenditures re-invested in the business.

Store Expansion Program

PETCO opened 16 new stores in the second quarter of fiscal 2005. The addition of 11 new stores during the period, net of relocations and closings, increased the store base to 752 locations. PETCO continued its ongoing program to refresh its store base, remodeling 14 stores into its Pisces format in the second quarter.

During the first half of 2005, PETCO opened 50 new stores, or 36 stores net of relocations and closings, and remodeled 29 stores to its Pisces format.

For the full year, PETCO plans to advance its national presence by opening approximately 90 new stores, or approximately 70 new stores net of relocations and closings, while continuing with its strategic initiative of remodeling up to 50 existing stores.

*To optimize its distribution footprint, the Company recently opened a new regional distribution center in Denver and expects to open another facility in Orlando later in the third quarter.*

Outlook for the Third Quarter and Full Fiscal Year 2005

PETCO is making investments in the third quarter to further improve customer service, more clearly communicate its marketing messages, and complete its remerchandising initiative. Although these investments are expected to weigh on its financial results for the third quarter, the Company expects to realize the benefits of these strategic initiatives on an increasing basis as it moves through the second half of the fiscal year. In addition, the overall economy, particularly the effect of

higher gasoline prices that became pronounced late in the second quarter, has continued to impact PETCO's performance in the current quarter.

Considering all of these factors, the Company currently expects to report a comparable store net sales increase of approximately 0% to 2% for the third fiscal quarter, and approximately 2% to 4% for the full fiscal year 2005. The Company currently expects third-quarter earnings per diluted share in the range of $0.25 to $0.28, and pro forma earnings per diluted share for the full year in the range of $1.36 to $1.44. Pro forma earnings per diluted share for fiscal 2005 exclude the effect of the debt retirement costs incurred in the first quarter.

"We believe the initiatives we have underway will enable PETCO to extend its leadership position in an industry with healthy long-term prospects," Myers said. "However, given current conditions in the overall economy and their effect on the retail sector, we are cautious about our expectations for top-line growth in the short term."

152.   On August 25, 2005, defendants Myers, Carter, Hall and Devine held a teleconference with analysts and investors during which they stated:

*Jim Myers:   Overall, we did not meet our own high expectations. A number of factors affected us in the second quarter but there was one major driver. We communicated previously that we suspected macroeconomic factors were having some impact on our business.*

*Through research with our customers, by talking with vendors and by looking at overall market data, we now know that those factors are at work. Most notably higher gas prices and the impact of related headlines on consumer behavior. We have learned that people are consolidating their shopping trips. Our good customers are remaining loyal but they are not always making that extra second or third trip to PETCO that we typically experience. Those additional store visits usually lead to sale of the more discretionary items, not necessarily consumables, but supply items and unique specialty products across a number of categories. Our analysis indicates that slower customer traffic affects the sale of supplies more than it does food. And because we have successfully built a higher margin supplies business, with 65% of our sales currently coming from supplies, accordingly, this trend has a proportionately greater impact on our overall results.*

153.   On August 25, 2005, Wedbush Morgan Securities issued a report entitled "PETC – Preliminary Note Reports Low End for Q2 EPS; Significantly Reduces 2H Guidance On Lighter Traffic and Investment Pressures" which stated:

Q2 Results: PETCO reported EPS of $0.31 vs. $0.33 LY, at the low end of guidance yet in line with FC consensus. Comps increased only 2.5% compared to +6.7% LY, again below recent guidance of 3-4%. Gross margin declined by 150 bps to 33.1%, significantly more than we had expected.   The company cited disappointing sales of high margin supplies as well as increased distribution costs and higher occupancy expenses.

Management Guidance:   The company significantly lowered guidance. Previously announced and new investment initiatives should cost more than originally projected especially on planned lower sales due to a difficult macro

environment and higher gas prices.  Initiatives include remerchandising initiatives, new DC's, and new customer service and marketing strategies.

- Q3: Expects comps of flat to +2% and provided an EPS range of $0.25-$0.28 (our estimate and FC consensus is at $0.39)

- FY:05: Expects comps of 2-4% and provided an EPS range of $1.36-$1.44 (not including $0.03 charge in Q1 for debt retirement).  This is down from previous guidance of 1.50-$1.51 and FC consensus of $1.64.

*Outlook and Valuation: This guidance is clearly very disappointing and significantly worse than PETM's lowered guidance.  Beyond the sales slowing, which PETC guidance has in common with PETM, the company's investment initiatives are costing much more than originally anticipated.*

154.    On August 25, 2005, Deutsche Bank Securities Inc. issued a report entitled "Sharply lowers guidance," which stated:

**2Q EPS in line with lowered guidance.**

2Q EPS of $0.31 was in line with estimates and at the low end of revised guidance.  Comp growth of +2.5% came in below revised plan of 3%-4%.  Gross margin was a big negative surprise, declining 150 bps on weak sales, higher distribution and occupancy costs.  We had been looking for flattish GM, per mgmt guidance.  SG&A was the offset, coming in flat despite the sale miss.

**Guidance comes down.**

PETCO sharply lowered FY05 EPS guidance, moving to a range of $1.36-1.44 from $1.66-1.72.  While many had expected numbers to come down, the magnitude of the reduction was worse than expected.  2005 comp guidance lowered to 2%-4% from 5%, with 3Q comps guided to 0%-2%.  Despite recent sales weakness, PETCO is moving forward with 2H investments in payroll and marketing, which will hurt margins in the short term, but could prove to be the right move if sales trends improve. . . .

*Similar to PetSmart, PETC blamed the sales shortfall on a sharp downturn in traffic around mid-July, driven by macro-economic issues (i.e., higher gas prices and hot weather).  However, this does not explain why PETCO lowered sales guidance in both May and June, or why we are not seeing similar weakness in other specialty retailers.  The key question is whether the slowdown is truly macro-related or due to higher competition in the space (via increased presence from mass merchants, store overlap and cannibalization).  While we believe the culprit is likely a combination of both factors, increasing competition is the bigger concern from a LT perspective.*

155.    On this news, PETCO's stock fell from a closing price on August 25, 2005 of $25.55, on a volume of 3,231,900 shares, to a low of $21.71 on August 26, 2005, before closing at $21.99 per share, on a volume of 10,751,600 shares.

05-CV-0823-H(RBB)

1      156.   On August 26, 2005, J.P. Morgan issued a report entitled: Downgrading to Neutral;

2  NT Visibility Uncertain = Move to Sidelines; Lowering Est.," which stated:

> ***On the comp weakness, for a company that was able to produce SSS in
> excess of 4.6% for 49 straight quarters, the recent deterioration is a big concern.***
> To this end, following a 5.2% comp in 1Q05, 2Q was only 2.5% (below guidance of
> 3.0%-4.0%) – its worst comp in over a decade.  Trends deteriorated in July roughly
> 200-300 bps and have remained in this range August to-date, therefore leading
> management to outline at 0.0%-2.0% SSS outlook for 3Q.  The company cited weak
> traffic for the lower forecast, echoing what PETM had outlined on Wednesday, as
> well as in-store disruptions from its re-merchandising campaign.
>
> ***While the lowered guidance was clearly priced into the stock, particularly
> following PETM's sobering outlook, the EPS revision was much lower than we
> were expecting.  Specifically, PETC provided FY05 EPS guidance of $1.36-$1.44,
> down 17.2% from its previous outlook of $1.66-$1.72, and materially lower than
> our estimate of $1.64.  On 3Q, the company provided an EPS range of $0.25-$0.28
> vs. our previous forecast and Street consensus of $0.41 and $0.39, respectively.***

<p align="center">*      *      *</p>

> ***On 2Q, PETC reported EPS of $0.31, in-line with JPM/Street forecast and
> guidance provided earlier this quarter.***  While the quarter's EPS was intact,
> comparable sales growth was surprisingly lower than the company's revised forecast
> of 3.0%-4.0%. . . .  SG&A expenses remained flat YOY at 26.2% of sales, which was
> surprising given the weak comp and suggests that PETC may have cut back on some
> G&A expenses to help make the quarter.

<p align="center">*      *      *</p>

> Specifically, 2Q05 comps were the lowest comparable sales gains in over a decade
> due to a slowdown in traffic, a change in advertising, and disturbances from store
> remerchandising efforts. . . .

<p align="center">*      *      *</p>

> The greatest risk to our rating rests with the company's comparable sales
> growth.  On the negative side, if comps continue to decelerate into 2006, from a
> tough retail backdrop and increasing competition, our estimates would need to be
> reduced.

157.   On August 26, 2005, Legg Mason issued a report entitled "2Q05 Confirms Pet

Spending Summer Slump; PETC Pricing and Labor Adjustments?" which stated:

> PETC reported 2Q05 EPS of $0.31, inline with our consensus-matching
> estimate and versus $0.33 in 2Q04.  Management had lowered 2Q EPS guidance
> from $0.33-$0.35 to $0.31-$0.33 on June 28.  Tightened G&A expenses during the
> period offset lower-than-expected comp and increased gross margin pressure. . . .

<p align="center">*      *      *</p>

> ELEMENTS OF THE Q: (1) 2Q comp of 2.5% below our 3.5% estimate and
> 3%-4% guidance (versus 6.7% in 2Q04).  (2) Services revenues up 22% y/y,

<p align="center">- 72 -</p>

representing 5.3% of sales.  (3) GM declined 146 bp, below our call for a 25 bp decline. (4) SG&A rate was flat, better than our expectation of 114 bp of deleverage.

\*       \*       \*

*PETC 2Q05 results confirmed the pet business has seemingly suffered more from higher gasoline prices than other hardline sectors we cover.  Simply put, we continue to believe PETC results suggest the company needs to address its pricing differential with some combination of price cuts (gross margin pressure) and increased advertising (SAG&A pressure). . . .*

\*       \*       \*

*Management cited declines in traffic as the key contributor to comp deceleration, in particular a consolidation of consumer shopping trips.  These incremental trips are believed to include more discretionary purchases in the pet supplies category, which represent the bulk of total sales (65%).  Price continued to contribute roughly +100 bp to comp.*

158.   On August 29, 2005, J.P. Morgan issued a report entitled "Central Garden and Pet Company: Downgrading to Neutral," which stated:

Summarizing weak results and guidance from PETCO and PETsMART, both companies focused on less consumer traffic as the key driver behind slowing results, although PETsMART did cite pressure from other retailers as a factor.  We think both companies are putting some positive spin on the situation, given a near-term blip in consumer spending is much less of a problem than admitting there is a structural change in the competitive dynamics of the industry, with expanding pet offerings at other retailers.

159.   On September 19, 2005, Thomas Weisel Partners LLC, issued a report entitled "PETC: Initiating Coverage With a Peer Perform Rating," which stated:

We do believe that the company has taken steps to materially improve internal controls and the probability of additional issues seems greatly reduced.

This past quarter the company claims that it suffered from a substantial slowdown in customer traffic due to consumers consolidating their number of shopping trips. The company suggested this trend may be partially attributable to the recent surge in retail gasoline prices. As a result, PETCO's 2Q05 results suffered from fewer sales of impulse purchases, which typically occur in the higher-margin supplies category.

## CONFIDENTIAL SOURCES

160.   Numerous former PETCO employees have provided plaintiff with information demonstrating defendants' knowledge or disregard of the falsity of their statements.   The confidential witnesses ("CW") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another and facts now admitted by the Company. The

- 73 -

witnesses provided information to plaintiff on a confidential basis and are particularly described by job description, title, and/or duration of employment, thereby providing sufficient detail demonstrating that each was in a position to know the information provided and thus their accounts are reliable.

161.    Confidential Witness 1 ("CW1") was a PETCO Financial Analyst who ran the Distribution Department until the spring of 2005. CW1 reported to the VP of Logistics, Robert Northcutt. In that capacity, CW1 was responsible for forwarding distribution center invoices to PETCO's Accounting Department for payment and tracking the payment of those invoices. CW1 was generally responsible only for the invoices regarding the distribution centers' operations (versus those expenses relating to traffic and transportation). One of the largest expenses of operations was labor, particularly temporary labor. CW1 also was responsible for preparing portions of the distribution centers' annual budget. In that capacity, CW1 had access to the communications and documents relating to finalizing PETCO's annual budget. As detailed below, CW1 has information and knowledge regarding unrealistic budgets and budgetary pressure from upper management and the improper withholding of expense invoices.

162.    Confidential Witness 2 ("CW2") was a PETCO Director and Operations Manager for the Mira Loma central distribution center until February 2005. During the Class Period, when CW2 was the Operations Manager, CW2 reported to the Director of the Mira Loma distribution center, Mike Hein. During the Class Period, CW2 often took on the responsibilities of Director (who was out periodically on medical leave) and reviewed expense-related invoices for the Mira Loma distribution center and participated on conference calls with defendant Richter, Northcutt (Vice President of Logistics), Regan (Director of Traffic and Transportation), and the directors of the other distribution centers. As detailed below, CW2 has information and knowledge regarding unrealistic budgets and budgetary pressure from upper management, improper withholding of expense invoices, responses to an early October 2004 employee survey disclosing the under-accrual of expenses, lack of internal controls, unrealistic budgets provided to upper management, and declining same-store sales.

163.    Confidential Witness 3 ("CW3") was a former PETCO Operations Manager at the Mira Loma distribution center until the spring of 2004. CW3 reported to CW2 and Mike Hein, director of the Mira Loma distribution center. In that capacity, CW3 reviewed Mira Loma's budget, reviewed expense-related invoices, and had discussions with CW3's direct reports regarding the distribution centers' operations. As detailed below, CW3 has information and knowledge regarding unrealistic budgets and budgetary pressure from upper management and the systematic withholding of expense invoices.

164.    Confidential Witness 4 ("CW4") was a former district manager employed by PETCO from the fall of 2002 through the winter of 2004. During that time, CW4 worked as a district manager in charge of approximately 15 stores in the Chicago, Illinois area. This region was headed by Lance Schwimmer, a regional VP who reported to defendant Martin. CW4 was responsible for training retail store managers in how to meet sales goals and store compliance with corporate policies. As detailed below, CW4 has information and knowledge regarding the improper withholding of expense invoices and declining same-store sales.

165.    Confidential Witness 5 ("CW5") was a former regional distribution center manager employed by PETCO from the winter of 2000 through the fall of 2004. During that time, CW5 worked at PETCO's regional distribution center in Portland, Oregon. As a regional distribution manager, CW5 reported to CW2. CW5 had primary responsibility over the Portland distribution center, which employed 19 individuals and supplied 50 stores in Oregon, Washington, Idaho and Montana. As detailed below, CW5 has information and knowledge regarding unrealistic budgets and budgetary pressure from upper management and the improper withholding of expense invoices.

166.    Confidential Witness 6 ("CW6") was a former director of distribution employed by PETCO from the summer of 2000 through the spring of 2005. During that time, CW6 worked as the director of distribution at PETCO's Monroe, New Jersey distribution center. In this capacity, CW6 was directly in charge of the Monroe Distribution center, as well as the Mansfield, Massachusetts regional distribution center. CW6 had oversight of a budget of approximately $25 million. The Monroe distribution center serviced 225 PETCO stores and employed approximately 300 individuals. CW6 reported to Northcutt, VP of Logistics. As detailed below, CW6 has information

1    and knowledge regarding the improper withholding of expense invoices, responses to an early

2    October 2004 employee survey disclosing the under-accrual of expenses, lack of internal controls,

3    unrealistic budgets sent to upper management, and declining same-store sales.

4         167.    Confidential Witness 7 ("CW7") is a former transportation manager, employed by

5    PETCO from the winter of 2000 until the spring of 2005. During that time, CW7 worked in

6    PETCO's headquarters located in San Diego, California. CW7 reported to Sharon Regan, Director

7    of Traffic and Transportation. Regan reported to Bob Northcutt, VP of Logistics. In turn, Northcutt

8    reported to defendant Brann and defendant Richter. As a transportation manager, CW7 was

9    responsible for the transportation end of distribution center-to-store deliveries made by PETCO

10   drivers in fleet (leased or rented) trucks. CW7 was responsible for deliveries made from six out of

11   the eight PETCO distribution centers. CW7 was also responsible for reviewing all of the invoices

12   that pertained to fleet services, such as leasing invoices, rental invoices, fuel invoices, and repair

13   invoices. Fleet-related invoices were sent directly to the traffic and transportation department. CW7

14   generated an Excel spreadsheet for directors of six distribution centers so they could track the fleet

15   expenses that were being posted to the general ledger against their accounts. The spreadsheet listed

16   the vendor, invoice number, the corresponding general ledger code and the amount due. As detailed

17   below, CW7 has information and knowledge regarding unrealistic budgets sent to upper

18   management, the improper withholding of expense invoices, responses to an early October 2004

19   employee survey disclosing the under-accrual of expenses, lack of internal controls, and declining

20   same-store sales.

21   **PETCO'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

22        168.    In order to artificially inflate PETCO's stock price, defendants falsely reported

23   PETCO's financial position and results during the Class Period through the use of unrecorded

24   expenses and liabilities and erroneous accounting of tenant improvement allowances, thereby

25   materially overstating its net earnings, earnings per share ("EPS") and stockholders' equity during

26   the Class Period.

27

28

169.    PETCO's 3Q 2004 financial results were filed with the SEC on Form 10-Q filed on December 7, 2004.[2]  PETCO's 4Q 2004 and fiscal year 2004 financial results were included in its press release filed with the SEC on Form 8-K on March 10, 2005.  PETCO reported the following results:

IN THOUSANDS
(except per share data)

|  | 3Q04 | 4Q04 | FY04 |
|---|---|---|---|
| Net Sales | $    455,469 | $    492,313 | $    1,812,145 |
| Gross Profit | 161,200 | 177,427 | 636,374 |
| Earnings Before Taxes | 34,651 | 44,960 | 137,503 |
| Net Earnings | 21,002 | 27,607 | 83,673 |
| EPS | 0.33 | 0.47 | 1.43 |

170.    These results, and defendants' representations about them, were false and misleading when made because, during the Class Period, PETCO's financial statements did not fairly present its financial position and results and were presented in violation of GAAP and SEC rules.

171.    Defendants intentionally failed to record and recognize material amounts of known distribution and temporary labor costs.  In addition, PETCO erroneously accounted for tenant improvement allowances associated with its leases.  PETCO understated its cost of sales by improperly amortizing its tenant improvement allowances as a reduction to depreciation and amortization in violation of GAAP.

172.    As a result of defendants accounting scheme, the Company understated its cost of sales by approximately $3.2 million, $5.6 million, and $5.6 million in 3Q 2004, 4Q 2004, and fiscal year 2004, respectively.  The following chart demonstrates PETCO's reported vs. actual financial results during the Class Period:

---

[2]    PETCO's 3Q 2004 Form 10-Q states: "In the opinion of management of PETCO, the unaudited consolidated financial statements presented herein contain all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position, results of operations and cash flows of the Company as of October 30, 2004 and for the thirteen and thirty-nine week periods ended November 1, 2003 and October 30, 2004."

**PETCO**
**IMPACT OF THE FRAUD**
(in thousands, except per share data)

| | 3Q 2004 | 4Q 2004 | FY 2004 |
|---|---|---|---|
| Reported Net Earnings before taxes in 10-Q, 8-K | $ 34,651 | $ 44,960 | $ 137,503 |
| Approximate Unrecorded distribution and temporary labor costs | $ (1,980) | $ (5,600) | $ (5,600) |
| Approximate Understated Lease Costs | $ (1,200) | $ - | $ - |
| Actual Net Earnings Before Taxes | $ 31,471 | $ 39,360 | $ 131,903 |
| Percentage Net Earnings Before Taxes Overstated | 10.1% | 14.2% | 4.2% |
| | | | |
| Reported EPS | $ 0.33 | $ 0.47 | $ 1.43 |
| Impact of Unrecorded Expenses | $ (0.03) | $ (0.06) | $ (0.06) |
| Actual EPS | $ 0.30 | $ 0.41 | $ 1.37 |
| Percentage EPS Overstated | 11.2% | 14.4% | 4.3% |

173. These unrecorded costs materially overstated PETCO's net earnings in 3Q 2004, 4Q 2004 and fiscal year 2004. Additionally, and as disclosed in the Company's 2004 annual report on Form 10-K filed with the SEC on June 28, 2005, the Company and its independent auditors, KPMG, concluded that the Company had *material* weaknesses in its internal controls specifically related to unrecorded liabilities and expenses that would, more than likely, cause a material misstatement in its public financial statements. Despite defendants' awareness of these material weaknesses and understating their costs, they also failed to disclose their accounting policies related to the recording, or lack thereof, of material amounts of liabilities and expenses.

**GAAP and SEC Violations**

174. GAAP are principles recognized by the accounting profession as the conventions, rules and guidelines that define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a). PETCO's 4Q 2004 earnings release filed on Form 8-K also was required to comply with GAAP and Regulation S-K.

175.    Defendants' improper accounting took various forms, including intentionally withholding, not recording and not accruing distribution costs such as freight, fuel and temporary labor costs.    Additionally, defendants erroneously recorded PETCO's tenant improvement allowances as a reduction to depreciation and amortization in violation of GAAP.    This caused PETCO's cost of sales to be understated and its profits to be overstated as depicted in the chart in ¶172 above.

176.    Financial Accounting Standards Board ("FAS") Statement of Concepts ("FASCON") No. 5.    FASCON No. 5, ¶86(a) states in part that cost of goods sold are matched with revenues – they are recognized upon recognition of revenues that result directly and jointly from the same transactions or other events as the expenses.    Additionally, FASCON No. 5, ¶88 states in part that "initial recognition of assets and liabilities incurred generally involves measurement based on current exchange prices at the date of recognition."    GAAP requires that payables for the purchase of assets should be recorded when the risks of ownership have passed and *payables for services should be recorded and charged to expenses as the services are performed*.    As such, PETCO was required to record and accrue all costs in the period incurred.    During the Class Period, PETCO intentionally ignored and failed to accrue and recognize *known* invoices and costs in the proper period.

177.    Additionally, FASCON No. 6, ¶¶144-152 discusses the need for proper recognition and matching of costs and revenues.    FASCON No. 6, ¶146 requires the matching of costs and revenues in simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions.    Additionally, FASCON No. 6 states that revenues and expenses are directly related to each other and require recognition at the same time.    As such, by not matching the true costs with related revenues, PETCO violated GAAP and the requirements of FASCON No. 6 which resulted in false and misleading financial statements.    Consequently the defendants violated GAAP and caused PETCO to report phony, understated cost of sales and overstated gross profit and earnings.

178.    Defendants improperly accounted for tenant improvement allowances by classifying such allowances as a reduction of leasehold improvements within fixed assets on the balance sheet and amortizing the allowance as a reduction to depreciation and amortization expense.    In

- 79 -

1    accordance with ¶15 of Statement of Financial Accounting Standards ("SFAS") No. 13, Accounting
2    for Leases, and the response 2 of FASB Technical Bulletin ("FTB") 88-1, Issues Related to
3    Accounting for Leases, the tenant allowances should have been recorded as deferred rent and
4    amortized as a reduction to lease expenses over the shorter of their economic lives or the lease terms
5    (as defined by ¶5(f) of SFAS No.13.  The SEC issued a letter to the Center for Public Company
6    Audit Firms on February 7, 2005 ("CPCAF Letter") regarding clarification of the SEC staff's
7    interpretation of certain operating lease issues.  The SEC position is consistent with the standards set
8    forth above and in SFAS 13 and FTB 88-1 and is not considered new guidance related to the
9    treatment of tenant improvement allowances and operating leases.  The CPCAF Letter discusses the
10   fact that the SEC's position is based on existing guidance and states in part that: *"The SEC staff
11   believes that the positions noted above are based upon existing accounting literature...."*

12          179.    Defendants are incorrectly using the CPCAF Letter as a justification for correcting a
13   known fraudulent error in their financial statements.  Defendants' erroneous accounting for tenant
14   improvement allowances resulted in understating costs of sales by approximately $1.2 million
15   through 3Q 2004.

16                              **ACCOUNTING SCHEME**

17          180.    As described in ¶¶65-93, PETCO launched an aggressive expansion plan (long-term
18   growth plan) in order to boost its stock price.  Realizing they could not meet their projected profit
19   targets communicated to Wall Street analysts, defendants embarked on an accounting scheme to
20   falsify and materially understate its costs and liabilities.  In order to achieve their now unreachable
21   earnings targets, defendants established unrealistic and unattainable cost budgets for distribution
22   centers along with instructions from management that the budgets could not be exceeded.  Despite
23   several efforts from operation and distribution managers, in late 2003 and early 2004, to submit and
24   establish realistic cost budgets for fiscal year 2004, senior management dictated unrealistically low
25   budgets that could not be met.  According to CW1, CW2, and CW7, as plead in ¶¶218-287, there
26   was incredible pressure from senior management to not record known costs and invoices in order to
27   meet fictitious budgeted cost figures each quarter in fiscal 2004.  According to CW2, as plead in
28   ¶¶218-287, Bob Northcutt (PETCO's Vice President of Logistics), acquiescing to pressure from

                              - 80 -                    05-CV-0823-H(RBB)

1  defendants Devine and Myers, insisted throughout 2004 that no one could accrue or report expenses

2  in excess of established budgets. According to CW2 and CW7, it was clear to defendants that costs

3  were exceeding budget and were increasing each month due to the implementation of the growth

4  plan.

5  **Distribution Centers' Expense Procedures**

6  181.   CW2 said that invoices for operating expenses such as temporary labor and supplies

7  initially were sent to the distribution center, while invoices for expenses such as traffic and

8  transportation costs (*e.g.*, delivery fees and fuel) went directly to Sharon Regan in PETCO's San

9  Diego corporate headquarters. CW2 said that the Mira Loma distribution center delivered inventory

10  to PETCO stores located in California, Arizona, Oregon and Washington, covering distances up to

11  1,200 miles. CW2 noted that the trucks only got about seven miles to the gallon, and so these

12  distances at gasoline prices between two and three dollars per gallon added up to very high fuel bills.

13  CW2 added that the Monroe, NJ distribution center's fuels costs may have been even worse because

14  it made deliveries to stores as far south as Florida. The invoices for the costs associated with these

15  trips were sent directly to Regan's office from the fuel and transportation vendors.

16  182.   According to CW2 the invoices that arrived at the distribution center were initially

17  entered onto an "accrual sheet," which was prepared using Quicken. A PETCO Accounting

18  Assistant prepared the accrual sheet for the Mira Loma distribution center. CW2 reviewed and

19  signed each invoice before sending them to CW1 or Regan for payment. Invoices for operational

20  expenses, such as temporary employees, office supplies and packing supplies were sent to CW1.

21  183.   Once a week, the Accounting Assistant prepared a "Forecast Report" based upon the

22  invoices received and the expenses accrued for the month. The Assistant prepared this report in

23  Quicken, and it listed the various invoices that the distribution center had received for the week and

24  accrued expenses for which an invoice had not yet been received. The report totaled the month-to-

25  date expenses that had been accrued, forecasted to be spent and the monthly budget for those items.

26  184.   CW1 sent the invoices to the Accounting department for payment. According to

27  CW2, CW1 took orders from Northcutt and Northcutt decided which invoices would be submitted

28  for payment and which ones would be withheld and not recorded. CW2 said that Northcutt was

under so much pressure from senior management to meet the budget that he threatened to quit several times a week. CW2 received the monthly "freight" accruals (truck leasing and rentals, fuel, and repairs) from CW7 in Sharon Regan's Traffic and Transportation Department. CW7 told CW2 what the actual accruals were, but told CW2 that a different number would be reflected on the general ledger pursuant to instructions from management. At the end of each month, CW1 sent the distribution center directors copies of general ledger entries reflecting the specific invoices that Accounting had posted to each distribution center's budget. CW2 said PETCO's general ledger entries always reflected fewer costs than the directors had submitted.

185.    CW2 said that it was not uncommon for invoices to be submitted to Accounting as late as 120 days after they were received. CW1 did this in an effort to keep the distribution centers from going over budget. As a result, CW2 said that some vendors *"were always getting ready to cut us off."* Additionally, the three main distribution centers were incurring between $750,000 and $1,000,000 per month of temporary labor costs. In order to meet the budget however, hundreds of thousands of dollars in temporary labor accruals and invoices were not recorded. For example, PETCO was always making late payments to its temp agency, Personnel Plus. Because Personnel Plus was a small company and was not getting paid by PETCO, Personnel Plus had to take out a $1,000,000 loan in order to pay its employees. Mira Loma also rented certain equipment for the distribution center's operations and vendors became so frustrated with PETCO's late payments that they eventually refused to supply Mira Loma with any equipment unless they received payment up front.

186.    During CW7's review of the Company's general ledger in March 2005, CW7 discovered massive amounts of invoices withheld for freight and fuel costs for all distribution centers. CW7 found at least $3.1 million of specific freight and fuel expenses incurred prior to and during the Class Period (some were incurred by the Company even prior to 3Q 2004.[3]) were not recorded until fiscal 2005.

---

[3]     For example, invoice #9182004 in the amount of $22,346.90 from "Handle With Care Express" is dated February 28, 2004 and remained unrecorded for over a year.

187.    Below is a summary of vendors who submitted invoices to PETCO in 2004 but were not recorded until fiscal 2005.[4]

| Vendor | Amount |
|---|---|
| ABF FREIGHT SYSTEM, INC | $ 55,898.34 |
| AMERICAN LOGISTICS SERVICES, LLC | 295,505.11 |
| AMERI-CO CARRIERS, INC | 187,354.63 |
| BRISK TRANSPORTATION, L.P. | 431,101.90 |
| CARGO TRANSPORT, INC | 6,525.04 |
| CH ROBINSON | 508,434.53 |
| CON-BROOK TRANSPORTATION | 25,453.57 |
| CRST FREIGHT SERVICES | 100,583.17 |
| EAGLE GLOBAL LOGISTICS | 855.00 |
| EXEL TRANSPORTATION SERVICES, INC | 13,918.04 |
| EXPRESS FREIGHT SYSTEM | 23,202.00 |
| FED EX FREIGHT EAST | 1,382.74 |
| FED EX FREIGHT WEST | 24,995.74 |
| FRED HAINES TRANSPORTATION | 24,647.70 |
| GILBERT EXPRESS, INC | 110,608.16 |
| HANDLE WITH CARE EXPRESS | 150,901.18 |
| HORIZON FREIGHT SYSTEM, INC | 86,722.50 |
| INTERSTATE DISTRIBUTOR CO | 86,000.40 |
| KNIGHT TRANSPORATION | 39,198.04 |
| LANTER TRANSPORT, INC | 310,948.69 |
| MACH 1 AIR SERVICES, INC | 1,276.80 |
| MAY TRUCKING | 140,033.43 |
| MWICIGI KANIU | 66,362.33 |
| NEW ENGLAND MOTOR FRT., INC | 17,094.79 |
| NORTHWEST HANDLING SYSTEMS | 52.50 |
| PEAK TECHNICAL SERVICES, INC | 5,975.22 |
| PERFORMANCE TRUCKING, INC | 62,146.65 |
| ROADWAY EXPRESS | 871.64 |
| SHAN-LOR TRUCKING | 37,088.31 |
| SPAN ALASKA CONSOLIDATORS, INC | 50,440.19 |
| SWIFT TRANSPORTATION CO., INC | 73,998.32 |
| TIGHE WAREHOUSING | 24,107.23 |
| TOTAL QUALITY LOGISTICS, INC | 45,973.00 |
| TRAFFIC TECH, INC | 5,300.00 |
| TRANSPORT DISTRIBUTION SERVICES, INC | 25,216.66 |
| USF HOLLAND, INC | 2,844.90 |
| W.C. MCQUADE, INC | 22,546.77 |
| WATKINS MOTOR LINES | 68.99 |
| WERNER ENTERPRISES | 52,375.04 |
| XPRESS DIRECT | 6,067.60 |
| XPRESS GLOBAL SYSTEMS, INC | 5,104.00 |

---

[4]    *See* Exhibit 2, a copy of PETCO's detailed general ledger listing unrecorded freight and fuel liabilities and expenses.

| Vendor | Amount |
|---|---|
| UNRECORDED INVOICES | $3,129,180.85 |

188.    Ultimately, PETCO adjusted its financial statements by $5.6 million to reflect the under-accrual and reporting of these and other costs incurred but not recorded during 2004.

189.    The scheme of holding back invoices and not accruing costs was intentional and known by senior management in order to meet budgeted Wall Street numbers.

190.    This is corroborated by a summary of the Control Environment Questionnaire conducted in early October 2004 (*see* Exhibit 1) in which PETCO employees reported to management in pertinent part:

> "I am directed to [bypass] GAAP in reference to accruals. No invoice in hand no accrual even though we know the expense has happened."

> "Freight bills don't get paid so department can meet budget."

191.    The holding back of invoices is further corroborated by CW2's employee survey response (*see* Exhibit 3) that states in pertinent part:

> "I am given direct orders to hold invoices and not show them as they happened. We are about to start the budget process. We will once again make a budget against a false prior year. I never thought of it before, but is this not what Enron did."

192.    This practice was so pervasive that at one point in mid-October 2004, defendant Richter, a Certified Public Accountant and former KPMG auditor, told CW2 not to record certain Q3 2004 invoices. She told CW2: "*hold onto any invoices because we gotta make the quarter.*"

## PETCO'S GAAP VIOLATIONS WERE MATERIAL

193.    PETCO's financial fraud alleged herein was material. As an initial matter, PETCO's financial misstatements were clearly material solely from a numerical (quantitative) standpoint because the unrecorded liabilities and expenses represent at least $3.2 million, $5.6 million and $5.6 million of inflated net earnings before taxes for 3Q 2004, 4Q 2004 and fiscal year 2004, respectively. Furthermore, EPS was overstated by $0.03, $0.06 and $0.06 (11.2%, 14.4% and 4.3%) for 3Q 2004, 4Q 2004 and fiscal year 2004, respectively.

194.    However, definitions of materiality are not limited to numbers and amounts – there are qualitative factors as well. SEC Staff Accounting Bulletin ("SAB") No. 99, Materiality,

1  summarizes GAAP definitions of materiality.  Among other items, SAB No. 99 says: "A matter is

2  'material' if there is a substantial likelihood that a reasonable person would consider it important." It

3  also stresses that materiality requires qualitative, as well as quantitative, considerations.  For

4  example, if a known misstatement would cause a significant market reaction that reaction should be

5  taken into account in determining the materiality of the misstatement.

6      195.    SAB No. 99 further states:

7      Among the considerations that may well render material a quantitatively small
       misstatement of a financial statement item are –

8                                   *        *        *

9      •    whether the misstatement masks a change in earnings or other trends

10

11     •    whether the misstatement hides a failure to meet analysts' consensus
            expectations for the enterprise

12     •    whether the misstatement concerns a segment or other portion of the
            registrant's business that has been identified as playing a significant role in
13          the registrant's operations or profitability

14     196.    SAB No. 99 also says that an intentional misstatement of even immaterial items may

15  be illegal and constitute fraudulent financial reporting.

16     197.    PETCO's misstatements, by their own admissions, satisfy these criteria and thus were

17  material from both a quantitative and qualitative perspective.

18  **DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS**

19     198.    Defendants knowingly certified false and misleading financial statements for the third

20  quarter 2004.  These financial statements were not in accordance with GAAP or SEC rules.  Section

21  302 of the Sarbanes-Oxley Act of 2002 and SEC Rules 13A-14(a) and 15D-14(a) of the Exchange

22  Act requires defendants Myers and Carter as the chief executive officer and chief financial officer,

23  respectively, to certify to the SEC and investors both the fairness of the financial information in each

24  quarterly and annual report.  Defendants Myers and Carter are required to and did certify that the

25  financial statements and other financial information included in the reports are fairly presented in all

26  material respects.  Defendants Myers and Carter also stated that the report did not contain any untrue

27  statement of material fact or omit to state a material fact.  In addition, defendants Myers and Carter

28  stated that PETCO has established and maintained disclosure controls and procedures sufficient to

1  ensure that the financial and non-financial information required to be disclosed in SEC reports was

2  recorded, processed, summarized, and reported within the specified time periods.

3      199.    Defendants Myers and Carter knowingly or recklessly certified misleading and

4  inaccurate third quarter end financial statements that were not in accordance with GAAP and SEC

5  rules.  Section 906 of the Sarbanes Oxley Act of 2002 and 18 U.S.C. §1350, defendants Myers and

6  Carter were required to certify each periodic report that includes financial statements.  Their signed

7  certification falsely stated that:  (i) the report fully complied with the requirements of section 13(a)

8  or 15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all

9  material respects, the financial condition and results of operations of PETCO.

10     200.    On August 30, 2004, December 7, 2004, and June 28, 2005, Myers signed and filed

11 with the SEC certifications under Rule 13a-14(a)/15d-14(a) of the Exchange Act and Section 906 of

12 the Sarbanes-Oxley Act of 2002 attesting to the accuracy and truthfulness of the corresponding Form

13 10-Qs and Form 10-K for PETCO.  At the time Myers signed these certifications, he knew or

14 recklessly disregarded that they were false or misleading for the reasons set forth in ¶¶218-287.

15     201.    On August 30, 2004, December 7, 2004, and June 28, 2005, Carter signed and filed

16 with the SEC certifications under Rule 13a-14(a)/15d-14(a) of the Exchange Act and Section 906 of

17 the Sarbanes-Oxley Act of 2002 attesting to the accuracy and truthfulness of the corresponding Form

18 10-Qs and Form 10-K for PETCO.  At the time Carter signed these certifications, he knew or

19 recklessly disregarded that they were false or misleading for the reasons set forth in ¶¶218-287.

20                    **PETCO FAILED TO MAKE REQUIRED DISCLOSURES**

21     202.    The SEC requires that, as to annual and interim financial statements filed with the

22 SEC, registrants include a management's discussion and analysis section which provides information

23 with respect to the results of operations and "also shall provide such other information that the

24 registrant believes to be necessary to an understanding of its financial condition, changes in financial

25 condition and results of operations."  *See* Regulation S-K, 17 C.F.R. §229.303(a).  Regulation S-K

26 states that, as to annual results, the management's discussion and analysis section shall:

27         (a)      Describe any unusual or infrequent events or transactions or any significant

28 economic changes that materially affected the amount of reported income from continuing

- 86 -                       05-CV-0823-H(RBB)

1   operations and, in each case, indicate the extent to which income was so affected.  In addition,

2   describe any other significant components of revenues or expenses that, in the registrant's judgment,

3   should be described in order to understand the registrant's results of operations.

4          (b)     Describe any known trends or uncertainties that have had or that the registrant

5   reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or

6   income from continuing operations.  If the registrant knows of events that will cause a material

7   change in the relationship between costs and revenues (such as known future increases in costs of

8   labor or materials or price increases, or inventory adjustments) the change in the relationship shall be

9   disclosed.

10   17 C.F.R. §229.303(a).

11         203.    The SEC also requires that interim period financial statements filed with the SEC

12   include a management's discussion and analysis of the financial condition and results of operations

13   so as to enable the reader to assess material changes in financial condition and results of operations.

14   Regulation S-K, 17 C.F.R. §229.303(b) states that "The discussion and analysis shall include a

15   discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set

16   forth in above, except that the impact of inflation and changing prices on operations for interim

17   periods need not be addressed."

18   17 C.F.R. §229.303(b)

19         204.    During the Class Period, PETCO failed to disclose its accounting policies related to

20   the recording of distribution and temporary labor costs in subsequent reporting periods and the

21   unfavorable impact that improperly recording such expenses would have on expenses and net

22   earnings.

23         205.    Financial reporting includes not only financial statements, but also other means of

24   communicating information that relates directly or indirectly to the information in the financial

25   statements.  *See* FASCON No. 1, ¶7.  For this reason, in addition to PETCO's failure to make the

26   required disclosures in its financial statements and in its SEC filings, PETCO also shirked its duty to

27   make such disclosures in its conference calls, its press releases and its Annual Reports.

28

1

## PETCO LACKED ADEQUATE INTERNAL CONTROLS

2      206.   Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting

3  company must:

4          (A) make and keep books, records, and accounts, which, in reasonable detail,
           accurately and fairly reflect the transactions and dispositions of the assets of the
5          issuer;

6          (B) devise and maintain a system of internal accounting controls sufficient to provide
           reasonable assurances that . . . transactions are recorded as necessary . . . to permit
7          preparation of financial statements in conformity with [GAAP].

8  15 U.S.C. §78m(b)(2).

9      207.   These provisions require an issuer to employ and supervise reliable personnel, to

10  maintain reasonable assurances that transactions are executed as authorized, to properly record

11  transactions on an issuer's books, and, at reasonable intervals, to compare accounting records with

12  physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

13      208.   Defendants caused PETCO to violate §13(b)(2)(A) of the Exchange Act by failing to

14  maintain accurate records concerning its accounts payable and cost of goods sold. Defendants knew

15  or recklessly disregarded PETCO's failure to record the appropriate standard costs increases for its

16  raw materials. PETCO's inaccurate and false records were not isolated or unique instances because

17  they were improperly maintained for multiple reporting periods. Accordingly, PETCO violated

18  §13(b)(2)(A) of the Exchange Act.

19      209.   In addition, defendants caused PETCO to violate §13(b)(2)(B) of the Exchange Act

20  by failing to implement procedures reasonably designed to prevent accounting irregularities.

21  PETCO failed to ensure that proper review and checks were in place to ensure that it was recording

22  and properly reporting cost of goods sold and properly recording related accounts payables. In fact,

23  although they knew or recklessly disregarded that the Company lacked of adequate controls,

24  defendants regularly issued quarterly and annual financial statements throughout the Class Period

25  without ever disclosing the deficiencies in PETCO's internal accounting controls and falsely asserted

26  that its financial statements complied with GAAP.

27      210.   As indicated in PETCO's 2004 annual report, KPMG, PETCO's independent

28  auditors, issued an Independent Registered Accounting Firm Report dated May 25, 2005. KPMG's

audit of management's assessment of internal control concluded that PETCO had material weaknesses relating to accruals for vendor invoices as of January 29, 2005. KPMG's adverse opinion on the ineffective operation of internal control over financial reporting states in part:

> A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weakness has been identified and included in management's assessment: As of January, 2005, the Company did not have appropriate policies and procedures relating to the review of the inventory warehousing and distribution function ("Distributions") accruals for vendor invoices and the performance of Distribution vendor statement reconciliations. Specifically, Distributions accruals were prepared and reviewed by the same Distribution personnel, and Distribution vendor statement reconciliations were also performed by these same Distribution personnel, resulting in inadequate segregation of duties. As a result of this deficiency, certain Distribution vendor invoices were not processed in a timely manner which caused errors in which expenses were under-accrued during fiscal 2004 and during prior interim and annual periods. This deficiency results in more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented on a timely basis by employees during the normal course of performing their assigned functions.

211. PETCO now attempts to hide its accounting fraud by characterizing it as a lack of segregation of duties. PETCO not only knew of material internal control weaknesses, but defendants caused PETCO not to record certain liabilities and expenses. As demonstrated in ¶¶218-287, however, defendants had the requisite scienter about the accounting fraud and knew or recklessly disregarded the true state of the Company's financial results and expectations prior to and during the Class Period. As CW2 told defendants:

> There were no errors made in the accruals or any accounting procedures. *Invoices were intentionally held back by a vice president of Petco to make the performance appear better than actual....* Petco is still disguising the problem as an accounting problem. *The holding of invoices caused future budgets to be inaccurate and that we were held accountable for performing to budgeted numbers that were unrealistic.*

## PETCO SHOULD HAVE RESTATED ITS FINANCIAL STATEMENTS

212. PETCO intentionally overstated its net earnings by understating its expenses throughout the Class Period as detailed in ¶¶168-192.

213. As a result of PETCO's fraudulent accounting practices, it is required to restate its 3Q04 financial statements. PETCO is required to restate its financial statements based on:

05-CV-0823-H(RBB)

1         (a)    the financial results originally issued, its certification of financial results, and

2 its public statements regarding *those results were materially false and misleading*; and

3         (b)    the financial statements reported were incorrect based on information

4 available to defendants at the time the results were originally reported.

5     214.    GAAP requires a restatement to occur when the originally issued financial statements

6 were based on fraudulent accounting practices.  As set forth in Accounting Principles Board

7 ("APB") No. 20, the type of restatement announced by PETCO was for "a correction of an error in

8 previously issued financial statements." *See* APB No. 20, ¶¶7-13, 38. APB No. 20 defines errors as

9 "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse

10 of facts that existed at the time the financial statements were prepared." *See* APB No. 20, ¶13.

11     215.    The SEC has reiterated its position regarding Restatements:

12     [T]he Commission often seeks to enter into evidence restated financial statements,
and the documentation behind those restatements, in its securities fraud enforcement

13     actions in order, *inter alia*, *to prove the falsity and materiality of the original
financial statements [and] to demonstrate that persons responsible for the original*

14     *misstatements acted with scienter*.

15 *In re Sunbeam Sec. Litig.*, 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and

16 Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude

17 Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Jan. 31, 2002).

18 <div align="center">**ADDITIONAL GAAP AND SEC VIOLATIONS**</div>

19     216.    Due to these accounting improprieties, the Company presented its financial results

20 and statements in a manner that violated GAAP, including the following fundamental accounting

21 principles:

22         (a)    The principle that interim financial reporting should be based upon the same

23 accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

24         (b)    The principle that financial reporting should provide information that is useful

25 to present and potential investors and creditors and other users in making rational investment, credit

26 and similar decisions (FASCON No. 1, ¶34);

27         (c)    The principle that financial reporting should provide information about the

28 economic resources of an enterprise, the claims to those resources, and the effects of transactions,

1    events and circumstances that change resources and claims to those resources (FASCON No. 1,

2    ¶40);

3            (d)     The principle that financial reporting should provide information about how

4    management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

5    for the use of enterprise resources entrusted to it.  And to the extent that management offers

6    securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

7    accountability to prospective investors and to the public in general (FASCON No. 1, ¶50);

8            (e)     The principle that financial reporting should provide information about an

9    enterprise's financial performance during a period.  Investors and creditors often use information

10    about the past to help in assessing the prospects of an enterprise.  Thus, although investment and

11    credit decisions reflect investors' expectations about future enterprise performance, those

12    expectations are commonly based, at least partly, on evaluations of past enterprise performance

13    (FASCON No. 1, ¶42);

14            (f)     The principle that financial reporting should be reliable in that it represents

15    what it purports to represent.  That information should be reliable as well as relevant is a notion that

16    is central to accounting (FASCON No. 2, ¶¶58-59);

17            (g)     The principle of completeness, which means that nothing is left out of the

18    information that may be necessary to insure that it validly represents underlying events and

19    conditions (FASCON No. 2, ¶79); and

20            (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

21    try to ensure that uncertainties and risks inherent in business situations are adequately considered.

22    The best way to avoid injury to investors is to try to ensure that what is reported represents what it

23    purports to represent (FASCON No. 2, ¶¶95, 97).

24       217.    Moreover, defendants' undisclosed, adverse, material information during the Class

25    Period is the type of information that, because of SEC regulations, national stock-exchange

26    regulations and customary business practice, investors and securities analysts expect to be disclosed

27    and that corporate officials and their legal and financial advisors know to be the type of information

28    that must be disclosed.

**CONFIDENTIAL SOURCES CONFIRM DEFENDANTS' SCIENTER**

218.   Defendants knew or deliberately disregarded that: (i) the Company's net earnings were materially overstated and that defendants systematically failed to record and recognize expenses relating to its distribution centers; (ii) PETCO's claims of same-store sales growth was an illusion; (iii) defendants' long-term growth strategy was failing because PETCO did not have a cost-effective distribution chain and PETCO was forced to open new distribution centers at substantial cost to service its stores in the Southeast; and (iv) the Company's new "Pisces" store format was resulting in reduced sales, for the following reasons:

(a)     According to multiple former PETCO employee witnesses, it was widely known at the Company that PETCO was withholding payment for invoices during the Class Period, often for several months, in order to lower expenses and thereby increase its net earnings, in violation of GAAP. For example, CW6, a former distribution center manager employed during the Class Period, described how the budget was monitored monthly by Bob Northcutt, Sharon Regan and CW1, and how CW1 and Regan held back on submitting invoices for operational expenses and for traffic and transportation expenses. After the "end" of the month, but before the actual "close," CW1 would tell CW6 what invoices he was putting through for the Monroe, New Jersey distribution center, and which ones he was not putting through. Based on his review of general ledger entries, CW6 said that traffic and transportation invoices were being paid anywhere from four to six months after the expense had been invoiced. *CW6 also reported that during approximately the second week of January 2005, CW6 received an email from Individual Defendant Razia Richter stating that she wanted to schedule a conference call with the distribution center directors in reference to "accruals and invoices being held back to make budget." The next day, however, defendant Richter cancelled the conference call with no explanation and never rescheduled for a new date.*

(b)     CW2, a former director and manger of operations at the Mira Loma distribution center during the Class Period, corroborated CW6's account. CW2 said that it was not uncommon for invoices to be submitted to PETCO's Accounting Department 30, 60, 90 or even 120 days late in an effort to keep the distribution centers from going over budget. As a result, CW2 said that some vendors "were always getting ready to cut us off." *CW2 also recounted that in mid-*

- 92 -

*October 2004 (a few weeks before the end of PETCO's 3Q04) Individual Defendant Richter*
*participated in a weekly forecasting conference call along with CW2, Northcutt, Regan, CW1 and*
*CW6. In this call, Richter told the distribution directors to "hold onto any invoices because we*
*gotta make the quarter."* She then asked the directors what invoices they had.

             (c)    CW7, a former transportation manager for PETCO who worked in PETCO's corporate headquarters during the Class Period, discovered a "stack" of unpaid "Freight Out Invoices" ("freight out" referred to the process of using "outside carriers" or outside trucking companies to transport PETCO products). In reviewing the stack of invoices, which he described as between 8 and 12 inches high and included many that were still in the envelopes, CW7 could tell that the invoices had not been processed by a Fleet Traffic Specialist or forwarded to Accounting for payment. CW7 said that the next thing he did was run the general ledger for all eight distribution centers for February of 2005, which was the first month of the 2005 fiscal year. CW7 estimated that the total amount of invoices for 2004 expenses that had neither been recorded as an accrued expense nor paid by the end of fiscal 2004 (January 29, 2005) totaled between three and five million dollars. CW7 then contacted Doug Beeuwsaert, the VP of PETCO's Internal Audit, by phone. CW7 told Beeuwsaert that he needed to speak to him. Beeuwsaert told CW7 that he was out of town and they agreed to meet the following morning at 7:00 a.m. Prior to meeting with Beeuwsaert, CW7 drafted an e-mail to Beeuwsaert outlining what he discovered as it pertained to the unpaid freight out invoices. He also attached a copy of the general ledger reports that he generated. *CW7 said he addressed the e-mail to defendants James Myers and Rodney Carter, in addition to Beeuwsaert. Prior to sending the e-mail, CW7 met with Beeuwsaert and described what he had found and provided Beeuwsaert with a hard copy of his email and the general ledger printouts.*

             (d)    CW1, a former Financial Analyst employed by PETCO during the Class Period, explained that Northcutt primarily held back temp labor invoices, since they were the most expensive and took up a large part of the distribution centers' budgets. Additionally, on two different occasions, once in August of 2004 and again in October of 2004, CW1 heard Northcutt tell the distribution center directors to hold off on submitting shipping supply invoices. Northcutt did not want the distribution centers to go over budget for shipping expenses. *According to CW1,*

1  *ultimately, to satisfy senior management's repeated directions to reduce distribution-related*

2  *expenses, Northcutt began holding back hundreds of thousands of dollars in temp labor invoices*

3  *each month, and an even larger amount of invoiced transportation expenses (fuel and freight).*

4  Beginning in October of 2004, defendant Razia Richter began to sit in on the weekly budget forecast

5  meetings with the distribution center directors, Northcutt, CW1, and Regan.  *In October 2004,*

6  *defendant Richter wanted to know why the distribution centers were going over budget and told*

7  *the directors "do whatever it takes to be on budget."*  CW1 further described how, after Northcutt

8  left PETCO in December 2004, CW1 and fellow Northcutt direct report Sharon Regan continued

9  these practices through the end of March 2005, until CW1 decided CW1 was unwilling to continue

10  it.

11              (e)      CW7 stated that PETCO's loss in comparable store sales was due to a very

12  rapid expansion on the east coast, particularly in Florida.  The expansion also resulted in an increase

13  in "traffic" expenses.  This was the main reason for opening the new distribution centers in Denver

14  in late 2004 and in Florida.  CW7 said that PETCO was spending too much money for "over-the-

15  road" drivers for short trips that can be made by PETCO-employed drivers and leased trucks.  For

16  example, for trips from the Mira Loma distribution center to Phoenix, over-the-road drivers were

17  getting paid hourly, and getting paid double time after eight hours.  Many of these trips required the

18  drivers to stay overnight and sleep in their cabs overnight, which resulted in even higher costs

19  because the drivers received triple time after 12 hours.

20              (f)      CW6 said that in an average six-day work week, which ran from Sunday to

21  Friday, the Monroe, NJ distribution center filled an average of 250,000 lines a week (a "line"

22  represents a Stock Keeping Unit or SKU, such as 100 bags of dog food).  Starting in February 2005,

23  CW6 began to notice a drop in the number of lines the distribution center was filling every week.

24  The drop in lines filled was approximately two to three percent.  CW6 said that a one percent drop

25  from one week to the next is not unusual but a consistent two to three percent drop that remains

26  steady from week to week and from month to month is particularly uncommon.  CW6 said the drop

27  in lines filled per week continued from February 2005 until he left PETCO in the summer of 2005.

28  CW6 said that during the first six months of 2005, PETCO opened 8 to 12 new stores in Florida.

1   CW6 said that a "bunch" of those new stores "bombed." CW6 said that on average, a store with
2   high volume sales was replenished with approximately 2,000-2,500 lines per week. A low volume
3   store (one with poor sales) was replenished with between 500 to 1000 lines per week. Most of the
4   new stores that had been opened in Florida were averaging fewer than 1000 lines per week. CW6
5   said that as new stores opened the line count would increase temporarily, but the same two to three
6   decrease in lines was still noticeable. By deducting the number of lines filled for the new stores
7   from the overall total number of lines filled, the difference was still obvious. CW6 said that Dave
8   Charron, the VP of the Northeast Region, forecasted hefty comparable store sales increases in
9   Florida and Georgia in 2005 and that sales in Florida and Georgia were actually doing poorly. In
10  September 2005, CW6 spoke to an individual who still works for PETCO at the distribution center
11  in Monroe, NJ. According to this individual, PETCO is currently $24 million dollars under its year-
12  to-date annual forecasted sales. Of that $24 million, the East Coast is responsible for approximately
13  $20 million. CW6 said that the total budgeted sales forecast for the entire fiscal year 2005 is $1.8 to
14  $1.9 billion.

15          (g)     CW6 said that PETCO has three main store designs: The Millennium, the
16  Pisces and the Pisces Plus. The Millennium is the oldest store design still in use. The Pisces design
17  came out in 2003 or 2004, and the Pisces Plus design came out for new stores in 2005. The main
18  differences in these store designs are the layout, the way the merchandise is displayed, and where it
19  is displayed. CW6 said that a problem PETCO had with the Pisces stores is that there was actually
20  less shelf space in the Pisces stores than in the Millennium stores. As a result, the stores could not
21  keep as many different products on the shelves and in the stores and were losing sales. He said that
22  store #791, which is located in Totowa, New Jersey, was usually the "number one store in the
23  chain." After PETCO redesigned the store from a Millennium store to a Pisces store "it fell out of
24  sight." The store had to eliminate 70 SKUs from its assortment, which lead to a decline in customer
25  traffic. CW6 explained that "if a customer came in to the store and could not find the item he
26  wanted, he goes and shops elsewhere." CW6 said that eventually PETCO redesigned the Pisces
27  stores to allow for most shelf space. Although the store in Totowa was redesigned in this way, it has
28  not reached the same level of sales that it had in the past. CW6 said that during the summer of 2005,

1   PETCO initiated a "remerchandising effort" in its stores in an effort to boost sales.  The idea was to

2   tailor the stock of each store in a manner which most closely matched the store's best selling items.

3   PETCO stocked the store with items that typically sold well in the store and limited those items that

4   did not sell well.  The store's "planograms" were to be redesigned to support this new initiative.

5   Based on PETCO employees he has spoken to since leaving the company, the initiative did not

6   work.  CW6 said that the plan was not well thought out and it took a lot of extra hours for the

7   workers to set up the stores differently.  CW6 said that it does not appear to have had a positive

8   effect on sales.

9   **DEFENDANTS' PARTICIPATION IN A SCHEME TO DEFRAUD SHAREHOLDERS**

10          219.    During the Class Period, each of the Individual Defendants (senior executives and/or

11  directors of PETCO) and defendant majority shareholders (TPG and LGP), were privy to

12  confidential and proprietary information concerning PETCO and its operations.

13          220.    Defendants received both periodic reports of PETCO's expenses from the general

14  ledger and sales data from the Company's POLARIS sales software that tracked daily sales figures

15  for PETCO's stores, both of which could be centrally accessed at corporate headquarters.

16          221.    Defendants also closely monitored same-stores sales figures through POLARIS,

17  which provided daily same-store sales figures and calculated daily same-store sales goals based on

18  the previous daily sales from the prior year.

19          222.    Because of the Individual Defendants' positions with the Company, they had access

20  to the adverse undisclosed information about its business, operations, products, operational trends,

21  financial statements, markets and present and future business prospects via access to internal

22  corporate documents (including the Company's operating plans, budgets and forecasts and reports of

23  actual operations compared thereto), conversations and connections with other corporate officers and

24  employees, attendance at management and Board of Directors meetings and committees thereof and

25  via reports and other information provided to them in connection therewith.  TPG and LGP had

26  access to this same information via their representatives on PETCO's Board of Directors.

27          223.    During the Class Period, defendants directly and indirectly engaged and participated

28  in a continuous course of conduct to misrepresent the results of PETCO's operations and to conceal

adverse material information regarding PETCO's operations as specified herein. Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of conduct as herein alleged in an effort to increase and maintain an artificially high market price for the securities of the Company. This included the formulation, making, and/or participation in the making of untrue statements of material facts, and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon plaintiff and the other members of the Class.

224.   The defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein; defendants had a duty promptly to disseminate accurate and truthful information with respect to PETCO's operations and future business prospects or to cause and direct that such information be disseminated so that the market price of PETCO stock would be based on truthful and accurate information.

225.   As officers, directors, majority shareholders and/or controlling persons of a publicly-held company whose securities are registered with the SEC under the Exchange Act, traded on the Nasdaq National Market System and governed by the provisions of the Exchange Act, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business and future business prospects, to correct any previously-issued statements from any source that had become untrue, and to disclose any trends that would materially affect the present and future financial operating results of PETCO, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

**DEFENDANTS INSIST THAT PETCO'S DISTRIBUTION CENTERS OPERATE UNDER UNREASONABLE COST CONSTRAINTS**

226.   Each year starting in October and ending in January, the Company would prepare an annual budget for the upcoming fiscal year, which started in February. For the distribution centers, each director or manager of a distribution center would prepare a budget for their respective distribution center. The budget was split into three categories: Labor, Operational, and Occupancy. The annual budget was based on a combination of two factors: a percentage of historical and

forecasted sales revenue and a percentage of "throughput" or the historical and forecasted dollar amount of merchandise that moved in and out of each distribution center.

227.    In September and November 2003, CW2 began preparing a budget for fiscal year 2004. This budget was based on monthly budgets for 2003, with certain increases.

228.    At the end of January 2004, Northcutt and Regan presented their budgets to defendants Hall, Myers, and Devine. *The budget as presented was already unreasonable and could not be met because it did not take into account the unpaid and withheld invoices and the lowered forecasted expenses for fiscal year 2003.* Defendants demanded more cuts. During a meeting with defendants Hall, Myers, and Devine, defendants ordered Northcutt to cut another *$1 million to $1.5 million* from the already unrealistic budget.

229.    According to CW2, the pressure by defendants to make the budget was so enormous that Northcutt threatened to quit.

230.    According to CW7, Regan was similarly pressured. If she went over budget by 10% on any line item, Regan would have to explain to upper management why she went over.

231.    According to CW3, the budgets set and approved by defendants were unrealistic and there was no way for PETCO to meet its budget.

232.    The distribution directors and managers agreed that defendants' allocation of allowable expenses was unrealistic. Indeed, by the first Monday in February 2004, which started PETCO's fiscal year, the Mira Loma distribution center was already $23,000 over budget.

233.    After the annual budget process, defendants would also receive monthly updates on the status of the expenses budgeted and what was actually expended.

234.    At the end of every month, CW1 prepared a Summary Budget and Forecast Report for Northcutt. It listed the expenses for total employee payroll, fleet payroll, fleet costs, operations costs, occupancy costs and freight out costs. The report presented the costs for all eight distribution

centers cumulatively. It listed the actual amount of money spent for each expense category, how much was forecasted for each category, and how much was budgeted for each category. According to CW1, Northcutt reviewed the report and routinely changed the numbers in the actual amount spent section to reflect only the amount that Northcutt would allow to be processed and paid. CW1 then prepared a report that separated the costs for each individual distribution center as well. The cumulative Summary Budget and Forecast report was the report that Northcutt presented to defendants Brann and/or Richter. In addition to presenting the Summary Budget and Forecast report to Brann and/or Richter, Northcutt presented the report at a monthly Senior Management meeting that generally took place two weeks after the hard close of each month. The members of upper management who would typically attend this meeting were defendants Devine, Hall, Myers, Carter, Brann and Richter along with John Morberg. The heads of various major departments also attended the meeting and presented their budget results as well. Northcutt often came back from these meetings saying that he was tired of having to stand up and explain to everybody why we went over budget. Many times it appeared to CW1 that Northcutt had been "chewed out" at these meetings.

**DEFENDANTS ORDER DISTRIBUTION CENTER DIRECTORS AND MANGERS TO WITHHOLD INVOICES IN ORDER TO STAY WITHIN THE BUDGET**

235.    Prior to, and during the Class Period, PETCO had a Logistics Department, which was headed by defendant Brann and then in the beginning of 2004, by defendant Richter. Directly below Richter was Bob Northcutt, the VP of Logistics. The Logistics Department was further separated into two departments: Traffic and Transportation Department and Distribution Department. The Traffic and Transportation Department was run by Sharon Regan, as the Director of Traffic and Transportation. Regan reported to Northcutt. The Distribution Department was run by CW1, a Financial Analyst. The Distribution Department was generally responsible for expenses relating to the operation of the PETCO's eight distribution centers. This included salary, including temporary

1  labor. Each department, separately and jointly, began withholding expenses from the Accounting
2  department in order to make the departmental budgets.

3       236.   This accounting fraud was no secret to management. In 2004, CW2 repeatedly –
4  sometimes on a daily basis – informed PETCO's Human Resource Manager that PETCO was
5  holding back invoices and that resulted in delaying the accrual of expenses. Furthermore, numerous
6  directors and managers of distribution centers were aware that the Company was withholding
7  expenses.
8

9  **Distribution Department**

10       237.   As stated above, defendant Brann, and in early 2004, defendant Richter oversaw the
11 Distribution Department. The Distribution Department was run by CW1, who processed the
12 operating invoices generated at PETCO's distribution centers.

13       238.   Before and throughout the Class Period, PETCO had eight distribution centers. There
14 were three central distribution centers and five regional distribution centers. These distribution
15 centers were responsible for delivering PETCO products to the PETCO retail stores.
16

17       239.   The difference between the central and regional distribution centers was that the
18 central distribution centers were much larger and were able to service far more stores.

19       240.   Each central distribution center was headed by a director. The director was
20 responsible for the expenses generated by his or her distribution center.
21

22       241.   Each regional distribution center was headed by a manager. The manager was
23 responsible for the expenses generated by his or her distribution center.

24       242.   Invoices for expenses generated at these distribution centers were either sent to the
25 distribution center that generated the expense or PETCO's corporate offices in San Diego,
26 California.

27

28

243.   Invoices sent to the distribution center were reviewed by the directors or managers and then forwarded to either Sharon Regan or CW1 in the corporate offices in San Diego.   As detailed more fully below, some directors were ordered to hold back on forwarding invoices to corporate headquarters as this would keep expenses down and allow PETCO to make its budget.

244.   For those invoices that were sent directly to corporate in San Diego, they were either sent to Sharon Regan or CW1.   As detailed more fully below, many expensive invoices were held back from accounting because Regan and Northcutt, CW1's superiors, were receiving pressure from senior management to stay within unrealistic budgets.

245.   CW1 reviewed the invoices sent to him by the distribution centers at least twice per week.   Every Wednesday, Northcutt would have a conference call from his office with the three central distribution center directors.   CW1 and Regan also participated in these weekly calls.   During these calls, the directors would discuss their budgets including actual amounts spent month-to-date, forecasted amounts to be spent the rest of the week, and the budgeted amount for the week.   After the end of the call, Northcutt reviewed the invoices that CW1 was holding, and then tell CW1 which ones to submit to Accounts Payable for payment for the week.   CW1 kept a separate folder for each distribution center, and kept the pending invoices in the folder in the order that they were received.   CW1 also logged the incoming invoices onto a spreadsheet that was provided to Northcutt every week.   The spreadsheet listed all of the invoices that the distribution centers should actually have accrued for the month.   Generally, after the weekly budget forecast conference calls on Wednesdays, Northcutt reviewed the spreadsheet and then made changes on the spreadsheet indicating which invoices he wanted paid for the week.   He would then email the changes to CW1.

246.   Despite the fact that Northcutt decided what invoices were to be paid and which ones were to be held, CW1 would occasionally tell Northcutt that certain vendors needed to get paid or the vendors were going to stop providing their services.   PETCO tried to pay the vendors just enough to keep them from refusing service to PETCO.

247.   *Of the operational invoices that CW1 handled, Northcutt primarily held back temporary labor invoices, since they were the most expensive and took up a large part of the distribution centers' budgets.  According to CW1, on two different occasions, once in August of 2004 and again in October of 2004, Northcutt told the distribution center directors to hold off on submitting shipping supply invoices.  He did not want the distribution centers to go over budget for shipping expenses.*

248.   CW1 would then send the distribution center directors general ledger entries so that they could see what operational invoices were actually being paid for the month (compared with the total invoiced amounts submitted).  This report also detailed the freight out invoices that were being paid.

249.   According to CW1, each month the accruals and expenses never got any better and the invoices began piling up and accumulating increasingly more debt.  When Northcutt needed extra help holding back invoices he would ask Regan how much she could contribute to them being under budget.

250.   According to CW2, invoices relating to operating expenses, such as temporary labor and supplies, were initially sent to the distribution center.  Invoices relating to transportation or freight out expenses were sent directly to Regan in PETCO's corporate office in San Diego, California.

251.   At the Mira Loma distribution center, temporary labor was a large expense, totaling approximately $300,000 per month.  According to CW2, $40,000-$70,000 of this was withheld from accounting every month.

252.   Once the invoice was received, CW2 would sign the invoice and forward it to CW1 or Regan for payment.  CW1, after conferring with Northcutt, would decide which invoices to submit to the Accounting department and which to hold back.  CW1 would then call or email the

central distribution center directors to let them know which invoices were sent to the Accounting department for accrual and payment. At the end of each month, CW1 sent the distribution center directors copies of the general ledger entries reflecting the specific invoices that had been paid and posted against each distribution center's budget. According to CW2, the general ledger entries always reflected that fewer invoices had been paid than the directors had submitted.

253.    Other times the directors were ordered by CW1 to hold back invoices. According to CW3, Mike Hein and CW2 were directed to hold back invoices that they had received until the following month.

254.    According to CW3, the directive to hold back invoices occurred more in the last two weeks of the month, as it appeared the distribution centers would be going over its monthly budget. According to CW3, this practice occurred during every month of the Class Period.

255.    CW2, with the assistance of an accounting assistant, prepared two reports to keep track of invoices. The first was called an Accrual Sheet. The Accrual Sheet recorded all invoices that arrived at the Mira Loma distribution center. The second document was the Forecast Report. The report listed the various invoices that the distribution center had received for the week and accrued expenses for which an invoice had not yet been received. The report totaled the month-to-date amount of money that had been accrued for expenses for items such as temporary labor and packing supplies, the amount of money forecasted to be spent on those items for the remainder of the month, and the monthly amount budgeted for those items.

256.    In the beginning of October 2004, according to CW2, defendant Richter began participating in weekly forecasting calls with Northcutt, Regan, CW1, and the three central distribution center directors.

257.    In mid October 2004, defendant Richter participated in a weekly forecasting conference call along with CW2, Northcutt, Regan, CW1 and CW6. In this call, defendant Richter

shut-down the inventory control teams and had the distribution center personnel assigned to processing returns take time off in order to reduce payroll expenses. Additionally, defendant Richter told the distribution directors to "*hold onto any invoices because we gotta make the quarter.*" Additionally, on or about the same time, according to CW1, defendant Richter wanted to know why the distribution centers were going over budget and told the directors to "*do whatever it takes to be on budget.*"

258.    Similarly, according to CW7, distribution center directors were being told to hold back operational invoices at the end of the month to stay within budget at this time.

259.    PETCO also had a central distribution center located in Monroe, New Jersey. Much like the other distribution centers, invoices were either sent to the corporate office in San Diego or sent to the distribution center.

260.    Once an invoice was sent to the Monroe distribution center, an administrative assistant would make a copy of it, place a general ledger code on it, and have CW6 sign the invoice. The information was then logged into an expense report on Quicken software. Every Thursday the assistant would forward the operational invoices to CW1 and all traffic related expenses to Regan.

261.    At month-end, but before the actual close, CW1 would tell CW6 what invoices were put through for CW6's distribution center and which ones that were not put through. CW6 said that at the end of every month, Northcutt and CW1 met to review the distribution center budgets and decide which invoices to put through and which ones to hold. According to CW6, Northcutt dictated where or from which line items the cuts would be taken.

262.    CW1 provided CW6 with general ledger entries that listed which invoices had been paid during the month and charged against the distribution center's budget. By reviewing the general ledger and comparing it to the expense report that CW6 maintained in Quicken, CW6 could

1  tell which invoices were being paid and which ones were not. CW6 could also tell which invoices

2  were being paid late based on the payment date listed on the general ledger.

3      263.    As previously explained, PETCO maintained five regional distribution centers. One

4  regional distribution center was located in Portland, Oregon. This distribution center was serviced

5  by the Mira Loma central distribution center. According to CW5, for expenses incurred at this

6  distribution center, 60% of the invoices for these expenses were sent to PETCO's corporate office in

7  San Diego, California where they went to either Northcutt or Regan. About 40% of the invoices

8  were sent to the Portland distribution center, which CW5 would then forward to the Traffic Manager

9  in the Mira Loma central distribution center if the invoices related to fleet or transportation expenses.

10  If the invoices related to operational expenses, such as office supplies, packing supplies and machine

11  maintenance, they were sent to CW1.

12      264.    CW6 would track expenses by creating two reports. The first was an Accrual Report.

13  This report tracked all expenses that were accrued by the distribution center during the month,

14  regardless of whether or not the expense had a corresponding invoice. This report was emailed to

15  CW1. The second report was the Budget Variance Report. This report listed what the proposed

16  budget was for the month and what the actual budget was. This report was also emailed to CW1.

17      265.    CW1 repeatedly told CW5 that if CW5 or Regan was not in possession of a vendor

18  invoice for services performed during the month in question, that expense would not be posted to the

19  distribution center's account for that month. Even if the exact cost of the pending invoice was

20  known, CW1 and Regan would not allow the expense to be posted. Once per week or every two

21  weeks, CW1 sent the former manager general ledger entries for expenses posted against the

22  distribution center's account. Because the general ledger did not have entries for those invoices they

23  did not possess, the general ledger did not reconcile with the Accrual Report.

24

25

26

27

28

266.    According to CW5, withholding expenses where no invoice was present occurred at all the distribution centers.  This withholding of expenses was done to keep the budget down.

267.    According to CW5, three regional center managers and one director of a central distribution center would often discuss during conference calls how frustrated they were with the fact that only invoiced expenses were to be posted as accrued.

268.    In fall 2004, CW5 resigned because CW5 was *"tired of falsely reporting the accrual of expenses."*

**Traffic and Transportation Department**

269.    PETCO routinely incurred freight out expenses.  These expenses related to the cost incurred by PETCO of renting or leasing trucks owned by outside companies to ship a particular product from its central and regional distribution centers to particular stores and the fuel costs associated with these shipments.  During the Class Period, PETCO had three central distribution centers and five regional distribution centers.  The difference between the central and regional distribution centers was the central distribution centers were larger and held more inventories.  The central distribution center would also deliver goods to the regional distribution centers, which would be redistributed to the stores.  According to CW2, PETCO incurred large fuel costs.  This made it extremely expensive for the distribution centers to deliver to stores.  The costs were even higher for those distribution centers, such as the one in Monroe, New Jersey, that had to deliver goods all the way to South Florida.

270.    PETCO leased or rented all of the trucks needed to make its center-to-store deliveries.  With the exception of the central distribution center in Joliet, Illinois and the regional distribution center in New Hope, Minnesota, all distribution centers leased or rented trucks to make deliveries.

271.    According to CW5, CW5 had discussions with Regan, and Regan informed CW5 that the manner in which expenses were being accrued at PETCO was wrong.

272.   This is further corroborated by CW2. CW2 would receive freight out expenses from CW7. CW7 told CW2 what the actual accruals were, but that a different number would be reflected on the general ledger.

273.   In 2005, CW7 discovered a stack of unpaid freight out invoices. At PETCO, the term "freight out" referred to the process of using outside carriers or outside trucking companies to transport PETCO products. The trucks used to make these deliveries were leased or rented by PETCO. As an example of a freight out expense, CW7 indicated that the Monroe, New Jersey central distribution center used outside carriers to transport supplies to PETCO stores in Florida. The trucking company made about 20 trips a week to Florida on behalf of PETCO, and charged approximately $1,400 per trip. According to CW7, some of the trucking companies that PETCO uses to transport inventory are CH Robinson Freight Broker, Brisk (the outsource company for the Joliet, Illinois distribution center), Swift, Interstate, May Trucking, Handle With Care and Gilbert Trucking. In reviewing the stack of invoices, which CW7 described as between 8 and 12 inches high and included many that were still in the envelopes, it was clear that the invoices had not been processed by a Fleet Traffic Specialist or forwarded yet to PETCO's Accounting department for payment. CW7 then generated a portion of the general ledger for all eight distribution centers for February of 2005 to March 23, 2005. A copy of this portion of PETCO's general ledger is attached hereto as Exhibit 2. This report listed all of the fiscal 2004 invoices that were paid in February of 2005 and all of the fiscal 2004 invoices that were paid through March 23, 2005. *Between the figures that were on the February and March 2005 general ledger reports and the stack of as-yet processed invoices, the total amount of invoices for 2004 expenses that had neither been recorded as an accrued expense nor paid by the end of fiscal 2004 (January 29, 2005) totaled over $3 million.* These invoices were reviewed by Northcutt, Regan and defendant Richter.

274.   CW7 then contacted PETCO's Vice President of Internal Audit, Doug Beeuwsaert, by telephone and requested a meeting to discuss the earlier findings concerning the under-accrual of freight out expenses. *CW7 then met with Beeuwsaert, described what was found concerning the under-accrued expenses and provided Beeuwsaert with a hard copy of the general ledger*

1  *printouts. After meeting with Beeuwsaert, CW7 then sent an email to Beeuwsaert, CEO Myers*

2  *and CFO Carter that same day attaching the general ledger reports and stating in the email:*

3  *"[a]ttached is information concerning 2004 expenses carried over into 2005 which were not*

4  *accrued for in 2004. This information is not meant to be 100% accurate but I feel further*

5  *examination is in order. I think you will find this is a substantial amount worthy of your concern*

6  *and attention."* Beeuwsaert then conducted a follow-up telephone interview with CW7 the

7  following week to further discuss these issues.

8  ## PETCO'S OCTOBER 2004 EMPLOYEE SURVEY

9  275.   In early October 2004, defendants sent out an email survey entitled "Control

10  Environment Questionnaire." The questionnaire contained 28 questions. It was only sent to

11  employees of the Mira Loma central distribution center and San Diego corporate employees.

12  276.   On October 7, 2004, CW2 filled out the same questionnaire and returned it to upper

13  management. Responses by both CW2 and CW7 informed upper management that PETCO's budget

14  was unrealistic and that CW2 was being ordered to improperly withhold invoices. The

15

16  questionnaire, and CW2's responses, are attached as Exhibit 3. Below are just a few of the survey

17  questions and responses from CW2:

18      9.   I do not bypass certain Company policies or procedures from pressure to meet
   short-term results.

19

20      Comments:   Possible. I am given direct orders to hold invoices and not show them
   as they happened. We are about to start the budget process. We will once again
   make a budget against a false prior year. I never thought of it before, but is this not
21  what Enron did.

22              *         *         *

23      25.   My compensation (or a portion thereof) is not based on unrealistic
   performance targets or goals.
24
       Comments:   Budgets must be real. If you do not account for expenses in the
25  month they were taken, and hold large expenses to level the months and budget
   against this. You budget aginst [sic] the prior year. How??
26

27              *         *         *

28      27.   The Company's leaders achieve financial goals without unethical behavior.

Comments:    See number 25.  Until 2003 we had always accrued all expenses in the year of the expense.  This year large amounts were held over.  Again, I never thought about it before.  Can this be done?

277.    CW7, who was employed at PETCO's San Diego headquarters, also filled out the survey and sent it back to upper management.  CW7 disclosed that expense accruals were not being done according to GAAP.  Below are just a few of CW7's responses:

8.    My department is staffed appropriately and with individuals holding the required levels of experience.

Comment:    Department has been short a traffic specialist for over a year.  Freight bills don't get paid so department can meet budget.

*    *    *

26.    There is not pressure placed on me to meet deadlines, goals, budgets, or the business plan that compromise my values.

Comment:    I gave a realistic budget for 2004.  I was told point blank that the director could not present the budget as is to the board.  Take out in excess of 400k.  2003 expenses are carried over to 2004 due to accrual process.

*    *    *

29.    Company leaders keep their promises.

Comment:    The Director plays games with expense reports and PTO.  Does not approve expense reports on timely basis – commits to doing so in future – and does not change.

278.    In the second week of January 2005, defendant Richter sent an email to CW6 stating she wanted to schedule a conference call with the distribution center directors in reference to accruals and invoices being held back to make budget.  Attached to defendant Richter's email was a selected compilation of responses from the October 2004 Employee Survey.  *See* Exhibit 1.  Below are just some of the survey questions and the responses on the selected compilation:

9.    I do not bypass certain Company policies or procedures from pressure to meet short-term results.

Comment: I am directed to do exactly that – not company procedures but rather GAAP [] reference to accruals.  No invoice in hand no accrual even though we know the expense has happened.

*    *    *

05-CV-0823-H(RBB)

23.     If I were to report unacceptable or unethical behavior to senior management, I believe that appropriate action would be taken.

Comment: My feeling is that the budgeting process has been going on long before I was here and will be long after I am gone.  Budgeting is an issue.

279.     One day later, however, defendant Richter cancelled the conference call with no explanation and never rescheduled for a new date.

## PETCO'S DECLINING SAME-STORE SALES

280.     According to CW4, stores were not meeting their same-store sales for 2004.  Stores were projected to have same-store sales of 5%.  Many of these stores were missing their goals by 15%-20%.

281.     According to CW7, PETCO suffered a loss in same-store sales due to the Company's rapid expansion, particularly in Florida.  This expansion resulted in increased traffic expenses to deliver to these new stores, but the expansion, at least not until late 2004, did not include adding new distribution centers.  This information is corroborated by CW6.

282.     According to CW7, at the beginning of the Class Period, Regan, CW7, and others were discussing the need for additional distribution centers to address the increasing distribution costs actively in the Southeast.  Indeed, as shown in Exhibit 2, defendants were modeling distribution center expenses in Denver, Colorado in October 2004.  At the time this general ledger was run – March 2005 –  the Denver, Colorado distribution center was not even in existence.

283.     According to CW6, in February of 2005, there was a drop in store sales.  A distribution center can gauge its activity on the number of lines that it fills in a week.  A line represents an individual SKU (Stock Keeping Unit) that a store has ordered.  For example, if a store orders 100 bags of a particular brand of dog food, that is considered one line.  If the store orders 100 bags of a different brand of dog food, that is considered another line.  In an average six day work week, which ran from Sunday to Friday, the Monroe, NJ distribution center filled an average of 250,000 lines a week. Starting in February 2005, the former director began to notice a drop in the number of lines the distribution center was filling every week.  The drop in lines filled was

1   approximately two to three percent.  A one percent drop from one week to the next is not unusual but

2   a consistent two to three percent drop that remains steady from week to week and from month to

3   month is not common.  The drop in lines filled per week continued after February 2005.

4       284.    According to CW6, a combination of factors such as location, competition, and poor

5   store management, particularly on the East Coast, led stores to have a decrease in sales.  The

6   Northeast Region had the highest turnover of store managers and poor store location is a greater

7   factor of decreasing sales.

8       285.    Also, according to CW6, PETCO had problems with the Pisces stores because they

9   contained less shelf space than that in the Millennium stores.  As a result, the stores could not keep

10  as many different products on the shelves and in the stores and were losing sales.  For example, store

11  #791, which is located in Totowa, New Jersey, was usually the number one store in the chain.  After

12  PETCO redesigned the store from a Millennium store to a Pisces store, however, its sales fell out of

13  sight.  The store had to eliminate 70 SKUs from its assortment, which lead to a decline in customer

14  traffic.  Because of these failing designs, in the summer of 2005, defendants caused PETCO to

15  initiate a remerchandising effort in its stores in an effort to boost sales.  According to CW6, the idea

16  was to tailor the stock of each store in a manner which most closely matched the store's best selling

17  items.  PETCO stocked the store with items that typically sold well in the store and limited those

18  items that did not sell well.  The store's "planograms" were to be redesigned to support this new

19  initiative.  This plan, however, was not well thought out and it took a lot of extra hours for the

20  workers to set up the stores differently and did not have a positive effect on sales.

21      286.    According to CW6 same-store sales in Florida and Georgia in 2005 were performing

22  very poorly.

23      287.    According to CW4, there was a noticeable decrease in customer traffic during 2004.

24  Despite the decrease in traffic, PETCO instituted higher prices to make up the decrease.  According

25  to CW4, there was approximately 10% increase in the average transaction amount.  In the last two

quarters of 2004, prices were increased across the board.  A normal price increase on a PETCO item would generally be 2%-3%, but during the last six months of 2004, prices were being increased 5%-6%.

### DEFENDANTS' INSIDER SALES DURING THE CLASS PERIOD

288.     While PETCO's top insiders were issuing favorable statements, *PETCO's insiders and majority shareholders sold more than 7.6 million shares of stock for more than $271 million in illegal trading proceeds to profit from the artificial inflation in PETCO's stock price.* Notwithstanding their access to material non-public information and their duty to disclose all material facts before trading in PETCO stock, they sold significant amounts of their PETCO stock at artificially inflated prices.  The insider selling during the Class Period is detailed below:

| INSIDER | DATE | OWNED | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|---|
| BRANN | 09/01/04 | Direct | 4,000 | $33.19 | $132,778 |
| BRANN | 10/01/04 | Direct | 4,000 | $32.88 | $131,534 |
| BRANN | 10/22/04 | Direct | 16,000 | $35.60 | $569,600 |
| BRANN | 11/01/04 | Direct | 4,000 | $35.67 | $142,670 |
| | | | 28,000 | | $976,581 |
| | | | | | |
| DAY | 10/14/04 | Indirect | 13,401 | $35.73 | $478,822 |
| DAY | 10/15/04 | Direct | 2,500 | $35.54 | $88,854 |
| DAY | 03/30/05 | Direct | 15,000 | $37.41 | $561,195 |
| | | | 30,901 | | $1,128,870 |
| | | | | | |
| DEVINE | 09/01/04 | Direct | 37,600 | $33.19 | $1,248,109 |
| DEVINE | 10/01/04 | Direct | 37,600 | $32.88 | $1,236,416 |
| DEVINE | 10/22/04 | Direct | 140,000 | $35.60 | $4,984,000 |
| DEVINE | 10/22/04 | Indirect | 13,000 | $35.60 | $462,800 |
| DEVINE | 11/01/04 | Direct | 37,600 | $35.67 | $1,341,094 |
| DEVINE | 12/01/04 | Direct | 37,600 | $36.87 | $1,386,252 |
| DEVINE | 01/03/05 | Direct | 37,600 | $38.89 | $1,462,099 |
| DEVINE | 02/01/05 | Direct | 37,600 | $37.48 | $1,409,286 |
| DEVINE | 03/01/05 | Direct | 37,600 | $34.94 | $1,313,782 |
| DEVINE | 04/01/05 | Direct | 37,600 | $37.41 | $1,406,729 |
| DEVINE | 07/01/05 | Indirect | 9,400 | $28.81 | $270,776 |
| DEVINE | 07/01/05 | Direct | 28,200 | $28.81 | $812,329 |
| DEVINE | 8/1/2005 | Direct | 28,200 | $28.00 | $789,600 |
| DEVINE | 8/1/2005 | Indirect | 9,400 | $28.00 | $263,200 |
| | | | 529,000 | | $18,386,472 |
| | | | | | |
| Green Equity Investors III, LP | 10/22/04 | | 3,355,954 | | $119,400,000 |
| | | | | | |
| HALL | 09/01/04 | Direct | 8,000 | $33.19 | $265,555 |
| HALL | 10/01/04 | Direct | 8,000 | $32.88 | $263,075 |

| INSIDER | DATE | OWNED | SHARES | PRICE | PROCEEDS |
|---------|------|-------|--------|-------|----------|
| HALL | 10/22/04 | Direct | 32,000 | $35.60 | $1,139,200 |
| HALL | 11/01/04 | Direct | 8,000 | $35.67 | $285,339 |
| HALL | 12/01/04 | Direct | 8,000 | $36.87 | $294,947 |
| HALL | 01/03/05 | Direct | 8,000 | $38.89 | $311,085 |
| HALL | 02/01/05 | Direct | 8,000 | $37.48 | $299,848 |
| HALL | 03/01/05 | Direct | 8,000 | $34.94 | $279,528 |
| HALL | 04/01/05 | Direct | 8,000 | $37.41 | $299,304 |
| HALL | 07/01/05 | Direct | 8,000 | $28.81 | $230,448 |
| HALL | 8/1/2005 | Direct | 8,000 | $28.00 | $224,000 |
| | | | 112,000 | | $3,892,330 |
| | | | | | |
| MAJOR | 09/01/04 | Direct | 1,000 | $33.19 | $33,194 |
| MAJOR | 10/01/04 | Direct | 1,000 | $32.88 | $32,883 |
| MAJOR | 10/22/04 | Direct | 4,000 | $35.60 | $142,400 |
| MAJOR | 11/01/04 | Direct | 1,000 | $35.67 | $35,667 |
| MAJOR | 12/01/04 | Direct | 1,000 | $36.87 | $36,868 |
| MAJOR | 01/03/05 | Direct | 1,000 | $38.89 | $38,886 |
| MAJOR | 02/01/05 | Direct | 1,000 | $37.48 | $37,481 |
| MAJOR | 03/01/05 | Direct | 1,000 | $34.94 | $34,941 |
| MAJOR | 04/01/05 | Direct | 1,000 | $37.41 | $37,413 |
| MAJOR | 07/01/05 | Direct | 1,000 | $28.81 | $28,806 |
| MAJOR | 8/1/2005 | Direct | 1,000 | $28.00 | $28,000 |
| | | | 14,000 | | $486,540 |
| | | | | | |
| MARTIN | 09/01/04 | Direct | 4,000 | $33.19 | $132,778 |
| MARTIN | 10/01/04 | Direct | 4,000 | $32.88 | $131,534 |
| MARTIN | 10/22/04 | Direct | 16,000 | $35.60 | $569,600 |
| MARTIN | 11/01/04 | Direct | 4,000 | $35.67 | $142,670 |
| MARTIN | 12/01/04 | Direct | 4,000 | $36.87 | $147,474 |
| MARTIN | 01/03/05 | Direct | 4,000 | $38.89 | $155,542 |
| MARTIN | 02/01/05 | Direct | 4,000 | $37.48 | $149,924 |
| MARTIN | 03/01/05 | Direct | 4,000 | $34.94 | $139,764 |
| MARTIN | 04/01/05 | Direct | 4,000 | $37.41 | $149,652 |
| MARTIN | 07/01/05 | Direct | 4,000 | $28.81 | $115,224 |
| MARTIN | 8/1/2005 | Direct | 4,000 | $28.00 | $112,000 |
| | | | 56,000 | | $1,946,161 |
| | | | | | |
| MITCHELL | 09/01/04 | Direct | 4,000 | $33.19 | $132,778 |
| MITCHELL | 10/01/04 | Direct | 4,000 | $32.88 | $131,534 |
| MITCHELL | 10/22/04 | Direct | 16,000 | $35.60 | $569,600 |
| MITCHELL | 11/01/04 | Direct | 4,000 | $35.67 | $142,670 |
| MITCHELL | 12/01/04 | Direct | 4,000 | $36.87 | $147,474 |
| MITCHELL | 01/03/05 | Direct | 4,000 | $38.89 | $155,542 |
| MITCHELL | 02/01/05 | Direct | 4,000 | $37.48 | $149,924 |
| MITCHELL | 03/01/05 | Direct | 4,000 | $34.94 | $139,764 |
| MITCHELL | 04/01/05 | Direct | 4,000 | $37.41 | $149,652 |
| MITCHELL | 07/01/05 | Direct | 4,000 | $28.81 | $115,224 |
| MITCHELL | 08/01/05 | Direct | 4,000 | $28.00 | $111,992 |
| | | | 56,000 | | $1,946,153 |
| | | | | | |
| MYERS | 09/01/04 | Direct | 8,000 | $33.19 | $265,555 |
| MYERS | 10/01/04 | Direct | 8,000 | $32.88 | $263,067 |
| MYERS | 10/22/04 | Direct | 32,000 | $35.60 | $1,139,200 |
| MYERS | 11/01/04 | Direct | 8,000 | $35.67 | $285,339 |

| INSIDER | DATE | OWNED | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|---|
| MYERS | 12/01/04 | Direct | 8,000 | $36.87 | $294,947 |
| MYERS | 01/03/05 | Direct | 8,000 | $38.89 | $311,085 |
| MYERS | 02/01/05 | Direct | 8,000 | $37.48 | $299,848 |
| MYERS | 03/01/05 | Direct | 8,000 | $34.94 | $279,528 |
| MYERS | 04/01/05 | Direct | 8,000 | $37.41 | $299,304 |
| MYERS | 07/01/05 | Direct | 8,000 | $28.81 | $230,448 |
| MYERS | 8/1/2005 | Direct | 8,000 | $28.00 | $224,000 |
| | | | 112,000 | | $3,892,322 |
| | | | | | |
| RICHTER | 09/01/04 | Direct | 1,000 | $33.19 | $33,194 |
| RICHTER | 10/01/04 | Direct | 1,000 | $32.88 | $32,883 |
| RICHTER | 11/01/04 | Direct | 1,000 | $35.67 | $35,667 |
| RICHTER | 12/01/04 | Direct | 1,000 | $36.87 | $36,868 |
| RICHTER | 01/03/05 | Direct | 454 | $38.89 | $17,654 |
| RICHTER | 02/01/05 | Direct | 454 | $37.48 | $17,016 |
| RICHTER | 03/01/05 | Direct | 454 | $34.94 | $15,863 |
| RICHTER | 04/01/05 | Direct | 454 | $37.41 | $16,986 |
| RICHTER | 07/01/05 | Direct | 454 | $28.81 | $13,078 |
| RICHTER | 8/1/2005 | Direct | 454 | $28.00 | $12,712 |
| | | | 6,724 | | $231,923 |
| | | | | | |
| TPG Advisors III Inc | 10/22/04 | | 3,305,955 | | $117,600,000 |
| | | | | | |
| WOODARD | 09/01/04 | Indirect | 4,000 | $33.19 | $132,778 |
| WOODARD | 10/01/04 | Indirect | 4,000 | $32.88 | $131,534 |
| WOODARD | 10/22/04 | Direct | 9,556 | $35.60 | $340,194 |
| WOODARD | 10/22/04 | Indirect | 6,444 | $35.60 | $229,406 |
| WOODARD | 11/01/04 | Indirect | 4,000 | $35.67 | $142,670 |
| WOODARD | 12/01/04 | Indirect | 4,000 | $36.87 | $147,474 |
| WOODARD | 01/03/05 | Indirect | 4,000 | $38.89 | $155,542 |
| WOODARD | 02/01/05 | Indirect | 4,000 | $37.48 | $149,920 |
| WOODARD | 03/01/05 | Indirect | 4,000 | $34.94 | $139,764 |
| WOODARD | 04/01/05 | Indirect | 4,000 | $37.41 | $149,652 |
| WOODARD | 07/01/05 | Indirect | 4,000 | $28.81 | $115,224 |
| WOODARD | 8/1/2005 | Indirect | 4,000 | $28.00 | $112,000 |
| | | | 56,000 | | $1,946,157 |
| | | | | | |
| TOTAL | | | 7,662,534 | | $271,833,507 |

289.   At the same time that defendants sold their shares of PETCO common stock on the open market, contemporaneous purchases were made by plaintiff class members, in violation of §20A of the Securities Exchange Act, including a purchase of 400 shares of PETCO's common stock on March 1, 2005, at $35.18 per share by class member West Virginia Laborers Pension Trust Fund.

290.    Defendants' insider sales consisted of a wide range of selling activity though open market sales, planned sales, and sales via a secondary offering of PETCO common stock.

291.    As part of their scheme to unload their shares of PETCO stock at artificially inflated prices, defendants Devine, Hall, Myers, Brann, Major, Martin, Mitchell, Richter and Woodard utilized a Rule 10b5-1 trading plan. Rule 10b5-1 is a rule adopted by the SEC that recognizes the creation of formal programs under which executives and other "insiders" may sell the securities of publicly traded companies on a regular basis pursuant to written plans while a Rule 10b5-1 plan commits an insider to a trading schedule, it does not commit an insider to a schedule for announcing important news. For example, a company executive who has a big trade scheduled for Tuesday would have an incentive to hold off putting out a negative press release until Wednesday. Defendants utilized the plan to routinely delay its adverse announcements until after their planned sales. Thus defendants sold PETCO common stock at artificially inflated prices.

292.    Initially, defendants utilized a Rule 10b5-1 plan established in November 2003 that expired in November 2004. In the aggregate, the November 2003 PETCO Rule 10b5-1 plan called for the sale of approximately 1% of the executive management team's initial PETCO holdings per month for twelve months. The first month in which sales could occur under the November 2003 Rule 10b5-1 plan was December 2003.

293.    In November 2004, defendants Devine, Hall, Myers, Brann, Major, Martin, Mitchell, Richter and Woodard renewed the Rule 10b5-1 plan for the period December 1, 2004 and ending on November 30, 2005.

294.    But defendants faced serious obstacles to selling off more of their own PETCO stock because large volume sales by a group of Company insiders that occurred outside of the Rule 10b5-1 plan would be met with market resistance, making it difficult if not impossible for defendants to secure a stable selling price. Defendants knew that if PETCO's top insiders started to sell off large blocks outside of the Rule 10b5-1 plan, this would disrupt the market and cause PETCO's stock to decline – thus undercutting their goal of maximizing the price at which they could sell their PETCO stock and their own personal profits. To take advantage of the artificial inflation in PETCO's stock and circumvent any market instability caused by a large stock sale by a group of insiders, defendants

1  decided to also undertake a large ***SEC-registered public offering of millions of shares of PETCO***

2  ***stock***.  On October 22, 2004, PETCO filed a Prospectus for a public offering of 6,946,909 shares

3  with a proposed maximum aggregate value of $247,309,960.40 to be received by the selling

4  shareholders.  The Public Offering not only allowed PETCO insiders the opportunity to sell vast

5  sums of common stock, but it also afforded defendants TPG and LGP the opportunity to sell-off

6  ***100%*** of their remaining shares of PETCO common stock.  PETCO received no financial benefit

7  from the Public Offering, and indeed, paid the expenses of the Public Offering.  The following chart

8  shows the number of shares owned, along with the number of shares sold, by each person who sold

9  stock in the Public Offering:

10

| Name of Selling Stockholder | Shares of Common Stock Beneficially Owned Before the Offering | | Shares of Common Stock Offered | Shares of Common Stock Beneficially Owned After the Offering | |
|---|---|---|---|---|---|
| | Number | Percentage | | Number | Percentage |
| Green Equity Investors III, L.P. | 3,355,954 | 5.8% | 3,355,954 | 0 | — |
| TPG Partners III, L.P. | 2,500,494 | 4.3 | 2,500,494 | 0 | — |
| TPG Parallel III, L.P. | 480,785 | * | 480,785 | 0 | — |
| TPG Dutch Parallel III, C.V. | 159,090 | * | 159,090 | 0 | — |
| FOF Partners III-B, L.P. | 92,434 | * | 92,434 | 0 | — |
| TPG Investors III, L.P. | 68,993 | * | 68,993 | 0 | — |
| FOF Partners III, L.P. | 4,159 | * | 4,159 | 0 | — |
| Brian K. Devine | 2,322,034 | 4.0 | 153,000 | 2,169,034 | 3.8% |
| Bruce C. Hall | 520,000 | * | 32,000 | 488,000 | * |
| James M. Myers | 520,000 | * | 32,000 | 488,000 | * |
| William M. Woodard | 260,000 | * | 16,000 | 244,000 | * |
| Keith G. Martin | 260,000 | * | 16,000 | 244,000 | * |
| Janet D. Mitchell | 259,506 | * | 16,000 | 243,506 | * |
| Robert E. Brann | 245,000 | * | 16,000) | 229,000 | * |
| Frederick W. Major | 15,000 | * | 4,000 | 11,000 | * |

\* = less than 1%.

295.  In the Public Offering, PETCO's insiders and majority shareholders could sell shares

in a single transaction where an underwriter would help them sell the stock ***and*** stabilize the market

trading price of PETCO stock ***while these large stock sales were taking place***.  This enabled

defendants to sell their stock at artificially inflated prices.  First, they could condition the market for

the stock offering by issuing very positive reports and forecasts and push the stock up to even higher

levels, including making Roadshow presentations just before the Public Offering to disseminate very

1   favorable information to potential stock purchasers to create demand for the stock.  Second, they

2   could use the underwriter – Lehman Brothers – to help merchandize the stock and rely upon the

3   underwriting firms' "firm commitment" purchase obligations to buy *all* their shares and then resell

4   them while the underwriter used special marketing techniques, only allowed in registered stock

5   offerings, to "stabilize" the stock price – thereby sustaining the price of the stock via techniques that

6   would not be legal in normal open-market stock trading.  This plan would enable PETCO's insiders

7   and majority shareholders to sell larger amounts of stock, many more shares than they could have

8   sold in open-market sales without disrupting the market on a single day.

9       296.   The chart below details the Individual Defendants' 10b5-1 open market sales and

10  those accomplished as part of the Public Offering in October 2004:

| Insider | 10b5-1 Sales from 9/1/04 to 8/1/05 Shares | $ Proceeds | Insider | Public Offering Sales on 10/21/04 Shares | $ Proceeds |
|---------|---------|---------|---------|---------|---------|
| BRANN | 12,000 | $406,981 | BRANN | 16,000 | $569,600 |
| DAY | 0 | $- | DAY | 30,901 | $1,128,870 |
| DEVINE | 376,000 | $12,939,672 | DEVINE | 153,000 | $5,446,800 |
| HALL | 80,000 | $2,753,130 | HALL | 32,000 | $1,139,200 |
| MAJOR | 10,000 | $344,140 | MAJOR | 4,000 | $142,400 |
| MARTIN | 40,000 | $1,376,561 | MARTIN | 16,000 | $569,600 |
| MITCHELL | 40,000 | $1,376,553 | MITCHELL | 16,000 | $569,600 |
| MYERS | 80,000 | $2,753,122 | MYERS | 32,000 | $1,139,200 |
| RICHTER | 6,724 | $231,923 | RICHTER | 0 | $- |
| WOODARD | 40,000 | $1,376,557 | WOODARD | 16,000 | $569,600 |
|  | 684,724 | $23,558,637 |  | 315,901 | $11,274,870 |
|  | 68.43% | 67.63% |  | 31.57% | 32.37% |

20      297.   Over the course of the Class Period, through both open market sales and the Public

21  Offering, the selling Individual Defendants sold substantial portions of their holdings, as detailed

22  below:

| DEFENDANT | % OF STOCK SOLD DURING CLASS PERIOD* |
|-----------|--------------------------------------|
| TPG | 100.00% |
| LGP | 100.00% |
| BRANN | 12.61% |
| DAY | 76.46% |
| DEVINE | 22.07% |
| HALL | 20.90% |
| MAJOR | 82.35% |
| MARTIN | 20.59% |
| MITCHELL | 20.96% |

| | |
|---|---|
| MYERS | 20.90% |
| RICHTER | 20.90% |
| WOODARD | 20.90% |

\* **Includes vested options**

298.    Though the Individual Defendants' trading plan is still in place, they have now opted (with the exception of Martin) to stop selling their PETCO stock. *Since the August 25, 2005 disclosure no Individual Defendants (with the exception of Martin) have sold any PETCO stock –* complete reversal from the Class Period where the Individual Defendants sold large blocks of stock at artificially inflated prices. Indeed, LGP, which sold all of its holding last October when PETCO was trading near its all-time high, waited until after August 25, 2005 to repurchase 1,818,600 PETCO shares.

<div align="center">

**LOSS CAUSATION/ECONOMIC LOSS**

</div>

299.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated PETCO's stock price and operated as a fraud or deceit on Class Period purchasers of PETCO stock by misrepresenting the Company's financial results, business success and future business prospects.

300.    Later, however, when the truth concerning PETCO's troubled business operations, finances and lack of business success entered the market and became apparent to investors, PETCO stock fell precipitously as the prior artificial inflation came out of PETCO's stock price. As a result of their purchases of PETCO stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

301.    By misrepresenting its future earnings and falsifying the Company's financial results, the defendants presented a misleading picture of PETCO's business and prospects. Thus, instead of truthfully disclosing during the Class Period that PETCO's business was stagnant and declining, defendants caused PETCO to falsely report its financial results and made false and misleading statements about PETCO's same-store sales growth, operational efficiency, and financial condition and prospects. *See* ¶¶218-287.

302.    These false and misleading statements caused and maintained the artificial inflation in PETCO's stock price throughout the Class Period until the truth was revealed to the market.

1   Defendants' false and misleading statements had the intended effect and caused PETCO stock to
2   trade at artificially inflated levels – reaching as high as $39.91 per share – throughout the Class
3   Period.

4          303.   On January 11, 2005, defendants caused PETCO to issue a press release stating that
5   "a sluggish start may render fourth-quarter same-store sales growth weaker than expected, though
6   not enough to force a paring of its profit forecasts." Investors were given their first inkling that there
7   might potentially be a reduction in same-store sales, but defendants continued to conceal from
8   investors the serious nature and extent of the problems surrounding PETCO's operations, which
9   were known to them internally, but not to the investing public. As a result, the stock declined from
10  $38.90 on January 11, 2005, to close at $37.12 per share on January 12, 2005.  The stock price,
11  however, continued to remain inflated.

12         304.   On April 15, 2005, defendants were forced to publicly disclose that PETCO under-
13  accrued distribution expenses and would delay filing its annual report.  As a result of this partial
14  disclosure, PETCO's stock declined from $35.14 per share on April 14, 2005, prior to the news, to
15  $28.71 per share within one week.  Moreover, in the days following this announcement, the trading
16  volume in PETCO's stock was extremely high, increasing from a volume of 520,100 shares on April
17  14, 2005 to 8.769 million shares on April 15, 2005.  This volume was much higher than in months
18  prior to this announcement.

19         305.   On May 25, 2005, PETCO belatedly revealed that its Q1 2005 results would be much
20  worse than its prior guidance and also that it was lowering its same-store sales guidance and EPS
21  guidance for the full year.

22         306.   As a result of this partial disclosure, PETCO's stock dropped from $32.30 per share
23  on May 24, 2005, on volume of 633,800 shares, to $28.81 per share on May 26, 2005, on volume of
24  5.67 million shares.  The price of PETCO's common stock still remained inflated.

25         307.   Later, on June 28, 2005, PETCO revealed that its Q2 2005 results would be much
26  worse than prior representations and also that it was lowering its same-store sales guidance and EPS
27  guidance for the full year.

28

                                          - 119 -                    05-CV-0823-H(RBB)

308.   As a result of this partial disclosure, PETCO's stock dropped from $31.61 per share on June 28, 2005, on volume of 624,100 shares, to $29.91 per share on June 29, 2005, on volume of 2.842 million shares.  However, the stock continued to remain inflated.

309.   Ultimately, on August 25, 2005, PETCO announced that its Q2 2005 same-store sales increase was only 2.5%, missing estimates.  PETCO also lowered guidance for same-store sales in Q3 2005  to 0% to 2%.  The stock fell to $21.99 per share on this news.

310.   In sum, as the truth was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged.

311.   The timing and magnitude of PETCO's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate PETCO's stock price and the subsequent significant decline in the value of PETCO's stock when the truth was gradually revealed to the market.

## CLASS ACTION ALLEGATIONS

312.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased PETCO common stock on the open market during the Class Period (the "Class").  Excluded from the Class are defendants, directors and officers of PETCO, TPG or LGP, and their families and affiliates.

313.   The members of the Class are so numerous that joinder of all members is impracticable while the exact umber of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery.  Plaintiff believes there are, at a minimum, hundreds of members of the Class who traded during the Class Period.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, PETCO had more than 57 million shares of stock outstanding, owned by thousands of persons.

314. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions solely affecting individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(d) Whether defendants artificially inflated the price of PETCO common stock; and

(e) The extent of damage sustained by Class members and the appropriate measure of damages.

315. Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

316. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the other Class members.

317. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

318. Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for PETCO stock.

05-CV-0823-H(RBB)

319.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     defendants failed to disclose material facts during the Class Period that would have corrected prior misrepresentations that became materially false and misleading as a result of subsequent events;

(b)     the omissions and misstatements were material;

(c)     the securities of the Company traded in an efficient market;

(d)     the omissions and misstatements alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     plaintiff and members of the Class purchased their PETCO stock between the time the defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

## NO SAFE HARBOR

320.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made, and many were representations about the Company's present status. To the extent there were any forward-looking statements: (a) there were no meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (b) the particular speakers of such forward-looking statements knew that the particular statements were false or misleading, and/or the forward-looking statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

321.     Any purported warnings contained in the press releases and statements quoted herein were generic and unparticularized boilerplate statements of risks, and thus lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

322.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

323.    Each of the defendants is liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly or indirectly as a participant in a scheme and/or course of business which: (i) deceived the investing public regarding PETCO, its business, finances and prospects; (ii) artificially inflated the price of PETCO common stock during the Class Period; (iii) caused Class members to purchase PETCO stock at inflated prices; and (iv) permitted defendants to sell shares of PETCO stock at inflated prices.

324.    The defendants' direct participation included preparing and/or reviewing PETCO's false and/or misleading SEC filings and/or press releases, and knowingly or recklessly giving false information to securities analysts, money and portfolio managers and institutional investors in conference calls and other presentations.

325.    Despite their knowledge of PETCO's false and misleading statements, the defendants failed, throughout the Class Period, to disclose material adverse facts about the financial condition and business prospects of PETCO, which caused the SEC filings, press releases and other public statements issued during the Class Period to be materially false and misleading for the reasons set forth herein.    The defendants directly and indirectly, knowingly or recklessly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition operations and future business prospects of PETCO.

326.    As a result of the above described acts of the defendants, they have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business

1  which operated as a fraud or deceit upon plaintiff and the other members of the Class in connection

2  with their purchases of PETCO stock.

3      327.   Plaintiff and the other members of the Class, at the time of the misrepresentations and

4  omissions, did not know that these statements were false and misleading and believed them to be

5  true.  In reliance upon the integrity of the market, plaintiff and the other Class members were

6  damaged as they paid artificially inflated prices for PETCO common stock.  Had plaintiff and the

7  other members of the Class known the truth, they would not have bought their shares at the prices

8  they paid

9      328.   Defendants' misrepresentations and misleading omissions were the reason for the loss

10  suffered by plaintiff and the other Class members.

11                           **SECOND CLAIM FOR RELIEF**

12              **For Violation of §20(a) of the 1934 Act Against All Defendants**

13      329.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

14  forth herein.

15      330.   Defendants acted as controlling persons of PETCO within the meaning of §20(a) of

16  the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their positions as officers,

17  directors or controlling shareholders of PETCO, their high-level positions, and participation in

18  and/or awareness of the Company's operations, defendants had the power to influence and control

19  and did influence and control, directly or indirectly, the decision-making of the Company, including

20  the content and dissemination of the various statements that plaintiff contends are false and

21  misleading.  Defendants were provided with or had unlimited access to copies of the Company's

22  reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior

23  to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

24  statements or cause the statements to be corrected.

25      331.   In particular, each of the Individual Defendants, TPG and LGP had direct

26  involvement or intimate knowledge of the day-to-day operations of the Company during the Class

Period. Therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. PETCO controlled the Individual Defendants and all of its employees.

332.   By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## THIRD CLAIM FOR RELIEF

### Insider Trading Under §20A of the 1934 Act Against the Individual Defendants (Excluding Day and Carter)

333.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs.

334.   This claim is asserted by plaintiff under §20A of the 1934 Act against the Individual Defendants excluding Day and Carter, on behalf of all persons who purchased PETCO common stock contemporaneously with the sale of PETCO common stock by these Individual Defendants.

335.   During the Class Period, each of the Individual Defendants occupied a position with PETCO that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects.   Individual Defendants' public representations on these subjects set forth herein were materially false and misleading.

336.   Notwithstanding their duty to refrain from trading in PETCO common stock unless they disclosed the foregoing material adverse facts, and in violation of their fiduciary duties to plaintiff and other members of the Class, Individual Defendants sold in the aggregate millions of dollars worth of PETCO common stock during the Class Period contemporaneously with plaintiff's and other Class members' purchases of PETCO common stock.

337.   The Individual Defendants sold their shares of PETCO common stock, as alleged above, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

338.    Each sale by the Individual Defendants occurred contemporaneously with PETCO common stock purchases by at least one or more of the members of the Class as detailed in the portion of this complaint detailing defendants' insider sales during the Class Period. *See* ¶¶288-298.

339.    The Individual Defendants knew that they were in possession of material adverse information which was not known to the investing public, including plaintiff and other members of the Class. Before selling their stock to the public, they were obligated to disclose that information to plaintiff and other members of the Class.

340.    By reason of the foregoing, the Individual Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased PETCO common stock contemporaneously with the sale of such stock by Individual Defendants.

341.    Plaintiff and other members of the Class who purchased shares of PETCO common stock contemporaneously with the Individual Defendants' sales of PETCO common stock: (1) have suffered substantial damages because they relied upon the integrity of the market and paid artificially inflated prices for PETCO common stock as a result of the violations of §10(b) and Rule 10b-5 alleged herein; and (2) would not have purchased PETCO common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and concealment. At the time of the purchases by plaintiff and members of the Class, the fair and true value of PETCO common stock was substantially less than the prices paid by them.

342.    This action was commenced within five years after the sales by the Individual Defendants while in possession of material, non-public information.

343.    As a result of the foregoing, plaintiff and the other members of the Class have suffered substantial damages.

**PRAYER**

WHEREFORE, plaintiff and other members of the Class pray for relief and judgment, as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy;

D.      Ordering defendants to disgorge their insider trading proceeds, including an accounting and constructive trust over those proceeds;

E.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees and other costs and disbursements; and

F.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: October 17, 2005                    LERACH COUGHLIN STOIA GELLER
                                                                  RUDMAN & ROBBINS LLP
                                                           DANIEL S. DROSMAN
                                                           DAVID A. THORPE
                                                           TED MINAHAN


                                                           _____
                                                           DANIEL S. DROSMAN

                                                           655 West Broadway, Suite 1900
                                                           San Diego, CA 92101
                                                           Telephone: 619/231-1058
                                                           619/231-7423 (fax)

- 127 -                                    05-CV-0823-H(RBB)

1

2

3

4

5

6

    S:\CptDraft\Securities\Cpt PetCo III.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

Lead Counsel for Plaintiff

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| Exhibit 1 | Compilation of October 2004 Employee Survey Responses; | 001-008 |
| Exhibit 2 | Email to Jim Myers, Rodney Carter and Doug Beeuwsaert re 2004 Expenses with attached General Ledger; | 009-053 |
| Exhibit 3 | Responses to CW2's October 2004 Employee Survey; and | 054-055 |
| Exhibit 4 | Certification of Lead Plaintiff Plumbers and Pipefitters Local 51 Pension Fund | 056-058 |

| Question | Comment |
|---|---|
| 1. I have adequate knowledge and experience necessary to be successful in my current position. * | Yes, My experience at the NSC has greatly helped.<br><br>I have over 20 years of experience in the transportation industry. I have been told I need knowledge of the Penco Corporate culture and to learn my place.<br>I have been an employee for over 8 years. I have 24 years experience but lack training is specific areas that I did not have responsibility for in the past.<br>I have just begun a new job and I am learning on the fly.<br><br>Still in learning process.<br><br>I have gained valuable experience from being in Field Operations and Merchandising in 3 different company's that will make me successful in my current position. |
| 2. I understand my job attitudes and my job description fits my job responsibilities. * | Yes, because this is a new position we change direction a lot.<br><br>My job duties continually change at the whim of the Director I report to. I scramble to put out fires which she waits until the last minute to acknowledge.<br>My present position is not only new for me but for the company. My job description and responsibilities were carefully thought out and I clearly understand them. |
| 3. Management's operating style and philosophy contribute positively to the success of the business. * | Yes, Razia and Lance are great and very helpful.<br><br>The philosophy changes based upon the whims of individuals. Training classes and seminars are given at great expense to the company. We are then given direct orders to do the exact opposite. We are held accountable to the original direction.<br>Management's inability to agree amongst themselves so although their is an opportunity for them to contribute positively the message is often muddied as it is filtered through the ranks. |

**Exhibit 1**

001

**4. The Company's culture and management policies contribute to my ability to perform my job responsibilities effectively.**

PETCO has the best Management style and philosophy than any other company that I have worked at. My supervisor gives me all the support that I need in be successful.

My career with Petco will probably be ending shortly. Frustration with Director and VP coupled with inability to get changes made by "obstructionist" director (industry impression) will force me to leave.

The culture of the company tends to sway. Communication is poor. We lean too much on e-mail for important issues. There is no single direction. Our division direction changes like the wind. Additional expenses are incurred.

I have received excellent support in my job.

It is great to work in a company that wants people to be successful and promotes them based on performance.

**5. I have adequate management support to fulfill my job duties.**

Given many job duties and responsibilities but not given the authority to complete.

We have been short staffed for over 1 year. We were down 8 management staff at one time. What managers that still remain must work 12-15 hours to cover all shifts. A critical inventory was taken with a total staff of 5 when normally there are 13.

I have all of the support that I need.

**6. I have received and continue to receive enough training in order for me to fulfill my responsibilities.**

Yes, if we need additional training I found Razis very open to our training needs.

Biggest deficiency is the routing software. 1 week initial training provided but no follow up and off site seminars discouraged.

Specific training has been requested for the past 3-4 years. Without this training Petco is exposed to the risk of decisions being made that are not only incorrect but possibly illegal.

Exhibit 1

002

I believe that the company should invest more in peoples future - training, education and continuing education. There should be a greater emphasis in this area from the highest levels of management.

Always room for more training knowledge is a good thing.

Training is available for the asking.

I receive little or no training. I rely mostly upon experience and common sence.

**7. I have adequate time to make sure that I am performing my job duties according to external legal or regulatory requirements. "**

I am forced to prioritize due to demands. DOT standards are primary but then I am given projects with unrealistic deadlines.

What are the legal or regulatory requirements as it pertains to my job?

I work for a company where integrity is number 1 on the list.

**8. My department is staffed appropriately and with individuals holding the required levels of experience. "**

Starting wages for hourly employees are not commensurate with other employers in the area so we are not competitive in hiring the most qualified individuals. Temporary staffing agencies hourly rate is the same as ours.

We are adding many more stores and I do see a need for additional staffing in the future.

Department has been short a traffic specialist for over a year. Freight bills don't get paid so department can meet budget

We have been short MGR's for over a year. Last month we were 20k under budget for salaried staff. Over all hourly payroll is excessive due to lack of coverage and support. We have lost almost every manager in the past year. No one asks why?

Staffing has been reduced or held level over the past few years with increased expectations. In my opinion there are is a continual addition of tasks without analysis of the availability of staff to complete those tasks.

I believe we have a very experienced and professional department.

New people in place and more training needed.

Exhibit 1

003

9. I do not bypass certain Company policies or procedures from pressure to meet short-term results. *

I am directed to do exactly that - not company procedures but rather GAAP in reference to accruals. No invoice in hand no accrual even though we know the expense has happened. I work for a company that looks at issues on a long term basis and expects company policies to be upheld.

10. The Company adequately safeguards and products their assets. *

The most important asset to a company should be its people. 9 supervisors at DC S/R, 1 supervisor at 188 and a DC manager at 800 in 1 year are gone. Does anybody wonder why. I am hoping to positively impact that issue in the distribution contents.

11. If needed, there is adequate access to senior management, both within and outside my department. *

Yes, I have worked with many of ten senior managers in the past and have access to them

⟶ Access to senior managment outside my department is highly discouraged.

⟶ Members of Senior Management outside my department are not visable.

I feel that I have total access to senior management in any department if I need help or have a question.

12. In looking at my job duties, I feel my reporting relationship is proper and it makes sense to report to my current supervisor. *

The position is right but the individual holding the position of Director is wrong. - and I don't want the job.
Yes.
As a manager I should not be reporting to a SVP. I know that their are recruitment efforts underway to create a more layered management team in my department.
I currently report directly to the Sr Vp. there are many staff openings in my department.

We have been without a Director position to report to for a long time.

Exhibit 1

**13. Information flows freely upstream, downstream, and across my area. '**

My position is new to PETCO. I report to Rozib and I could not ask for a better supporter. It makes sense for me to report to her.

We currently do not have anything between a Manager and A Senior VP in our department.

Some times we are notified after changes have occurred (and directly effect us . We have had to make many changes after the fact.

I found out about the upcoming PPI program through an e-mail not through the Director I report to. This is just an example

Due to the pressures of workload it creates an environment that does not allow for this.

The timeliness of the information needs to improve sometimes it is after the fact.

I am well informed on all levels.

I do not receive adequate information from "upstream".

**14. I have sufficient time to carry out my job responsibilities effectively. '**

More and more of our time is spent reporting status on daily functions and expenditures, that we have less time to be creative and experiment with new ideas.

Could always use more time

Unrealistic deadlines, taking on outside duties (supervisor at 808, supervisor at 528) with no alleviation of current duties. Must prioritize by what is hottest at the time.

In my opinion too much time is spent on tasks as opposed to managing.

Staff has been short handed and we seem to always have to due double duty.

**15. I have adequate authority to fulfill my job responsibilities. '**

I have zero authority and that has been emphasized. Major violations of federal regulations and I can only recommend discipline (a long drawn out affair). I hold of time by drivers - same.

**16. I feel that there are adequate policies and procedures for hiring, training, promoting, and compensating associates. '**

Exhibit 1

005

**17. I have received a copy of the Code of Ethics. "**

**18. I am aware of where I can locate a copy of the Code of Ethics. "**

**19. I am aware of the PETCO Ethics Hotline. "**

I am since this survey came out.

**20. I believe reports of misconduct to the PETCO Ethics Hotline will be anonymous, confidential and free of retribution. "**

Retribution would be swift by department head if info was revealed.

Always

**21. I believe reports to the Ethics Hotline will be adequately investigated and addressed. "**

I don't think specific examples would be investigated if Directors and VP's were involved.

Not sure.

**22. Management talks about the importance of ethics, values, and integrity. "**

Yes, but sometimes are than given a different direct.

PETCO is built on a very strong foundation of ethics, values and integrity. That is why I want to work for them.

I believe there need to be more structured/formal training programs within the organization. Overall I do not feel that compensation appears to have kept up with the cost of living in San Diego.

The existing policies and procedures need to be communicated. We are hiring in new employees at salaries higher that our existing staff. This is causing our qualified existing staff to look elsewhere for a job.

I am new to the company and am not aware of all the policies and procedures for these areas.

PETCO is very particular who they hire. They provide excellent training.

I believe I am discouraged from pursuing advancement in my field due to economic constraints.

Exhibit 1

**23. If I were to report unacceptable or unethical behavior to senior management, I believe that appropriate action would be taken.**

I do not know of anyone "talking" about ethics but the management team members that I interact with demonstrate ethics and integrity.

My feeling is that the budgeting process has been going on long before I was here and will be long after I am gone. Budgeting is an issue

Not sure.

Without a doubt.

**24. PETCO has established standards of behavior that create an overall appreciation for and compliance with its documented policies and procedures.**

Petco has the standards - however they are not always followed by management. Do you mean Code of Ethics when you say standards of behavior?

**25. My compensation (or a portion thereof) is not based on unrealistic performance targets or goals.**

My last review was inauthentic. Director stated that if I could convince her to change she would but there was no money avail for increase. Feel review was backed into for monetary reasons.

There are things we do not have direct control over which was an affect on our compensation

The company does an excellent job of setting realistic targets and goals.

**26. There is not pressure placed on me to meet deadlines, goals, budgets, or the business plan that compromise my values.**

I gave a realistic budget for 2004. I was told point blank that the Director could not present the budget as is to the board. Take out in excess of 400K. 2003 expenses are carried over in 2004 due to accrual process.

Never.

Exhibit 1

27. The Company's leaders achieve financial goals without unethical behavior.

If the leaders are Director and VP of my department - no. Accruals again. DC, give accruals, I submit to Director, she changes and I tell DC's to resubmit. Accruals only when intence in hand.

I would say yes mostly but would like a better defination on who specifically are you referring to when you say "The Company leaders".
PETCO has the best Senior Management team that I have ever worked with.

28. I feel that Company leaders that are selected and/or promoted have a high-level of integrity.

Not the current Director and VP.

Questionable based upon above.

I would say yes mostly but would like a better defination on who specifically are you referring to when you say "The Company leaders".
I agree fully.

29. Company leaders keep their promises.

The Director plays games with expense reports and PTO. Does not approve expense reports on timely basis - commits to doing so in future - and does not change.
I would say yes mostly but would like a better defination on who specifically are you refering to when you say "The Company leaders".
Always

Exhibit 1

008

To:                      Jim Myers; Rodney Carter; Doug Beeuwsaert
Subject:                 2004 Expenses

I have submitted my resignation effective 3-25-05.  My resignation was requested by the Director of Traffic and Transportation with the concurrance of "upper management".  This process started at my last review and culminated on 10-4-04 with a final written warning which was given to me at DC 528.  Several things were untrue and they were brought to the attention of HR.  I feel that my response was filed away only as a document.

It would be easy for me to stand and say that this was not true and that was not true and the Director would reply that it was true.  Below is information that should show the Director possibly lacks credibility in her truthfulness.

Attached is information concerning 2004 expenses carried over into 2005 which were not accrued for in 2004.  This information is not meant to be 100% accurate but I feel further examination is in order.  I think you will find this is a substantial amount worthy of your concern and attention.

If you would like to speak with me on this issue you can either reach me at extension          or if it is after 3-25-05 you can reach me at my home -

I wish Petco the very best in it's future endeavors.


Sincerely,


Transportation Manager


**Exhibit 2**


009


REDACTED


1

## SUMMARY OF ISSUES

**FUEL – 807170**

| | |
|---|---|
| 2004 invoices paid in 2005: | $67,362 |
| 2004 accruals carried over to 2005: | $32,392 |
| Un-accrued 2004 fuel expenses carried over to 2005 | $34,970 |

**FREIGHT OUT – 807250**

| | |
|---|---|
| 2004 invoices paid in 2005 (through 3-23-05) | $3,099,979 |
| 2004 accruals carried over to 2005: | $560,631 |
| Un-accrued 2004 freight out expenses carried over to 2005 Through 3-23-05 | $2,539,348 |

**Exhibit 2**

010



### GL totals for "Fuel" - GL code 807170

#### Feb-05

| DC | 2004 invoices Paid | Accrued | Diff |
|---|---|---|---|
| 200 | $8,741 | $8,392 | $349 |
| 300 | $6,171 | $2,324 | $3,847 |
| 400 | $11,022 | | $11,022 |
| 528 | $24,221 | $12,639 | $11,582 |
| 800 | $4,663 | $5,283 | -$620 |
| 808 | $12,544 | $3,754 | $8,790 |
| TOTALS | $67,362 | $32,392 | $34,970 |

Exhibit 2

FEBRUARY GL FOR CODE 8u/170 - FUEL - THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807170 | 8200 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125231 | 4,357.79 | PENSKE TRUCK LEASING CO. | F10350459 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Portland | Tbd |
| 807170 | 8200 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125227 | 4,081.09 | PENSKE TRUCK LEASING CO. | F10350695 | 2/1/2005 | 871400 | 2/21/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Portland | Tbd |
| 807170 | 8200 | 00000 | | PETCO | 2005 | 1 | 2/25/2005 | AP12037619 | AP | Accounts Payable | Expense Distribution | 0125442 | 4,515.06 | PENSKE TRUCK LEASING CO. | F10353171 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Stockton | Tbd |
| 807170 | 8200 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 04120018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | 0125428 | 255.01 | PENSKE TRUCK LEASING CO. | S10000405 | 1/17/2005 | | | | Distrb Del Veh Gas/Oil | DC Portland | Tbd |
| 807170 | 8200 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 05010018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | (4,302.01) | | | | | | | Distrb Del Veh Gas/Oil | DC Portland | Tbd |
| | | | | | | | | | | Total Dept | | | 12,540.00 | | | | | | | | | |
| | | | | | | | | | | Total Prod | | | 17,300.85 | | | | | | | | | |

| 807170 | 8400 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125227 | 3,470.14 | PENSKE TRUCK LEASING CO. | F10311205 | 2/1/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Stockton | Tbd |
| 807170 | 8400 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125227 | 2,701.06 | PENSKE TRUCK LEASING CO. | F10324606 | 2/1/2005 | 871400 | 2/21/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Stockton | Tbd |
| 807170 | 8400 | 00000 | | PETCO | 2005 | 1 | 2/25/2005 | AP12037619 | AP | Accounts Payable | Expense Distribution | 0125427 | 3,797.75 | PENSKE TRUCK LEASING CO. | F10353867 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Stockton | Tbd |
| 807170 | 8400 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 04120018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | (23,211.00) | | | | | | | Distrb Del Veh Gas/Oil | DC Stockton | Tbd |
| | | | | | | | | | | Total Dept | | | 28,333.00 | | | | | | | | | |

| 807170 | 8400 | 00000 | | TEXAS | 2005 | 1 | 2/10/2005 | AP12037560 | AP | Accounts Payable | Expense Distribution | 0125224 | 15,111.55 | PENSKE TRUCK LEASING CO. | F10361453 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Texas | Tbd |
| 807170 | 8400 | 00000 | | TEXAS | 2005 | 1 | 2/17/2005 | AP12037535 | AP | Accounts Payable | Expense Distribution | 0125027 | 5,305.50 | PENSKE TRUCK LEASING CO. | F10381111 | 2/1/2005 | 871400 | 2/21/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Texas | Tbd |
| 807170 | 8400 | 00000 | | TEXAS | 2005 | 1 | 2/25/2005 | AP12037937 | AP | Accounts Payable | Expense Distribution | 0125429 | 5,516.67 | PENSKE TRUCK LEASING CO. | F10342264 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Texas | Tbd |
| 807170 | 8400 | 00000 | | TEXAS | 2005 | 1 | 2/28/2005 | 05010018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | 4,645.00 | | | | | | | Distrb Del Veh Gas/Oil | DC Texas | Tbd |
| | | | | | | | | | | Total Dept | | | 20,304.45 | | | | | | | | | |

| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125183 | 454.15 | PENSKE TRUCK LEASING CO. | F10361614 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125247 | 11,235.42 | PENSKE TRUCK LEASING CO. | F10360296 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125279 | 1,685.65 | PENSKE TRUCK LEASING CO. | F10310562 | 2/1/2005 | 871400 | 2/21/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP12037743 | AP | Accounts Payable | Expense Distribution | 0125079 | 662.83 | PENSKE TRUCK LEASING CO. | F10352472 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/25/2005 | AP12037619 | AP | Accounts Payable | Expense Distribution | 0125106 | 630.36 | PENSKE TRUCK LEASING CO. | F10342514 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| 807170 | 8528 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 05010018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | 0125412 | (12,935.00) | | F10354007 | 2/8/2005 | | | | Distrb Del Veh Gas/Oil | DC Mira Loma - Main | Tbd |
| | | | | | | | | | | Total Dept | | | 28,384.00 | | | | | | | | | |
| | | | | | | | | | | Total Prod | | | 54,302.41 | | | | | | | | | |

| 807170 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125240 | 2,378.04 | PENSKE TRUCK LEASING CO. | F10350510 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mansfield, MA | Tbd |
| 807170 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125031 | 2,284.55 | PENSKE TRUCK LEASING CO. | F10324026 | 2/1/2005 | 871400 | 2/21/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mansfield, MA | Tbd |
| 807170 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/25/2005 | AP12037619 | AP | Accounts Payable | Expense Distribution | 0125450 | 2,114.50 | PENSKE TRUCK LEASING CO. | F10352274 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Mansfield, MA | Tbd |
| 807170 | 8800 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 04120018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | 3,883.65 | | | | | | | Distrb Del Veh Gas/Oil | DC Mansfield, MA | Tbd |
| 807170 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 05010018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | 6,557.00 | | | | | | | Distrb Del Veh Gas/Oil | DC Mansfield, MA | Tbd |
| | | | | | | | | | | Total Dept | | | 7,871.09 | | | | | | | | | |

| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037390 | AP | Accounts Payable | Expense Distribution | 0124751B | 118.00 | PETTY CASH - STEVE ONDRACK | 013105 | 1/31/2005 | 868633 | 2/2/2005 | 45349 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125233 | 4,741.75 | PENSKE TRUCK LEASING CO. | F10361805 | 1/25/2005 | 870193 | 2/14/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | Expense Distribution | 0125230 | 741.86 | RYDER TRANSPORTATION SERVICES | 576780 | 1/1/2005 | 869800 | 2/10/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125015 | 1,038.87 | RYDER TRANSPORTATION SERVICES | 576743 | 2/1/2005 | 871072 | 2/17/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037015 | AP | Accounts Payable | Expense Distribution | 0125015 | 344.89 | RYDER TRANSPORTATION SERVICES | 576743 | 2/1/2005 | 871072 | 2/17/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125015 | 618.27 | RYDER TRANSPORTATION SERVICES | S10000452 | 2/1/2005 | 871072 | 2/17/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/17/2005 | AP12037824 | AP | Accounts Payable | Expense Distribution | 0125015 | 4,028.52 | RYDER TRANSPORTATION SERVICES | 576736598 | 2/1/2005 | 871072 | 2/17/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/25/2005 | AP12037619 | AP | Accounts Payable | Expense Distribution | 0125015 | 4,622.82 | RYDER TRANSPORTATION SERVICES | 576744 | 2/8/2005 | 871072 | 2/17/2005 | 00013 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 04120018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | 0125435 | 5,578.32 | PENSKE TRUCK LEASING CO. | F10354732 | 2/8/2005 | 872532 | 2/28/2005 | 01859 | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| 807170 | 8888 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 05010018SA | REC | ACCRUALS - FLEET | FUEL ACCRUAL | | (3,754.00) | | | | | | | Distrb Del Veh Gas/Oil | DC Monroe, NJ | Tbd |
| | | | | | | | | | | Total Dept | | | 26,000.79 | | | | | | | | | |
| | | | | | | | | | | Total Prod | | | 26,000.70 | | | | | | | | | |
| | | | | | | | | | | Total Account | | | 140,020.15 | | | | | | | | | |
| | | | | | | | | | | Total Report | | | 140,020.15 | | | | | | | | | |

Exhibit 2

012

GL entry totals for "Freight Out" - GL code 807250

### FEBRUARY

| DC | 2004 Invoices<br>Paid | Accrued | Diff |
|----|------|---------|------|
| 198 | $196,955.00 | $181,286.00 | $15,669.00 |
| 200 | $109,075.00 | $37,723.00 | $71,352.00 |
| 300 | $40,269.00 | $19,544.00 | $20,725.00 |
| 400 | $89,646.00 | $94,155.00 | -$4,509.00 |
| 499 | $132,917.00 | $42,947.00 | $89,970.00 |
| 528 | $85,381.00 | $29,991.00 | $55,390.00 |
| 800 | $90,950.00 | $33,664.00 | $57,286.00 |
| 808 | $303,692.00 | $84,973.00 | $218,719.00 |
| 899 | $100.00 | $36,348.00 | -$36,248.00 |
| | $1,048,985.00 | $560,631.00 | $488,354.00 |

### MARCH TOTALS THRU 3-23-05 POSTINGS

| DC | |
|----|------|
| 198 | $692,772.00 |
| 200 | $179,298.00 |
| 300 | $42,211.00 |
| 400 | $137,476.00 |
| 499 | $157,612.00 |
| 528 | $82,453.00 |
| 800 | $103,759.00 |
| 808 | $359,908.00 |
| 899 | $295,505.00 |
| | $2,050,994.00 |

| TOTALS | $3,099,979.00 | $560,631.00 | $2,539,348.00 |
|--------|---------------|-------------|---------------|

Exhibit 2

013

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP12037715 | AP | Accounts Payable | 807250819600000 | 01260201 | 1,150.00 | CH ROBINSON | 23772294 | 8/24/2004 | 871470 | 2/22/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP12037715 | AP | Accounts Payable | 807250819600000 | 01260200 | 1,193.12 | CH ROBINSON | 23779643 | 8/24/2004 | 871470 | 2/22/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP12037715 | AP | Accounts Payable | 807250819600000 | 01260202 | 1,725.00 | CH ROBINSON | 23685778 | 8/26/2004 | 871470 | 2/22/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP12037715 | AP | Accounts Payable | 807250819600000 | 01260199 | 1,453.90 | CH ROBINSON | 24197708 | 10/11/2004 | 871470 | 2/22/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP12037715 | AP | Accounts Payable | 807250819600000 | 01260204 | 1,375.00 | CH ROBINSON | 24331162 | 10/14/2004 | 871470 | 2/22/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP12037743 | AP | Accounts Payable | 807250819600000 | 01262751 | 280.00 | CH ROBINSON | 24231692A | 10/15/2004 | 871996 | 2/24/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248870 | 1,410.71 | CH ROBINSON | 24581207 | 11/11/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248869 | 1,647.89 | CH ROBINSON | 24578787 | 11/11/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248868 | 1,410.71 | CH ROBINSON | 24667467 | 11/11/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248862 | 1,150.00 | CH ROBINSON | 24196807 | 11/15/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248799 | 657.41 | CH ROBINSON | 24696585 | 11/15/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248801 | 1,477.09 | CH ROBINSON | 24694020 | 11/15/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248866 | 898.88 | CH ROBINSON | 24705801 | 11/16/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248872 | 898.88 | CH ROBINSON | 24815502 | 11/16/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248871 | 1,234.50 | CH ROBINSON | 24735413 | 11/16/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248804 | 874.82 | CH ROBINSON | 24719650 | 11/17/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248858 | 203.54 | ABF FREIGHT SYSTEM INC | 251134951 | 11/17/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248805 | 1,389.40 | CH ROBINSON | 24724840 | 11/17/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248864 | 1,150.00 | CH ROBINSON | 24324867 | 11/17/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248863 | 1,150.00 | CH ROBINSON | 24306965 | 11/17/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248880 | 84.95 | ABF FREIGHT SYSTEM INC | 031366296 | 11/17/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248877 | 118.66 | ABF FREIGHT SYSTEM INC | 008737406 | 11/17/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248800 | 1,241.00 | CH ROBINSON | 24698834 | 11/17/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248797 | 657.41 | CH ROBINSON | 24640557 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248865 | 1,411.75 | CH ROBINSON | 24750274 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248874 | 657.41 | CH ROBINSON | 24640536 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248873 | 657.41 | CH ROBINSON | 24640511 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248803 | 1,267.70 | CH ROBINSON | 24716781 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248798 | 657.41 | CH ROBINSON | 24640596 | 11/19/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/5/2005 | AP12037465 | AP | Accounts Payable | 807250819600000 | 01249678 | 1,234.50 | CH ROBINSON | 24719541 | 11/19/2004 | 869078 | 2/7/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/8/2005 | AP12037479 | AP | Accounts Payable | 807250819600000 | 01250405 | 1,483.02 | CH ROBINSON | 24768992 | 11/19/2004 | 869251 | 2/8/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248859 | 148.72 | ABF FREIGHT SYSTEM INC | 201222525 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248854 | 84.95 | ABF FREIGHT SYSTEM INC | 118634119 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248849 | 84.95 | ABF FREIGHT SYSTEM INC | 093218440 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248848 | 105.46 | ABF FREIGHT SYSTEM INC | 064682509 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248847 | 105.15 | ABF FREIGHT SYSTEM INC | 094952064 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248846 | 96.53 | ABF FREIGHT SYSTEM INC | 083445404 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248845 | 171.72 | ABF FREIGHT SYSTEM INC | 082603353 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248876 | 138.67 | ABF FREIGHT SYSTEM INC | 004051180 | 11/22/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/8/2005 | AP12037479 | AP | Accounts Payable | 807250819600000 | 01250406 | 991.72 | CH ROBINSON | 24786348 | 11/22/2004 | 869251 | 2/8/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248867 | 1,411.75 | CH ROBINSON | 24554917 | 11/23/2004 | 868918 | 2/4/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/5/2005 | AP12037465 | AP | Accounts Payable | 807250819600000 | 01249679 | 1,002.64 | CH ROBINSON | 24695497 | 11/23/2004 | 869078 | 2/7/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/8/2005 | AP12037479 | AP | Accounts Payable | 807250819600000 | 01250408 | 1,389.40 | CH ROBINSON | 24796908 | 11/23/2004 | 869251 | 2/8/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/8/2005 | AP12037479 | AP | Accounts Payable | 807250819600000 | 01250407 | 1,523.98 | CH ROBINSON | 24801194 | 11/23/2004 | 869251 | 2/8/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP12037743 | AP | Accounts Payable | 807250819600000 | 01262752 | 874.92 | CH ROBINSON | 24796904 | 11/23/2004 | 871996 | 2/24/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247070 | 981.60 | LANTER TRANSPORT , INC. | 312978 | 11/24/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247067 | 1,552.34 | CH ROBINSON | 24642975 | 11/29/2004 | 868585 | 2/2/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247074 | 1,063.70 | CH ROBINSON | 24852224 | 11/29/2004 | 868585 | 2/2/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247079 | 1,267.70 | CH ROBINSON | 24868450 | 11/29/2004 | 868585 | 2/2/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/4/2005 | AP12037418 | AP | Accounts Payable | 807250819600000 | 01248879 | 102.73 | ABF FREIGHT SYSTEM INC | 004051189 | 11/29/2004 | 868886 | 2/4/2005 | 01013 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/9/2005 | AP12037515 | AP | Accounts Payable | 807250819600000 | 01250796 | 1,483.02 | CH ROBINSON | 24838647 | 11/29/2004 | 869569 | 2/9/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/9/2005 | AP12037515 | AP | Accounts Payable | 807250819600000 | 01250795 | 1,267.70 | CH ROBINSON | 24843039 | 11/29/2004 | 869569 | 2/9/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247065 | 1,502.34 | CH ROBINSON | 24791967 | 11/30/2004 | 868585 | 2/2/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/9/2005 | AP12037515 | AP | Accounts Payable | 807250819600000 | 01250794 | 1,802.12 | CH ROBINSON | 24868068 | 11/30/2004 | 869569 | 2/9/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | 807250819600000 | 01251716 | 1,552.34 | CH ROBINSON | 24769749 | 12/1/2004 | 869693 | 2/10/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/16/2005 | AP12037618 | AP | Accounts Payable | 807250819600000 | 01255664 | 1,461.41 | USF HOLLAND INC | 58742052 | 12/2/2004 | 870764 | 2/16/2005 | 17959 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/10/2005 | AP12037531 | AP | Accounts Payable | 807250819600000 | 01251718 | 1,013.74 | CH ROBINSON | 24620296 | 12/3/2004 | 869693 | 2/10/2005 | 01455 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247068 | 1,713.36 | LANTER TRANSPORT , INC. | 313005 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247071 | 1,383.60 | LANTER TRANSPORT , INC. | 313016 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247072 | 1,699.20 | LANTER TRANSPORT , INC. | 314821 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247073 | 1,699.20 | LANTER TRANSPORT , INC. | 313040 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247076 | 1,762.80 | LANTER TRANSPORT , INC. | 313060 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247082 | 1,483.20 | LANTER TRANSPORT , INC. | 312948 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247083 | 976.80 | LANTER TRANSPORT , INC. | 312958 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247084 | 1,699.20 | LANTER TRANSPORT , INC. | 312968 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247085 | 967.20 | LANTER TRANSPORT , INC. | 312984 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247087 | 1,057.20 | LANTER TRANSPORT , INC. | 312974 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247089 | 1,699.20 | LANTER TRANSPORT , INC. | 312994 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247090 | 1,699.20 | LANTER TRANSPORT , INC. | 312999 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247091 | 1,699.20 | LANTER TRANSPORT , INC. | 314863 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247092 | 1,398.00 | LANTER TRANSPORT , INC. | 314842 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247094 | 1,383.60 | LANTER TRANSPORT , INC. | 314848 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |
| 807250 | 8196 | 00000 | | PETCO | 2005 | 1 | 2/2/2005 | AP12037340 | AP | Accounts Payable | 807250819600000 | 01247095 | 1,762.80 | LANTER TRANSPORT , INC. | 314653 | 12/6/2004 | 868621 | 2/2/2005 | 68713 | Distrib Freight Out | DC Joliet - Regional | Tbd |

Exhibit 2

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Check# | Inv Dte | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|----|-----|---------|---------|-----|-------|------------|-----|--------|--------|----------|--------|---------|---------|---------|------------|------------|------------|

*The body of this page is a dense financial ledger with approximately 70 rows. Consistent column values across rows include: Acct 607250; Dept 8188; Prod 00000; CER 00000; Unit PETCO; FY 2005; Descr "Accounts Payable"; Acct Descr "Distrib Freight Out"; Dept Descr "DC Jobst - Regional"; Prod Descr "Tbd". Vendors include "LANTER TRANSPORT, INC.", "ABF FREIGHT SYSTEM INC", "WERNER ENTERPRISES", "CRST FREIGHT SERVICES", "SWIFT TRANSPORTATION CO, INC.", "USF HOLLAND INC", and "PERFORMANCE TRUCKING, INC." The individual numeric values (amounts, invoice numbers, check numbers, dates) are not legibly reproducible.*

Exhibit 2

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 2-23-05



| Acct | Dept | Prod | Unit | FY | Per | Jrnl Dt | Src | Jrnl ID | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dt | Check# | Chk Dt | Vendor# |
|------|------|------|------|----|-----|---------|-----|---------|-------|-----------|-----|--------|--------|----------|--------|--------|--------|---------|
| 607250 | 8198 | 00000 | PETCO | 2005 | 1 | 2/27/2005 | AP1 | 2037340 | Accounts Payable | 00752001800000 | 01241027 | 1,855.04 | LANTER TRANSPORT, INC. | 314894 | 12/21/2004 | 800821 | 2/2/2005 | 68713 |
| 607250 | 8198 | 00000 | PETCO | 2005 | 1 | 2/27/2005 | AP1 | 2037340 | Accounts Payable | 00752001800000 | 01241043 | 950.53 | LANTER TRANSPORT, INC. | 314844 | 12/21/2004 | 800821 | 2/2/2005 | 68713 |
| 607250 | 8198 | 00000 | PETCO | 2005 | 1 | 2/27/2005 | AP1 | 2037340 | Accounts Payable | 00752001800000 | 01241043 | 951.08 | LANTER TRANSPORT, INC. | 314822 | 12/21/2004 | 800821 | 2/2/2005 | 68713 |

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 2-23-05

| Acct | Dept | Perd | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | PETCO | 2005 | 1 | | AP120377715 | AP | Accounts Payable | | | 255.41 | ABF FREIGHT SYSTEM INC | | | | | | | DC Portland | Tbd |
| | | | PETCO | 2005 | 1 | | AP120377715 | AP | Accounts Payable | | | 133.96 | ABF FREIGHT SYSTEM INC | | | | | | | DC Portland | Tbd |

(Remaining rows — freight-out ledger detail, Accounts Payable, DC Portland — with vendors including OH ROBINSON, FEDEX FREIGHT WEST, FEDEX FREIGHT SYSTEM INC, SPAN ALASKA CONSOLIDATORS INC, EXEL TRANSPORTATION SERVICES INC, HORIZON FREIGHT SYSTEM INC, TRAFFIC TECH INC, INTERSTATE DISTRIBUTOR CO, MAY TRUCKING.)

Exhibit 2

FEBRUARY GL FOR CODE 807250 FREIGHT OUT THROUGH 3-23-05

Exhibit 2

018

FEBRUARY GL FOR COR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Expense Distribution | Ref | Amount | Vendor | Invoice | Inv Dts | Check# | Chk Dts | Vendor# | Acct Descr | Dept Descr | Proj Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 800 | 00000 | 00000 | PETCO | 2005 | 1 | | | | Accounts Payable | | | | | SPAN ALASKA CONSOLIDATORS INC | | | | | | Distrib Freight Out | DC Portland | Tbd |

*(Remainder of this page is a dense multi-row general-ledger report for GL cost code 807250 "Freight Out," with hundreds of line entries for vendors including FEDEX FREIGHT WEST, FRED HAINES TRANSPORTATION, XPRESS GLOBAL SYSTEMS INC, SPAN ALASKA CONSOLIDATORS INC, HORIZON FREIGHT SYSTEM INC, TRAFFIC TECH INC., and others. Individual cell values are not legibly resolvable.)*

Exhibit 2

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 2-23-05

| Acct | Dept | Prod | CFR | Unit | FY | Pr | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|----|----|---------|---------|-----|-------|-----------|-----|--------|--------|----------|---------|--------|---------|--------|-----------|-----------|-----------|

Exhibit 2

020

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl ID | Jrnl Dt | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice | Chk Dt | Check | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(Table rows illegible at available resolution — dense ledger listing of freight-out transactions for vendors including HORIZON FREIGHT SYSTEM INC, INTERSTATE DISTRIBUTOR CO, FEDEX FREIGHT WEST, SWIFT TRANSPORTATION CO INC, ONEXT TRANSPORATION, ABF FREIGHT SYSTEM INC, WERNER ENTERPRISES, etc. Account 807250, Dept 8528, Unit PETCO, FY 2005. Acct Descr "Distrb Freight Out", Dept Descr "DC Mira Loma", Prod Descr "Main Tbd".)*

Exhibit 2

022

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | Prod | PY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(This page is a rotated, densely printed general-ledger report. The tabular data below the header consists of many rows of account entries (Acct 607250, Unit PETCO, Dept 6800, Prod 8800, CER 00000, Src AP, Descr "Accounts Payable", Line Descr "Freight Out", Acct Descr "Distrib Freight Out", Dept Descr "DC Mira Loma - Han", Prod Descr "Tbd") with varying Journal IDs, amounts, vendors (e.g. TICHE WAREHOUSING AND, MWYDCIO KANU, GILBERT EXPRESS, INC., GA ROBINSON CO), invoice numbers, invoice dates, check numbers, and check dates. Totals shown include 64,787.00, 144,088.93, 144,088.93.)*

Exhibit 2

023

FEBRUARY GL FOR CODE #07250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CCtr | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Expense Distribution | Amount | Ref | Vendor | Invoice# | Inv Dt | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8800 | 0000 | 0000 | PETCO | 2005 | 1 | 2/4/2005 | AP120371418 | | Accounts Payable | 807250000000 | | 867.83 | 0124XXXX | TCHE WAREHOUSING AND | | 1/XX/2004 | | 2/4/2005 | 14449 | DistRib Freight Out | DC Mansfield, MA | Tbd |
| 807250 | 8800 | 0000 | 0000 | PETCO | 2005 | 1 | 2/4/2005 | AP120371418 | | Accounts Payable | 807250000000 | | | | GILBERT EXPRESS, INC. | | | | 2/4/2005 | 0153 | DistRib Freight Out | DC Mansfield, MA | Tbd |
| 807250 | 8800 | 0000 | 0000 | PETCO | 2005 | 1 | 2/9/2005 | AP120371485 | | Accounts Payable | 807250000000 | | | | CH ROBINSON | | | | 2/9/2005 | 0125 | DistRib Freight Out | DC Mansfield, MA | Tbd |

*(The remainder of the page is a continuation of the same ledger. Each row records Acct 807250 or 807254, Dept 8800, Prod 0000, CCtr 0000, Unit PETCO, FY 2005, Per 1, with Jrnl Dt dates from 2/4/2005 through 2/17/2005, Jrnl ID values such as AP120371418 / AP120371531 / AP120371618 / AP120371715 / AP120371743 / AP120371824, Descr "Accounts Payable", Line Descr 807250000000 (later rows "Expense Distribution"), Vendors "TCHE WAREHOUSING AND" and "GILBERT EXPRESS, INC.", Acct Descr "DistRib Freight Out", Dept Descr "DC Mansfield, MA", and Prod Descr "Tbd". The individual Amount, Ref, Invoice#, Inv Dt, Check#, Chk Dte and Vendor# values are too faint to read reliably.)*

Exhibit 2

12

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Chq Dt | Chk Dte | Vendor | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|----|-----|---------|---------|-----|-------|-----------|-----|--------|--------|----------|---------|--------|---------|--------|-----------|-----------|-----------|
| 807250 | 8800 | 0000 | PETCO 2005 | 1 | 2/17/2005 | | AP | Accounts Payable | Expense Distribution | | | TDHE WAREHOUSING AND | | | | | 14448 | DistRb Freight Out | DC Mansfield, MA | Tbd |

(Subtotal) 23,048.90
(23,694.09)
85,243.21
85,243.21

Total Dect

Exhibit 2

025

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-06

| Acct | Dept | Prod | Unit | CER | FY | Per | Jrnl Dt | Jrnl ID | Src | Owner | Line Descr | Ref | Amount | Vendor | Trxnload | Inv Dte | Check# | Chk Dte | Vendor# | Dept Descr | Acct Descr | Dept Descr | Prog Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Exhibit 2

FEBRUARY GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-06

| Acct | Dept | Prod | Unit | PY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|------|----|----|---------|---------|-----|-------|-----------|-----|--------|--------|----------|---------|--------|---------|---------|-----------|-----------|-----------|

Exhibit 2

FEBRUARY GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/11/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252580 | 1,138.75 | PERFORMANCE TRUCKING, INC. | 0043693 | 1/6/2005 | 870088 | 2/11/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/11/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252582 | 1,238.52 | PERFORMANCE TRUCKING, INC. | 0043679 | 1/6/2005 | 870088 | 2/11/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252582 | 100.13 | ABF FREIGHT SYSTEM INC | 277274638 | 2/22/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252543 | 1,233.85 | CON-BROOK TRANSPORTATION | 173677 | 2/24/2005 | 73437 | 2/24/2005 | 73437 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 1/6/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252582 | 1,210.04 | PERFORMANCE TRUCKING, INC. | 0044569 | 1/7/2005 | 870088 | 1/6/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8830 | 00000 | | PETCO | 2005 | 1 | 1/7/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252582 | 1,175.62 | PERFORMANCE TRUCKING, INC. | 0044575 | 1/7/2005 | 870088 | 1/7/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 1/11/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252584 | 63.58 | PERFORMANCE TRUCKING, INC. | 0044594 | 1/7/2005 | 870088 | 1/11/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252584 | 1,326.01 | NEW ENGLAND MOTOR FRT. INC | 494021905 | 1/7/2005 | 870077 | 2/24/2005 | 21910 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203712 | AP | Accounts Payable | 60725085080000000 | 01252212 | 209.34 | ABF FREIGHT SYSTEM INC | 221080318 | 1/7/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252546 | 870.33 | CON-BROOK TRANSPORTATION | 173678 | 1/7/2005 | 872032 | 2/24/2005 | 73437 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252603 | 585.00 | W.C. MCQUADE INC. | 231543 | 1/10/2005 | 872104 | 2/24/2005 | 72046 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252646 | 648.00 | W.C. MCQUADE INC. | 231558 | 1/10/2005 | 872104 | 2/24/2005 | 72046 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252649 | 946.88 | CARGO TRANSPORT INC | 00111240 | 1/10/2005 | 871985 | 2/24/2005 | 78167 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252654 | 584.38 | CARGO TRANSPORT INC | 00111239 | 1/10/2005 | 871985 | 2/24/2005 | 78167 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252651 | 595.00 | W.C. MCQUADE INC. | 231557 | 1/10/2005 | 872104 | 2/24/2005 | 72046 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252551 | 733.70 | CON-BROOK TRANSPORTATION | 173810 | 1/11/2005 | 872032 | 2/24/2005 | 73437 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 1/11/2005 | AP1203754/8 | AP | Accounts Payable | 60725085080000000 | 01252513 | 1,103.98 | PERFORMANCE TRUCKING, INC. | 0044590 | 1/11/2005 | 870088 | 1/11/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252513 | 1,138.71 | PERFORMANCE TRUCKING, INC. | 0044571 | 1/11/2005 | 871450 | 2/22/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252541 | 1,228.52 | PERFORMANCE TRUCKING, INC. | 0044594 | 1/11/2005 | 872032 | 2/24/2005 | 73043 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252513 | 403.48 | ABF FREIGHT SYSTEM INC | 221422334 | 1/13/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252550 | 153.58 | CON-BROOK TRANSPORTATION | 382007118 | 1/13/2005 | 872032 | 2/24/2005 | 73437 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252550 | 757.29 | CON-BROOK TRANSPORTATION | 173817 | 1/13/2005 | 872032 | 2/24/2005 | 73437 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252606 | 243.91 | PERFORMANCE TRUCKING, INC. | 173829 | 1/13/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252607 | 358.02 | ABF FREIGHT SYSTEM INC | 069307055 | 1/14/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/24/2005 | AP1203743 | AP | Accounts Payable | 60725085080000000 | 01252607 | 694.38 | CARGO TRANSPORT INC | 00111340 | 1/14/2005 | 871985 | 2/24/2005 | 78167 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/3 | AP | Accounts Payable | 60725085080000000 | 01252625 | 1,132.25 | PERFORMANCE TRUCKING, INC. | 0044581 | 1/14/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252625 | 207.74 | ABF FREIGHT SYSTEM INC | 069320323 | 1/18/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252616 | 291.49 | ABF FREIGHT SYSTEM INC | 220461453 | 1/18/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252611 | 136.18 | ABF FREIGHT SYSTEM INC | 222431421 | 1/18/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252611 | 63.58 | ABF FREIGHT SYSTEM INC | 220154320 | 1/19/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252621 | 631.91 | ABF FREIGHT SYSTEM INC | 069174384 | 1/20/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/5 | AP | Accounts Payable | 60725085080000000 | 01252246 | 438.29 | ABF FREIGHT SYSTEM INC | 069152302 | 1/20/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203723 | AP | Accounts Payable | 60725085080000000 | 01252246 | 488.29 | ABF FREIGHT SYSTEM INC | 125320738 | 1/20/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/6 | REC | Accrual - Freight Out | Freight Out | | (54,373.00) | | | | | | | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 0412003166 | REC | Accrual - Freight Out | Freight Out | | 184,907.00 | | | | | | | Distrb Freight Out | DC Morris, NJ | Tbd |
| 607250 | 8800 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 050100166 | REC | Accrual - Freight Out | Freight Out | | 405,058.38 | | | | | | | Distrb Freight Out | DC Morris, NJ | Tbd |
| | | | | | | | | | | **Total Prod** | | | | | | | | | | | | |
| 607250 | 8880 | 00000 | | PETCO | 2005 | 1 | 2/22/2005 | AP1203711/6 | AP | Accounts Payable | 60725085080000000 | 01250145 | 100.36 | ABF FREIGHT SYSTEM INC | 352090451 | 1/4/2005 | 871450 | 2/22/2005 | 01013 | Distrb Freight Out | DC New Hope, NJ | Tbd |
| 607250 | 8880 | 00000 | | PETCO | 2005 | 1 | 1/30/2005 | 0412003166 | REC | Accrual - Freight Out | Freight Out | | (99,340.00) | | | | | | | Distrb Freight Out | DC New Hope, NJ | Tbd |
| 607250 | 8880 | 00000 | | PETCO | 2005 | 1 | 2/28/2005 | 050100166 | REC | Accrual - Freight Out | Freight Out | | 184,908.00 | | | | | | | Distrb Freight Out | DC New Hope, NJ | Tbd |
| | | | | | | | | | | **Total Prod** | | | 127,612.36 | | | | | | | | | |
| | | | | | | | | | | **Total Dept** | | | 127,612.36 | | | | | | | | | |
| | | | | | | | | | | **Total Account** | | | 1,564,730.01 | | | | | | | | | |
| | | | | | | | | | | **Total Report** | | | 1,564,730.01 | | | | | | | | | |

Exhibit 2

029



MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | InvoiceID | Inv Dte | Check# | Chk Dte | VendorID | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|----|-----|---------|-----|-------|-----------|-----|--------|--------|-----------|---------|--------|---------|----------|-----------|-----------|-----------|
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | Expense Distribution | 01266260 | 1,960.00 | XPRESS DIRECT | 820944500-00A | 11/24/2004 | 873629 | 3/2/2005 | 74309 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266304 | 1,045.03 | CH ROBINSON | 24885105 | 12/1/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266306 | 1,241.00 | CH ROBINSON | 24789088 | 12/2/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266308 | 1,786.42 | CH ROBINSON | 24821533 | 12/2/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266310 | 1,241.00 | CH ROBINSON | 24840781 | 12/2/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266313 | 1,415.38 | CH ROBINSON | 24841314 | 12/14/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266315 | 1,389.40 | CH ROBINSON | 24863375 | 12/2/2004 | 873910 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266317 | 1,470.84 | LANTER TRANSPORT, INC. | 313597 | 12/2/2004 | 873190 | 3/2/2005 | 74013 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01266519 | 1,508.00 | TOTAL QUALITY LOGISTICS INC | 123201 | 8/29/2004 | 873365 | 3/2/2005 | 75425 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | Expense Distribution | 01277618 | 1,900.00 | EXEL TRANSPORTATION SERVICES INC | 7410003165 | 12/2/2004 | 873396 | 3/15/2005 | 75875 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038179 | AP | Accounts Payable | Expense Distribution | 01277771 | 907.30 | BRISK TRANSPORTATION SERVICES INC | 0442 | 10/25/2004 | 873770 | 3/2/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038179 | AP | Accounts Payable | Expense Distribution | 01277772 | 1,567.01 | BRISK TRANSPORTATION, L.P. | 0442 | 10/25/2004 | 873770 | 3/2/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038179 | AP | Accounts Payable | 8072501800000 | 01277773 | 1,607.92 | LANTER TRANSPORT, INC. | 311147 | 10/25/2004 | 873338 | 3/16/2005 | 74013 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038179 | AP | Accounts Payable | 8072501800000 | 01277775 | 867.30 | LANTER TRANSPORT, INC. | 311147 | 10/25/2004 | 873338 | 3/16/2005 | 73713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 2 | AP120037895 | AP | Accounts Payable | 8072501800000 | 01288144 | 1,312.64 | CH ROBINSON | 813432000 | 10/2/2004 | 873108 | 3/2/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037894 | AP | Accounts Payable | Expense Distribution | 01270431 | 2,418.42 | BRISK TRANSPORTATION, L.P. | 0444 | 3/2/2005 | 873706 | 3/2/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037894 | AP | Accounts Payable | Expense Distribution | 01270432 | 3,288.24 | BRISK TRANSPORTATION, L.P. | 0443 | 3/4/2005 | 873706 | 3/2/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037894 | AP | Accounts Payable | Expense Distribution | 01270432 | 1,630.48 | BRISK TRANSPORTATION, L.P. | 0445 | 11/20/2004 | 873410 | 3/4/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037894 | AP | Accounts Payable | Expense Distribution | 01270432 | 1,646.42 | BRISK TRANSPORTATION, L.P. | 0447 | 11/20/2004 | 873410 | 3/4/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037894 | AP | Accounts Payable | Expense Distribution | 01277900 | 3,307.14 | BRISK TRANSPORTATION, L.P. | 0450 | 11/28/2004 | 873770 | 3/4/2005 | 73377 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01289312 | 1,462.12 | CH ROBINSON | 24873773 | 11/20/2004 | 873770 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01289313 | 1,483.12 | CH ROBINSON | 24922940 | 12/7/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01289314 | 1,471.08 | CH ROBINSON | 24884409 | 12/7/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01289315 | 1,287.70 | CH ROBINSON | 24775331 | 12/7/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01270063 | 1,552.34 | CH ROBINSON | 24838575 | 12/7/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01270063 | 902.34 | CH ROBINSON | 24778331 | 12/7/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038116 | AP | Accounts Payable | 8072501800000 | 01270064 | 1,552.34 | CH ROBINSON | 24815884 | 12/2/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038177 | AP | Accounts Payable | Expense Distribution | 01277870 | 10.00 | LANTER TRANSPORT, INC. | 312341A | 3/16/2005 | 874187 | 3/16/2005 | 74013 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038233 | AP | Accounts Payable | 8072501800000 | 01274846 | 1,287.40 | CH ROBINSON | 24811112 | 12/15/2004 | 874187 | 3/16/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038184 | AP | Accounts Payable | 8072501800000 | 01271369 | 1,463.64 | CH ROBINSON | 25001983 | 12/15/2004 | 874113 | 3/16/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038184 | AP | Accounts Payable | 8072501800000 | 01271370 | 902.10 | CH ROBINSON | 24744227 | 12/16/2004 | 874180 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038184 | AP | Accounts Payable | 8072501800000 | 01271371 | 874.82 | CH ROBINSON | 24944230 | 12/14/2004 | 874180 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038184 | AP | Accounts Payable | 8072501800000 | 01271372 | 1,287.70 | CH ROBINSON | 25002415 | 12/14/2004 | 874180 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038184 | AP | Accounts Payable | 8072501800000 | 01271344 | 902.34 | CH ROBINSON | 25106888 | 12/15/2004 | 874180 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271318 | 1,552.34 | CH ROBINSON | 24782237 | 12/22/2004 | 874080 | 3/10/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037954 | AP | Accounts Payable | 8072501800000 | 01271322 | 948.38 | CH ROBINSON | 25007629 | 12/22/2004 | 874080 | 3/10/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037954 | AP | Accounts Payable | 8072501800000 | 01271651 | 1,470.84 | CH ROBINSON | 25006461 | 12/22/2004 | 874014 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037954 | AP | Accounts Payable | 8072501800000 | 01271405 | 1,125.00 | CH ROBINSON | 24927427 | 12/22/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120037954 | AP | Accounts Payable | 8072501800000 | 01273066A | 1,742.40 | CH ROBINSON | 25108552 | 12/23/2004 | 874080 | 3/10/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038113 | AP | Accounts Payable | 8072501800000 | 01273066 | 1,548.16 | CH ROBINSON | 25123850 | 12/23/2004 | 874080 | 3/10/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038115 | AP | Accounts Payable | 8072501800000 | 01273087 | 1,548.16 | CH ROBINSON | 25133777 | 12/23/2004 | 874080 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038115 | AP | Accounts Payable | 8072501800000 | 01273063 | 901.72 | CH ROBINSON | 25143725 | 12/23/2004 | 873059 | 3/11/2005 | 01455 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271393 | 1,672.68 | LANTER TRANSPORT, INC. | 314681 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271406 | 1,733.42 | LANTER TRANSPORT, INC. | 314636 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271407 | 2,348.16 | LANTER TRANSPORT, INC. | 314643 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271403 | 865.24 | LANTER TRANSPORT, INC. | 314610 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271404 | 851.08 | LANTER TRANSPORT, INC. | 314631 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271398 | 1,548.16 | LANTER TRANSPORT, INC. | 314607 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271397 | 1,470.08 | LANTER TRANSPORT, INC. | 314636 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271393 | 870.85 | LANTER TRANSPORT, INC. | 314685 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |
| 807250 | 8198 | 00000 | | PETCO | 2005 | 3 | AP120038102 | AP | Accounts Payable | 8072501800000 | 01271392 | 851.08 | LANTER TRANSPORT, INC. | 314590 | 12/27/2004 | 874244 | 3/7/2005 | 68713 | Distrib Freight Out | DC Jobbi - Regional | Tbd |

Exhibit 2.

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | Fy | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8198 | 0000 | | PETCO | 2005 | 2 | | | AP | Accounts Payable | 807250018000000 | | | CH ROBINSON | | | | | | Distrib Freight Out | DC Sales - Regional | Tbd |

*(Note: This is a dense multi-page financial general ledger spreadsheet with many repeated rows. Vendors listed include CH ROBINSON, LANTER TRANSPORT INC, ABF FREIGHT SYSTEM INC, XPRESS DIRECT, and LAURA GILL. The Acct Descr column repeats "Distrib Freight Out", Dept Descr repeats "DC Sales - Regional", and Prod Descr repeats "Tbd" throughout. Individual amounts, invoice numbers, and dates are illegible at this resolution.)*

Exhibit 2

MARCH GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dt | Check# | Chk Dt | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 8186 | 0000 | | PETDO | 2005 | 2 | | | AP | Accounts Payable | | | 1,079.81 | LATTER TRANSPORT , INC. | | | | | | Distrib Freight Out | OC Admin - Regional | Tbd |
| 607250 | 8186 | 0000 | | PETDO | 2005 | 2 | | | AP | Accounts Payable | | | 1,395.04 | LATTER TRANSPORT , INC. | | | | | | Distrib Freight Out | OC Admin - Regional | Tbd |
| 607250 | 8186 | 0000 | | PETDO | 2005 | 2 | | | AP | Accounts Payable | | | 852.39 | LATTER TRANSPORT , INC. | | | | | | Distrib Freight Out | OC Admin - Regional | Tbd |

Exhibit 2.

033

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dstn Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/3/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273582 | 1,516.24 | ASF FREIGHT SYSTEM INC | 116800000 | 1/27/2005 | 875353 | 3/3/2005 | 01013 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273582 | 1,718.74 | LANTER TRANSPORT, INC | 316799 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273558 | 643.02 | LANTER TRANSPORT, INC | 316705 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273543 | 1,377.08 | LANTER TRANSPORT, INC | 316723 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273543 | 1,549.01 | LANTER TRANSPORT, INC | 316754 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273558 | 1,303.05 | LANTER TRANSPORT, INC | 316759 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273558 | 1,033.17 | LANTER TRANSPORT, INC | 316720 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273584 | 852.33 | LANTER TRANSPORT, INC | 316724 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01273564 | 1,533.04 | LANTER TRANSPORT, INC | 316710 | 1/27/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/3/2005 | AP01207307 | AP | Accounts Payable | 807250019800000 | 01270010 | 1,091.61 | ASF FREIGHT SYSTEM INC | 09644584 | 1/26/2005 | 873633 | 3/3/2005 | 01013 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/3/2005 | AP01207307 | AP | Accounts Payable | 807250019800000 | 01270010 | 223.77 | ASF FREIGHT SYSTEM INC | 09301553 | 1/26/2005 | 873633 | 3/3/2005 | 01013 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/3/2005 | AP01207307 | AP | Accounts Payable | 807250019800000 | 01369902 | 118.50 | ASF FREIGHT SYSTEM INC | 09644588 | 1/26/2005 | 873633 | 3/3/2005 | 01013 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01275503 | 982.23 | LANTER TRANSPORT, INC | 316663 | 1/26/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01275574 | 1,291.65 | LANTER TRANSPORT, INC | 316744 | 1/26/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01275574 | 1,446.11 | LANTER TRANSPORT, INC | 316749 | 1/26/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/12/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01275379 | 1,078.91 | LANTER TRANSPORT, INC | 316761 | 1/26/2005 | 875353 | 3/14/2005 | 68713 | Distrb Freight Out | DC Outlet - Regional | Tbd |
| 807250 | 6198 | 0000 | | PETCO | 2005 | 2 | 3/17/2005 | AP01208139 | AP | Accounts Payable | 807250019800000 | 01275235 | 170.79 | ASF FREIGHT SYSTEM INC | 00916367 | 1/26/2005 | 875385 | 3/17/2005 | 01013 | Distrb Freight Out | DC Outlet - Regional | Tbd |

Exhibit 2

034



MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Amount | Ref | Vendor | Invoice | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | E200 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1203784 | AP | Accounts Payable | 807250C00000000 | | | MAY TRUCKING | | | | | | Distrib Freight Out | DC Portland | Tbd |

*(This is a dense multi-row freight-out general ledger report. The body consists of numerous rows for account 807250, dept E200, unit PETCO, FY 2005, with vendors including MAY TRUCKING, TOTAL QUALITY LOGISTICS INC, SPAN ALASKA CONSOLIDATORS INC, FEDEX FREIGHT WEST, and INTERSTATE DISTRIBUTOR CO, each with amounts, reference numbers, invoice numbers, and dates in January–March 2005. Individual cell values are not legible at this resolution.)*

Exhibit 2.

MARCH GL FOR CODE 807230 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

037

MARCH GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CFR | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 8300 | 0000 | 0000 | PETCO | 2005 | 2 | 3/11/2005 | AP01035102 | AP | Accounts Payable | 6072505000000000 | 01271387 | 184.62 | FEDEX FREIGHT WEST | 67271-48258 | 1/22/2005 | 874824 | 3/10/2005 | 98720 | Distrib Freight Out | DC Stockton | Tbd |
| 607250 | 8300 | 0000 | 0000 | PETCO | 2005 | 2 | 3/11/2005 | AP01035102 | AP | Accounts Payable | 6072505000000000 | 01271503 | 314.08 | FEDEX FREIGHT WEST | 67271-48259 | 1/24/2005 | 874824 | 3/10/2005 | 98720 | Distrib Freight Out | DC Stockton | Tbd |

*(The central portion of this table is obscured by scanning artifacts and is illegible.)*

| Acct | Dept | Prod | CFR | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/16/2005 | AP01037700 | AP | Accounts Payable | 6072504000000000 | 01377774 | 1,623.40 | LANTER TRANSPORT, INC. | 308830 | 9/13/2004 | 873630 | 3/16/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/16/2005 | AP01037700 | AP | Accounts Payable | 6072504000000000 | 01377775 | 1,623.40 | LANTER TRANSPORT, INC. | 307020 | 9/15/2004 | 873630 | 3/16/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/5/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01271488 | 1,670.88 | LANTER TRANSPORT, INC. | 314488 | 12/27/2004 | 873248 | 3/7/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/5/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01271387 | 1,548.15 | LANTER TRANSPORT, INC. | 314508 | 12/20/2004 | 873248 | 3/7/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/5/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01271524 | 1,670.88 | LANTER TRANSPORT, INC. | 314867 | 12/30/2004 | 873671 | 3/4/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/4/2005 | AP01037700 | AP | Accounts Payable | 6072504000000000 | 01270541 | 1,670.88 | LANTER TRANSPORT, INC. | 314581 | 12/30/2004 | 874671 | 3/4/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/4/2005 | AP01037700 | AP | Accounts Payable | 6072504000000000 | 01270647 | 1,670.88 | LANTER TRANSPORT, INC. | 314677 | 12/30/2004 | 874671 | 3/4/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/4/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01269850 | 1,578.60 | LANTER TRANSPORT, INC. | 314632 | 12/31/2004 | 873720 | 3/2/2005 | 63713 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01269300 | 1,578.60 | CRST FREIGHT SERVICES | C777178 | 1/1/2005 | 873720 | 3/2/2005 | 98640 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01269303 | 1,587.37 | CRST FREIGHT SERVICES | C773968 | 1/1/2005 | 873720 | 3/2/2005 | 98640 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037800 | AP | Accounts Payable | 6072504000000000 | 01269304 | 1,587.37 | CRST FREIGHT SERVICES | C773964 | 1/1/2005 | 873720 | 3/2/2005 | 98640 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/16/2005 | AP01037300 | AP | Accounts Payable | 6072504000000000 | 01378721 | 1,049.16 | OH ROBINSON | 25235410 | 3/15/2005 | 873870 | 3/15/2005 | 01435 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037900 | AP | Accounts Payable | 6072504000000000 | 01269319 | 1,900.00 | TOTAL QUALITY LOGISTICS INC | 113562 | 1/4/2005 | 873822 | 3/2/2005 | 73423 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037900 | AP | Accounts Payable | 6072504000000000 | 01269322 | 2,200.00 | TOTAL QUALITY LOGISTICS INC | 120237 | 1/4/2005 | 873822 | 3/2/2005 | 73423 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037900 | AP | Accounts Payable | 6072504000000000 | 01269323 | 2,500.00 | TOTAL QUALITY LOGISTICS INC | C773840 | 1/5/2005 | 873822 | 3/2/2005 | 73423 | Distrib Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP01037900 | AP | Accounts Payable | 6072504000000000 | 01269325 | 2,000.00 | TOTAL QUALITY LOGISTICS INC | 120266 | 1/5/2005 | 873822 | 3/2/2005 | 73423 | Distrib Freight Out | DC Texas | Tbd |

Exhibit 2

MARCH GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CCR | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Dt | Ref | Amount | Vendor | Invoice | Inv Dt | Check# | Chk Dts | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP12037900 | AP | Accounts Payable | 607250040000000 | 01288324 | 2,500.00 | TOTAL QUALITY LOGISTICS INC | 120233 | 1/6/2005 | 873822 | 3/2/2005 | 73425 | Dsrtb Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP12037900 | AP | Accounts Payable | 607250040000000 | 01288325 | 1,738.44 | CRST FREIGHT SERVICES | CT42180 | 1/7/2005 | 873720 | 3/2/2005 | 09540 | Dsrtb Freight Out | DC Texas | Tbd |
| 607250 | 8400 | 0000 | 0000 | TEXAS | 2005 | 2 | 3/2/2005 | AP12037900 | AP | Accounts Payable | 607250040000000 | 01288326 | 1,738.44 | CRST FREIGHT SERVICES | CT42187 | 1/7/2005 | 873720 | 3/2/2005 | 09540 | Dsrtb Freight Out | DC Texas | Tbd |

*(Table continues for many additional rows with repeating values: Acct 607250, Dept 8400, Prod 0000, CCR 0000, Unit TEXAS, FY 2005, Per 2, Src AP, Descr "Accounts Payable", Acct Descr "Dsrtb Freight Out", Dept Descr "DC Texas", Prod Descr "Tbd". Vendors include CRST FREIGHT SERVICES, LANTER TRANSPORT INC, TRANSPORT DISTRIBUTION SERVICES INC, WERNER ENTERPRISES. Individual invoice numbers, dates and amounts are largely illegible in this scan.)*

Exhibit 2

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | CTR | Prod | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | CheckF | Chk Dte | VendorF | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203784 | AP | Accounts Payable | 807250649000000 | 01773928 | 1,742.74 | AMERI-CO CARRIERS, INC | 105315400 | 9/23/2004 | 874834 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203784 | AP | Accounts Payable | 807250649000000 | 01773928 | 1,570.25 | AMERI-CO CARRIERS, INC | 105313700 | 11/23/2004 | 874834 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203784 | AP | Accounts Payable | 807250649000000 | 01035087 | 1,521.34 | AMERI-CO CARRIERS, INC | 105820800 | 12/16/2004 | 874834 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203784 | AP | Accounts Payable | 807250649000000 | 01035087 | 1,031.72 | AMERI-CO CARRIERS, INC | 105814800 | 12/17/2004 | 874834 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203785 | AP | Accounts Payable | 807250649000000 | 01035087 | 2,033.00 | HORIZON FREIGHT SYSTEM, INC | 01003 | 12/20/2004 | 874834 | 3/10/2005 | 70094 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203785 | AP | Accounts Payable | 807250649000000 | 01766068 | 1,517.50 | HORIZON FREIGHT SYSTEM, INC | 01003 | 12/20/2004 | 874834 | 3/10/2005 | 70094 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203786 | AP | Accounts Payable | 807250649000000 | 01766068 | 1,519.95 | AMERI-CO CARRIERS, INC | 105317500 | 12/21/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203786 | AP | Accounts Payable | 807250649000000 | 01766068 | 1,837.42 | AMERI-CO CARRIERS, INC | 105922700 | 12/21/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203787 | AP | Accounts Payable | 807250649000000 | 01766066 | 1,405.00 | AMERI-CO CARRIERS, INC | 105922000 | 12/22/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203788 | AP | Accounts Payable | 807250649000000 | 01766072 | 433.68 | AMERI-CO CARRIERS, INC | 105914900 | 12/22/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203788 | AP | Accounts Payable | 807250649000000 | 01358074 | 1,300.00 | AMERI-CO CARRIERS, INC | 105922600 | 12/22/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203788 | AP | Accounts Payable | 807250649000000 | 01358072 | 1,311.88 | AMERI-CO CARRIERS, INC | 105922300 | 12/22/2004 | 872941 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203788 | AP | Accounts Payable | 807250649000000 | 01358072 | 1,907.14 | SWIFT TRANSPORTATION CO, INC | 1990443 | 12/25/2004 | 873589 | 3/2/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203788 | AP | Accounts Payable | 807250649000000 | 01358072 | 1,711.72 | AMERI-CO CARRIERS, INC | 105923400 | 12/26/2004 | 873589 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203789 | AP | Accounts Payable | 807250649000000 | 01358224 | 1,655.00 | SWIFT TRANSPORTATION CO, INC | 1990709 | 12/26/2004 | 873589 | 3/2/2005 | 70094 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203789 | AP | Accounts Payable | 807250649000000 | 01358224 | 1,344.42 | AMERI-CO CARRIERS, INC | 105815300 | 12/26/2004 | 873589 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203789 | AP | Accounts Payable | 807250649000000 | 01358223 | 1,886.44 | AMERI-CO CARRIERS, INC | 105803700 | 12/26/2004 | 873751 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203789 | AP | Accounts Payable | 807250649000000 | 01358233 | 1,434.10 | AMERI-CO CARRIERS, INC | 105932800 | 12/28/2004 | 873751 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203792 | AP | Accounts Payable | 807250649000000 | 01358067 | 1,008.00 | AMERI-CO CARRIERS, INC | 105944400 | 12/29/2004 | 873589 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203792 | AP | Accounts Payable | 807250649000000 | 01358075 | 1,595.08 | AMERI-CO CARRIERS, INC | 105943000 | 12/29/2004 | 873589 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203786 | AP | Accounts Payable | 807250649000000 | 01358075 | 1,469.04 | AMERI-CO CARRIERS, INC | 105945400 | 12/29/2004 | 873589 | 3/2/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203786 | AP | Accounts Payable | 807250649000000 | 01367625 | 1,538.93 | SWIFT TRANSPORTATION CO, INC | 2021919 | 12/30/2004 | 873333 | 3/22/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/15/2005 | AP1203179 | AP | Accounts Payable | 807250649000000 | 01367623 | 419.16 | AMERI-CO CARRIERS, INC | 105953000 | 12/30/2004 | 873333 | 3/15/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203271 | AP | Expense Distribution | 807250649000000 | 01367871 | (834.83) | SWIFT TRANSPORTATION CO, INC | 2021777 | 12/31/2004 | | | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203271 | AP | AP Manual Disburse | 807250649000000 | 01367425 | 1,072.63 | SWIFT TRANSPORTATION CO, INC | 2021787 | 12/31/2004 | | | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204909 | AP | Accounts Payable | 807250649000000 | 01770694 | 2,033.00 | SWIFT TRANSPORTATION CO, INC | 2021787A | 12/31/2004 | 874185 | 3/4/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204802 | AP | Accounts Payable | 807250649000000 | 01770464 | 2,033.00 | HORIZON FREIGHT SYSTEM, INC | 010293 | 1/3/2005 | 874153 | 3/4/2005 | 70094 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204802 | AP | Accounts Payable | 807250649000000 | 01771448 | 1,317.98 | HORIZON FREIGHT SYSTEM, INC | 010404 | 1/3/2005 | 874153 | 3/4/2005 | 70094 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204802 | AP | Accounts Payable | 807250649000000 | 01770627 | 1,497.86 | AMERI-CO CARRIERS, INC | 105953300 | 1/4/2005 | 873394 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204802 | AP | Accounts Payable | 807250649000000 | 01770627 | 1,520.74 | AMERI-CO CARRIERS, INC | 105965700 | 1/5/2005 | 873394 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01770641 | 1,963.84 | AMERI-CO CARRIERS, INC | 105960000 | 1/5/2005 | 873394 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01770641 | 1,572.87 | AMERI-CO CARRIERS, INC | 105962100 | 1/5/2005 | 873554 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01770630 | 1,578.84 | KNIGHT TRANSPORTATION | 744632 | 1/5/2005 | 873554 | 3/4/2005 | 33335 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01770630 | 1,470.77 | AMERI-CO CARRIERS, INC | 105967100 | 1/6/2005 | 873554 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01771537 | 1,365.73 | AMERI-CO CARRIERS, INC | 105963000 | 1/6/2005 | 873554 | 3/4/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01771527 | 1,599.83 | ABF FREIGHT SYSTEM, INC | 206895 | 1/6/2005 | 874138 | 3/4/2005 | 01015 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01771527 | 1,599.83 | ABF FREIGHT SYSTEM, INC | 206832 | 1/6/2005 | 874138 | 3/4/2005 | 01015 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/4/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01274334 | 239.13 | ABF FREIGHT SYSTEM, INC | 1107884.82 | 1/6/2005 | 874138 | 3/4/2005 | 01015 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/17/2005 | AP1204809 | AP | Accounts Payable | 807250649000000 | 01274334 | 123.10 | SWIFT TRANSPORTATION CO, INC | 2024519 | 1/6/2005 | 875858 | 3/17/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/17/2005 | AP1203324 | AP | Accounts Payable | 807250649000000 | 01773513 | 181.61 | ABF FREIGHT SYSTEM, INC | 208110 | 1/7/2005 | 875858 | 3/17/2005 | 01015 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/17/2005 | AP1203324 | AP | Accounts Payable | 807250649000000 | 01773527 | 2,033.00 | SWIFT TRANSPORTATION CO, INC | 112202348 | 1/10/2005 | 875858 | 3/17/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/17/2005 | AP1203324 | AP | Accounts Payable | 807250649000000 | 01773527 | 132.46 | SWIFT TRANSPORTATION CO, INC | 112203123 | 1/10/2005 | 875858 | 3/17/2005 | 03447 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/2/2005 | AP1203324 | AP | Accounts Payable | 807250649000000 | 01773527 | 2,033.00 | AMERI-CO CARRIERS, INC | 010543 | 1/11/2005 | 874164 | 3/2/2005 | 01015 | Distrib Freight Out | DC Denver Colorado | Tbd |
| 807250 | 8499 | 0000 | | PETCO | 2005 | 2 | 3/1/2005 | AP1203324 | AP | Accounts Payable | 807250649000000 | 01773529 | 1,553.83 | AMERI-CO CARRIERS, INC | 105958000 | 1/11/2005 | 874004 | 3/10/2005 | 2064 | Distrib Freight Out | DC Denver Colorado | Tbd |

Exhibit 2

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Unit | FY | Per | Prod | CER | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dte | Check# | Chk Dte | Vendor | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8499 | PETCO | 2005 | 2 | 0000 | 0000 | 3/11/2005 | AP01038102 | AP | Accounts Payable | 807250649000000 | 01275800 | 1,395.75 | AMERI-CO CARRIERS, INC | 100570700 | 1/11/2005 | 874834 | 3/10/2005 | 20434 | Distrib Freight Out | OC Denver Colorado | Tbd |

*(table continues — hundreds of rows of Accounts Payable freight-out entries for AMERI-CO CARRIERS, INC; FEDEX FREIGHT WEST; SWIFT TRANSPORTATION CO, INC; KNIGHT TRANSPORTATION; ABF FREIGHT SYSTEM INC, account 807250, dept 8499, PETCO, FY 2005)*

Exhibit 2

MARCH GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | Src | Descr | Line Descr | Ref | Amount | Invoiced | Vendor | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01268102 | 74.34 | 841568617 | FEDEX FREIGHT WEST | 11/20/2004 | 872848 | 3/1/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01270681 | 1,250.00 | 24905122 | CH ROBINSON | 12/9/2004 | 874013 | 3/4/2005 | 01455 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01268067 | 242.34 | 105914490 | AMERI-CO CARRIERS, INC | 12/17/2004 | 873841 | 3/2/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01258067 | 932.72 | 195949 | SWIFT TRANSPORTATION CO. INC. | 12/21/2004 | 873841 | 3/2/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01268064 | 1,084.94 | 105914490 | HORIZON FREIGHT SYSTEM, INC | 12/22/2004 | 873841 | 3/1/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01268035 | 1,548.00 | 105923000 | AMERI-CO CARRIERS, INC | 12/22/2004 | 873841 | 3/22/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283257 | 1,817.21 | 105940000 | HORIZON FREIGHT SYSTEM, INC | 12/27/2004 | 873583 | 3/22/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283151 | 1,601.50 | 01039 | HORIZON FREIGHT SYSTEM, INC | 12/25/2004 | 873815 | 3/17/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283210 | 1,601.50 | 01038 | HORIZON FREIGHT SYSTEM, INC | 12/25/2004 | 873815 | 3/7/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283249 | 918.36 | 192190 | SWIFT TRANSPORTATION CO. INC. | 12/29/2004 | 873815 | 3/2/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283238 | 1,548.00 | 01038 | HORIZON FREIGHT SYSTEM, INC | 12/30/2004 | 873815 | 3/2/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283061 | 610.25 | 7535617 | KNIGHT TRANSPORATION | 1/1/2005 | 873838 | 3/1/2005 | 35398 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01276711 | 671.62 | 25331029 | CH ROBINSON | 1/3/2005 | 873372 | 3/2/2005 | 01455 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01276321 | 799.40 | 195257010 | KNIGHT TRANSPORATION | 1/3/2005 | 873372 | 3/17/2005 | 73673 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283331 | 1,500.00 | 741000341 | EXCEL TRANSPORTATION SERVICES INC | 1/4/2005 | 873736 | 3/22/2005 | 73673 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283060 | 799.00 | 7545770 | KNIGHT TRANSPORATION | 1/5/2005 | 873838 | 3/22/2005 | 35398 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01270842 | 918.86 | 195670000 | SWIFT TRANSPORTATION CO. INC. | 1/5/2005 | 873835 | 3/4/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01276529 | 1,116.12 | 2058631 | TOTAL QUALITY LOGISTICS INC | 1/5/2005 | 874138 | 3/7/2005 | 03338 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01283335 | 1,297.22 | 2073032 | SWIFT TRANSPORTATION CO. INC. | 1/5/2005 | 873815 | 3/7/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01280908 | 3,500.00 | 2055242 | SWIFT TRANSPORTATION CO. INC. | 1/6/2005 | 873956 | 3/22/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01280908 | 8.88 | 119917 | KNIGHT TRANSPORATION | 1/6/2005 | 873986 | 3/17/2005 | 73425 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01280908 | 6.38 | 643370309 | CH ROBINSON | 1/6/2005 | 873736 | 3/2/2005 | 01455 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01271483 | 176.15 | 195730046 | KNIGHT TRANSPORATION | 1/6/2005 | 874278 | 3/22/2005 | 73425 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01271492 | 785.40 | 2055653 | SWIFT TRANSPORTATION CO. INC. | 1/6/2005 | 874278 | 3/2/2005 | 25447 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01270722 | 1,210.32 | 2517831 | CH ROBINSON | 1/7/2005 | 873372 | 3/15/2005 | 01455 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01271470 | 198.44 | 7848776 | KNIGHT TRANSPORATION | 1/7/2005 | 873838 | 3/22/2005 | 35398 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285329 | 106.56 | 114015570 | ABF FREIGHT SYSTEM, INC | 1/10/2005 | 873875 | 3/22/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01271140 | 1,631.50 | 01076 | HORIZON FREIGHT SYSTEM, INC | 1/10/2005 | 873233 | 3/7/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01271058 | 180.64 | 499075007 | ABF FREIGHT SYSTEM, INC | 1/10/2005 | 873875 | 3/22/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01278335 | 1,548.00 | 01080 | ABF FREIGHT SYSTEM, INC | 1/10/2005 | 873588 | 3/17/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01278333 | 83.58 | 195024550 | ABF FREIGHT SYSTEM, INC | 1/10/2005 | 873588 | 3/17/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01278332 | 216.63 | 140233431 | ABF FREIGHT SYSTEM, INC | 1/22/2005 | 873588 | 3/17/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01278350 | 1,483.62 | 195730046 | CH ROBINSON | 1/22/2005 | 873588 | 3/17/2005 | 01455 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285091 | 1,084.12 | 250953703 | INTERSTATE DISTRIBUTOR CO | 1/23/2005 | 873256 | 3/1/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285080 | 147.82 | 250953703 | INTERSTATE DISTRIBUTOR CO | 1/23/2005 | 873256 | 3/1/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273571 | 1,378.00 | 817310211 | FEDEX FREIGHT WEST | 1/23/2005 | 873738 | 3/2/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273731 | 81.73 | 010961 | FEDEX FREIGHT WEST | 1/23/2005 | 874222 | 3/10/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273570 | 1,653.56 | 758010944 | INTERSTATE DISTRIBUTOR CO | 1/23/2005 | 874222 | 3/10/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285100 | 141.99 | 3332472 | FEDEX FREIGHT WEST | 1/25/2005 | 873738 | 3/7/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285608 | 1,548.00 | 3338390 | HORIZON FREIGHT SYSTEM, INC | 1/25/2005 | 873959 | 3/10/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285623 | 72.85 | 01081 | INTERSTATE DISTRIBUTOR CO | 1/25/2005 | 873736 | 3/22/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285612 | 851.62 | 383734485 | KNIGHT TRANSPORATION | 1/25/2005 | 873738 | 3/22/2005 | 35398 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01280698 | 2,108.44 | 01080 | HORIZON FREIGHT SYSTEM, INC | 1/14/2005 | 873956 | 3/2/2005 | 25404 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273567 | 199.55 | 673377612 | INTERSTATE DISTRIBUTOR CO | 1/4/2005 | 873738 | 3/10/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273570 | 170.63 | 632234988 | FEDEX FREIGHT WEST | 1/4/2005 | 874222 | 3/10/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273570 | 103.16 | 437155678 | FEDEX FREIGHT WEST | 1/4/2005 | 874222 | 3/10/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273573 | 63.42 | 632234988 | INTERSTATE DISTRIBUTOR CO | 1/5/2005 | 873875 | 3/10/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01285623 | 72.85 | 3338390 | FEDEX FREIGHT WEST | 1/7/2005 | 873738 | 3/10/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273554 | 60.19 | 140234402 | ABF FREIGHT SYSTEM, INC | 1/7/2005 | 873875 | 3/10/2005 | 01013 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01280698 | 1,043.29 | 703277773 | FEDEX FREIGHT WEST | 1/17/2005 | 874222 | 3/10/2005 | 00720 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01273484 | 1,548.00 | 3337994 | INTERSTATE DISTRIBUTOR CO | 1/17/2005 | 873738 | 3/10/2005 | 33333 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |
| 607250 | 6521 | 00000 | AP | Accounts Payable | 607250652500000 | 01275731 | 1,548.00 | 011113 | HORIZON FREIGHT SYSTEM, INC | 1/18/2005 | 873410 | 3/15/2005 | 70906 | Distrib Freight Out | DC Mtn Loma - Main | Tbd |

Exhibit 2

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | CER | Unit | FY | Per | Prod | Acct | Dept | Jrnl ID | Src | Descr | Jrnl Dt | Amount | Ref | Line Descr | Vendor | Invoiced | Inv Dte | Chk Date | Check# | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 6528 | 00000 | PETCO | 2005 | 2 | | | | AP1203784 | AP | Accounts Payable | 3/1/2005 | 1,006.26 | 01285008 | 80725085200000 | INTERSTATE DISTRIBUTOR CO | 3338750 | 1/18/2005 | 3/1/2005 | 872534 | 42839 | Distrb Freight Out | DC Mira Loma - Main | Tbd |
| 807250 | 6528 | 00000 | PETCO | 2005 | 2 | | | | AP1203784 | AP | Accounts Payable | 3/1/2005 | 734.43 | 01270800 | 80725085200000 | INTERSTATE DISTRIBUTOR CO | 3338749 | 1/18/2005 | 3/1/2005 | 872534 | 42839 | Distrb Freight Out | DC Mira Loma - Main | Tbd |
| 807250 | 6528 | 00000 | PETCO | 2005 | 2 | | | | AP1203784 | AP | Accounts Payable | 3/4/2005 | 588.46 | 01270857 | 80725085200000 | KNIGHT TRANSPORTATION | 7976037 | 1/19/2005 | 3/4/2005 | 874854 | 09770 | Distrb Freight Out | DC Mira Loma - Main | Tbd |

Exhibit 3



MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

044

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice | Inv Dt | Check# | Chk Dt | Vendor | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|-----|-----|---------|---------|-----|-------|-----------|-----|--------|--------|---------|--------|--------|--------|--------|-----------|-----------|-----------|
| 807250 | 8500 | 0000 | | PETCO | 2005 | 2 | 3/5/2005 | AP120038020 | AP | Accounts Payable | 8072508000000 | 01371428 | | MWVDGF KANU | 11010H | 1/7/2004 | 874235 | 3/7/2005 | 33573 | Distrib Freight Out | OC Mansfield, MA | Tbd |
| 807250 | 8500 | 0000 | | PETCO | 2005 | 2 | 3/5/2005 | AP120038020 | AP | Accounts Payable | 8072508000000 | 01371433 | | MWVDGF KANU | 11010J | 1/7/2004 | 874235 | 3/7/2005 | 33573 | Distrib Freight Out | OC Mansfield, MA | Tbd |
| 807250 | 8500 | 0000 | | PETCO | 2005 | 2 | 3/5/2005 | AP120038020 | AP | Accounts Payable | 8072508000000 | 01371431 | | MWVDGF KANU | 11010K | 1/7/2004 | 874235 | 3/7/2005 | 33573 | Distrib Freight Out | OC Mansfield, MA | Tbd |
| 807250 | 8500 | 0000 | | PETCO | 2005 | 2 | 3/5/2005 | AP120038020 | AP | Accounts Payable | 8072508000000 | 01371430 | | MWVDGF KANU | 11010F | 1/7/2004 | 874235 | 3/7/2005 | 33573 | Distrib Freight Out | OC Mansfield, MA | Tbd |
| 807250 | 8500 | 0000 | | PETCO | 2005 | 2 | 3/5/2005 | AP120038020 | AP | Accounts Payable | 8072508000000 | 01371427 | | MWVDGF KANU | 11010L | 1/7/2004 | 874235 | 3/7/2005 | 33573 | Distrib Freight Out | OC Mansfield, MA | Tbd |

*[Table continues with additional rows of similar freight-out accounts payable entries for PETCO, Acct 807250, Dept 8500, vendor MWVDGF KANU (and GILBERT EXPRESS, INC. and TIGRE WAREHOUSING AND), Acct Descr "Distrib Freight Out", Dept Descr "OC Mansfield, MA", Prod Descr "Tbd". Individual amounts, invoice numbers, and dates are not legible at this resolution.]*

Exhibit 2

MARCH GL FOR CODE 607250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Amount | Ref | Invoice# | Inv Dte | Check# | Chk Dte | Vendor# | Vendor | Acct Descr | Dept Descr | Prod Descr |
|------|------|-----|------|----|----|---------|---------|-----|-------|-----------|--------|-----|----------|---------|--------|---------|---------|--------|-----------|-----------|-----------|
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265041 | 128805700 | 12/29/2004 | 872651 | 3/1/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265101 | 128814704 | 12/29/2004 | 872655 | 3/1/2005 | 14444 | TIGHE WAREHOUSING AND | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 739.58 | 01265037 | 128814725 | 12/27/2004 | 872655 | 3/1/2005 | 14444 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265037 | 128805800 | 12/27/2004 | 872651 | 3/1/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265042 | 128805800 | 12/27/2004 | 872651 | 3/1/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265036 | 128805800 | 12/29/2004 | 872651 | 3/1/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265043 | 128805800 | 12/29/2004 | 872651 | 3/1/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/1/2005 | AP1203785.AP | AP | Accounts Payable | 60772505000000 | 844.18 | 01174801 | 128848100 | 12/29/2004 | 872658 | 3/1/2005 | 01453 | CH ROBINSON | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265217 | 128870200 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265220 | 127008100 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265222 | 127008100 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265221 | 127004900 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265222 | 127004900 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/2/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01265224 | 128870400 | 1/3/2005 | 873742 | 3/2/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/3/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01270578 | 127007100 | 1/4/2005 | 874045 | 3/3/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/3/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01270579 | 127007100 | 1/4/2005 | 874045 | 3/3/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/3/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01270580 | 127005900 | 1/4/2005 | 874045 | 3/3/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/3/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01270581 | 127005900 | 1/4/2005 | 874045 | 3/3/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/3/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 756.25 | 01270576 | 127014100 | 1/5/2005 | 874045 | 3/3/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/4/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01270589 | 127041100 | 1/10/2005 | 874225 | 3/4/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/4/2005 | AP1203786.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01272245 | 127042900 | 1/10/2005 | 874225 | 3/4/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/4/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01272256 | 127042700 | 1/10/2005 | 874225 | 3/4/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/4/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01272257 | 127042700 | 1/11/2005 | 874225 | 3/4/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/5/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01271448 | 127041400 | 1/10/2005 | 874377 | 3/5/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/5/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01272251 | 127041400 | 1/13/2005 | 874377 | 3/5/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/5/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01271462 | 127011400 | 1/14/2005 | 874377 | 3/5/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/7/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01271487 | 127018000 | 1/17/2005 | 874377 | 3/7/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/7/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01271453 | 127014400 | 1/18/2005 | 875129 | 3/7/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/8/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01274900 | 127072900 | 1/21/2005 | 875129 | 3/8/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/8/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01274409 | 127071800 | 1/21/2005 | 875129 | 3/8/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/9/2005 | AP1203820.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01272253 | 127075300 | 1/21/2005 | 875129 | 3/9/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/10/2005 | AP1013815.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01274902 | 127076400 | 1/21/2005 | 875129 | 3/10/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/11/2005 | AP1013815.AP | AP | Accounts Payable | 60772505000000 | 750.00 | 01274901 | 127073500 | 1/24/2005 | 875129 | 3/11/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/11/2005 | AP1013815.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01274416 | 127111000 | 1/25/2005 | 875129 | 3/11/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |
| 607250 | 8800 | 0000 | PETCO | 2005 | 2 | 3/11/2005 | AP1013815.AP | AP | Accounts Payable | 60772505000000 | 733.13 | 01274539 | 127115700 | 1/25/2005 | 875129 | 3/11/2005 | 81153 | GILBERT EXPRESS, INC. | Distrib Freight Out | DC Mansfield, MA | Tbd |

Exhibit 1

046

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dt | Check | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|----|----|---------|---------|-----|-------|-----------|-----|--------|--------|----------|--------|-------|---------|---------|-----------|-----------|-----------|

*(Ledger detail rows — account 807250, dept 8808, PETCO FY 2005, Accounts Payable, vendor CH ROBINSON and ABF FREIGHT SYSTEM INC; Acct Descr "Distrb Freight Out", Dept Descr "DC Monros, NJ", Prod Descr "Tbd". Individual row amounts, invoice numbers, and dates are not legible at this resolution.)*

Exhibit 2

048

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dtc | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|------|------|------|-----|------|----|-----|---------|---------|-----|-------|-----------|-----|--------|--------|----------|---------|--------|---------|---------|-----------|-----------|-----------|

Exhibit 3

MARCH GL FOR CODE 807250 - FREIGHT OUT THROUGH 3-23-05

| Acct | Dept | Prod | CER | Unit | FY | Per | Jrnl Dt | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoice# | Inv Dt | Check# | Chk Dte | Vendor | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*Exhibit 2*

050

MARCH GL FOR CODE 807230 - FREIGHT OUT THROUGH 3-23-05

Exhibit 2



MARCH GL FOR CODE 807250 FREIGHT OUT THROUGH 3-23-05

| Acct. | Dept. | Prod. | CER | Unit | FY | Per | Jrnl Qy | Jrnl ID | Src | Descr | Line Descr | Ref | Amount | Vendor | Invoiced | Inv Dte | Check# | Chk Dte | Vendor# | Acct Descr | Dept Descr | Prod Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 807250 | 8500 | 00000 | 00000 | PETCO | 2005 | 2 | | | AP | Accounts Payable | Expense Distribution | | | ABF FREIGHT SYSTEM INC | | | | | | Distrb Freight Out | DC Monroe, NJ | Tbd |
| | | | | | | | | | | | | | | | | | | | | | | |

Total Prod

Total Dept

Total Account

Total Report

| 807250 | 8599 | 00000 | 00000 | PETCO | 2005 | 2 | | | AP | Accounts Payable | Expense Distribution | 01288004 | | AMERICAN LOGISTICS SERVICES, LLC | | | | | | Distrb Freight Out | DC New Hope, NJ | Tbd |

Thank you for taking the time to fill out the web form
**Control Environment Questionnaire!**

Please **PRINT** this confirmation.

1. I have adequate knowledge and experience necessary to be successful in my current position.      4

Comments:

I have been an employee for over 8 years. I have 24 years experience but lack training is specific areas that I did not have responsibilty for in the past.

2. I understand my job duties and my job description fits my job responsibilities.      4
Comments:

3. Management's operating style and philosophy contribute positively to the success of the business.      2

Comments:

The philosophy changes based upon the whims of individuals. Training classes and seminars are given at great expense to the company. We are than given direct orders to do the exact opposite. We are held accountable to the original direction.

4. The Company's culture and management policies contribute to my ability to perform my job responsibilities effectively.      2

Comments:

The culture of the company tends to sway. Communication is poor. We lean too much on e-mail for important issues. There is no single direction. Our division direction changes like the wind. Additional expenses are incurred.

5. I have adequate management support to fulfill my job duties.      1

Comments:

We have been short staffed for over 1 year. We were down 6 management staff at one time. What managers that still remain must work 12-15 hours to cover all shifts. A critical inventory was taken with a total staff of 5 when normally there are 13.

6. I have received and continue to receive enough training in order for me to fulfill my responsibilities.      1

Comments:

Specific training has been requested for the past 3-4 years. Without this training Petco is exposed to the risk of decisions being made that are not only incorrect but possibly illegal.

7. I have adequate time to make sure that I am performing my job duties according to external legal or regulatory requirements.      1

Comments:

Possible. When you are salaried you are n 24/7. Unfortunnately that has been the case lately. Without adequate rest between shifts performance is impacted.

8. My department is staffed appropriately and with individuals holding the required levels of experience.      1

Comments:

We have been short MGR's for over a year. Last month we were 20k under budget for salaried staff. Over all hourly payroll is excessive due to lack of coverage and support. We have lost almost every manager in the past year. No one asks why?

9. I do not bypass certain Company policies or procedures from pressure to meet short-term results.      1

Comments:

Possible. I am given direct orders to hold invoices and not show them as they happened. We are about to start the budget process. We will once again make a budget against a false prior year. I never thought of it before, but is this not what Enron did

10. The Company adequately safeguards and protects their assets.      1

Comments:

No. Employees are the biggest asset. A short term goal is always the direction rather than a long term solution. Problems are always re-addressed at a letter date.

11. If needed, there is adequate access to senior management, both within and outside my department.      1

Comments:

No. This is where the mis-direction is given. Question number 9 is now a concern to me and the success of Petco.

12. In looking at my job duties, I feel my reporting relationship is proper and it makes sense to report to my current supervisor.      4

Comments:      Yes.

13. Information flows freely upstream, downstream, and across my area.      2

**Exhibit 3**

054

across my area.

Comments: No. Some areas of the company are in an information vacuum and I am better informed than most.

14. I have sufficient time to carry out my job responsibilities effectively. 2

Comments: No. Spread too thin.

15. I have adequate authority to fulfill my job responsibilities. 4

Comments: Yes.

16. I feel that there are adequate policies and procedures for hiring, training, promoting, and compensating associates. 1

Comments: No. It takes too long to fill positions. Several years ago we had a program to promote some key hourly employees into entry level supervisor positions. We no longer do it. The qualified hourly are asking why.

17. I have received a copy of the Code of Ethics. 4

Comments: Yes.

18. I am aware of where I can locate a copy of the Code of Ethics. 4

Comments: Yes.

19. I am aware of the PETCO Ethics Hotline. 4

Comments: Yes. I now need to re-read it concerning number 9.

20. I believe reports of misconduct to the PETCO Ethics Hotline will be anonymous, confidential and free of retribution. 2

Comments: Not sure. There are a lot of un-employed whistle blowers.

21. I believe reports to the Ethics Hotline will be adequately investigated and addressed. 2

Comments: Not sure.

22. Management talks about the importance of ethics, values, and integrity. 3

Comments: Yes, but sometimes are than given a different direct.

23. If I were to report unacceptable or unethical behavior to senior management, I believe that appropriate action would be taken. 2

Comments: Not sure.

24. PETCO has established standards of behavior that create an overall appreciation for and compliance with its documented policies and procedures. 3

Comments:

25. My compensation (or a portion thereof) is not based on unrealistic performance targets or goals. 2

Comments: Budgets must be real. If you do not account for expenses in the month they were taken, and hold large expenses to level the months and budget against this. You budget aginst the prior year. How? ?

26. There is not pressure placed on me to meet deadlines, goals, budgets, or the business plan that compromise my values. 2

Comments: See number 25.

27. The Company's leaders achieve financial goals without unethical behavior. 2

Comments: See number 25. Until 2003 we had always accrued all expenses in the year of the expense. This year large amounts were held over. Again, i never thought about it before. Can this be done?

28. I feel that Company leaders that are selected and/or promoted have a high-level of integrity. 3

Comments: Questionable based upon above.

29. Company leaders keep their promises. 3

Comments: Petco tends to finger point and look for short term solutions. E-mail is a way of dumping something critical on someone just to say they told them. If something is that important follow up with a call. 200 e-mails a day is hard to follow up on.

Additional Comments or Suggestions:

Completed by (optional):
Department (required): Supply Chain (Razia Richter)
Position (optional):
Time in Position (required): 3+ years

Exhibit 3

055

1   CERTIFICATION OF NAMED PLAINTIFF
    PURSUANT TO FEDERAL SECURITIES LAWS

2

3   PLUMBERS AND PIPEFITTERS LOCAL 51 PENSION FUND ("Plaintiff")

4   declares:

5       1.      Plaintiff has reviewed a complaint and authorized its filing.

6       2.      Plaintiff did not acquire the security that is the subject of this action at the

7   direction of plaintiff's counsel or in order to participate in this private action or any

8   other litigation under the federal securities laws.

9       3.      Plaintiff is willing to serve as a representative party on behalf of the

10  class, including providing testimony at deposition and trial, if necessary.

11      4.      Plaintiff has made the following transaction(s) during the Class Period in

12  the securities that are the subject of this action:

13

    Security            Transaction            Date            Price Per Share

14

15                      *See* attached Schedule A.

16      5.      During the three years prior to the date of this Certificate, Plaintiff has

17  not sought to serve or served as a representative party for a class in an action filed

18  under the federal securities laws except as detailed below:

19

20

21

22

23

24

25      6.      The Plaintiff will not accept any payment for serving as a representative

26  party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

27

28

056

1   except such reasonable costs and expenses (including lost wages) directly relating to

2   the representation of the class as ordered or approved by the court.

3         I declare under penalty of perjury that the foregoing is true and correct.

4   Executed this\ 8  day of ___April___, 2005.

PLUMBERS AND PIPEFITTERS LOCAL
51 PENSION FUND

By: _____

        KENNETH AURECHITA

Its: _____CO CHAR_____

057

S:\Case Startup\Petco\Cmts\Plumbers 51.doc

- 2 -

Exhibit 4

PETCO

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 02/16/2005 - SD | 470 | $37.2620 |
| 02/16/2005 - SD | 710 | $37.2620 |
| 02/22/2005 - SD | 50 | $37.0000 |
| 03/09/2005 - SD | 250 | $36.4700 |
| 03/09/2005 - SD | 190 | $36.2947 |

Settlement dates are indicated with "SD" attached to the date.

058

**Exhibit 4**

1            <u>DECLARATION OF SERVICE BY MAIL</u>

2      I, the undersigned, declare:

3      1.      That declarant is and was, at all times herein mentioned, a citizen of the United States

4 and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested

5 party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San

6 Diego, California 92101.

7      2.      That on October 17, 2005, declarant served the **CONSOLIDATED COMPLAINT**

8 **FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** by depositing a true copy

9 thereof in a United States mailbox at San Diego, California in a sealed envelope with postage

10 thereon fully prepaid and addressed to the parties listed on the attached Service List.

11      3.      That there is a regular communication by mail between the place of mailing and the

12 places so addressed.

13      I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th

14 day of October, 2005, at San Diego, California.

15

16                          MICHELE M. HENRY

17

18

19

20

21

22

23

24

25

26

27

28

PETCO III (LEAD)
Service List - 10/17/2005  (05-0084)
Page 1 of  1

**Counsel For Defendant(s)**

Peter H. Benzian
Latham & Watkins LLP *
600 West Broadway, Suite 1800
San Diego, CA  92101-3375
   619/236-1234
   619/696-7419 (Fax)

**Counsel For Plaintiff(s)**

Patrick J. Coughlin
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
   310/859-3100
   310/278-2148 (Fax)

Daniel S. Drosman
David A. Thorpe
Ted  Minahan
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

    *   denotes service via hand delivery