USDC SCAN INDEX SHEET

















R1R   8/1/06    10:56

3:05-CV-00823   PETCO CORP V.

*60*

*O.*

1

2    2006 AUG -1  AM 9: 56

3    CLERK U.S. DISTRICT COURT
     SOUTHERN DISTRICT OF CALIFORNIA

4

5    BY_____ DEPUTY

6

7

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   In re PETCO ANIMAL SUPPLIES INC.          CASE NO. 05-CV-0823-H (RBB)
     SECURITIES LITIGATION,
12                                             ORDER GRANTING IN PART
                                               AND DENYING IN PART
13                                             MOTIONS TO DISMISS
                                               CONSOLIDATED COMPLAINT
14
                                               [Docket Nos. 28, 31, 33, & 39]
15

16         Defendants move to dismiss the Consolidated Complaint alleging violations of the

17   Securities Exchange Act of 1934 ("Exchange Act").  The Court held a hearing on the motions

18   on May 22, 2006.  Daniel Drosman, Esq., David Thorpe, Esq., and Ted Minahan, Esq.

19   appeared as Lead Counsel for Lead Plaintiff; Peter Benzian, Esq. appeared for Defendant

20   Petco Animal Supplies, Inc. and its corporate officers and executives; Andrew Weissman,

21   Esq., John Valentine, Esq., Timothy Pestontnik, Esq., and Russell Gold, Esq., appeared for

22   Defendant Texas Pacific Group, Inc., its related entities, and individuals; and Eric Waxman,

23   Esq., appeared for Defendant Leonard Green & Partners, L.P., its related entity, and

24   individuals.  For the reasons stated below, the Court GRANTS IN PART and DENIES IN

25   PART the motions to dismiss.

26   I. Request for Judicial Notice & Motion to Strike

27         Before addressing the merits of the motions to dismiss, the Court must resolve the

28   requests for judicial notice. Fed. R. Evid. 201. Plaintiffs have requested judicial notice of nine



ENTERED ON 8|1|06

1   documents, while Defendants have joined to lodge fifty documents. Most of the documents

2   are public filings with the Securities and Exchange Commission ("SEC"). Plaintiffs move to

3   strike certain portions of Defendants' exhibits, or in the alternative, convert the motion into

4   a summary judgment motion.

5   When determining a motion to dismiss for failure to state a claim for relief pursuant to

6   Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court cannot consider matters

7   outside the complaint with exceptions for (1) authenticated documents that have been

8   incorporated into the complaint and (2) facts that are subject to judicial notice. *Lee v. City of*

9   *Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

10  A. <u>Documents Incorporated into Complaint</u>

11  The Consolidated Complaint ("CC") refers to and quotes from several statements that

12  were released to investors by the Defendants. Plaintiffs have quoted substantial portions of

13  the press releases, prospectuses, web-cast telephone conferences, and other SEC filings

14  because these are central to Plaintiffs' case that various statements were misleading. *E.g.*, CC

15  ¶ 94-95 (Aug. 18, 2004 press release and telephone conference and referencing SEC Form 10-

16  Q for second quarter 2004).[1] Because Plaintiffs rely on large portions of such statements, it

17  is appropriate to consider the entire statement. Most documents lodged by Defendants are

18  complete copies of the press releases (filed in conjunction with SEC Forms) and the official

19  transcripts of the telephone calls broadcast to investors. *E.g.*, Defs.' Exs. I (press release) &

20  J (conference call transcript).

21  In some instances, the Consolidated Complaint refers to, but does not quote a SEC

22  filing, and Defendants have lodged the underlying document. *E.g.*, CC ¶ 100 (referencing SEC

23  Form 10-Q for Q2 2004) & 108 (referencing Oct. 22, 2004 SEC Prospectus Supplement);

24  Defs.' Exs. M (SEC Form 10-Q) & F (prospectus supplement Form 424B4). The Court

25  concludes that the underlying documents have been incorporated by reference into Plaintiffs'

26  _____

27  [1] Petco's fiscal year ends on the Saturday closest to January 31 (*i.e.*, February 1, 2003, January 31, 2004, and January 29, 2005). *See* Pls.' Ex. H at 59. The parties have abbreviated the fiscal year as "FY," and any fiscal quarter as "Q." For example, Q3 2004 refers to the third

28  quarter of fiscal year 2004, and "FY 2004" would have ended on January 29, 2005. The Court uses the same abbreviations.

1  complaint and can be considered in the Rule 12(b)(6) context. *In re Silicon Graphics Inc. Sec.*

2  *Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (considering SEC filings in a motion to dismiss under

3  the doctrine of incorporation by reference); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405

4  n.4 (9th Cir. 1996) (proper to consider prospectus though not mentioned in complaint alleging

5  violations of securities laws).

6      B.    Judicial Notice

7          A district court may take judicial notice of matters of public record, but cannot use this

8  rule to take judicial notice of a fact that is subject to "reasonable dispute" simply because it is

9  contained within a public record. *Lee*, 250 F.3d at 689-90. For example, a court may take

10 judicial notice of the *existence* of a court opinion, but not "'the truth of the facts recited

11 therein.'" *Id.* at 689 (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping*

12 *Group, Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999)). The district court must reject requests to

13 the extent that parties seek to have the court accept as true the facts contained within public

14 documents. Disputed factual questions are not suitable for judicial notice. *E.g., United States*

15 *v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003). Nonetheless, the court can take note of the

16 fact that certain *statements were made*. *Lee*, 250 F.3d at 689-90 (distinguishing between fact

17 that person had signed a document waiving his rights *and* the validity of the waiver); *Southern*

18 *Cross*, 181 F.3d at 426-27 & n.8 (distinction between truth and existence for judicial notice

19 is similar to analysis of hearsay exception).

20          Plaintiffs object to a portion of a declaration submitted by Defendants on the ground

21 that it contains facts that conflict with the allegations in their complaint. A defense attorney

22 summarized the sales by insiders before and during the class period in a chart. Decl. Horton

23 ¶ 52-54. Plaintiffs sole example of a conflict is a mathematical error, which has been corrected

24 in a supplemental filing. Decl. Beck-Meloche. The Consolidated Complaint contains

25 calculations of the date, number, and value of the alleged insider stock trades, and Defendants

26 have submitted the SEC Form 4s, which are filed with the SEC to report a sale of stock by an

27 interested party, for those sales and for sales in the preceding year. *Compare* CC ¶ 31 & 288

28 *with* Defs.' Exs. AD (Devine's sales) & AC (Devine's sales for prior period). From the

1   Court's review, it appears that both sides obtained the trading information from the same
2   source, and neither side has identified a true discrepancy. *Silicon Graphics*, 183 F.3d at 986
3   ("Although [plaintiff] questions the veracity of the SEC forms, her ongoing and substantial
4   reliance on the forms as a basis for her allegations substantially weakens her position."). To
5   the extent that Defendants' SEC documents report the exercise of stock options, the Court
6   finds it appropriate to take judicial notice of those events. *Id.* (district court properly
7   considered stock options to calculate volume of shares traded by an insider). Consequently,
8   the Court has referred to those SEC documents for specific dates, prices, and amounts of sales
9   by named Defendants. *See also Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001)
10  (requiring plaintiff to allege context of an insider's trading history and noting easy public
11  access to SEC Form 4s).

12       The Court denies Plaintiffs' request for judicial notice of its exhibits B and I. Exhibit
13  B purports to be a list of the price of Petco's stock price but there is no indication who created
14  the summary or the basis for it. The Court has used the stock price recorded on the SEC Form
15  4s. Exhibit I, a newspaper article, is not suitable for judicial notice. Similarly, the Court did
16  not need the press release by a competitor. Defs.' Ex. G (PetSmart).

17       Finally, in the alternative, Plaintiffs move to convert Defendants' motions into motions
18  for summary judgment so that they can conduct discovery. Having reviewed the record, the
19  Court determines that it can resolve the motions to dismiss on the allegations in the
20  Consolidated Complaint (supplemented, when appropriate, by documents incorporated into the
21  complaint or subject to judicial notice) without treating them as summary judgment motions.

22       The Court has indicated this Order that it relied on particular statement in particular
23  documents by citing to the document.

24  II. Background

25       For purposes of resolving this motion to dismiss, the Court accepts all well-pleaded
26  facts alleged in the Consolidated Complaint as true. *Gompper v. VISX, Inc.*, 298 F.3d 893, 895
27  (9th Cir. 2002). This factual summary is taken in the light most favorable to Plaintiffs.
28  *Number 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding*

05-CV-0823

1    *Corp.*, 320 F.3d 920, 925 n.2, 931 (9th Cir. 2003).  Where appropriate, the Court has also

2    considered documents attached to and incorporated into the complaint and has taken judicial

3    notice of certain facts.

4         A.  Parties

5         Plaintiffs are a proposed class of investors who purchased Petco Animal Supplies, Inc.,

6    ("Petco") common stock during the period from August 18, 2004 to August 25, 2005 at

7    allegedly inflated prices.  Petco is a retail store selling pet food, small companion animals, and

8    supplies.  CC ¶ 26; Defs.' Ex. A at 3.  Petco is a large, warehouse style store (typically, over

9    12,000 square feet) that carries specialty pet items not carried by the nearby supermarket.

10   Defs.' Ex. A at 3.  As of July 31, 2004, near the commencement of the class period, Petco

11   reported that it had 685 stores nationwide and annual sales of $1.8 billion.  CC ¶ 94; *see* Defs.'

12   Ex. P at 523 (net sales for 2004).

13        The defendants fall into two categories.  The first group contains the corporation and

14   its key executives.  The second group contains two clusters of partnerships that had once

15   owned Petco.

16             1.  Petco and its Executives

17        In the first category, Plaintiffs have sued Petco and several executives of Petco,

18   including James Myers, Chief Executive Officer ("CEO") and director; Rodney Carter, Senior

19   Vice President and Chief Financial Officer ("CFO"); Brian Devine, Executive Chairman of

20   the Board of Directors and member of the Executive Management Committee; Bruce Hall,

21   President and Chief Operating Officer ("COO"); Robert Brann, Senior Vice President of

22   Merchandising; Frederick Major, Senior Vice President of Information Systems; Keith Martin,

23   Senior Vice President of Operations; Janet Mitchell, Senior Vice President of Human

24   Resources; Razia Richter, Senior Vice President of the Supply Chain; William Woodard,

25   Senior Vice President of  Business Development; and Julian Day, director and member of

26   Audit, Compensation, and Nominating and Corporate Governance Committees.  (In addition

27   to Day, Plaintiffs name other members of the Board of Directors, who are connected to the

28   partnerships.)

### 2. The Partnerships TPG and LGP

The second category consists of two groups of investment partnerships. The Consolidated Complaint does not explain the relationship between the two partnerships, though they appear to have acted together in their relationship with Petco. The private investment partnerships had owned and managed Petco for a year and a half, and during that time, they took simultaneous action to buy and sell their shares.

Texas Pacific Group, Inc., is named along with several related entities: TPG Advisors III, TPG Partners III, L.P., TPG Parallel III, L.P., TPG Dutch Parallel III, C.V., TPG Investors III, L.P., FOF Partners III, L.P., FOF Partners III-B, L.P. Of those, TPG Advisors III acts as general partner of another entity, TPG GenPar III. In turn, TPG GenPar III and TPG GenPar Dutch are general partners of the limited partnerships named. Defendants David Bonderman, Jonathan Coslet, James Coulter, and William Price are officers, directors, and shareholders of the TPG Advisors III entity. Coslet and Price served on Petco's Board of Directors. The parties collectively refer to this group as "TPG."

The other partnership includes Leonard Green & Partners, L.P. and an affiliated entity, Green Equity Investors III, L.P. Defendants John Baumer, John Danhakl, Jonathan Sokoloff, and Peter Nolan are named as managing partners of Leonard Green & Partners, L.P. Baumer and Danhakl served on Petco's Board of Directors. The parties collectively refer to this group as "LGP."

One of the main issues in these motions is the inclusion of TPG and LGP (collectively referred to as the "Partnerships"). They argue they should be dismissed because they sold their stock holdings *before* Petco made any of the alleged false and misleading statements. The Consolidated Complaint describes the history of the ownership, financial, and management relationship between Petco and the Partnerships. Plaintiffs contend that the Partnerships had a special relationship with Petco, and consequently, had direct and indirect control over the company's decisions.

Petco was founded in La Mesa in 1965, and it went public in 1994. In 2000, Petco was taken private when the Partnerships acquired 75% of the stock. CC ¶ 27-28, 53-56; LPG's Br.

at 5 (stating that *each* Partnership group owned approximately 37.5%); *see* Defs.' Ex. B at 50 (showing that shares owned by Petco Individual Defendants Brann, Day, Devine, Hall, Martin, Mitchell, Myers, Woodard; and Partnership Individual Defendants Baumer, Coslet, Danhakl, and Price). Shortly thereafter, TPG and LGP led Petco through a recapitalization transaction and the stock split 22-for-1. CC ¶ 56-59. Concurrent with its purchase of Petco, TPG and LGP entered into a ten-year management services contract with Petco. CC ¶ 58. Simultaneously, two partners from TPG and two partners from LGP served on the five-member Petco Board of Directors. CC ¶ 39-40, 43, 45 (Baummer, Coslet, and Danhakl served since October 2000, and Price from 2000 to April 2004); *see also* Defs.' Ex. B at 65-66 (as of January 2002, Baumer, Coslet, Danhakl, and Price were directors with connections to the partnerships).

In February 2002, TPG and LGP led the company through a public offering. CC ¶ 61; Defs.' Ex. B at 37, 46 (Prospectus for Initial Public Offering of 14.5 million shares of common stock on Feb. 27, 2002 to raise $254 million and to purchase all outstanding shares of preferred stock held by TPG and LGP). Together, the partnerships (through their own reorganization holding company) owned 79.6% of the shares before the public offering, and would own a majority of 55.8% of the stock afterwards (or 27.9% each). Defs.' Ex. B at 50, 72 & n.2 (Prospectus). As to each of these transactions, Plaintiffs describe how TPG and LGP structured the finances to their benefit. *E.g.*, CC ¶ 55 (buyout in 2000 was structured so "common stock holdings of TPG and LGP were virtually risk-free assets") & 294.

Upon the completion of the public offering in February 2002, Petco's Board of Directors was expanded to nine members, and TPG and LGP each had two nominees. *See* Defs.' Ex. B at 66. TPG and LGP further agreed that they would vote for each others nominees for directors, and as noted above, several partners – including Baumer, Coslet, Danhakl, and Price – served in that capacity. CC ¶ 27-28, 64; *see* Defs.' Ex. A at 11-13 (showing that these four continued to serve through Feb. 2004).

Two years later, in February 2004, Petco announced a public offering of 12.2 million shares. Defs.' Ex. A (SEC Form S-3 Registration Statement filed Feb. 6, 2004); see Defs.'

1    Exs. D, E, & F (supplements).  At that time, there were 57.6 million shares outstanding, held

2    by approximately 100 shareholders. Defs.' Ex. A at 19.  One of the LGP entities expected to

3    sell 5,855,954 shares; and 6 of the TPG entities, collectively, would sell that same number of

4    shares.  Defs.' Ex. A at 14 (Green Equity Investors, III, L.P. could offer 100% of its shares,

5    which accounted for 10.2% of the common stock, with similar numbers dispersed amongst

6    several TPG entities); Pls.' Ex. C & D (sales by Green Equity Investors, III, L.P. in December

7    2003).  Thus, as of February 2004, TPG and LGP were offering to sell most of the 12.2 million

8    shares in that transaction, but assuming all those shares sold, TPG and LGP would collectively

9    still own 11.6% of the outstanding shares (or 5.8% each consisting of 3.3 million shares). *See*

10   Defs.' Ex. D at 174 (Prospectus Supplement dated June 10, 2004 shows the same shares

11   offered in Feb. being offered in June).

12          In April 2004, Baumer and Price apparently resigned from Petco's Board of Directors.

13   CC ¶ 43 & 45 (alleging terms from 2000 to April 2004); *see* Defs.' Ex. C at 134 (showing two

14   new directors replaced Baumer and Price in April 2004).  That left two of Petco's nine

15   directors with connections to the partnerships (TPG's Coslet and LGP's Danhakl).  CC ¶ 39

16   & 40 (alleging current service on Petco's Board); *see* Defs.' Ex. C at 134 (as of April 2004,

17   Baumer and Price were no longer listed, but Coslet and Danhakl were listed); Pls.' Ex. A at

18   9-11 (same as of July 2005).

19          All of this background occurred before the beginning of the proposed Class Period for

20   this lawsuit.  Plaintiffs allege a Class Period beginning on August 18, 2004.  The following

21   facts occur after that date.

22          In a "Supplement" to the February Prospectus, which was dated October 22, 2004,

23   Petco announced an offer of an additional 6.9 million shares.  Defs.' Ex. F.  In this offering,

24   TPG and LGP (through their entities) released all of their remaining shares.  CC ¶ 107, 294;

25   Defs' Ex. F at 238 (showing both partnerships offered to sell 3,355,954 shares, which

26   amounted to their remaining 5.8% beneficial ownership of Petco).

27          After that offering, TPG and LGP did not own any Petco common stock. *Id.*  However,

28   at least two individuals connected to the partnerships, Coslet and Danhakl, continued to serve

1   on Petco's Board of Directors. CC ¶ 27, 39; *see* Defs.' Ex. H at 305 (listing dates the directors'

2   terms ended); Pls.' Ex. A at 9-11 (same for July 2005 Annual Meeting).

3       B. Allegations of Fraud

4       Plaintiffs describe two categories of fraud: (1) an improper accounting practice to defer

5   the recording of incurred distribution expenses in order to make quarterly earnings goals; and

6   (2) operational problems that led to slow sales, including an inadequate distribution

7   infrastructure (particularly in the Southeast) and an inefficient store format (called "Pisces").

8   With regard to each of these problems, Plaintiffs allege that Petco issued false and misleading

9   statements about its financial condition which had the effect of artificially inflating the stock

10   price. The false statements were contained in the press releases announcing financial results

11   and predictions of growth for the relevant quarters and fiscal years, and then repeated in web-

12   cast telephone conference calls for investors and financial analysts. *E.g.*, CC ¶ 94-95.

13   Moreover, Plaintiff alleges that individual defendants sold common stock during the Class

14   Period, at inflated prices, for a combined value of $270 million. *Id.* ¶ 1, 27-38, & 41.

15       1. Accounting Improprieties

16       Plaintiffs link the accounting scheme to early 2002, when TPG and LGP took the

17   company public but retained a majority of the shares. Plaintiffs allege that in 2002, Petco

18   "launched an aggressive expansion plan (long-term growth plan) in order to boost its stock

19   price." CC ¶ 180. "Realizing that they could not meet their projected profit targets," Plaintiffs

20   allege that Petco "embarked on an accounting scheme to falsify and materially understate its

21   costs and liabilities." *Id.* "In order to achieve their now unreachable earnings targets,

22   defendants established unrealistic and unattainable cost budgets for distribution centers along

23   with instructions from management that the budgets could not be exceeded." *Id.*. In order to

24   meet those budgets, Plaintiffs allege that Petco manipulated the accounting procedures. *Id.*

25   Plaintiffs allege that the accounting scheme continued through April 2005, when it was

26   disclosed to the public. *See* CC ¶ 150. Plaintiffs further allege that when Petco released its

27   2004 fiscal year results in late June 2005, the company falsely reported that it had remedied

28   the problem by revising it policies with respect to distribution accruals. CC ¶ 141.

1   Plaintiffs allege securities law violations because "Petco's financial position and results
2   were falsified through the use of an accounting scheme of unrecorded expenses and liabilities,
3   which materially overstated PETCO's net earnings and EPS [earnings per share]." CC ¶ 86.
4   Plaintiffs allege that the statements Petco and its executives made about the company's
5   earnings and prospects were false and misleading because they were based upon the
6   accounting scheme. *See* CC ¶ 94 (press release on 2Q 2004 earnings), 95 (teleconference on
7   same), 100 (SEC Form 10-Q for 2Q 2004), 101 (repeating results at conference), 111 (setting
8   forth statements between August and October 2004, and reasons they were misleading); *accord*
9   CC ¶ 112-59 & 168-98 (identifying allegedly false statements between November 2004 and
10  June 2005 and describing false financial reporting through use of unrecorded invoices at
11  distribution centers).

12  The Consolidated Complaint does not merely repeat the disclosures that Petco itself
13  made when it announced the accounting problem to the public. Instead, the Consolidated
14  Complaint corroborates the allegations with information from former employees who
15  witnessed and participated in the underlying acts. The percipient witnesses describe in detail
16  the scope of the accounting error. CC ¶ 234-68. For example, former employees describe the
17  accounting procedures followed at the distribution centers to decide "which invoices would
18  be submitted for payment and which ones would be withheld and not recorded." CC ¶ 184.
19  The Consolidated Complaint also includes contemporaneous reports by employees, on a
20  corporate survey, that there was an accounting problem and that they felt coerced into violating
21  Generally Accepted Accounting Procedures ("GAAP") in order to be meet the unrealistic
22  budget. CC Ex. 1 at 4; CC ¶ 275-78. One employee asked "is this not what Enron did[?]" CC
23  Ex. 3. Plaintiffs attached to the Complaint an e-mail from late March 2005, in which a
24  Transportation Manager told Defendants Myers (CEO) and Carter (CFO) that he had resigned
25  because he had been complaining about the held-back invoices and he wanted to alert them to
26  his concern. CC Ex. 2. He attached his own calculations from ledgers that Petco had held-
27  back $3 million of fuel and freight expenses from 2004 and carried the expense into 2005. *Id.*
28  The Consolidated Complaint also contains factual allegations connecting upper

- 10 -

management to the problem. Former employees report that there was tremendous pressure by senior management to meet the budget, and that the distribution centers began to hold onto invoices instead of recording the expenses. *E.g.*, CC ¶ 181-92, 218. They report conversations with executives who allegedly instructed the employees to "hold onto any invoices because we gotta make the quarter." CC ¶ 5, 218(d) (alleging that Defendant Richter, a Senior Vice President of the Supply Chain, instructed the directors of the distribution centers to "do whatever it takes to be on budget"). Confidential witnesses identify the senior executives who attended the regular monthly meetings to review budget summaries and forecasts that had been assembled with the incorrect data. *E.g.*, CC ¶ 218, 234.

On April 15, 2005, Petco issued a Press Release announcing that it would delay filing its SEC Form 10-K for fiscal year 2004 because of "accounting errors" related to under-accrued expenses in its distribution centers. CC ¶ 85, 126; *see also* CC ¶ 130 (April 29 press release updated status of internal review); CC ¶ 132 (May 23 press release announces SEC issued notice of potential de-listing on NASDAQ due to delay in filing year end reports); CC ¶ 137 (June 24 press release announces internal review ongoing and receipt of SEC notice of failure to timely file 1Q 2005 results). Petco investigated and learned that the distribution centers had not recorded invoices totaling $5.6 million in the proper quarter for an entire fiscal year. CC ¶ 139. Petco acknowledged it had overstated its earnings per share by $0.03 in 3Q 2004, by $0.06 in the 4Q 2004, and by $0.06 for FY 2004. CC ¶ 150(a). On June 28, 2005, Petco filed its Form 10-K for the fiscal year that ended on January 29, 2005, and as revised after its internal investigation of the accounting errors. CC ¶ 139-41; Defs.' Ex. U; *see* CC ¶ 146 (shortly thereafter, SEC ended process to delist and Petco announces that NASDAQ "hearing file has been closed").

### 2. Operational Problems in Distribution and Store Format

Plaintiffs contend that Petco's celebrated "business strategy" was "illusory" because the company suffered from several operational problems. These operational problems include an inadequate distribution infrastructure; an ineffective program to re-model the stores, which in turn affected the same-store sales; and erroneous accounting of tenant improvement allowances

- 11 -

1    on Petco's leases. Plaintiffs contend that Petco hid these related problems from investors while

2    they stated positive forecasts for continued growth. *E.g.*, CC ¶ 111 (c)-(f); *accord* CC ¶ 112-

3    52 (repeating theory for statements during Class Period).

4            Plaintiffs state that Petco touted its aggressive growth strategy to open new stores

5    nationwide, especially in the Southeast region of the United States, but contend it did not

6    similarly expand its distribution infrastructure. *See* CC ¶ 66 & 111. As of February 2002,

7    Petco had 561 stores (14 of those were in the Southeastern states), and Petco had 8 distribution

8    centers (3 central and 5 regional). CC ¶ 67-68. The distribution center in New Jersey filled

9    orders for the stores in the Southeast, and that distant location was expensive and inefficient

10   because of high fuel costs, overtime for truck drivers, and the need for expensive temporary

11   workers. CC ¶ 281-82. Plaintiffs contend that Petco compounded the problem by dramatically

12   expanding its store presence in the Southeast. CC ¶ 66-70. Between February 2002 and

13   January 2004, Petco increased its stores in Southeastern states from 14 to 41, and operated a

14   total of 654 stores nationwide. CC ¶ 66-70 & 2 (alleging Petco "failed to open additional

15   distribution centers where they were greatly needed, especially in Georgia and Florida, where

16   Petco had expanded exponentially"). By 2004, during the Class Period, Plaintiffs allege that

17   Petco planned to build two new distributions centers in Florida and Colorado to serve the

18   Southeast areas but did not tell investors about this planned expense until May 2005. *Id.* ¶ 72-

19   80, 133.

20           The second operational problem concerned the store format. In August 2004, at the

21   start of the Class Period, Petco began remodeling stores in a format that was more open and

22   "fun" but which did not provide as much shelf space. CC ¶ 82, 285. This was an change from

23   the prior "new and distinct store format known as the Millennium" that had commenced in

24   2001. CC ¶ 60 ("This new store format incorporated a more dramatic presentation of animals

25   and emphasized higher-margin supplies categories."). Plaintiffs further contend that the Pisces

26   format lead to lower sales because trucks could not distribute product quickly, and the empty

27   shelves caused customers to shop elsewhere. CC ¶ 218(g). Petco hid the problem by raising

28   prices on items but continued to report success with the new format. CC ¶ 287. In addition,

1  Plaintiffs allege that Petco's "same-store sales" forecasts were false because customer traffic
2  had actually decreased. CC ¶ 94-95, 280, 283, 286-87.

3       Third, Plaintiffs allege that Petco understated its cost of sales because it improperly
4  amortized tenant improvement allowances as a reduction to depreciation, and improperly
5  amortized them. CC ¶ 8.

6       In summary, Plaintiffs allege that the stock price was artificially inflated because of the
7  under-accrued invoices at the distribution centers and the combined effect of the operational
8  problems. Near the start of the Class Period, Petco common stock had been selling for $33.19.
9  *See* Defs.' Ex. AD at 800 (stock price as of Sept. 1, 2004). The price continued to rise, and
10 by April 1, 2005, had reached $37.41. *See id.* at 840. Once Petco announced the accounting
11 discrepancy on April 15, 2005, "PETCO's stock collapsed to $30.36 per share," which
12 Plaintiffs calculate as "a one day drop of 13.6%." CC ¶ 129 (bold type omitted). Thereafter,
13 the common stock was selling at $28.00 on August 1, 2005, which Plaintiffs contend was
14 inflated by the operational difficulties. *See* Defs.' AC at 848. But when "they released their
15 final bombshell" on August 25, 2005 – that the same store sales in the second quarter had
16 increased 2.5% instead of the anticipated 3% to 4% – the "stock plummeted to $21.99 per
17 share." CC ¶ 18-19, 91; *see* CC ¶ 139 (expected 2Q 2005 comparable store net sales increase).
18 "[A] one day drop in price at 13%." CC ¶ 19 (bold type omitted).

19       C. Insider Trading

20       Plaintiffs allege that the false and misleading statements about Petco had the effect of
21 artificially inflating the price of the stock, and that Defendants sold approximately $270
22 million worth of inflated common stock during the one year Class Period. CC ¶ 1, 288 (chart
23 of 7.6 million shares sold by insiders during Class Period). Plaintiffs also allege that the
24 insiders routinely delayed announcements of bad news until after they sold stock on the
25 schedule established by their Rule 10b-5 trading plans. CC ¶ 291.

26       Plaintiffs highlight the public offering on October 22, 2004 as an example of the use
27 of material non-public information by insiders. In October "defendants learned through an
28 employee that PETCO was violating accounting rules by systematically withholding payment

- 13 -

1   for invoices," and after senior management instructed distribution center managers to withhold

2   invoices and falsify budgets so that Petco reported false financial results. CC ¶ 13-14, 294.

3   In bold type, Plaintiffs allege that this "Public Offering not only allowed PETCO insiders the

4   opportunity to sell vast sums of common stock, but it also afforded PETCO's two largest and

5   controlling shareholders, Texas Pacific Group and Leonard Green & Partners, the opportunity

6   to sell-off 100% of their remaining shares of PETCO common stock." CC ¶ 13; *accord* CC

7   ¶ 15-16 (stock trades through April 1, 2005 were based on the same inside information); *see*

8   *also* CC ¶ 18-19 (attributing sales in July and August 2005 to inside information about the

9   company's operational difficulties)

10          D. Causes of Action

11          The Consolidated Complaint alleges three causes of action under federal securities law.

12   First, it alleges that all Defendants violated § 10 (b) of the Exchange Act and Rule 10b-5

13   promulgated thereunder by making false and misleading statements, failing to disclose material

14   adverse facts, or participating in a scheme to deceive investors regarding Petco's business

15   prospects and by artificially inflating the common stock.  15 U.S.C. § 78j(b); 17 C.F.R. §

16   240.10b-5; CC ¶ 322-28.

17          The second cause of action alleges that all Defendants violated § 20(a) of the Exchange

18   Act because they were "controlling persons" of Petco and had the ability to prevent the

19   misleading statements.  15 U.S.C. § 78t(a); CC ¶ 329-32.

20          The third and final claim alleges that all but two Individual Defendants engaged in

21   insider trading in violation of anti-fraud provisions.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-

22   5; *see* 15 U.S.C. § 78t-1 (§ 20A of PSLRA provides right of private action and defines measure

23   of damages as amount of disgorged profits); CC ¶ 29-48, 333-43.

24   III.  Discussion of Motion to Dismiss

25          "A complaint should not be dismissed under Rule 12(b)(6) 'unless it appears beyond

26   doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

27   him to relief.'" *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) (quoting

28   *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## A. Falsity and Scienter

The Private Securities Litigation Reform Act (PSLRA) dictates that a securities complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The Ninth Circuit traditionally analyzes the overlapping issues of falsity and scienter at the same time. *Ronconi*, 253 F.3d at 429 (pleading requirements of PSLRA can be collapsed into a single inquiry because analysis of both factors involves the same facts); *see America West*, 320 F.3d at 932. A securities fraud claim must "state with particularity facts giving rise to a strong inference" that each defendant acted with the intent to defraud or with deliberate recklessness. 15 U.S.C. § 78u-4(b)(2); *America West*, 320 F.3d at 931; *Silicon Graphics*, 183 F.3d at 979 ("deliberate or conscious recklessness").

"[A]n inevitable tension arises between the customary latitude granted the plaintiff on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and the heightened pleading standard set forth under the PSLRA." *Gompper*, 298 F.3d at 895. The Court accepts as true the Plaintiffs' allegations; however, with regard to the element of scienter, "the court must consider *all* reasonable inferences to be drawn from the allegations, *including inferences unfavorable to the plaintiffs*." *Id.* at 897 (emphasis added). "Under the PSLRA, the court ultimately reviews the complaint *in its entirety* to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." *Id.* at 895 (emphasis added).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires fraud claims to be alleged with particularity. This rule applies to claims brought under § 10(b) and Rule 10b-5. *Stat Elec.*, 89 F.3d at 1401.

### 1. Alleged Accounting Fraud

The Court concludes that Plaintiffs have stated sufficient facts to state a § 10(b) and Rule 10b-5 cause of action against some of the Petco Defendants concerning the allegations of accounting improprieties. Petco acknowledges that the accounting discrepancy occurred, that there were inadequate control systems, and that its prior financial statements had overstated the earnings per share. *See* CC ¶ 126, 130, 132, 137, 139-41 (press release by Petco

- 15 -

1   states that "the Company understated its cost of sales by approximately $3.2 million, $5.6

2   million, and $5.6 million in 3Q 2004, 4Q 2004, and fiscal year 2004, respectively" and CEO

3   Myers concludes "the errors in under-accruals were limited to our Distribution Operation" and

4   hopes "to prevent such errors in the future"), 146. Therefore, the key question in the motions

5   is whether Plaintiffs have pleaded, "in great detail, facts that constitute strong circumstantial

6   evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974.

7   To plead that state of mind, "plaintiffs must state facts that come closer to demonstrating

8   intent, as opposed to mere motive and opportunity." *Id.*

9        Plaintiffs have alleged facts showing that the accounting problem was apparent to those

10  in the distribution centers and that employees been considered it an ongoing issue of concern.

11  On October 14, 2004, employees at the Mira Loma distribution center in San Diego completed

12  a "Control Environment Questionnaire." CC Ex 1; CC ¶ 275-78. The survey is attached to the

13  Consolidated Complaint and Plaintiffs have quoted responses from employees, including two

14  of the Confidential Witnesses, who report improper methods of accruing expenses.

15  Confidential Witness No. 7 ("CW7"), a former transportation manager, reported that "[f]reight

16  bills don't get paid so department can meet budget." CC ¶ 277 & Ex. 1 at 3. When asked if

17  there was pressure to meet goals, budgets, or business plans that "compromise my values,"

18  CW7 answered that "2003 expenses are carried over to 2004 due to accrual process." CC ¶

19  277 & Ex. 1 at 7; *accord* CC ¶ 276 ("Budgets must be real. If you do not account for expenses

20  in the month they were taken, and hold large expenses to level the months and budget against

21  this. You budget [against] the prior year. How?"). Similarly, when asked if there was

22  pressure to meet short-term results and to bypass company policies, one employee emphatically

23  answered yes, "I am directed to do exactly that – not company procedures by rather GAAP in

24  reference to accruals. No invoice in hand no accrual even though we know the expense has

25  happened." CC ¶ 278 & Ex. 1 at 4. Another response said that Petco's company policies were

26  "not always followed by management." CC Ex. 1 at 4. Question 27 asked if Petco's "leaders

27  achieve financial goals without unethical behavior," and one response was: "If the leaders are

28  Director and VP of my department – no. Accruals again. DC give accruals, I submit to

1  Director, she changes and I tell DC's to resubmit. Accruals only when invoice in hand." CC
2  Ex. 1 at 8. Another employee, Confidential Witness No. 2 ("CW2"), a former Director and
3  Operations Manager for the Mira Loma central distribution center, hesitantly answered
4  "Possible," but then described the factual basis for the accounting problem: "I am given direct
5  orders to hold invoices and not show them as they happened. We are about to start the budget
6  process. We will once again make budget against a false prior year. I never thought of this
7  before, but is this not what Enron did." CC ¶ 276 & Ex. 3 (Bates Stamp 054). Another
8  employee indicated that the accounting impropriety was entrenched when he said that "[m]y
9  feeling is that the budgeting process has been going on long before I was here and will be long
10 after I am gone. Budgeting is an issue." CC ¶ 278. These survey responses support Plaintiffs'
11 allegation that the accounting impropriety was systemic and "widely known." CC ¶ 218. The
12 quotations from former employees "offer a substantial window" into Petco's procedures and
13 finances. *Oracle*, 380 F.3d at 1231.

14        The quotations from employees who felt coerced by their supervisors to violate ethical
15 standards to meet business goals provides circumstantial evidence of scienter.  The
16 Consolidated Complaint also includes allegations that upper management specifically
17 instructed the distribution centers to manipulate the accruals. Plaintiffs quote Confidential
18 Witness No. 1 ("CW1"), a former Financial Analyst, who alleges Defendant Richter, a Senior
19 Vice President of the Supply Chain, instructed the directors of the distribution centers to "hold
20 onto any invoices because we gotta make the quarter." CC ¶ 218. Defendant Richter, a
21 Certified Public Accountant ("CPA") and former Controller at Petco, had also held executive
22 positions in inventory management and business development. CC ¶ 37. During a weekly
23 budget meeting, Defendant Richter allegedly instructed the distribution directors to "do
24 whatever it takes to be on budget." CC ¶ 218(d). The Consolidated Complaint alleges that
25 these meetings were attended by Bob Northcutt (Vice President of Logistics) and Sharon
26 Regan (Director of Traffic and Transportation), who are not named as defendants, but who
27 reported to Defendant Richter. CC ¶ 218(a) & (d).

28        CW2, the former Director and Operations Manager at the Mira Loma central

- 17 -

1    distribution center described above, quotes Northcutt, the Vice President of Logistics, as giving

2    in to the intense pressure by Defendants Myers and Devine to hold back invoices so that it

3    looked like the distribution centers were within their budget. CC ¶ 218(b); *accord* CC ¶ 184

4    ("Northcutt was under so much pressure from senior management to meet the budget that he

5    threatened to quit several times a week"). Northcutt, the Vice President of Logistics but is not

6    named as a defendant in the action, decided which invoices would be paid and which would

7    be withheld and not recorded. CC ¶ 184; CC Ex 1 at 8 (describing process of giving accruals

8    to director, who then changes them for re-submission). Northcutt reported to Defendant

9    Brann, who reported to Defendant Richter. CC ¶ 167, 234. Defendant Myers, a CPA, joined

10   Petco in 1990, and had been promoted through Finance and Controller positions to become the

11   CEO in 2004. CC ¶ 29. Defendant Devine had previously served as CEO. CC ¶ 31.

12          CW1 confirms CW2's description of the process by which distribution center reports

13   were changed to appear to be within the budget and also identifies the people involved. CC

14   ¶ 234-268. CW1 states that Northcutt discussed the budget with the distribution centers in

15   weekly telephone calls. CC ¶ 245; *accord* CC ¶ 256 (CW2 states that Defendant Richter

16   joined the weekly telephone calls in October 2004). CW1 states that the budget reports for the

17   distribution centers were taken to monthly management meetings where all department heads

18   presented reports to Devine, Carter, Hall, and Myers. CC ¶ 234.

19          Another factor probative of scienter is that Plaintiffs have quantified the under-accrued

20   expenses. Plaintiffs rely on a witness who documented the problem and alerted Petco

21   management to a serious financial discrepancy. CW7, the former transportation manager who

22   expressed his concerns in the October 2004 survey, reports that he reviewed the general

23   ledgers and could see the massive amounts of invoices that had been withheld. CC ¶ 218(c).

24   On or about February 2005, CW7 reviewed an eight inch stack of unpaid "freight out" invoices

25   that had not been processed, and ran a general ledger for all eight distribution centers. CC ¶

26   273. He estimated that between three and five million dollars worth of invoices had not been

27   recorded as accrued expenses for FY 2004. CC ¶ 218(c). Plaintiffs attached an e-mail to the

28   Complaint from late March 2005, in which CW7 told Defendant Myers (CEO), Defendant

1   Carter (CFO), and another supervisor Doug Beeuwsaert (the Vice President of the Internal

2   Audit, who is not named in this case), that he had resigned because he had been complaining

3   about the held-back invoices and he wanted to alert them to his concern. CC Ex. 2. CW7

4   attached his calculations and the ledgers showing that Petco had held-back over three million

5   dollars of fuel and freight expenses from 2004, instead, carrying this expense into 2005. CC

6   ¶ 186-87 & Ex. 2. The document identifies dozens of vendors affected by the accounting

7   procedure by listing the invoices, the amounts involved, and the relevant dates. *Id.*

8       Confidential Witness No. 2 ("CW2"), who had knowledge of Petco's procedure to

9   process invoices, said temporary labor and transportation costs were commonly set aside. CC

10  ¶ 181. CW2 was responsible for reviewing the invoices as they came into the Mira Loma

11  distribution center, and for giving a report to CW1 or Regan for payment. CC ¶ 182. CW2

12  said that its temporary worker agency was "always getting ready to cut us off" because of the

13  four month delays in getting paid. CC ¶ 185. CW1 describes the specific ledgers that showed

14  the accounting discrepancy, and estimates that the Mira Loma distribution center withheld

15  $40,000 to $70,000 of temporary labor expenses every month. CC ¶ 248, 251-52, 261.

16      Thus, the Consolidated Complaint contains first-hand accounts and documented

17  estimates of the amount of under-accrued expenses of the factual basis of the allegations.

18  *Daou*, 411 F.3d at 1016-20 (irregularities in revenue recognition can be supported by basic

19  information of amount, products, dates, and persons involved, so that court can assess whether

20  violations were technical or significant and widespread; and complaint that included actual

21  witness descriptions of incriminating acts meets PSLRA pleading standard); *Oracle*, 380 F.3d

22  at 1233 (knowledgeable confidential witness described company's accounting practices,

23  provided estimate of discrepancy, and "documents themselves appear to establish improper

24  revenue adjustment").

25      Plaintiffs further allege that Petco violated GAAP by under-recording its distribution

26  costs. CC ¶ 174-77. "Violations of GAAP standards can also provide evidence of scienter."

27  *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1335 (2006).

28  The Court agrees that the facts describe a type of manipulation that supports an inference of

knowing misconduct.  This was not an arcane rule of accounting:  a lay person can easily understand the need to record expenses in a timely fashion so that accounts are balanced correctly.  *Id.* at 1016-20 (plaintiffs plead details of GAAP violations); *cf. In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (in summary judgment context, reasonable accountants could resolve differently the complex issues of accounting, therefore, the misapplication of GAAP did not support *scienter*).  Taken together with the quotations that managers were instructed to hold back invoices in order to "make quarter," the alleged facts create a strong inference that the purpose of altering the accounts was to influence the third quarter 2004 results.  CC ¶ 218; *Daou*, 411 F.3d at 1016-20 (specific allegations of improper accounting to mislead investors by artificially inflating revenue).  The Confidential Witness heard Defendant Richter make the statement shortly before the third quarter period ended on October 31, 2004.  Plaintiffs have alleged the chain of command showing that the problem was visible.  A direct order to alter the ledgers from a high level executive creates a strong inference that Petco was acting either deliberately or recklessly to inflate the stock price.  The totality of Plaintiffs' allegations about the accounting impropriety are sufficient to survive a motion to dismiss under the PSLRA standard.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-34 (9th Cir. 2004) (factors included confidential witnesses and specific admissions by top executives); *cf. In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002) (listing factors).

In their motion to dismiss, the Petco Defendants identify facts that suggest the Petco did not know about the accounting error until the "whistleblower" alerted top executives about Northcutt's and Defendant Richter's conduct, and that once known, the company promptly investigated and corrected the problem.  Petco's Br. at 16-17; CC ¶ 9, 87, 139 (June 28, 2005 press release describes discovery of error and comprehensive internal review); *see* Defs.' Exs. S at 570 (during May 25, 2005 conference call with investors, Defendant Myers describes investigation and remedy) (partially quoted at CC ¶ 133).  Defendants also argue that the error was minor relative to Petco's financial situation, and that the company did not have to re-state its prior financial results.

05-CV-0823

1    Although the promptness with which Petco corrected the accounting mistake weakens

2    the inference of scienter, the Court concludes that the totality of circumstances described in

3    Plaintiffs' allegations satisfies the PSLRA pleading standard. *See Gompper*, 298 F.3d at 895-

4    97 (court must take into account the existence of all plausible inferences to determine scienter

5    from the total mix of alleged facts).   The alleged circumstances provide cogent and plausible

6    allegations that indicate "no less than a degree of recklessness that strongly suggests actual

7    intent." *Silicon Graphics*, 183 F.3d at 979.

8    Petco's argument that the accounting error was insignificant in its amount is more

9    appropriately directed to the "materiality" element of the securities violation claim. Materiality

10   is a typically a fact-intensive question. *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450

11   (1976); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996).   At the pleading stage, the

12   Court accepts the Plaintiffs' reasonable premise information that a company holding back

13   invoices to affect the bottom line "would have been viewed by the reasonable investor as

14   having significantly altered the 'total mix' of information made available." *See Basic Inc. v.

15   Levinson*, 485 U.S. 224, 231-32 (1988); *America West*, 320 F.3d at 935 (at motion to dismiss

16   stage, allegation that company concealed information about the "overall economic health"

17   satisfied materiality requirement).   The employee's question, "isn't this what Enron did[?]"

18   highlights that an investor might find it relevant that there were pressures to violate company

19   policies by withholding expenses.   *See* CC ¶ 128 (quoting a stock analyst that "Petco's

20   discovery of errors related to under-accrual of distribution expenses not only reveals lower

21   profitability in its business but also increases the perception of risk.   There could be a

22   credibility issue with investors that may be difficult to recover from in the short term.")

23   (emphasis omitted).

24   The Court now turns to the analysis of whether Plaintiffs have named particular

25   individuals by "indiscriminately grouping all of the . . . defendants into one wrongdoing

26   monolith." *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1433 (S.D. Cal. 1998). After careful

27   review, the Court finds sufficient allegations against Individual Petco Defendants Brann,

28   Carter, Devine, Hall, Myers, and Richter on the allegations of accounting improprieties. These

1    executives were specifically mentioned by Confidential Witnesses as possessing information

2    about the under-accrual of distribution expenses and either directly instructing or indirectly

3    pressuring employees. *See In re GlenFed Inc., Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994)

4    (en banc) ("*GlenFed I*"). They were also in the chain of command of the distribution centers

5    where the ledgers were modified and attended regular meetings where the results were

6    discussed. This provides circumstantial evidence for Plaintiffs' allegations that these

7    defendants recklessly disregard information that the earnings were based upon accounting

8    improprieties. *Oracle*, 380 F.3d at 1231.

9         Defendants Carter and Myers certified that the SEC Forms were correct. CC ¶ 100

10    (August 30, 2004 Form 10Q) & 198-201 (identifying other SEC forms); Defs.' Exs. H at 307-

11    09 & M at 414-17. "[W]hen a corporate officer signs a document on behalf of the corporation,

12    that signature will be rendered meaningless unless the officer believes that the statements in

13    the document are true. " *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000).

14    Because the Consolidated Complaint contains sufficient factual allegations of scienter, those

15    who sign the documents (even if there are no facts showing they were involved in the

16    preparation) can be held liable as a primary violator of § 10(b) for making a false statement.

17    *Id.*

18         Defendants Carter, Devine, and Myers were often quoted in press releases which

19    contain statements alleged to be false and misleading. *E.g.*, CC ¶112 (Nov. 18, 2004 press

20    release quotes Devine & Myers), ¶ 121 (March 10, 2005 press release quotes Devine &

21    Myers). Having been quoted giving information about Petco's financial returns, it is

22    reasonable to infer that these individuals participated in reviewing or preparing such

23    documents. *See Howard*, 228 F.3d at 1061 ("By standing behind a statement, the public

24    assumes that they can trust the word of the maker of that statement").

25         Each quarter, Defendants Carter, Devine, Hall, and Myers participated in web-broadcast

26    telephone conference calls that repeated these financial statements to investors and to market

27    analysts, who used the information to evaluate the financial health of the company. CC ¶ 96-

28    99, 105, 110, 114, 116, 119, 128, 135-36, 138, 144-45, & 147-49, 324. Plaintiffs have

- 22 -

1   identified statements made during those conference calls in which these executives held

2   themselves out to the public as sources of reliable information about Petco's financial

3   condition. *E.g.*, CC ¶ 95, 113, 122; Defs' Exs. J, L, & P.

4       Though Defendants Brann and Richter are not alleged to have made any statements

5   about the stock value, Plaintiffs allege that they participated in the scheme to defraud investors

6   by causing or permitting Petco to overstate its earnings by recklessly disregarding proper

7   accounting procedures for the distribution centers. The Consolidated Complaint contains

8   sufficient specific facts of their participation in the orders to hold back invoices to sustain their

9   inclusion in the First Claim for Relief on the accounting issue.

10      Consequently, the Court finds sufficient allegations to state primarily liability claims

11  for the allegedly false and misleading statements at a time when the stock value was allegedly

12  artificially inflated by the under-accrued expenses against Defendants Myers, Carter, Devine,

13  Brann, and Richter, as well as the corporation, Petco itself.

14      The Consolidated Complaint, however, does not mention Individual Petco Defendants

15  Major, Martin, Mitchell, and Woodard in connection with the under-accrual of expenses

16  problem. Their job descriptions do not reveal an apparent connection with the distribution

17  centers' finances or any particular accounting responsibilities. CC ¶ 32, 34-36, 38. Plaintiffs

18  argue that their allegations against *all* of the individual Petco defendants are justified under

19  "group published" doctrine. CC ¶ 50.

20          Prior to the PSLRA, the Ninth Circuit accepted the "group published" doctrine:
            A plaintiff may satisfy Fed. R. Civ. P. 9(b) through reliance upon a presumption

21          that the allegedly false and misleading "group published information"
            complained of is the collective action of officers and directors. *See Blake v.*

22          *Dierdorff,* 856 F.2d 1365, 1369 (9th Cir.1988); *Wool v. Tandem Computers,*
            *Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987). In cases of corporate fraud where the

23          false and misleading information is conveyed in prospectuses, registration
            statements, annual reports, press releases, or other "group-published

24          information," it is reasonable to presume that these are the collective actions of
            the officers. Under such circumstances, a plaintiff fulfills the particularity

25          requirement of Rule 9(b) by pleading the misrepresentations with particularity
            and where possible the roles of the individual defendants in the

26          misrepresentations.

27  *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir. 1995) ("*GlenFed II*").

28      Defendants argue that the legal concept of "group publishing" did not survive the

1  enactment of the PSLRA in 1995, which raised the pleading standards in an effort to deter

2  abusive securities fraud claims. *See America West*, 320 F.3d at 931. They rely on the PSLRA

3  language that requires specific acts by "the" defendant, which they interpret as meaning "each"

4  defendant. 15 U.S.C. § 78u-4(b)(2); *e.g.*, LGP's Br. at 9. Defendants cite a Fifth Circuit

5  decision; however, that Circuit did not recognize the doctrine *before* the PSLRA. *Southland*

6  *Sec. Corp v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004). Defendants

7  also cite district court decisions within the Ninth Circuit that have concluded the doctrine was

8  incompatible with the PSLRA. A district judge in this district held that the "group published

9  doctrine permits an inference of wrongdoing not based on defendant's conduct, but based

10  solely on defendant's status as an officer or director of a corporation." *Allison v. Brooktree*

11  *Corp.*, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998).

12      Because Defendants have not cited Ninth Circuit authority to question the viability of

13  the doctrine, the Court will apply it to this motion. The Ninth Circuit had the opportunity to

14  reject the group published doctrine in the case of *Silicon Graphics*, 183 F.3d at 973-79. There,

15  the Ninth Circuit first set forth the guiding principles for applying the PSLRA to securities

16  litigation. The district court had relied on the group published doctrine to create a rebuttable

17  presumption that six top executives had participated in the production of the company's

18  prospectuses and other public documents. *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp.

19  746, 759 (N.D. Cal. 1997), *aff'd*, 183 F.3d at 989. Thereafter, the district court granted an

20  early summary judgment motion to the four executives who filed affidavits stating that they

21  had not been involved in the preparation of those documents. *Id.* The Ninth Circuit neither

22  accepted nor refuted the district court's reliance on this doctrine. This Court will follow suit

23  until the Ninth Circuit expressly rejects the doctrine. *Silicon Graphics*, 183 F.3d at 980. In

24  any event, "[i]t is important to note that the group pleading doctrine allows *attribution of*

25  *statements to individual defendants*; it has *no application* to the determination of *scienter* as

26  to individual defendants." *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1370-71

27  (N.D. Ga. 2004) (emphasis added) (concluding the group pleading doctrine survived PSLRA

28  "provided that the application of the doctrine is kept within proper bounds").

1    Nonetheless, even using the group published presumption, Plaintiffs have cast too wide

2 a net. When the Ninth Circuit adopted the presumption in *Wool v. Tandem Computers, Inc.*,

3 818 F.2d 1433, 1441-42 (9th Cir. 1987), it dealt with allegations against three individuals who

4 had direct involvement with the day-to-day affairs of the company and, in particular, with the

5 financial statements. The three individuals held the offices of President/Chief Executive

6 Officer, Senior Vice President/Chief Operating Officer, and Vice President/Controller. On

7 those facts, the Ninth Circuit held that it was "reasonable to presume" that false or misleading

8 information conveyed in "prospectuses, registration statements, annual reports, press releases,

9 or other 'group-published information . . . are the collective action of the corporate officers."

10 *Id.* "[I]n cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge

11 of the facts constituting the wrongdoing." *Id.*

12    The reasonableness of the presumption, however, weakens when an outside director or

13 other venture capital defendants are involved. *Stac Elec.*, 89 F.3d at 1410-11; *GlenFed II*, 60

14 F.3d at 593 ("Merely because the complaint identifies a corporation's outside directors, various

15 committee assignments, and generic responsibilities for every committee does not mean that

16 the presumption of 'group published information' is applicable.") (citing Fed. R. Civ. P. 9(b)).

17 In such situations, the Ninth Circuit requires the plaintiff to allege that the person participated

18 in the day-to-day corporate activities or participated in preparing or communicating group

19 information at particular times. *Stac Elec.*, 89 F.3d at 1410-11; *GlenFed II*, 60 F.3d at 593;

20 *AFC*, 348 F. Supp. 2d at 1371 ("The group pleading doctrine creates a rebuttable presumption

21 that applies to *a limited number of persons* within a given company to be held accountable for

22 the company's public statements.") (emphasis added).

23    The Court finds that Plaintiffs have exceeded the reasonable bounds of the presumption

24 by including every executive at Petco. Here, Plaintiffs have named the Senior Vice Presidents

25 of Information Systems, CC ¶ 34 (Major), Operations, CC ¶ 35 (Martin), Human Resources

26 and Administration, CC ¶ 36 (Mitchell), and Business Development, CC ¶ 38 (Woodard).

27 Unlike the CEO or CFO, these job titles do not suggest day-to-day involvement with the

28 financial statements of Petco such that it would be reasonable to presume that they participated

- 25 -

1    in communicating information to investors or that they would have access to information about

2    the accounting problem that would make them liable for any misleading statements in the press

3    releases, prospectuses, and other SEC filings.

4        Martin and Woodard did participate in one of the conference calls that accompanied the

5    release of Petco's quarterly financial statements, but Major and Mitchell did not participate in

6    any of those communications. *See* CC ¶ 95, 113, 134, 152; *accord* Defs.' Exs. J at 321, L at

7    359, P at 521, & X at 657 (transcripts identify participants).   At the August 18, 2004

8    conference call, Woodard's participation was limited to the subject of new services offered by

9    Petco (such as doggy-day care, canine education, and grooming), and Martin stated that it took

10   up to three weeks in the evening hours to remodel a Millennium store into a Pisces format and

11   commented on the new signs. Defs.' Ex. J at 335-36, 343, 345, 347.  Thus, on the one

12   occasion that Woodard and Martin participated in communications to investors and analysts,

13   they did not make statements relative to the allegations in the Consolidated Complaint.

14   Moreover, the date of that call, August 18, 2004, predates the time Plaintiffs' quote Defendant

15   Richter as instructing distribution center directors to hold onto invoices to make the quarter

16   ending on October 31, 2004.

17       Unlike the specific allegations of statements made by Defendants Myers and Richter,

18   for example, the Consolidated Complaint does not mention these other four individuals.

19   Accordingly, the group pleading presumption does not assist Plaintiffs in this case as to these

20   Petco officers. *Stac Elec.*, 89 F.3d at 1410-11 (dismissing outside director and venture capital

21   defendant under Fed. R. Civ. P. 9(b) when complaint alleged scheming but "provides no

22   specific facts – no names, no meetings, no internal memorandum or documents, no specific

23   conduct – in support of its theory"); *GlenFed II*, 60 F.3d at 593 (same)

24       In opposing the motion to dismiss the Petco individual defendants, Plaintiffs argue that

25   the stock trades by these individuals were suspicious. "[I]nsider stock sales are only suspicious

26   when they are dramatically out of line with prior trading practices at times calculated to

27   maximum the person benefit from undisclosed inside information." *America West*, 320 F.3d

28   at 938 (quotations and citations omitted). "In determining whether the pattern and amounts

- 26 -

05-CV-0823

1  of trades is suspicious, the court considers where the trades were made under a pre-set plan.

2  *Id.* Here, Major, Martin, Mitchell, and Woodard regularly made identical trades on the first

3  of each month during the Class Period, and during the preceding year. CC ¶ 288; Defs.' Exs.

4  AG (Major initially sold 833 shares per month in 2003, and then increased to 1,000), AI, AK,

5  & AQ. The amounts are consistent with the SEC Forms 4, which indicate that these automatic

6  trades were "sold in accordance with the reporting person's previously established Rule 10b5-1

7  sales plan." Defs.' Exs. AG, AH, AI, AJ, AK, AL, AQ, & AR. Each of these defendants also

8  sold a larger block of shares on October 22, 2004, which was the day that TPG and LGP

9  completed the divestment of their own stock and was described in Petco's Supplement to the

10  February 2004 Prospectus. CC ¶ 288. The Court has examined the Form 4s and concludes that

11  those trades are not suspicious in the circumstances described, and they do not provide

12  circumstantial evidence of scienter as to these four individuals. The Court dismisses individual

13  Defendants Major, Martin, Mitchell, and Woodard from the first cause of action.

14       The Court now considers whether Plaintiffs have provided probative facts that some

15  members of Petco's Board of Directors acted with the requisite scienter.

16       Defendant Day, a director, presents a close call. The Court examines the allegations

17  that he had access to inside information and that his stock trades were suspicious. Day was a

18  member of the Audit Committee "during all of fiscal 2003 and until his resignation in April

19  2004." Pls.' Ex. A at 12. Petco describes the duties of the Audit Committee:

20       The Audit Committee is responsible for engaging the independent auditors to audit the Company's financial statements, and for reviewing the

21  scope of the audit effort. The Audit Committee oversees the Company's internal audit function, and reports its recommendations as to the approval of the

22  Company's financial statements to the Board of Directors. In addition, the Audit Committee members meet periodically with management, the independent

23  auditors and internal auditors to review matters relating to the Company's financial statements, accounting principles and systems of internal accounting

24  controls.

25  *Id* at 12-13. Petco disclosed the under-accrual of expenses as a result of findings by its

26  independent auditor, who had been preparing the company's financial statement for the fiscal

27  year 2004 (ending January 29, 2005). A member of the Audit Committee would oversee the

28  process and could learn of the discovery of the accounting impropriety before others. But Day

- 27 -

05-CV-0823

1   was no longer a member of the Audit Committee at the time that Petco learned of and

2   disclosed the accounting problem in 2005.  Day resigned from the Audit Committee the prior

3   year.  Thus, this first factor is inconclusive.

4         In light of this relevant former service, the timing of one of Day's large stock trades is

5   very suspicious because it creates an appearance that he may have had advance knowledge that

6   Petco would disclose the accounting problem to the public on April 15, 2005.  On March 30,

7   2005, Day exercised his option right to buy 15,000 shares of common stock at $19.00, and on

8   the same day, sold those shares at the market price of $37.41.  Defs.' Ex. AS at 1595.

9   Plaintiffs suggest that the timing shows Day had learned of that the accounting impropriety

10  might go public because CW7, who had resigned over the problem, had sent an e-mail

11  outlining the scope of the under-accrual to Defendants Myers and Carter in late March 2005.

12  Pls.' Opp. Br. at 50.

13        "Unusual or suspicious stock sales by corporate insiders may constitute circumstantial

14  evidence of scienter."  *America West*, 320 F.3d at 938 (quotations and citations omitted).  The

15  timing and amount of the trades are significant factors, and it is appropriate to compare the

16  challenged trades to the insider's prior history of trading.  *Id.*  Day's prior trading history

17  shows that he exercised options in both February 2004 and 2005 to acquire 3,000 shares each

18  year; and that he sold 15,901 shares in October 2004.  CC ¶ 288; Defs.' Ex. AS.  Plaintiffs

19  assert that the October 2004 trades are also suspicious because they coincide with the internal

20  disclosure of the employee survey, which stated Petco had not been properly accounting for

21  its expenses.  Pls.' Opp. Br. at 50.  All of Day's trades occurred during the proposed Class

22  Period, and the only exception is the exercise of a stock option in February 2004.  Plaintiffs

23  contend that the suspicion is heightened because Day was a director for five years, but had not

24  sold any stock during that time.  Pls.' Opp. Br. at 51 n.26 (quoting Horton Decl. ¶ 52) & 53

25  n.29.  Plaintiffs allege that he waited until after Petco made positive disclosures, or just before

26  Petco made negative disclosures.  *Id.*

27        On this record, the Court finds that the March 30 sale troubling in light of the negative

28  disclosure by Petco on April 15.  Day suddenly exercised his option on a large number of

1   shares, and immediately sold those same at a peak price. *Oracle*, 380 F.3d at 1228-29, 1232.

2   Day did not have a regular pattern of selling Petco shares, and after he sold the 15,000 shares

3   on March 30, he retained only 511 shares. *Id.* (selling a large percentage of one's shares is

4   probative of scienter). The suspicious trade occurred at a time that would have maximized the

5   personal benefit from undisclosed inside information. *America West*, 320 F.3d at 938-39;

6   *Silicon Graphics*, 183 F.3d at 986. The Court finds that Plaintiffs' have adequately plead that

7   Day acted with scienter, and denies his motion to dismiss. In making this determination, the

8   Court has in mind the strong, detailed, and corroborated allegations of the accounting

9   improprieties, and finds, on the whole, that the Consolidated Complaint has stated a § 10(b)

10  claim against Defendant Day.

11      The Consolidated Complaint, however, fails to allege specific facts to support the

12  conclusory allegations that the any other members of Petco's Board of Directors would have

13  known about or participated in the accounting impropriety. Aside from attending an annual

14  meeting, the Plaintiffs rely solely on the position of being a director, but that is insufficient to

15  meet the heightened pleading standard. *Cf. GlenFed II*, 60 F.3d at 593 (pre-PSLRA case, using

16  Rule 9's particularity requirement to dismiss outside directors). There are no factual

17  allegations to substantiate Plaintiffs' bald assertion that the directors would have known about

18  the employee survey, Defendant Richter's directive to the distribution center, or the March e-

19  mail by the Confidential Witness. Prior membership on committees unrelated to financial

20  statements does not assist Plaintiffs' case. Pls.' Ex. A at 12-13 (Compensation Committee

21  makes recommendations on executive salary and bonuses, and Danhakl and Price resigned

22  from that Committee in April 2004, before Class Period). Accordingly, the Court dismisses

23  the § 10(b) claim against Baumer, Coslet, Danhakl, and Price. (These directors also have

24  connections to the Partnerships, which the Court discusses below.)

25              2. Operational Problems

26      In contrast to the specific and corroborated allegations about the under-accrual of

27  expenses at the distribution centers, Plaintiffs' muddled allegations of operational problems

28  are general and conclusory. The Court concludes that Plaintiffs have not met the heightened

1    pleading standard against any defendant regarding the alleged operational problems. *Vantive*,

2    283 F.3d at 1086 ("We hardly need elaborate on the inadequacy of these generalized

3    allegations under the heightened pleading standard of the PSLRA. Their deficiency is that they

4    fail to plead falsity or scienter with particularity.") (citation omitted).   The operational

5    deficiencies are not connected to each other nor do they relate to the accounting problem at the

6    distribution centers. These allegations diminish the strength of Plaintiffs' core theory, thus,

7    they are not saved by considering them in combination with the accounting problem. *See*

8    *Gompper*, 298 F.3d at 895 (court must consider totality of circumstances to assess scienter).

9         Plaintiffs describe several operational problems which undermined Petco's statements

10   to investors that it had a successful business strategy. Plaintiffs allege that Petco issued false

11   forecasts of 5% to 6% growth when the Pisces store format actually afforded less shelf space

12   and sales potential. CC ¶ 10-11, 17, 82, 86, 111(e), 120(e), 131(e), 150(d), 218(f) & (g), 280-

13   87. "Petco's claims of same-store sales growth was an illusion." *Id.* ¶ 218(ii) & (iv).   To

14   compound the problems caused by the Pisces format, Plaintiffs allege that Petco raised prices

15   to make up the difference. *Id.* ¶ 150(e), 287. The Consolidated Complaint alleges that "Petco

16   was not executing successfully on its long-term growth strategy, rather defendants had

17   embarked upon a scheme to superficially report increased same-store sales growth forecasts

18   and results." *Id.* ¶ 111(d). Plaintiffs further allege that Petco knew that it did not have an

19   adequate distribution infrastructure to support the new stores opening in the Southeast. CC ¶

20   10, 74-80, 111(d), 120(d), 131(e), 150(d), 280-87. Plaintiffs allege that Petco issued the false

21   forecasts despite knowing that these operational problems threatened the likelihood that the

22   company could continue to grow successfully. Another allegation is that Petco erroneously

23   accounted for tenant improvement allowances on its leases, and understated the cost of sales

24   by improperly amortizing its tenant improvement allowances as a reduction to depreciation.

25   CC ¶ 111(c), 120(c), 131 (c), 150(c).

26        "A number of problems cripple this allegation." *Vantive*, 283 F.3d at 1089. Plaintiffs

27   rely on two Confidential Witnesses for these general allegations, but they provide meager

28   support for Plaintiffs' theory. The PSLRA requires that Confidential Witnesses be described

1    with "sufficient particularity to support the probability that a person in the position occupied

2    by the source would possess the information alleged" and the complaint contains adequate,

3    reliable, and plausible corroborating details. *Daou*, 411 F.3d at 1015 (quotations omitted).

4    First, Plaintiffs rely on Confidential Witness No. 6 ("CW6"), a former director of

5    distribution for the New Jersey and Massachusetts distribution centers, who stated that because

6    the Pisces format had less shelf space, the stores could not keep as many products on the

7    shelves. CC ¶ 166, 218(g), 285. CW6 gives the example of a store in New Jersey that had

8    been a top performer, but "its sales fell out of sight" once it was remodeled in the Pisces

9    format. *Id.* ¶ 285. CW6 cites seventy products that were not carried after the remodeling, and

10   reports that the store tried to boost sales by stocking the best-selling items for that location.

11   *Id.*; *accord* ¶ 218(f). CW6 complains that these efforts failed because they "took a lot of extra

12   hours for the workers to set up." *Id.* ¶ 285. CW6 reports that "same-store sales in Florida and

13   Georgia in 2005 were performing very poorly." *Id.* ¶ 286, 218(f), 283-84.

14   Defendant Petco contends that the anecdote of a single store in New Jersey is

15   insufficient to support Plaintiffs' broad claim of an effect on the stock price in any particular

16   quarter. The Court agrees that this information is inadequate. The sales figures of a single

17   store are insufficient when Petco operated nearly 700 stores and reported $1.8 billion in net

18   sales. Petco's financial statements were based on *nationwide* sales, and in a company of its

19   size, the slow performance of a New Jersey store is immaterial. *Ronconi*, 253 F.3d at 430

20   (finding it difficult to believe problem was material).

21   Moreover, the general description of "less shelf space" and "losing sales" is immaterial

22   when Petco as a whole was still profitable.[2] *See* CC ¶ 112 (Petco reports net sales of $455.5

23

---

24   [2]Defendants illustrate the implausibility of the Plaintiffs' theory by calculating that a 5-
     6% increase in prices coupled with a 2-3% reduction in customer traffic would result in 4%
25   net growth; yet, Petco reported 6.7% growth in the third quarter of 2004. Petco's Br. at 10.
     While that oversimplifies the finances, it does show that the Consolidated Complaint relies on
26   vague generalities instead of providing "contemporaneous facts in sufficient detail that would
     create a strong inference that the alleged adverse facts were known at the time of the
27   challenged statements." *Vantive*, 283 F.3d at 1085.
     Plaintiffs characterize the positive statements about the "fun" and "theatrical" new store
28   format as "misleading" but this is a conclusory label attached to an innocuous marketing
     description. "To be actionable under the securities laws, an omission must be misleading; in

1   million with a comparable store net sales increase of 7% for 3Q 2004). Petco told investors

2   that one of the purposes of the Pisces format was to change the product mix by increasing the

3   number of higher margin items, and by tracking the products that were actually selling in that

4   area. CC ¶ 112 (Nov. 18, 2004 press release attributes rising gross profit to improvements in

5   margin categories); CC ¶ 113 (at Nov. 18, 2004 teleconference, Defendant Hall states that

6   "product mix contributed about half" the increase in "comp sales"); Defs.' Ex. N at 422. Thus,

7   CW6's subjective critique of shelf space in the new store format does not necessarily mean that

8   the remodeling was a "flop." Pls.' Opp. Br. at 21; *Vantive*, 283 F.3d at 1085 (dismissing

9   complaint because "bulk of the alleged adverse facts are generic, subjective, . . . and could be

10   alleged against almost any company that has experienced a drop in sales revenue.").

11        CW6's report that stores in Florida and Georgia had slow sales in 2005 is weak because

12   it is vague. *Daou*, 411 F.3d at 1015; *Vantive*, 283 F.3d at 1085. An undefined measure of

13   slow sales in a small percentage of new stores would not necessarily affect the overall financial

14   health of a large, nationwide chain. *See* Defs.' Ex. N at 433 (of its 761 stores in January 2005,

15   Florida had 21 and Georgia had 12). In addition, CW6's statement describing low sales is not

16   logically connected to the allegations in Plaintiffs' complaint about operational difficulties or

17   inadequate distribution infrastructure. CW6 gave his opinion that the falling sales were caused

18   by a variety of factors "such as location, competition, and poor store management, particularly

19   on the East Coast," which had the "highest turnover of store managers and poor store

20   location." CC ¶ 284. None of these factors is relevant to Plaintiffs' theory of why defendants

21   were misleading the investing public about Petco's prospects. Generic allegations of

22   mismanagement could be made against any business, and do not support a federal securities

23   fraud lawsuit. *Vantive*, 283 F.3d at 1085.

24        Second, Plaintiffs rely on Confidential Witness No. 4 ("CW4") to bolster their

25   allegations of operational problems. CW4 was a former district manager in the Chicago area

26   who had trained retail store managers in how to meet sales goals and she reported that "there

27

28   other words it must affirmatively create an impression of a state of affairs that differs in a
material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d
997, 1006 (9th Cir. 2002).

1   was approximately 10% increase in the average transaction amount." *Id.* ¶ 164 & 287. "A

2   normal price increase on a PETCO item would generally be 2% to 3%, but during the last six

3   months of 2004, prices were being increased 5% to 6%." *Id.* The same CW states that "stores

4   were not meeting their same-store sales for 2004. Stores were projected to have same-store

5   sales of 5%. Many of these stores were missing their goals by 15% - 20%." CC ¶ 280, 287

6   ("noticeable decrease in customer traffic during 2004").

7        Defendant challenges CW4 on the ground that a district manager in charge of only

8   fifteen stores in the Chicago, Illinois area would probably not have job skills to understand the

9   nationwide policies of pricing and how to calculate same-store sales. CC ¶ 164. This is a valid

10  observation. *Daou*, 411 F.3d at 1015. In context of Petco's large business, the decline of

11  stores near Chicago would not materially effect the calculations made on a nationwide level.

12  The Court further notes that CW4 was employed "through the fall of 2004," CC ¶ 165, so it

13  is unclear if she would have had complete and reliable information about the company for

14  2004. And like the statement of CW6, CW4's assertion of "rising prices" in the stores she

15  managed is immaterial when Petco, on average, was profitable. The Court rejects the

16  argument that because CW4 reported price increases of 10% in Chicago stores that Petco

17  falsely reported only 1% price increases because, again, Petco's statements concern the

18  nationwide average of all 654 stores. For these reasons, CW4 does not provide specific facts

19  that create a strong inference that the defendants knew their statements about same-store sales

20  were misleading at the time they made them.

21        Plaintiffs' allegations about the inadequacy of the distribution infrastructure are not

22  corroborated by inside information, except two comments by CW7. *See* CC ¶ 66 & 111

23  (defining "Southeast" as Alabama, Florida, Georgia, Louisiana, and Mississippi; but omitting

24  Texas, Oklahoma, Tennessee, Arkansas, North Carolina, and South Carolina, as well as the

25  distribution center in Garland, Texas). First, CW7 stated it was more expensive to transport

26  merchandise to stores in Florida. CC ¶ 218(e) (drivers were paid overtime for longer trips,

27  especially if they stayed overnight), 281-282. It is obvious that driving from New Jersey to

28  Florida would take longer and cost more than a shorter trip, thus, the Confidential Witness's

- 33 -

1   observation does little to support Plaintiffs' fraud theory. CW7's second statement is that *he*

2   had discussed the need for a distribution center in the Southeast with two individuals who are

3   not named as Defendants in the action. CC ¶ 282. This statement sheds no light on what the

4   defendants actually knew, or whether their awareness of the potential need for future

5   distribution centers rendered misleading their positive statements about Petco's finances and

6   growth. *See Brody*, 280 F.3d at 1006-07.

7          In addition to the weak generalities of the information provided by these Confidential

8   Witnesses, there is no basis to infer that any particular defendant knew the information would

9   affect the truth of their statements about Petco's business strategy or future prospects.[3] "It is

10  clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier,

11  cheerier statement a falsehood." *GlenFed I*, 42 F.3d at 1548 (footnote omitted), *cited in*

12  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir.1999). While it might be reasonable to

13  infer that some executives reviewed some reports of sales figures, CC ¶ 220-22, the

14  Consolidated Complaint fails to allege that any individual executive knew or consciously

15  disregarded that such isolated operational difficulties would impact the overall financial health

16  of Petco. *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). The

17  existence of POLARIS reports does not corroborate the allegation that defendants foresaw that

18  their statements about Petco's successful business strategy were misleading. *Vantive*, 283 F.3d

19  at 1087-88 (access to internal reports about sales inadequate to plead falsity and scienter).

20  "Problems and difficulties are the daily work of business people. That they exist does not

21  make a lie out of any of the alleged false statements." *Ronconi*, 253 F.3d at 434.

22         Defendant Petco challenges the allegations as being illogical because the company had

23  49 consecutive quarters of profit at or above 4.6%. Petco's Mo. at 5-6; Defs.' Ex R at 563

24

25      [3]The Court takes judicial notice of portions of Petco's statements that Plaintiffs' omitted
    from the quotations in their Complaint. For example, Defendant Carter disclosed to investors
26  in the teleconference that high fuel costs and increased transportation costs were affecting the
    results. *Compare* CC ¶ 95 *with* Defs.' Ex. J. at 324; Defs.' Ex. H at 299. Petco cautioned
27  investors that it took at least a year for a new store to become profitable. *Compare* CC ¶ 94
    (referring to Form 10-Q) *with* Defs.' Ex. H at 296. The fact that these statements were made
28  further diminishes the inference that Plaintiffs seek to create that the defendants acted with
    deliberate recklessness.

1  (press release quoting Defendant Devine).  Defendant notes that the Consolidated Complaint

2  contains the facts showing that Petco met its predicted earnings all but one quarter. The Court

3  agrees that Plaintiffs' allegations of fraud are significantly weakened when Petco achieved the

4  goals it had publically announced.  *Vantive*, 283 F.3d at 1087 n.6 (noting weaknesses in

5  complaint alleging false predictions because company actually met it projected goals for fiscal

6  year).  The Consolidated Complaint reflects the facts that Petco achieved its forecasted

7  comparable store sales growth during most of the Class Period.  On August 18, 2004, Petco

8  announced its second quarter financial results (ending July 31), and predicted comparable store

9  sales increase of 6.7%.  CC ¶ 94.  On November 18, 2004, Petco announced that it had

10  exceeded that prediction, and had a comparable store net sales increase of 7% during the third

11  quarter (ending October 30).  *Id.* ¶ 112.  For the upcoming fourth quarter of 2004, Petco

12  predicted a 6% increase.  *Id.*  Petco did not meet that goal.  On March 10, 2005, Petco reported

13  a 5.1% increase of net sales for the fourth quarter, falling short of its prediction, but

14  nonetheless reaching a respectable level of growth.  *Id.* ¶ 121 (quoting Myers that "doldrums"

15  and harsh weather negatively affected sales figures).  Petco projected that the first quarter of

16  fiscal year 2005 would achieve a 5 to 6% increase.  *Id.*  On May 25, 2005, Petco announced

17  its first quarter results with a comparable store net sales increase of 5.2%, thereby falling

18  within the predicted range.  *Id.* ¶ 133.  Because of the planned expense of the new distribution

19  centers, Petco predicted only a 4 to 5% increase during the second quarter of 2005.  *Id.*  On

20  June 28, 2005, after correcting the accounting problem, Petco revised those expectations and

21  decreased the forecast to 3 to 4%.  *Id.* ¶ 139.  The Court agrees that this earnings record

22  significantly weakens Plaintiffs' allegations of falsity and scienter.  *Ronconi*, 253 F.3d at 434

23  ("A company could experience 'serious operational problems,' 'substantial difficul[ties],' and

24  'difficult problems' and still have increasing revenue."); *cf. Silicon Graphics*, 183 F.3d at 988

25  (rejecting generic allegations that conveniently follow a successful company's turn for the

26  worse).

27       Another weakness is that the Consolidated Complaint does not quantify the financial

28  impact that these operational problems had on Petco.  *Cf.* CC ¶ 172-73 (calculating impact of

1  under-recorded distribution costs) & 187 (chart lists $3,129,180.85 of invoices from vendors
2  deferred into next fiscal year).   The vagueness of Plaintiffs' allegations regarding the
3  operational problems significantly weakens the inference they ask the Court to draw about the
4  defendants' supposed knowledge of such a minor and esoteric problem.   In contrast to the
5  obvious error of under reporting expenses involved in the accounting impropriety, the
6  amortization of tenant leases is a complex issue and subject to differing interpretations.  CC
7  ¶ 175-78.  "The mere publication of inaccurate accounting figures, or a failure to follow
8  GAAP, *without more*, does not establish *scienter*."  *Worlds of Wonder*, 35 F.3d at 1426
9  (quotation omitted & emphasis added).  It is not the type of problem that demonstrates the
10 defendants necessarily must have been aware of an accounting violation. *DSAM Global Value*
11 *Fund v. Altris Software, Inc.*, 288 F.3d 385, 387, 390-91 (9th Cir. 2002).  Plaintiffs rely on the
12 figures that Petco provided in its SEC Form 10K about tenant improvement allowances. *See*
13 Defs.' Ex. N at 460.25-460.26.  These circumstances suggest that Plaintiffs are attempting to
14 allege "fraud by hindsight" by including the alleged error regarding tenant improvement
15 allowances on leases and amortizing those allowances as a reduction to depreciation. *See*
16 *Silicon Graphics*, 183 F.3d at 988.

17       Another critical factor in the Court's decision is that the alleged false and misleading
18 statements about same-store sales are projections of future growth.   15 U.S.C. § 78u-
19 5(c)(1)(B)(i) (PSLRA requires actual knowledge for future statements); *In re Vantive*, 283 F.3d
20 at 1085.  The statements are clearly cast as predictive based upon past performance. The *past*
21 sales increases are accurately reported: "Net sales in the second quarter of 2004 were $438.5
22 million with a comparable store net sales increase of 6.7%." CC ¶ 94. This 6.7% increase is
23 then compared to the *prior* quarter's increase of 6.1%.  *Id.*  The statement merely states in
24 general that the success "again highlights the consistency and resilience of our business and
25 continues our strong comparable store sales growth trend, now in its twelfth year." *Id.*
26 (quoting Defendant Devine).   The company reported that its profits would enable it to
27 "implement such initiatives as our remodel program" which had generated "competitive
28 advantages." *Id.* (quoting Defendant Carter).  In the paragraph titled "Outlook for the Third

1  Quarter and Full Fiscal Year 2004," Petco stated that it "currently expects a comparable store

2  net sales increase of approximately 5%-6%" and describes it as an "anticipated increase" based

3  on the second quarter's results. *Id.*

4       The PSLRA requires the Court to examine the cautionary statements cited by a

5  defendant. 15 U.S.C. § 78u-5(e) ("On any motion to dismiss based upon subsection (c)(1) of

6  this section, the court shall consider any statement cited in the complaint and any cautionary

7  statement accompanying the forward-looking statement, which are not subject to material

8  dispute, cited by the defendant."). The PSLRA does not require that the cautionary statements

9  actually accompany the forecasts, for instance, an oral statement may properly refer listeners

10 to additional risk factors "in a readily available written document," such as a Form 10K. 15

11 U.S.C. § 78u-5(c)(2)(B)(i);. *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund*

12 *v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).

13      Therefore, the Court takes judicial notice of the fact that Petco included cautionary

14 language in its prospectuses and conference call presentations. *Lee*, 250 F.3d at 689-90.

15 Moreover, because the Consolidated Complaint quotes extensively from the conference calls

16 and refers to the other SEC filings prepared by Petco, those documents are incorporated by

17 reference and may be considered in a motion to dismiss.  The Court emphasizes that it is not

18 evaluating the truth of the assertions; rather, it is assessing whether, taken as a whole, Petco's

19 forward-looking statements to investors contained "meaningful cautionary statements

20 identifying important factors that could cause actual results to differ materially." 15 U.S.C.

21 § 78u-5(c)(1)(A); *Clorox*, 353 F.3d at 1133 (court can rule as a matter of law in a motion to

22 dismiss "that defendants' forward-looking representations contained enough cautionary

23 language or risk disclosure to protect the defendant against claims of securities fraud")

24 (quotations and citations omitted).

25      Here, the SEC forms contain the full text of Petco's press releases. For example, the

26 August 18, 2004 press release, quoted at CC ¶ 94 and alleged to be false and misleading in CC

27 ¶ 111(c)-(f), contains a paragraph warning that states, in part, "[s]tockholders and other readers

28 are cautioned not to place undue reliance on these forward-looking statements. Such forward

1    looking statements involve known and unknown risks, uncertainties and other factors, which

2    may cause actual results of PETCO to be materially different from historical results or from

3    any results expressed or implied by such forward-looking statements." Petco then identifies

4    some of the factors (for example, "performance of new stores, ability to execute expansion

5    strategy and sustain growth," and competition), and states that they are discussed in the

6    company's SEC reports. Defs.' Ex. I at 316. In the SEC report, Petco explained that an

7    investor could identify a forward-looking statement by verbs such as "believe," "expect,"

8    "may," "plan," "anticipate," or "project." Defs.' Ex. H at 305. The same is true for the

9    conference call that same day, and the later presentation at an investor and analyst meeting in

10   Philadelphia. CC ¶ 95 & 104. In both instances, Petco expressly cautioned that predictions

11   and forecasts were not guaranteed and investors should not place undue reliance on forward-

12   looking statements because actual results may differ materially. Defs.' Ex. J at 322

13   (conference call transcript); Defs.' Ex. V at 623 (printout of presentation slides refers to SEC

14   filings).

15          Many of the statements that Plaintiffs identify as being false contain similar cautions.

16    Defs.' Ex. K at 357 (press release quoted in CC ¶ 112 reports "outlook" and "expect[ations]"

17   for comparable store net sales increase, and contains caution); Defs.' Ex. L at 380

18   (teleconference quoted at CC ¶ 113, contains caution not to place undue reliance on forward

19   looking statements, and refers investors to SEC forms); Defs.' Ex. M at 412 (cited by CC ¶

20   115, warns that discussions of strategy, plans, and intentions involve known and unknown risks

21   that may cause performance and achievement to differ materially from forward-looking

22   statements); Defs.' Ex. N at 425-32 (cited by CC ¶ 140, describes several risk factors that can

23   affect predictions and future growth, including caution that continued growth depends upon

24   ability to increase sales at new and existing stores), 439; Defs.' Ex. O at 511 (quoted at CC ¶

25   121, contains warning); Defs.' Ex. P at 522 (cited at CC ¶ 122); Defs.' Ex. R at 565 (quoted

26   at CC ¶ 133, contains warning); Defs.' Ex. S at 569 (quoted at CC ¶ 134, teleconference begins

27   with caution about forward-looking statements); Defs.' Ex. T at 598 (press release quoted at

28   CC ¶ 139, contains caution). One notable example is the report for FY 2004 (dated June 28,

2005). Plaintiffs contend it mislead investors about sales growth because Petco knew it could not achieve more than 2% same-store sales. CC ¶ 140, 150(f). Yet the report plainly states that "our comparable store net sales increases in future periods may be lower than the historical levels or our comparable store net sales may not increase at all." Defs.' Ex. N at 426.

The presence of cautionary language weakens Plaintiffs' assumption that Petco's forecasts of future growth were false or that any defendant knew the positive predictions were misleading at the time made. *Ronconi*, 253 F.3d at 428-30 (not every optimistic statement is fraud because business decisions must be based on predictions of what might work).

Finally, the stock sales do not strengthen the inference of scienter regarding the operational problems. *Vantive*, 283 F.3d at 1092 ("[i]nsider stock sales are not inherently suspicious"). Plaintiffs' conclusory allegation that the defendants manipulated the timing of the announcements to take advantage of the strictures of their Rule 10b-5 trading plans carries no weight. This is particularly true when the allegation that operational problems amounted to fraud are "woefully inadequate" and Petco met its earnings projections in most quarters. *Id.* The regular, steady pattern of sales on the first of each month by the Petco Defendants greatly diminishes any inference of scienter on this aspect of the case. *See* Defs.' Exs. AA-AS.

In sum, the Court agrees with Defendant Petco that these allegations, taken as a whole, are insufficient to plead fraud with the particularity required by the PSLRA. The rumors about operational problems do not come close to showing falsity. *Cf. America West*, 320 F.3d 927-29, 932-3, 941-44 (magnitude of operational problems – deferring maintenance of airplanes which lead to delayed and cancelled flights, failing to conduct safety inspections, impending investigation by Federal Aviation Administration – were sufficiently plead). Nor do the allegations show that any particular corporate executive acted with at least conscious recklessness when describing the company's growth strategy. *Brody*, 280 F.3d at 1006-07; *Ronconi*, 253 F.3d at 429-34. Plaintiffs' attempt to broaden the scope of the alleged fraud fails because these peripheral operational problems do not state a coherent theory of fraud and the tenuous allegations do not have any markers of corroboration or supporting detail. *See Medhekar v. U.S. Dist. Ct.*, 99 F.3d 325, 328 (9th Cir. 1996).

### 3. The Partnerships

The Court now turns to the inclusion of the LGP and TPG as defendants in this litigation about Petco. TPG and LGP argue, and the Court agrees, that the Consolidated Complaint relies on conclusory allegations to draw these parties into this litigation.[4] *E.g.*, CC ¶ 28-29 (alleging that Partnerships "enjoyed a special relationship with Petco"), 219-25. Although the Consolidated Complaint describes the prior relationship that TPG and LGP had with Petco, the majority of that information pre-dates the beginning of the Class Period (August 2004). CC ¶ 54-64, 66. TPG and LGP correctly state that the Consolidated Complaint does not mention incriminating actions by a person connected to TPG and LGP after the introduction section, where the parties are described. CC ¶ 27-28, 39-40, 42-47.

At one time TPG and LGP were in a position to influence management decisions and to participate in the operation of Petco. For sixteen months beginning October 2000, TPG and LGP owned and controlled Petco, until it was again taken public in February 2002. CC ¶ 27-28 (TPG and LGP acquired Petco in 2000, when they owned a majority of the shares, until they led the company through a public offering in 2002); CC ¶ 61 (public offering on February 27, 2002); Pls.' Exs. C & D (showing LGP sold 850,000 and 1,400,000 shares in December 2003); LPG's Br. at 5 (clarifying that each Partnership owned approximately 37.5% of stock, for a combined total of 75% of the common stock). That ownership relationship ended in June 2004 when TPG and LGP sold all but 11.6% of Petco's outstanding shares (or 5.8% each). *Cf. America West*, 411 F.3d at 937-46 (denying TPG's motion to dismiss because of its significant and controlling involvement in corporate affairs *during class period*). By including the

---

[4]Because the Court finds that Plaintiffs have not alleged a securities violation on the operational problems, the Court limits this discussion to the accounting problem. The analysis, however, applies with equal force to the alleged operational problems because TPG and LGP are not mentioned in regard to that situation. Plaintiffs allege that Petco falsely stated on August 18, 2004 that the Pisces format would provide the catalyst to accelerate comparable store sales growth. CC ¶ 82. At the hearing Plaintiffs argued that this August 2004 statement ties TPG and LGP to the start of the Class Period because the Partnerships still owned 11.6% of Petco stock. This is a tenuous connection. Plaintiffs' theory is undermined by the totality of circumstances that show TPG and LGP were ending their investment in Petco. Nor do the specific facts illustrate any involvement by TPG and LGP in the August 18 statement or the plan to remodel the stores. Petco met its comp store sales prediction for 2Q 2004, which significantly weakens any inference of scienter regarding the August 18 announcement about Pisces.

1    historical facts regarding the investment, Plaintiffs attempt to create the appearance that TPG

2    and LGP were involved in alleged misleading statements. *See SG Cowan Sec. Corp. v. United*

3    *States Dist. Ct.*, 189 F.3d 909, 911 (9th Cir. 1999) (Congress enacted the PSLRA heightened

4    pleading requirements to restrict abuse of targeting "deep pocket" defendants). On close

5    inspection, however, only a narrow time frame is relevant, and the Partnerships' conduct

6    during that window does not expose them to potential liability for the securities violations

7    alleged in this action.

8          By the start of the Class Period on August 18, 2004, TPG and LGP had largely

9    relinquished control of Petco. They owned large blocks of Petco stock (5.6% each), but were

10   no longer majority shareholders. There is no basis for holding a former majority shareholder

11   directly liable for corporate fraud. *Cf. Berry v. Valence Tech., Inc.*, 175 F.3d 699 (9th Cir.

12   1999) (after date CEO resigns, he is not responsible company's statements).

13         The Court agrees with TPG's assertion that the Consolidated Complaint "fails to

14   identify any viable ground for a securities fraud claim based on PETCO's disclosures of Q2

15   2004 results and Q3 forecasts in the period before TPG [and LGP] sold" their stock. TPG's

16   Br. at 2. The Consolidated Complaint does not allege fraudulent statements in Petco's second

17   quarter results for the period ending July 31, 2004. Plaintiffs quote an August 18, 2004 press

18   release in which Petco announced its financial results for the months of May, June, and July,

19   but do not allege that *the second quarter* results were false or misleading. CC ¶ 94. Instead,

20   Plaintiffs contend that the quoted statements were false and misleading *because of errors in*

21   *the third quarter.* CC ¶ 111(a) (Q3 earnings per share overstated); 111(b) (failure to record

22   distribution center costs for Q3); 111(c) (error in accounting tenant improvements through Q3);

23   111(e) ("In announcing PETCO's same-store sales results to the markets, defendants failed to

24   disclose that sales growth throughout the Class Period were primarily due to increased pricing"

25   and stores "were recording reduced customer traffic and sales"). The Consolidated Complaint

26   focuses on the *forecasts for the third quarter* and Petco's predictions of the results for the

27   entire fiscal year 2004. CC ¶ 111(d) ("Petco was not executing successfully on its long-term

28   growth strategy"); 111(f) ("there was no basis in fact for defendants' forecasts that PETCO

1   would continue to achieve same-store sales above 0%-2%"); *see* CC ¶ 103 (Petco re-affirms

2   its expected gains).  The PSLRA imposes a higher standard of scienter on forward-looking

3   statements.  15 U.S.C. § 78u-5(c)(1)(B)(i) (PSLRA requires actual knowledge for future

4   statements); *Vantive*, 283 F.3d at 1085.  Thus, there are no specific allegations of misconduct

5   by TPG and LGP at the time the fraud allegedly began.  The narrow time frame is significant

6   because it demonstrates the weak connection of TPG and LGP to the theory of Plaintiffs' case.

7   When the Partnerships sold the rest of their Petco stock, and it is the primary act by the

8   Partnerships during the proposed Class Period (between August 2004 and August 2005).

9       Plaintiffs allege TPG and LGP continued to have a special relationship after August 18,

10  2004, because they selected members of the Board of Directors, and had a management and

11  consulting contract with Petco.  CC ¶ 64 (alleging the Partnerships agreed to vote for each

12  others' nominees).  Plaintiffs also point out that Defendants Coslet and Danhakl continued to

13  serve as directors and signed Petco's fiscal year end financial statements.  CC ¶ 141 (referring

14  to the delayed Form 10-Q for FY 2004, dated June 28, 2005); Pls.' Ex. H at 93 (Form 10-K for

15  FY 2003, signed on April 5, 2005).  The Consolidated Complaint also alleges that "Defendant

16  Coslet conveyed the adverse non-material information to defendants TPG, Bonderman, Price

17  and Coulter."  CC ¶ 141.  Coslet, a partner of the TPG defendants, served on Petco's Board

18  of Directors from 2000 to the present.  CC ¶ 39.  Plaintiffs repeat the statement against

19  Danhakl regarding LGP. *Id.*

20      The ability to nominate four of the nine members of the Board of Directors has some

21  weight, but is not overwhelming.  Four is a minority, and in actuality, only two people

22  connected to the Partnerships served as directors after April 2004.  But the Court gives no

23  weight to the conclusory accusation that Coslet and Danhakl passed inside information to the

24  Partnerships.  The statement is wholly lacking in detail.

25      The fact that those two directors, Coslet and Danhakl, signed the fiscal year financial

26  reports might carry some weight if those statements were alleged to be false, but they are not.

27  *Howard*, 228 F.3d at 1061.  The April 2004 signing is irrelevant because occurred before the

28  Class Period and relates to a fiscal year that is not at issue in this litigation.  *See* Pls.' Ex. H

1   (Petco's Form 10-K for FY 2003 covered time between February 2, 2003 to January 31, 2004).

2   The Consolidated Complaint does not identify any misleading statements in the Form 10-K

3   for FY 2004.   That financial report was prepared after Petco announced the accounting

4   problem, after the internal investigation, and after the accountants calculated the errors in *prior*

5   financial reports.  *See* CC ¶ 150(a), (b), (c) (alleging false reports of overstated net earnings

6   "*[u]ntil* PETCO's Form 10-K filing on June 28, 2005") (emphasis added).   There is a passing

7   reference that the Form 10-K "contained materially false and misleading statements *regarding*

8   *the purported correction of internal controls*," but the Consolidated Complaint fails to explain

9   how or why Petco's statements were false or misleading. CC ¶ 141 & 150.  Thus, Coslet and

10  Danhakl signed a form that is not a necessary component of the accounting theory of Plaintiffs'

11  case against Petco.

12      The other connection is the financial consulting role.  Plaintiffs allege that TPG and

13  LGP still had several years left on their management services contract wherein Petco paid $3.1

14  million annually for "management, consulting and financial planning services and transaction-

15  related financial advisory and investment banking services." CC ¶ 58.  TPG and LGP contend

16  that the contract was terminated in February 2002 (for a lump sum payment of $12.5 million).

17  *See* Defs.' Ex. D at 192.  The Court will accept Plaintiffs' allegation as true, but in any event,

18  the management services contract is not sufficient to give TPG and LGP access to day-to-day

19  operations information or the authority to direct corporate affairs.  Nor does management and

20  consulting contract give TPG and LGP any incentive to participate in Petco's misleading

21  financial statements, as the Partnerships would be paid under the contract. *See America West*,

22  320 F.3d at 944-45 (motive or incentive is probative of scienter); *Vantive*, 283 F.3d at 1097.

23      More importantly, Plaintiffs fail to allege any specific conduct by TPG and LGP *during*

24  the Class Period. *Ronconi*, 283 F.3d at 1094 (affirming Rule 12(b)(6) dismissal of defendant

25  who "is not alleged to have uttered a word, or have participated in preparing statements, during

26  the entire class period").  Plaintiffs fail to allege that any of these parties ever reviewed an

27  internal communication (such as the March e-mail from CW7), the employee control

28  questionnaire, budgets, the general ledgers, or other reports that are alleged to show accounting

1    fraud. There are no allegations that any of the Partnership Defendants visited the distribution

2    centers where they might have seen stacks of unpaid invoices or talked to employees who had

3    been ordered hold back invoices and re-write their reports. There are no allegations to explain

4    how TPG and LGP would have known that distribution center employees were violating

5    GAAP to increase its net earnings by withholding invoices. CC ¶ 218(a) ("it was widely

6    known at the Company that Petco was withholding payment for invoices during the Class

7    Period"). None of the Partnership Defendants signed the SEC forms that contain allegedly

8    overstated earnings, and none participated in the quarterly web broadcasts. None of the seven

9    Confidential Witnesses mentions TPG and LGP or describes and contact with persons

10    affiliated with them. This lack of action dispels an inference of scienter as to TPG and LGP.

11    *Clorox*, 320 F.3d at 939 (considering insider's silence as a factor to determine whether strong

12    inference of scienter has been raised); *Ronconi*, 283 F.3d at 1094.

13           Plaintiffs defend the claims against TPG and LGP by focusing on the events of October

14    2004. CC ¶ 13, 109, 294. This is the month when employees returned surveys mentioning that

15    invoices were being held back, and when Defendant Richter allegedly instructed the

16    distribution centers to do "anything" to make the quarter that ended October 31. But the sole

17    action by TPG and LGP during October was to sell their remaining shares. Plaintiffs allege

18    that this sale shows that TPG and LGP were taking advantage of the inflated stock price, but

19    this theory is undermined by two vital facts. First, the October 22, 2004 sale was the

20    culmination of TPG and LGP divestiture of their stock holding that had begun several months

21    earlier and before there was any indication of an accounting problem. Second, the offering

22    occurred *before* Petco issued the allegedly inflated financial information for the third quarter,

23    and the stock price continued to rise another several months. CC ¶ 83, 112 (Petco reported

24    financial results for third quarter ending October 30, 2004 on November 18, 2004 and stock

25    continued to rise to $37 by April 2005); *Vantive*, 283 F.3d at 1093 ("stock sales are helpful

26    only in demonstrating that certain statements were misleading and made with knowledge or

27    deliberate recklessness *when those sales are able to be related to the challenged statements*")

28    (emphasis added). Equally important is that, as described above, the Consolidated Complaint

1    contains no factual support that TPG and LGP could have known about the accounting

2    problem (in particular the employee survey or Defendant Richter's instructions).  Therefore,

3    the Court finds nothing suspicious in the October 2004 stock sale, and it does not create an

4    inference that TPG and LGP had the necessary level of scienter to be held accountable for the

5    fraud alleged in the first claim for relief. *Vantive*, 283 F.3d at 1093 ("insufficient allegations

6    of fraud elsewhere in the complaint have a spillover effect" when evaluating whether stock

7    sales are probative of scienter).

8         In a related theory, Plaintiffs generally allege that a reason the distribution centers felt

9    compelled to hold back invoices was because management had imposed unrealistically-strict

10   budgets, and that TPG and LGP initiated this practice when they owned Petco. CC ¶ 180, 226-

11   34, 277 (CW7 discussed budget pressure in 2003, when expenses were carried over to 2004);

12   *see also* CC ¶ 65 (alleging Partnerships initiated Petco's aggressive growth strategy), 81

13   (alleging that while TPG and LGP were majority shareholders, Petco lacked adequate internal

14   controls to detect accounting impropriety), 161-67 (while describing invoices in distribution

15   centers, many CWs mention the "unrealistic budgets and budgetary pressure from upper

16   management").  This theory also fails because there are no specific facts showing that TPG and

17   LGP participated in or directed the under-accrual of distribution center expenses during the

18   Class Period.  As Defendant Petco notes, "[t]here is nothing fraudulent about strict budgets."

19   Petco's Br. at 17 n.10.

20        In sum, while Plaintiffs are entitled to have their allegations construed in their favor,

21   the Court must consider the most plausible inferences when evaluating scienter. *Gompper*, 298

22   F.3d at 896-97.  The Court finds the totality of circumstances negate any inference of scienter

23   as to the Partnerships.

24        B. Control Person Liability

25        The 1934 Exchange Act imposes primary liability on those who violate the securities

26   laws, but also imposes secondary liability on collateral participants who qualify as "control"

27   persons.  Plaintiffs' second claim for relief asserts that "all" individual defendants have

28   violated § 20(a) of the Exchange Act.  CC ¶ 329-32; *see* CC ¶ 48 (defining "Individual

1   Defendants"). Plaintiffs allege broadly and generally that "all" defendants by virtue of "their

2   high-level positions, and participation in and/or awareness of the Company's operations" had

3   the "power to influence and control" Petco's decisions, press releases, SEC filings, and

4   financial statements. CC ¶ 330.

5          "Section 20(a) provides joint and several liability for controlling persons who aid and

6   abet violations of the 1934 Act absent a finding of good faith and lack of inducement."

7   *America West*, 320 F.3d at 945 (footnote omitted); 15 U.S.C. § 78t(a).   In order to plead

8   control person liability, the plaintiff must allege (1) a primary violation of the securities law

9   and (2) "'that the defendant exercised actual power or control over the primary violator.'"

10  *America West*, 320 F.3d at 945 (quoting *Howard*, 228 F.3d at 1065). Scienter is not an element

11  of control person liability, because the primary violation suffices; instead, the defendant may

12  assert the affirmative defense of good faith by proving the absence of scienter. *Howard*, 228

13  F.3d at 1065 (citing *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993)).

14  Here, the first element is met because the Court finds that Plaintiffs have alleged a primary

15  violation by Petco and some of its executives of the securities laws in regard to accounting

16  impropriety.

17         The motion to dismiss concerns the second element of "control."   The SEC's

18  regulations define "control" as the direct or indirect power to "cause the direction of

19  management and policies of a person whether through the ownership of voting securities, by

20  contract, or otherwise." 17 C.F.R. § 230.405. The Ninth Circuit looks to "the defendant's

21  participation in the day-to-day affairs of the corporation and the defendant's power to control

22  corporate actions." *Howard*, 228 F.3d at 1065 (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382

23  (9th Cir. 1994)).   Factors include whether the person has previously lent money to the

24  corporation, whether she owns stock, and whether she is a member of the board. *Id.* (citing

25  *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996)).

26         The Petco Defendants make a blanket assertion that the Consolidated Complaint fails

27  to adequately plead control person liability against any of the individual executives. The Court

28  agrees except as to CEO Myers (CEO), Carter (CFO), Devine (Chair), and Hall (COO). The

1    extensive level of their control over general company decisions is apparent in the factual

2    allegations and their public statements about Petco's operations. *Paracor*, 96 F.3d at 1162-63.

3    If, however, Plaintiffs intend to pursue their control person claims against any other executive

4    at Petco, the amended pleaded must provide facts to support the standard allegations in

5    Paragraph 330. As to Brann and Richter, there are allegations suggesting they had the power

6    to influence the specific accounting procedures at issue, but no facts to show any power over

7    general corporate policies. *Paracor*, 96 F.3d at 1162 (control person "inquiry must revolve

8    around 'management and policies' of the corporation, not around discrete transactions"). No

9    facts show that Major, Martin, Mitchell, and Woodard would have had power over general or

10   specific corporate policies. Accordingly, the Court dismisses Defendants Brann, Day, Major,

11   Martin, Mitchell, Richter, and Woodard from the second claim for relief.

12       TPG and LGP argue that Plaintiffs have not identified specific facts to state a claim that

13   they are liable as control persons. They argue that Plaintiffs have not identified specific facts

14   that any of the partners participated in the accounting process or the public statements, or that

15   they had access to information that would allow them to discover the problem.

16       The Court concludes that the Consolidated Complaint contains the proper boilerplate

17   allegations of control, but lacks sufficient facts to apply the theory to TPG and LGP. Plaintiffs

18   broadly allege that "TPG and LGP had direct involvement or intimate knowledge of the day-to-

19   day operations of the Company during the Class Period. Therefore, each is presumed to have

20   had the power to control or influence the particular transactions" described in the complaint.

21   CC ¶ 331. But the facts set forth in the pleading describe the relationship that TPG and LGP

22   *had* with Petco *before* the beginning of the Class Period. A close reading of the allegations

23   reveals that only a very narrow time frame is relevant when analyzing conduct by TPG and

24   LGP. The factual allegations describing TPG's and LGP's control over Petco relate to the time

25   that the Partnerships owned the corporation from October 2000 to February 2002. TPG and

26   LGP were majority shareholders in Petco in February 2002; however, they sold those

27   controlling percentages by June 2004. Plaintiffs allege that the Class Period began in August

28   2004, and by that time, TPG and LGP each owned 5.8% of Petco's shares. This is a large

1    block of stock, but soon thereafter those shares were sold. TPG and LGP sold the rest of their

2    stock on October 22, 2004. Yet, the Consolidated Complaint does not allege or identify any

3    false statements *until* November 18, 2004 when Petco reported the third quarter earnings. *See*

4    CC ¶ 111(a), (b) (accounting fraud rendered *Q3* 2004 earnings misleading), 112. The

5    Consolidated Complaint does not contain facts that TPG or LGP could have influenced Petco's

6    general policies or any specific accounting procedures *after* they sold their stock on October

7    22, 2004.

8        Turning to activity after October 2004, Plaintiffs rely on the management services

9    contract and the directors. The management consulting contract indicates that TPG and LGP

10   were outside advisors, not controlling persons. And while two of the directors had connections

11   to the Partnerships, membership on the board is not sufficient to support an allegation that

12   these individuals were involved in the day-to-day operations of the company. *Paracor*, 96

13   F.3d at 1163 (being a director is "a sort of red light" but does not create any presumption of

14   control) (quotation omitted). The Consolidated Complaint lacks underlying factual support

15   for its vague conclusion that the Partnerships could control Petco's corporate actions. Rather

16   than facts, Plaintiffs have alleged only status.

17       Plaintiffs argue that this case is governed by *America West*, in which TPG (along with

18   related entities, Coulter individually, and co-defendant Continental Airlines, Inc.) was alleged

19   to be a control person liable for the securities violations by America West Airlines. *America*

20   *West*, 320 F.3d at 945. The district court had dismissed TPG from the second amended

21   complaint for failing to plead § 20(a) liability, but the Ninth Circuit reversed. The Ninth

22   Circuit held that all three factors indicated that TPG had direct or indirect power to control

23   corporate operations. TPG had owned shares in the airline from 1994 through 1998, which

24   included the class period. TPG owned 49% of the Class A stock, and entered into a

25   Stockholder's Agreement that required the investors to retain two shares of Class B stock for

26   every share of Class A stock traded. *Id.* at 925. That Agreement further provided that the

27   shareholders would select nine of the fifteen board directors. *Id.* & nn. 3 & 4. "By virtue of

28   their ownership of the 'supervoting Class A stock, TPG and Continental constituted a majority

of the stockholders." *Id.* "Coulter, a TPG officer, was appointed a director of America West and served on its Executive Committee, which exercised all powers of the Board of Directors between full Board meetings." *Id.* The complaint further alleged that TPG sought to raise the stock price so it could exercise stock options under the Stockholder's Agreement. *Id.* at 927. "To accomplish this goal, TPG and Continental allegedly joined forces to exert undue influence on America West officers, taking advantage of their position as majority owners who controlled the Board of Directors and related committees." *Id.* The complaint alleged that TPG contributed to a marketing campaign to influence the stock price, including giving misinformation to stock analysts. *Id.* The complaint alleged that TPG manipulated the stock price by forcing America West to re-purchase $100 million of its own stock. *Id.* at 928, 940. After the stock price "soared to an all-time high," TPG sold 99% of its Class B stock for $44 million, which the Stockholder's Agreement permitted it to do without having to give up its supervoting Class A shares. *Id.* at 928.

The Ninth Circuit held that the complaint alleged sufficient facts to state a § 10(b) claim against TPG, even though it had not made any of the allegedly misleading statements. *Id.* at 937-41. The Court held that the factual allegations also showed that TPG knew about America West's underlying problems. *Id.* at 942-43. The Ninth Circuit noted that Coulter, a director of TPG and a director of America West, had been to most of the eleven board meetings in 1997. *Id.* at 943 & n.21.

Based upon these allegations, the Ninth Circuit rejected TPG's argument that it could not be considered a "control person" for § 20(a). The Court found that three factors indicated that TPG had direct or indirect power to direct America West's management and policies. TPG had been a shareholder from 1994, through the class period of 1997 to 1998. When combined with Continental's shares, TPG was the largest shareholder and controlled 57.4% of the total voting power. TPG, with Continental, could appoint the majority of the members of the Board of Directors, and TPG had taken advantage of that opportunity by selecting two of its own partners to serve. *Id.* at 945-46.

The crucial difference between the *America West* case and the instant case is timing.

1  In *America West*, TPG was, *at the time of the alleged securities violations*, able to exercise

2  control over the corporation.  In this case, TPG and LGP had a strong *prior* relationship with

3  Petco, but the Partnerships had largely severed those ties by the start of the class period.  If

4  Plaintiffs had sued Petco for conduct during 2000 to early 2004, then the level of involvement

5  of TPG and LGP might be closer to the circumstances in the *America West* case.  By contrast,

6  in this case, by the start of the class period in August 2004, TPG and LGP (if considered

7  together) held 11.8% of the shares, not a majority of shares nor a supervoting class of shares.

8  By August 2004, two of the directors connected with TPG and LGP had already resigned, and

9  only two members (Danhakl and Coslet) remained on Petco's nine-person board of directors.

10  CC ¶ 39-40, 43, 44; *see* Defs.' Ex. C at 134 (dated May 3, 2004); Pls.' Ex. A at 9-11 (dated

11  July 1, 2005); *Paracor*, 96 F.3d at 1163 (mere fact defendant served as director does not create

12  presumption of control).  According to the allegations in the Complaint, TPG and LGP were

13  still under the ten-year contract to provide management, consulting, and financial planning

14  services to Petco.  But even the presence a services contract confirms that TPG and LGP were

15  no longer "controlling" Petco because they had shifted to an advisory role.  This current

16  litigation alleges securities violations after TPG and LGP had relinquished control, and that

17  timing distinguishes this case from *America West*. *Cf. Berry*, 175 F.3d 699 (after the date CEO

18  resigned, he is not responsible company's statements).  When studied with care, the

19  Consolidated Complaint fails to plead any facts from which it could be reasonably inferred that

20  TPG and LGP were control persons when Petco allegedly made misleading statements about

21  the company's earnings per share because the distribution centers had not properly reported

22  expenses.

23  Accordingly, the Court grants the motion to dismiss the TPG and LGP defendants from

24  the second claim for relief.

25  C.  Trading on Non-Public, Material Information

26  The third cause of action alleges that the Individual Defendants, except Petco executives

27  Carter and Day, engaged in "insider trading."  CC ¶ 334 & ¶ 288-98 (cataloging insider sales);

28  *see* CC ¶ 48 (defining "Individual Defendants").  Plaintiffs allege that "each of the Individual

05-CV-0823

1   Defendants occupied a position with PETCO that allowed access to confidential information
2   concerning the Company, its operations, finances, financial condition and future business
3   prospects. Individuals Defendants' public representations on these subject set forth herein
4   were materially false and misleading." CC ¶ 335. Plaintiffs allege that the Individual
5   Defendants failed to disclose the material adverse facts, yet sold their own stock holding using
6   that non-public information. CC ¶ 339; *accord* CC ¶ 288-98.

7        Trading on inside information damages the integrity of the stock market by giving an
8   unfair advantage to a small group of individuals with non-public material information about
9   a company's stock. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Liability for insider
10  trading arises from § 10(b) of the Exchange Act, which imposes civil liability for
11  "manipulative or deceptive" acts in connection with the sale of stock. *See United States v.*
12  *O'Hagan*, 521 U.S. 642, 651-54 (1997) (describing and adopting theory in context of criminal
13  case). In turn, SEC Rule 10b-5 to forbids any "artifice to defraud" or any act "which operates
14  or would operate as a fraud or deceit." *Id.* at 651. The traditional type of insider trading
15  violates this statute and regulation "when a corporate insider trades in the securities of his
16  corporation on the basis of material, non-public information." *Id.* at 651-52. "Trading on such
17  information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust
18  and confidence [exists] between the shareholders of a corporation and those insiders who have
19  obtained confidential information by reason of their position with that corporation.'" *Id.* at 652
20  (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)). The traditional theory applies
21  to officers, directors, and "other permanent insiders of a corporation, but also to attorneys,
22  accountants, consultants, and others who temporarily become fiduciaries of a corporation."
23  *Id.*

24        Though commonly called "insider" trading, liability extends to a corporate "outsider"
25  under the misappropriation theory. A person who commits fraud in connection with a
26  securities transaction by misappropriating confidential information that exclusively belongs
27  to the corporation. *Id.* at 652, 654. The corporation entrusted access to confidential
28  information, and the trader breached a duty owed to the source of the information. *Id.* at 652-

- 51 -

1   54. "A misappropriator who trades on the basis of material, nonpublic information, in short,

2   gains his advantageous market position through deception; he deceives the source of the

3   information and simultaneously harms members of the investing public." *Id.* at 656. The

4   misappropriation theory "catches fraudulent means of capitalizing on [confidential]

5   information through securities transactions." *Id.*

6       Scienter is an element of an either theory of insider trading, therefore, must be plead

7   with particularity under the PSLRA. *See United States v. Smith*, 155 F.3d 1051, 1063-64 (9th

8   Cir. 1998) (setting forth scienter element in criminal case, citing a SEC enforcement action);

9   *SEC v. Clark*, 699 F. Supp. 839, 844 & n.4 (W.D. Wash. 1988) (elements are same in criminal,

10  administrative, or civil proceedings). In addition, because a claim that a person used non-

11  public material information in a securities transaction arises out of the anti-fraud provisions

12  of Rule 10b-5 and § 10(b), plaintiff must comply with Rule 9(b) and plead the circumstances

13  with particularity. *See Stat Elec.*, 89 F.3d at 1404-5 & nn.2-3.

14      1. Scienter of Defendants

15      In order for a person to be liable for a § 20A insider trading claim, there must be an

16  independent violation of § 10(b). *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1488-89 (N.D.

17  Cal. 1992), *aff'd*, 11 F.3d 865, 871-72 (9th Cir. 1993). The Court has narrowed the claims

18  because the Plaintiffs' theory of operational problems has not been sufficiently plead, but the

19  alleged accounting fraud claim has survived this motion to dismiss as to some of the Petco

20  Defendants.

21      Because the Court has dismissed the § 10(b) claims against Petco Defendants Major,

22  Martin, Mitchell, and Woodard, the Court also dismisses the § 20A claims against these four

23  parties. Though Plaintiffs have generally alleged that these executives had access to material,

24  nonpublic information, their job status alone does meet the heightened pleading standard of

25  the PSLRA. Plaintiffs have not identified specific facts that would support an inference that

26  these four executives knew about the accounting problem in the distribution centers. The

27  timing and amount of their stock trades do not indicate an awareness of the accounting

28  problem. The additional trades on October 22, 2004 occurred *before* Petco made any allegedly

1    false statements on that issue. CC ¶ 296. All other trades regularly occurred on the first of

2    each month pursuant to their Rule 10b-5 trading plans. *See* Defs.' Exs. AG & AH (Major), AI

3    & AJ (Martin), AK & AL (Mitchell), AQ & AR (Woodard). While each appears to have

4    suspended trading in May and June 2005, the reasonable inference is that they were responding

5    to the *public* disclosure on April 15, 2005 about the accounting errors; and they resumed the

6    normal schedule once Petco corrected its statement on June 28, 2005. The percentages sold

7    during the Class Period is not dramatically out of line with the history of trading in the prior

8    year. *E.g.*, Defs.' Exs. AQ & AR (Woodard beneficially owned 330,000 shares in August

9    2003, regularly sold 4,000 shares a month, and exercised stock options, which left him with

10   212,000 shares in August 2005).

11          As for the insider trading claim against the partnerships, TPG & LPG first challenge the

12   inclusion of the individual partners. The Consolidated Complaint does not identify any stock

13   trades by Defendants Baumer, Bonderman, Coslet, Coulter, Danhakl, Nolan, Price, or

14   Sokoloff. CC ¶ 288 & 294. The Court appreciates that the Partnerships' entities are

15   interrelated. CC ¶ 27 (Bonderman, Coulter, and Price are directors and officers of TPG

16   Advisors III, and that entity is the general partner of TPG GenPar III, which is the sole general

17   partner of six other TPG entities). But in order to state an insider trading claim against the

18   individuals, Plaintiffs must articulate a theory of liability. It is not enough to allege that "all"

19   defendants traded stock, and then identify trades by half of the named parties.

20          The insider trading allegations against the TPG and LGP defendants also fail because

21   Plaintiffs have not alleged specific facts that create a strong inference of scienter. As the Court

22   found in the primary § 10(b) claim, Plaintiffs fail to show a connection between the alleged

23   fraud (as narrowed by the Court to the under reporting distribution center expenses to inflate

24   the stock) *with* the October 22, 2004 stock sale. The first statement that Plaintiffs identify as

25   being affected by the accounting fraud was Petco's November 2004 report of its third quarter

26   financial results. CC ¶ 111(a), (b), 120(a), (b). The October 22 sale preceded that November

27   statement, nor was the sale suspicious when considered in the context of the Partnerships'

28   investment relationship with Petco. Plaintiffs have identified internal information showing

1   Petco was aware of the accounting problem in October 2004, but they have not identified how

2   TPG and LGP would have had access to those internal communications.  The conclusory

3   assertion that Coslet and Danhakl told the others is not supported by facts.  The presence of

4   two directors on Petco's Board is not enough in these circumstances.  The Consolidated

5   Complaint fails to allege sufficient facts that these parties acted with scienter in executing their

6   decisions to sell their Petco stock whether they would have been considered either insiders or

7   outsiders on October 22, 2004.  Accordingly, the Court grants the motion to dismiss as to TPG

8   and LGP on the third claim for relief.

9                    2.  Contemporaneous Trades by Plaintiffs

10      Defendants raise a question of standing by arguing that the Plaintiffs have failed to

11  allege "contemporaneous" stock trades.  15 U.S.C. § 78t-1(a).  Section 20A of the Exchange

12  Act provides a private right of action when a person who sells or purchases a security "while

13  in possession of material, nonpublic information"is liable "to any person who,

14  contemporaneously with the purchase or sale of securities" in the same class.  17 U.S.C. § 78t-

15  1(a).

16      The Consolidated Complaint broadly alleges that members of the proposed class

17  purchased shares of common stock during the time that the Petco Defendants traded.  CC ¶ 289

18  & 338.  The only example is that West Virginia Laborers Pension Trust Fund acquired 400

19  shares on March 1, 2005.  CC ¶ 289.  At that time, the share price was allegedly inflated by the

20  accounting impropriety (which was announced to the public on April 15, 2005).  The Lead

21  Plaintiff, however, is the Plumbers and Pipefitters Local 51 Pension Fund.  Order Appointing

22  Lead Plaintiff (Aug. 17, 2005) [Doc. No. 13].  In their certification of their stock trades, the

23  Lead Plaintiff list purchases with "settlement dates" on February 16, 2005, February 22, 2005,

24  and March 9, 2005.  CC Ex. 4 (Schedule A).

25      Defendants argue that Plaintiffs have failed to show that they purchased shares at the

26  inflated prices "contemporaneous" to the sales by Defendants, which is a requirement for

27  standing under the PSLRA.  Petco argues that the purchases were too far removed to count.

28      The Ninth Circuit has adopted the Second Circuit's approach to defining the scope of

- 54 -

1    a "contemporaneous" period. *See Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993)

2    (citing *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88 (2d Cir. 1981)).

3    "[C]ontemporaneous trading must be pleaded with particularity under Rule 9(b)." *Id.* This

4    rule "ensures that only private parties who have traded with someone who had an unfair

5    advantage will be able to maintain insider trading claims." *Id.* Although the Ninth Circuit did

6    not define with precision an acceptable time range, it has held that two months is too distant.

7    *See Brody*, 280 F.3d at 1002 ; *Neubronner*, 6 F.3d at 670 ("The delineation of how far apart

8    in time trades may be without being too far apart to satisfy the contemporaneous trading

9    requirement is best worked out in cases much closer to a probable borderline than this one.").

10

11         When Congress adopted the "contemporaneous" requirement, it left the development

12    of a definition to the courts, but it did cite with approval a district court case, *O'Connor &*

13    *Assoc. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800 (S.D.N.Y. 1983), that held a trade

14    within seven days was "clearly" contemporaneous. H.R. Rep. No. 910, 100th Cong., 2d. Sess.

15    27 (1988) *reprinted in* 1988 U.S.C.C.A.N. 6043, 6064, *cited in In re Verifone Sec. Litig.*, 784

16    F.Supp. at 1488-89 (the appeal did not consider definition of contemporaneous).

17         Here, the Petco Defendants have provided the SEC Form 4s that list the dates of their

18    transactions. Petco Defendants Devine, Hall, Myers, and Richter each sold shares on March

19    1, 2005, so the trading by Plaintiff West Virginia Laborers Pension Trust Fund on that same

20    day was contemporaneous under any test. Thus, the Consolidated Complaint pleads with

21    particularity the contemporaneous sales by a member of the proposed class.

22         The status of the Lead Plaintiff Plumbers and Pipefitters Local 51 Pension Fund is less

23    clear.[5] The Lead Plaintiff purchased shares on Wednesday, March 9, 2005, and that is eight

24    days after the insiders' sold shares on Tuesday, March 1, 2005. The Lead Plaintiff also

25

26        [5]The Lead Plaintiff purchased shares on March 9, 2005 – the day before Defendant
Devine exercised a stock option to purchase 100,000 shares on March 10, 2005. *See* Defs.'

27    Ex. AD at 837. That purchase by Devine, however, is not identified by Plaintiffs in the
Complaint. CC ¶ 288 & 294. Moreover, Devine's *purchase* of an additional 100,000 shares

28    runs counter to Plaintiffs' theory that the stock price was inflated at that time and that Devine
was acting on that undisclosed information when he *sold* shares for personal profit.

1 | purchased shares on Tuesday, February 22, 2005, which is one week before the insiders sold
2 | shares on Tuesday, March 1. The district courts have reached conflicting decisions when the
3 | time period is around seven days, and the parties have cited numerous published and
4 | unpublished district court decisions to support their view.

5 | The Court concludes that Lead Plaintiff has alleged contemporaneous trades sufficient
6 | to state an insider trading claim. The Lead Plaintiff's trades within seven or eight days of sales
7 | by insiders is on the border of an acceptable time period. *O'Connor*, 559 F. Supp. at 803 *cited*
8 | *by* H.R. Rep. No. 910. The purpose of the contemporaneous requirement is to protect investors
9 | who trade within the same period as those with non-public information, while protecting
10 | traders from limitless liability "to all the world." *Neubronner*, 6 F.3d at 670 (quoting *Wilson*,
11 | 648 F.2d at 94). Section 20A requires the defendant to disgorge the illegal profit, thus, the
12 | plaintiff must have been harmed by the failure to disclose material information. The distance
13 | between the trades of the Lead Plaintiff and the Petco Defendants in this case strikes a
14 | reasonable balance. This is particularly true because the Lead Plaintiff's purchases in February
15 | and March 2005 were made at a time when the Consolidated Complaint alleges the stock price
16 | was artificially inflated by the under-accrued expenses, and that information was disclosed
17 | soon thereafter, in mid-April 2005.

18 | III. Leave to Amend

19 | Plaintiffs request leave to amend so that they may attempt to correct the deficiencies.
20 | The Court grants this request. Fed. R. Civ. P. 15(a).

21 | CONCLUSION

22 | Upon due consideration of the parties' memoranda and exhibits, the arguments of
23 | counsel, a review of the record, and for the reasons set forth above:

24 | 1. The Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to strike
25 | [#39-1], and DENIES Plaintiffs' alternative motion to convert motions into summary judgment
26 | motions. [# 39-2]

27 | 2. The Court GRANTS IN PART AND DENIES IN PART Defendants' motions to
28 | dismiss the Consolidated Complaint. [# 28, 31, & 33] The Court dismisses without prejudice

05-CV-0823

1  Defendants Frederick Major, Keith Martin, Janet Mitchell, William Woodard, Texas Pacific

2  Group, Inc., TPG Advisors III, TPG Partners III, L.P., TPG Parallel III, L.P., TPG Dutch

3  Parallel III, C.V., TPG Investors III, L.P., FOF Partners III, L.P., FOF Partners III-B, L.P.,

4  David Bonderman, William Price, James Coulter, Leonard Green & Partners, L.P., Green

5  Equity Investors III, L.P., John Baumer, Jonathan Sokoloff, and Peter Nolan from these

6  consolidated proceedings.

7         3. Lead Plaintiff may file its First Amended Consolidated Complaint ("FACC") on or

8  before **September 1, 2006**. Those Defendants who choose to answer the FACC shall do so

9  by **September 18, 2006**. If Defendants instead choose to file motions to dismiss, they shall

10  meet and confer with all counsel as to a briefing schedule, and contact the law clerk for a

11  hearing date.

12         IT IS SO ORDERED.

13  DATED: __7/31/06__

14                                    MARILYN L. HUFF, District Judge
                                     UNITED STATES DISTRICT COURT

15

16  cc: all counsel of record

17

18

19

20

21

22

23

24

25

26

27

28

05-CV-0823