COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
DANIEL S. DROSMAN (200643)
SCOTT H. SAHAM (188355)
JESSICA T. SHINNEFIELD (234432)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
pcoughlin@csgrr.com
ddrosman@csgrr.com
scotts@csgrr.com
jshinnefield@csgrr.com
      – and –
REGINA M. AMES (228363)
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)
rames@csgrr.com

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PETCO CORPORATION SECURITIES LITIGATION | Master File No. 05-CV-0823-H(RBB) |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' OPPOSITION TO DEFENDANT PETCO ANIMAL SUPPLIES, INC.'S AND INDIVIDUAL DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF SCOTT D. HAKALA, Ph.D., CFA |
| ALL ACTIONS. | |

DATE: April 21, 2008
TIME: 10:30 a.m.
COURTROOM: 13
The Honorable Marilyn L. Huff

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT .........................................................................................................2

    A.    Dr. Hakala Is Well Qualified to Render an Opinion in This Matter .......................2

    B.    Dr. Hakala's Opinions Easily Satisfy the Liberal Standard of Admissibility Under Fed. R. Evid. 702 ...................................................................................3

    C.    Dr. Hakala's Use of the Constant Percentage Method Is Well Accepted and Appropriate ...................................................................................................5

    D.    Dr. Hakala's Selection of Relevant Dates Is Well Supported and Reliable ..........12

        1.    Dr. Hakala's Exercise of Judgment in the Selection of Relevant Events Was Appropriate ...........................................................................13

        2.    Dr. Hakala Properly Considered Whether Price Movements on Relevant Days Were Influenced by Non-Fraud Related Factors ...............18

    E.    The Model Used by Dr. Hakala to Calculate Aggregate Damages Is Reliable and Has Been Accepted By Numerous Courts .......................................21

III. CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

Page

CASES

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)..................................................................................10

*BE & K Contr. Co. v. Will & Grundy Counties Bldg. Trade Council*,
    156 F.3d 756 (7th Cir. 1998) .....................................................................4

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)...................................................................................3

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...................................................................11

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)...........................................................................22, 23

*Carpe v. Aquila, Inc.*,
    No. 02-0388-CVW-FJG, 2005 U.S. Dist. LEXIS 44667
    (W.D. Mo. Mar. 23, 2005) .........................................................................5

*Carpenters Health & Welfare Fund v. The Coca-Cola Co.*,
    No. 1:00-CV-2838 WBH (N.D. Ga. Mar. 14, 2008) ................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .....................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................ *passim*

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336, 125 S. Ct. 1627 (2005).............................................6, 12, 22

*Frye v. United States*,
    293 F. 1013 (D.C. Cir. 1923) .....................................................................4

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................13

*Good v. Fluor Daniel Corp.*,
    222 F. Supp. 2d 1236 (E.D. Wash. 2002) ...............................................13

*Gordon Partners v. Blumenthal*,
    No. 02-Civ-7377 (LAK), 2007 U.S. Dist. LEXIS 9110
    (S.D.N.Y. Feb. 9, 2007)..............................................................................5

Page

*Green v. Occidental Petroleum Corp.*,
   541 F.2d 1335 (9th Cir. 1976) ..........................................................5, 6, 11

*Hanley v. Warburg Pincus Capital Co., L.P.*,
   No. CV 96-390 TUC FRZ, slip. op.
   (D. Ariz. Dec. 7, 2005) ...........................................................................22

*In re Apollo Group, Inc. Secs. Litig.*,
   509 F. Supp. 2d 837 (D. Ariz. 2007) .......................................................8

*In re Broadcom Corp. Sec. Litig.*,
   No. SACV 01-275 DT, 2005 U.S. Dist LEXIS 41976
   (C. D. Cal. Sept. 12, 2005)..................................................................2, 11

*In re Cendant Corp. Sec. Litig.*,
   109 F. Supp. 2d 235 (D.N.J. 2000) .................................................6, 22, 23

*In re Crazy Eddie Sec. Litig.*,
   948 F. Supp. 1154 (E.D.N.Y. 1995) ...............................................18, 22, 24

*In re Enron Corp. Sec. Litig.*,
   2006 WL 4381143 (S.D. Tex. June 5, 2006) ...........................................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) .......................................................1, 2, 7

*In re Imperial Credit Indus. Sec. Litig.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ....................................................5

*In re JDS Uniphase Corp.*,
   No. 02-01486 CW, Minute Order (N.D. Cal. Oct. 9, 2007) ......................7

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-1486 CW (N.D. Cal. Sept. 21, 2007) ......................................2, 8

*In re Melridge, Inc. Sec. Litig.*,
   837 F. Supp. 1076 (D. Or. 1993) ...........................................................24

*In re Melridge, Inc. Sec. Litig.*,
   No. 87-1426-FR, 1994 U.S. Dist. LEXIS 4536
   (D. Or. Apr. 5, 1994)..............................................................................22

*In re Metris Cos. Inc. Sec. Litig.*,
   428 F. Supp. 2d 1004 (D. Minn. 2006)......................................................2

**Page**

*In re Oracle Sec. Litig.,*
   829 F. Supp. 1176 (N.D. Cal. 1993) ............................................................5

*In re Oxford Health Plans, Inc. Sec. Litig.,*
   244 F. Supp. 2d 247 (S.D.N.Y. 2003) ...............................................8, 9, 23

*In re Reliance Sec. Litig.,*
   135 F. Supp. 2d 480 (D. Del. 2001) ..........................................................2

*In re Rent-Way Sec. Litig.,*
   218 F.R.D. 101 (W.D. Pa. 2003) ...........................................11, 12, 22

*In re Seagate Technology II Sec. Litig.,*
   843 F. Supp. 1341, 1364 (N.D. Cal. 1994) ...............................................11

*In re Texas Int'l Sec. Litig.,*
   114 F.R.D. 33 (W.D. Okla. 1987) .............................................................22

*In re Williams Sec. Litig.,*
   496 F. Supp. 2d 1195 (N.D. Okla 2007) ...............................................6, 8

*In re WorldCom. Inc. Sec. Litig.,*
   No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215
   (S.D.N.Y. Feb. 17, 2005) ......................................................................21

*In re Xcelera.com Sec. Litig.,*
   Civ. No. 00-11649-RWZ, 2004 U.S. Dist. LEXIS 29064
   (D. Mass. Sept. 30, 2004) ......................................................................2

*Koch v. Koch Indus., Inc.,*
   6 F. Supp. 2d 1192 (D. Kan. 1998) ..........................................................10

*Kumho Tire Company, Ltd. v. Carmichael,*
   526 U.S. 137 (1999)..........................................................................12, 14

*Lyons v. Scitex Corp.,*
   987 F. Supp. 271 (S.D.N.Y. 1997) ...................................................22, 23

*Main Street Mortgage, Inc. v. Main St. Bancorp., Inc.,*
   158 F. Supp. 2d 510 (E.D. Pa. 2001) ..........................................................3

*Oddi v. Ford Motor Co.,*
   234 F.3d 136 (3d Cir. 2000)..........................................................................3

*Quiet Tech. v. Horel-DuBois UK Ltd.,*
   326 F.3d 1333 (11th Cir. 2003) ...................................................................4

**Page**

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
    2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) ...................................................14, 21, 23, 25

*RMED Int., Inc. v. Sloan's Supermarkets, Inc.,*
    2000 U.S. Dist LEXIS 4892
    (S.D.N.Y. Apr. 17, 2000) ...............................................................................................18

*Rochez Bros., Inc. v. Rhoades,*
    527 F.2d 891 (3d Cir. 1975)...........................................................................................18

*Sirota v. Solitron Devices, Inc.,*
    673 F.2d 566 (2d Cir. 1982)..............................................................................................7

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004).........................................................................................................11

*Stilwell v. Smith & Nephew, Inc.,*
    482 F.3d 1187 (9th Cir. 2007) ..........................................................................................4

*United States Securities and Exchange Commission v. Snyder,*
    No. H-03-04658, 2006 U.S. Dist. LEXIS 81830
    (S.D. Tex. Aug. 22, 2006)..................................................................................................1

*Villa v. Burlington Northern & Santa Fe Ry.,*
    397 F.3d 1041 (8th Cir. 2005) ..........................................................................................4

*Volk v. D.A. Davidson & Co.,*
    816 F.2d 1406 (9th Cir. 1987) ........................................................................................10

*Wool v. Tandem Computers, Inc.,*
    818 F.2d 1433 (9th Cir. 1987) ........................................................................................11

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Evidence
    Rule 403 ............................................................................................................................5
    Rule 702 ................................................................................................................... *passim*

17 C.F.R.
    §240.10b-5 ....................................................................................................................6, 24

**SECONDARY AUTHORITIES**

Michael Barclay & Frank Torchio,
    *A Comparison of Trading Models Used for Calculating Aggregate Damages*
    *in Securities Litigation,*
    64 Law & Contemp. Prob. 105 (Spring/Summer 2001) ....................................................24

**Page**

Donald A. Berry & Bernard W. Lindgren,
*Statistics: Theory and Methods* (2d ed. 1996) ...................................................15

G. E. P. Box & G. C. Tiao,
*Intervention Analysis With Applications To Economic and Environmental
Problems, Journal of the Am. Statistical Assoc.* (Mar. 1975)...........................15

Henry J. Cassidy,
*Using Econometrics* (1981) ............................................................................15

Bradford Cornell & R. Gregory Morgan,
*Using Finance Theory to Measure Damages in Fraud
on the Market Cases* (June 1990)
37 UCLA L. Rev. 883 ....................................................................................6, 9

John Finnerty & George Pushner,
*An Improved Two-Trader Model for Estimating Damages in
Securities Fraud Class Actions,*
8 Stanford J. L. Bus. Fin. 213 (2002) ..................................................................9

Philip Hans Franses,
*Time Series Models For Business and Economic Forecasting*
(Cambridge Univ. Press 1998).........................................................................15

Craig A. Jacobsen,
*Valuation of Improperly Priced Securities and Shareholder Damages
Shareholder Litigation Insights* 43 (Summer 2004) ............................................9

Jon Koslow,
*Estimating Aggregate Damages in Class-Action Litigation
Under Rule 10b-5 for Purposes of Settlement,*
59 Fordham L. Rev. 811 (1991)........................................................................24

18 James William Moore, *et al.,*
*Moore's Federal Practice* (3d ed. 2007)
§134.02 [1][D] ...............................................................................................8

3 Herbert B. Newberg and Alba Conte,
*Newburg on Class Actions* (4th ed. 2002)
§§10.2-10.3 ...................................................................................................24

*Reference Manual on Scientific Evidence* (2d ed. 2000) ........................................15

Alan Stuart, *et al.,*
*Kendall's Advanced Theory of Statistics,*
*Volume 2A: Classical Inference & The Linear Model* (6th ed. 1999) ...............15

Madge Thorsen, Richard Kaplan & Scott Hakala,
*Rediscovering the Economics of Loss Causation,*
6 J. Bus. & Sec. L. 93 (Apr. 2006)....................................................................15

# I.       INTRODUCTION

There is no basis to exclude Dr. Hakala's testimony.  His credentials are unimpeachable, his methodology is reliable, and his conclusions are based on an event study that even defendants' expert uses in his own analysis.  *See* Prowse Depo. at 48:23-50:8[1]; *see, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 170 (S.D.N.Y. 2007) ("numerous courts have held that an event study is a reliable method for determining market efficiency and the market's responsiveness to certain events or information").  Indeed, Dr. Hakala's methodology is so reliable that not only does defendants' expert, Stephen Prowse, not even challenge it, he adopts Dr. Hakala's event study wholesale into his own analysis.  Not surprisingly, therefore, defendants do not challenge Dr. Hakala's opinion on loss causation, market efficiency or materiality.  As a result, defendants' motion to exclude Dr. Hakala's report and testimony in its entirety must be rejected.

Stripped bare, defendants' *Daubert* motion is based on little more than the unsurprising fact that Prowse has interpreted the data differently than Dr. Hakala.[2]  That defendants' expert sees things a different way is neither troubling nor surprising.  It is not the Court's job to pick between competing experts.  Rather, if two contradictory experts can offer testimony that is reliable and helpful, both are admissible and it is the function of the finder of fact, and not the trial court, to determine what is more trustworthy and credible.  *See* Fed. R. Evid. 702 Advisory Committee Notes (2000) ("When a trial court . . . rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable.  The amendment [to Rule 702] is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.").

Notwithstanding defendants' attempts at misdirection, there is no basis in fact or in law to

---

[1]       Attached as Ex. 1 to the Declaration of Daniel S. Drosman in Support of Opposition to Defendant PETCO Animal Supplies, Inc.'s and Individual Defendants' *Daubert* Motion to Exclude Expert Report and Testimony of Scott D. Hakala, PH.D., CFA ("Drosman Decl."), filed herewith.

[2]       In the **only** case in which defendants' expert Prowse testified about an event study, the federal court criticized Prowse's analysis and conclusions as "speculative," noting that "***there are several reasons to question the accuracy of Prowse's calculation*** [of the true value of the company's stock]." *United States Securities and Exchange Commission v. Snyder*, No. H-03-04658, 2006 U.S. Dist. LEXIS 81830, at *7 (S.D. Tex. Aug. 22, 2006).  The *Snyder* court expressed concern about "the ***speculative nature of Prowse's analysis and conclusions***." *Id.* at *9 (Here, as elsewhere, emphasis is added and citations omitted.).

1   exclude Dr. Hakala's opinions or testimony.  Dr. Hakala's damage calculations are reliably based on

2   the economic impact on PETCO's stock price of its under-accrual of expenses and resulting

3   misleading financial results.  These misrepresentations have been at the core of this case from the

4   beginning.  Defendants' strained efforts to portray Dr. Hakala's damage calculations as speculative

5   amount to a difference of opinion and should be rejected.  Thus, defendants' motion should be

6   denied in its entirety.

7   **II.     ARGUMENT**

8   **A.     Dr. Hakala Is Well Qualified to Render an Opinion in This Matter**

9            Defendants do not contest that Dr. Hakala is qualified to render an opinion on damages in

10  this litigation.  Nor could they.  Dr. Hakala received a Bachelors degree and Ph.D. in economics

11  from the University of Minnesota.  *See* Hakala Report at 1-2 & Ex. A, Drosman Decl., Ex. 2.  He has

12  earned the designation of Chartered Financial Analyst, which required extensive study and

13  knowledge of securities markets and financial analysis.  *Id*.  He currently serves as a principal of a

14  national business valuation and consulting firm.  *Id*.  Dr. Hakala, who studied under the well-known

15  economist and Nobel prize winner Edward Prescott, has taught courses on asset pricing and market

16  efficiency at the doctorate level at Southern Methodist University.  *Id*.  He has written extensively

17  about damage-related issues in securities cases and is a frequent speaker on valuation, economics,

18  ethics and monetary policy.  *Id*.  Consequently, ***no court has ever excluded Dr. Hakala's event***

19  ***study and damages per share testimony on Daubert grounds in a securities class action***.

20           To the contrary, courts have often commented favorably on Dr. Hakala's expertise and

21  helpfulness, as the court did in *In re Xcelera.com Sec. Litig*.:

22           > [A]lthough defendants attack Hakala's credentials and expertise, such arguments
            > largely amount to a red herring.  His training and experience amply qualify him to
23           > testify about the efficiency of the market in which Xcelera shares were traded. . . .  I
            > credit plaintiff's expert's analysis . . . that the stock price did respond to information.
24
    *In re Xcelera.com Sec. Litig*., Civ. No. 00-11649-RWZ, 2004 U.S. Dist. LEXIS 29064, at *9-*10 &
25
    n.5 (D. Mass. Sept. 30, 2004).[3]  Dr. Hakala is more than well qualified to serve as an expert under
26

27  ─────────────────────
    [3]        Defendants attempt to discredit Dr. Hakala by citing cases in which Dr. Hakala's conclusions
28  were critiqued.  *See* Defs. Mem. at 1 n.1.  Only two of these cases, however, involve securities class

the relevant standards.

**B.      Dr. Hakala's Opinions Easily Satisfy the Liberal Standard of Admissibility Under Fed. R. Evid. 702**

In a desperate effort to evade liability for their conduct, defendants insist that the Court must exclude the testimony of plaintiffs' damages expert, Scott D. Hakala, Ph.D., CFA.  In doing so, defendants completely pervert the holding of the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  In fact, defendants' arguments, which boil down to an attack of Dr. Hakala's particular application of an accepted methodology, go to the weight of the evidence, not its admissibility.

Contrary to defendants' arguments, the standard for the admission of expert economic testimony is not nearly so difficult to meet as defendants would wish.  Indeed, as the Supreme Court held long ago in *Bigelow v. RKO Radio Pictures, Inc.*, "*the jury may make a just and reasonable estimate of the damage based on relevant data . . . .  Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.*"  327 U.S. 251, 264 (1946).  *Daubert* does *not* require plaintiffs "'to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of [the] evidence that their opinions are reliable.'"  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).  The reliability requirement is intended only to preclude opinions that are based on so-called "junk science."  *Main Street Mortgage, Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 513 (E.D. Pa. 2001).  As a result, "[t]he standard for determining reliability 'is not that high.'"  *Id.*

Indeed, the Supreme Court in *Daubert* actually held that Federal Rule of Evidence 702 had

---

actions, and **neither** of those courts excluded Dr. Hakala's testimony.  *See Fisher v. Omnicom Group, Inc.*, No. 02-Civ-4483 WHP, hearing transcript at 30 (S.D.N.Y. Aug. 24, 2007) (rejecting defendants' *Daubert* attack on Dr. Hakala as "unavailing"), Drosman Decl., Ex. 3; *In re Metris Cos. Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1014 (D. Minn. 2006) (in summary judgment context, court "decline[d] to decide" whether Dr. Hakala's testimony on loss causation was sufficient).  More significantly, defendants ignore the multitude of securities fraud cases cited *infra* – including *In re Clarent Sec. Litig.*, *In re JDS Uniphase Sec. Litig.*, *In re Broadcom Sec. Litig.*, *In re Xcelera.com Sec. Litig.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.* – in which courts in securities fraud class actions found Dr. Hakala's expert testimony admissible.  *See also In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 510 (D. Del. 2001) (denying defendants' summary judgment motion on damages based on Dr. Hakala's damage model).

dramatically relaxed the standard for the admission of expert testimony, by doing away with the more restrictive standard which had been sometimes applied by lower courts based on the decision in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).  As the Court held in *Daubert*: "Nothing in the text of [F.R.E. 702] establishes 'general acceptance' as an absolute prerequisite to admissibility. . . . That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials."  509 U.S. at 588-89 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. . . .  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").  *Id*. at 594-96.

The *Daubert* Court itself stressed that exclusion of conclusions based on sound methodology is not the proper course:

> ***Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence*. . . .**  These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

*Id.* at 596.

The Court's gatekeeper role in evaluating the admissibility of expert testimony is not intended to supplant the adversary system or the role of the jury.  *See Quiet Tech. v. Horel-DuBois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  "Both parties should be permitted to present evidence, cross-examine each other's witnesses, and present to the jury the methodologies that they believe should be applied in the calculation of damages."  *Villa v. Burlington Northern & Santa Fe Ry.*, 397 F.3d 1041, 1046 (8th Cir. 2005).  Utilizing this framework, courts and commentators repeatedly have recognized that there is a presumption of admissibility of expert testimony of the kind proffered by Dr. Hakala in this case.  *See, e.g.*, *BE & K Contr. Co. v. Will & Grundy Counties Bldg. Trade Council*, 156 F.3d 756, 770 (7th Cir. 1998) (a trial court should exclude evidence of damages only if it has no "basis in fact").

Thus, it is well settled that disputes about an expert's particular application of an accepted methodology – which is the actual dispute raised by defendants here – go to the weight of the evidence, not its admissibility.  *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir.

2007) ("The test for reliability, however, 'is not the correctness of the expert's conclusions but the soundness of his methodology.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).  Accordingly, numerous courts – including the courts cited in defendants' papers – have allowed Dr. Hakala to testify as an expert regarding his event studies and have relied on those studies for various purposes, including settlements and plans of allocations.  It is obvious that Dr. Hakala's expert testimony easily satisfies the applicable standards of reliability and relevance in the action at bar, including all of the *Daubert* factors which pertain to the circumstances of this lawsuit.[4]

### C.   Dr. Hakala's Use of the Constant Percentage Method Is Well Accepted and Appropriate

In calculating damages here, Dr. Hakala performed an event study-regression analysis and value-line calculation.  Hakala Report, at 6-13, 22-29, Drosman Decl., Ex. 2.  After accounting for market and industry factors, Dr. Hakala calculated the portions of the price declines related to the revelation of PETCO's true financial performance, condition and prospects.  *Id.* at 29-43.  He then calculated damages under the out-of-pocket measure using an event-study methodology to determine the price at which PETCO's stock would have traded absent the alleged fraud.  *Id.*  The difference between PETCO's actual trading price and its value represents the inflation per share, also commonly referred to as the damages per share.  Thus, in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1344 (9th Cir. 1976), the Ninth Circuit discussed and approved the event-study methodology that Dr. Hakala employed here.[5]

As Dr. Hakala explained in his report, the out-of-pocket measure of damages for shares held through April 14, 2005 is "measured by inflation on the day of purchase minus inflation on the day

---

[4]     Relying on *ipse dixit* alone, defendants assert that Dr. Hakala's opinions should somehow be excluded under Fed. R. Evid. 403.  Defs. Mem. at 19.  But, as demonstrated *infra*, Dr. Hakala's opinions are neither misleading nor unfairly prejudicial.

[5]     *Accord In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993) (use of event study proper in securities case to evaluate impact of false statements); *In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (the event study method is "'an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation'"); *Gordon Partners v. Blumenthal*, No. 02-Civ-7377 (LAK), 2007 U.S. Dist. LEXIS 9110, at *43-*44 (S.D.N.Y. Feb. 9, 2007) (same); *Carpe v. Aquila, Inc.*, No. 02-0388-CVW-FJG, 2005 U.S. Dist. LEXIS 44667, at *12 (W.D. Mo. Mar. 23, 2005) (same).

1   of sale (or measuring date, if not sold before 90 days after the end of the Class Period").  Hakala

2   Report at 30, Drosman Decl., Ex. 2.  To determine the true value of PETCO's stock during the Class

3   Period, Dr. Hakala employed an event study methodology which resulted in a constant percentage

4   inflation, reflecting PETCO's stock price as it traded (the price line) and its true value during the

5   Class Period (the value line).  *See* Hakala Report at 23-30 & Exs. B and C thereto, Drosman Decl.,

6   Ex. 2.  The event study methodology employed by Dr. Hakala to construct the value line has been

7   recognized as "[t]he most common method of calculating damages in Rule 10b-5 cases," is fully

8   supported by academic literature, and will necessarily result in a constant percentage inflation during

9   periods with no fraud-related disclosures.  *See* Bradford Cornell & R. Gregory Morgan, *Using*

10  *Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 885

11  (June 1990), Drosman Decl., Ex. 4.[6]

12        In his expert report, Dr. Hakala explained why the constant dollar method (what he refers to

13  as the "dollar-drop method") is "inconsistent with academic literature on modeling stock-price

14  movements and is generally an inappropriate method for determining inflation per share at the time

15  of purchase in a case such as this."  Hakala Report at 32, Drosman Decl., Ex. 2 ("The failure of the

16  dollar drop methodology to adjust for changes in market, industry and non-fraud-related factors

17  renders the dollar drop method inappropriate for calculating damages.").[7]

18        Relying on *a single case from the District of Oklahoma*, *In re Williams Sec. Litig.*, 496 F.

19  Supp. 2d 1195 (N.D. Okla. 2007), defendants nonetheless criticize Dr. Hakala's use of the "constant

20  percentage" methodology to calculate per share inflation.  *See* Defs. Mem. at 6-8.  First, defendants

21  ignore the fact that courts throughout the country have endorsed the use of the constant percentage

22  method to calculate damages in securities fraud litigation.  *See, e.g.*, *In re Cendant Corp. Sec. Litig.*,

23

---

24  [6]    Given Judge Sneed's concurrence in *Green v. Occidental Petroleum* and the Supreme Court's opinion in *Dura*, Dr. Hakala did not calculate any damages for investors who purchased

25  during the Class Period and then sold before the corrective disclosure and are often referred to as "in-and-out traders."  *Green*, 541 F.2d at 1345; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 1632 (2005).

26

27  [7]    Defendants' damages expert, Dr. Prowse, used a constant dollar or dollar-drop methodology to calculate damages sustained by investors in this lawsuit.  Prowse Report at 24, Drosman Decl., Ex. 5.

28

1   109 F. Supp. 2d 235, 265 (D.N.J. 2000) (explaining damage analysis: "The rate of artificial increase

2   over the class period links *the percentage of artificial inflation over the class period* (increasing to

3   the maximum percentage of 58.1%) to the actual amount by which each earnings release was

4   overstated over the three year period."); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir. 1982)

5   (upholding jury finding that stock was overvalued by 33% during one part of the class period and by

6   54% during another part).

7          Significantly, many of the cases approving the use of the percentage method to calculate

8   inflation include cases in which Dr. Hakala was an expert.  For example, in *Flag Telecom Holdings*,

9   the court recently rejected the same arguments that defendants make here:

10         Defendants contend that Hakala's affidavit shows that market and industry forces,
       and not company-specific information, including, for example, statements and news
11         relating to the fraud, were actually causing the decline in the value of Flag common
       stock.  Therefore, defendants argue, Hakala's leakage argument is not sufficient to
12         establish loss causation in light of *Dura*'s "recognition that market and industry
       events must be factored out in order to determine whether any part of the alleged
13         economic loss was caused by the alleged fraud."  (*See* Defs. Sur-Reply Mem. Opp.
       Class Cert. at 9.)   *As plaintiffs correctly point out, defendants' argument*
14         *misrepresents the Supreme Court's holding in Dura.*

15   45 F.R.D. at 169-70 ("*Despite defendants' arguments, we find nothing unreliable about Hakala's*

16   *methodology*.  The study culminates in an eighteen-page chart detailing 154 events and their effects

17   on the value of Flag common stock.").

18         Similarly, in *In re Clarent Corp. Sec. Litig.*, No. C 01-3361 CRB, hearing transcript (N.D.

19   Cal. Jan. 31, 2005), the defendants challenged the methodology that Dr. Hakala used to calculate

20   inflation, Drosman Decl., Ex. 6.  At a *Daubert* hearing on the issue, Dr. Hakala explained his use of

21   the percentage methodology to calculate inflation.  *See, e.g.*, *id.* at 61 (discussing the "percentage of

22   the inflation that occurs" during the class period).  At the conclusion of the hearing, Judge Breyer

23   deemed Dr. Hakala's methodology relevant and reliable, holding: "[B]ased on what has been

24   presented to me and based upon the filings of this case, *I am satisfied that you have met your*

25   *burden with respect to Daubert on the inflation issue*."  *Id.* at 88; *see also In re JDS Uniphase*

26   *Corp.*, No. 02-01486 CW, Minute Order (N.D. Cal. Oct. 9, 2007), Drosman Decl., Ex. 7 (in a post-

27   *Dura* case, denying *Daubert* motion to exclude Dr. Hakala's testimony where Dr. Hakala used the

28

1    constant percentage method to calculate inflation).[8]

2          Second, the court in *Williams* – the *lone* case on which defendants rely in attacking Dr.

3    Hakala's use of the percentage method – made clear that its exclusion of the percentage method did

4    not apply to the particular facts of this case:

5                  ***The court can conceive of a case, involving a short class period, in which***
            ***the constant percentage inflation approach would at least clear the Daubert***
6           ***hurdle, leaving the final determination of the merits of the matter to be resolved by***
            ***the finder of fact***.  But, given the tortured history of [the William Company's]
7           securities in the 18 months before the first asserted corrective disclosure January 29,
            2002, this is not that case.

8    *Williams*, 496 F. Supp. 2d at 1270 n.54.  Unlike the 21-month class period in *Williams*, the Class

9
     Period in this case is not even five months long.

10
           In addition, at the end of the Class Period, the stock in the *Williams* case was trading for just
11
     ***pennies per share***.  *Id.*  In *Williams*, unlike this case, the stock had fallen from a high of more than
12
     $60 to less than $2 per share ***before*** there was a single corrective disclosure identified by the
13
     plaintiffs.  *Id.* at 1207, 1224-25.  The *Williams* court noted this fact when it reached the fact-specific
14
     conclusion that defendants quote out-of-context:
15
                  Where, as in the case at bar, the value of a common share is driven down to the
16          penny stock range by forces unrelated to revelation of the fraud . . . , the application
            of the constant percentage inflation approach would give the equity investor the
17          'partial downside insurance policy' which *Dura* counsels that the securities law
            should not provide.
18
     *Id.*  Thus, *Williams* is inapposite.
19
           Not only is *Williams* distinguishable from this case, the *Williams* decision is well outside
20
     mainstream jurisprudence; the ***only*** court to cite *Williams* refused to follow it.  *See In re Apollo*
21
     *Group, Inc. Secs. Litig.*, 509 F. Supp. 2d 837, 846 n.7 (D. Ariz. 2007).  In any event, "principles of
22
     *stare decisis* do not require this Court to give any deference to decisions of another district judge."
23
     *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 249 (S.D.N.Y. 2003) (citing 18
24
     James William Moore, *et al.*, *Moore's Federal Practice* §134.02 [1][D] (3d ed. 2007)).  Thus, this
25

26   _____
        [8]      *See* Declaration of Scott Hakala in Opposition to Defendants' Motion to Exclude Testimony
27   of Plaintiffs' Experts, filed in *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW (N.D. Cal.
     Sept. 21, 2007) (explaining Dr. Hakala's use of the percentage method to calculate inflation),
28   Drosman Decl., Ex. 8.

1    Court "should hesitate to cast aside years of prior practice experience with class action litigation,

2    stampeded by a single district court decision in another circuit." *Id.* at 250.

3        Finally, Dr. Hakala's use of the percentage method to measure inflation is well accepted by

4    professional economists and has been approved and recognized by academic and professional

5    publications. For example, during his deposition in the *Enron* securities fraud litigation, Daniel

6    Fischel – a professor of law and economics at the University of Chicago who defendants in this

7    action rely on extensively for their attack on aggregate damages – recently acknowledged that the

8    percentage method is an acceptable methodology for calculating inflation:

9        Q.    ***Do you have a view of whether inflation should be measured by strict dollar drops or by percentage***?

10

11        A.    ***No, I don't. I think – you know, I've seen, you know, circumstances where both are used, both might be applicable. Sometimes there's really no clear basis for choosing one or the other. So they're both possibilities***.

12                         \*      \*      \*

13

14        Q.    Okay. Both are – let's say both [the percentage and dollar method] have an economic basis. Is that what you would say?

15        A.    Both can have an economic basis.

16    May 24, 2006 deposition of Daniel Fischel in *Newby v. Enron*, No. H-01-3624 (S.D. Tex.) at 41:10-

17    42:12, Drosman Decl., Ex. 9. Likewise, in their paper on calculating damages in securities fraud

18    class action cases, John Finnerty and George Pushner discuss the adjustment of corrective events

19    over time using a "backwardation" approach based on percentage returns, not absolute dollar

20    changes. John Finnerty & George Pushner, *An Improved Two-Trader Model for Estimating*

21    *Damages in Securities Fraud Class Actions*, 8 Stanford J. L. Bus. Fin. 213, 219-221 (2002),

22    Drosman Decl., Ex. 10.[9]

23

24    [9]      Bradford Cornell and R. Gregory Morgan also have authored a paper describing the application of the percentage method, which they term the "event study approach." *Using Finance*

25    *Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. at 899-901, Drosman Decl., Ex. 4. More recently, Craig Jacobson described the constant percentage method as one of the "[t]hree basic methods may be used to estimate the true value of the stock absent any distortions."

26    Craig A. Jacobsen, *Valuation of Improperly Priced Securities and Shareholder Damages*, Shareholder Litigation Insights at 43 (Summer 2004), Drosman Decl., Ex. 11. Jacobsen concluded:

27    "The determination of which methods to use in each situation is based on the facts and circumstances of the particular case." *Id.*

28

1    A simple example illustrates why the constant percentage method used by Dr. Hakala – not

2    the constant dollar method used by Dr. Prowse – is the appropriate method to calculate damages.  An

3    investor purchases a share of stock during the class period at $10.  During the class period, the stock

4    rises to $20 for reasons entirely unrelated to the fraud and just because the market is doing well.

5    After the price hits $20, there is a corrective disclosure that causes the stock price to drop to $5.

6    Under the constant dollar method used by Dr. Prowse, the investor would receive a claim of $15

7    ($20 minus $5), equal to the price decline at the time of the corrective disclosure.  Thus, ***under the***

8    ***constant dollar method, damages to the investor would be greater than the price she paid for the***

9    ***stock***; even though the investor spent just $10 on the stock, the constant dollar method would

10   compute her losses at $15.  Using the percentage method, on the other hand, yields a much different

11   result.  If inflation is actually a percentage of the stock price, then the inflation at the time that the

12   investor made her purchase was 75 percent: the value of the stock after the price decline (or $5)

13   divided by the value of the stock before the price decline (or $20).  Thus, under the percentage

14   method, the investor would be entitled to damages of $7.50 or 75 percent of her original purchase

15   price of $10.

16        The above example clearly shows why defendants' use of the dollar method is not only

17   illogical, but actually violates the securities laws.  In the Ninth Circuit, "a plaintiff in an action under

18   § 10(b) is generally limited to recovery of out-of-pocket losses or actual damages."  *Volk v. D.A.*

19   *Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir. 1987).  In this example, awarding an investor $15 in

20   damages for stock she purchased at only $10 would hardly "compensate" the investor for her "out-

21   of-pocket losses," as required by the Ninth Circuit.  In contravention of Ninth Circuit case law, the

22   dollar method would provide the investor with a windfall and systematically ***overstate*** actual losses.

23   *See Koch v. Koch Indus., Inc.*, 6 F. Supp. 2d 1192, 1204 (D. Kan. 1998) ("The court is confident that

24   the general rule as stated in *Affiliated Ute* was never intended to permit a situation where the

25   defrauded seller could obtain more than the actual, true or fair value of the shares, except 'where the

26   defendant receives more than the seller's actual loss.'") (citing *Affiliated Ute Citizens v. United*

27

28

*States*, 406 U.S. 128, 155 (1972)).[10]  The percentage method, however, would provide the investor with her "out-of-pocket losses."   Because the stock was inflated by 75% when the investor purchased her share, the investor lost $7.50 (75% of her initial $10 investment) "by being deceived into the purchase."  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1437 n.2 (9th Cir. 1987).

Using a hypothetical "Investor A" and "Investor B," defendants insist that the percentage method has a "fundamental flaw" because the amount of inflation in PETCO's stock varied slightly during the course of the Class Period.  Defs. Mem. at 7.  But the plaintiff's loss need not be caused exclusively by the defendant's fraud.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("Proximate cause is causation substantial enough and close enough to the harm to be recognized by the law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm.").  Other courts have "long . . . recognized and accepted that market forces can act on a fraud and can increase or decrease artificial inflation even without company-specific corrective disclosures."  *In re Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT, 2005 U.S. Dist LEXIS 41976, at *13 (C. D. Cal. Sept. 12, 2005).  As the Honorable Vaughn R. Walker observed in *In re Seagate Technology II Sec. Litig.*:

> In the full disclosure case, absent leakages, some fluctuation in the level of price inflation during the class period is to be expected.  ***As the Ninth Circuit recognized in Wool v. Tandem Computers, Inc., 818 F.2d 1433 (9th Cir. 1987), the degree of price inflation may change*** "'***as a result of market forces operating on the misrepresentations.***'"  *Id*. at 1437 (quoting *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1345 (9th Cir. 1976) (Sneed, J., concurring)).  Yet, because by assumption there are no leakages and no partial disclosures, ***one can expect that the degree of price inflation will remain substantially constant***; the variations which occur are thus likely to be oscillations around some base value.

843 F. Supp. 1341, 1364 (N.D. Cal. 1994).[11]  Consequently, there is nothing wrong with the fact that the amount of inflation in PETCO's stock price may have slightly fluctuated throughout the Class

---

[10]     For this reason, Dr. Hakala opined in his report that "***[i]t can be shown by counter-example that the dollar drop method will yield results that are illogical***."  Hakala Report at 32, Drosman Decl., Ex. 2.

[11]     Indeed, "the degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period.  Where the alleged fraud is of a 'prolonged nature,' this factor 'introduces other market variables which may affect the amount the market reacted to disclosures at different times during the class period.'"  *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 119 (W.D. Pa. 2003) (quoting *Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir. 1975)).

1   Period so long as "the degree of price inflation . . . remain[ed] substantially constant," as it did in Dr.

2   Hakala's analysis.  *See id.*[12]

3   Under the standards set forth in *Daubert* and *Kumho Tire*, defendants have utterly failed to

4   demonstrate that Dr. Hakala's constant percentage method has no scientific basis and is not accepted

5   in the economic community.  *See Daubert*, 509 U.S. at 592-94.  To the contrary, numerous courts

6   have found the constant percentage to be grounded in science, and it is the preferred method of

7   courts and professionals for calculating damages in complex securities class action litigation.  *See*

8   *supra*.  Dr. Hakala applied that methodology consistently and rationally, and using his experience,

9   education and training, to draw valid conclusions from the available facts and data.  Compounding

10  the flaws in defendants' attack, defendants completely failed to provide ***any*** evidence regarding the

11  reliability of the constant dollar method used by their expert.  Simply put, defendants' attack on Dr.

12  Hakala's methodology constitutes nothing more than a disagreement of opinion that is wholly

13  insufficient to warrant exclusion.

14       **D.    Dr. Hakala's Selection of Relevant Dates Is Well Supported and**
              **Reliable**

15

16       Defendants do not challenge the science behind Dr. Hakala's use of the event study.  Nor do

17  defendants challenge the methodology Dr. Hakala used to perform the event study.  In fact, Dr.

18  Prowse used Dr. Hakala's event study to calculate damages.  Defendants' criticism of Dr. Hakala's

19  event study is limited to a disagreement with respect to his selection of "relevant events."

20  Defendants, through Dr. Prowse, disagree with Dr. Hakala as to which events are relevant to the

21  fraud and should be used in calculating damages.  Defendants claim that Dr. Hakala's exercise of

22  judgment in this regard was inappropriate, and that he failed to distinguish between fraud-related and

---

23  [12]    Contrary to defendants' unsupported assertion, the Supreme Court in *Dura* did not address
    the issue of how to calculate damages.  In fact, the Supreme Court simply determined that price
24  inflation alone is not sufficient to demonstrate loss causation, and then expressly stated that it "need
    not, and do[es] not, consider other proximate cause or loss related questions."  *Dura*, 544 U.S. at
25  346.  Nowhere in *Dura* does the Court require plaintiffs to calculate damages based on fraud-related
    dollar decline in the stock, as opposed to the traditional out-of-pocket methodology.  *See In re Enron
    Corp. Sec. Litig.*, 2006 WL 4381143, at *53 (S.D. Tex. June 5, 2006) ("***[T]he high court [in Dura]***
26  ***did not indicate what must be pled to establish loss causation other than requiring more than a***
    ***simple allegation of inflated stock price***."); *Omnicom Group*, hearing transcript at 10, Drosman
27  Decl., Ex. 3 (in *Daubert* hearing concerning plaintiffs' damages expert's use of the percentage
    method, court observed: "***But Dura is not the question here.  Dura is the question on the summary***
    ***judgment motion about whether or not the plaintiffs have established loss causation***.").

28

non-fraud-related declines in PETCO's stock price.  Once again, defendants' arguments ignore Dr. Hakala's report and basic principles of statistics and econometrics.

### 1. Dr. Hakala's Exercise of Judgment in the Selection of Relevant Events Was Appropriate

As described in his report, Dr. Hakala identified 12 dates where disclosures occurred that were relevant to the instant fraud.  *See* Hakala Report at 9-12 & Ex. B, Drosman Decl., Ex. 2.  These dates include press releases and other news specifically relating to the under-accrual of expenses in PETCO's distribution operation and the impact of the under-accrual on PETCO's financial conditions and results of operations.  *Id.*  Obviously, when determining what information is relevant to the alleged fraud, Dr. Hakala was required to undertake a *qualitative* analysis – *i.e.*, he had to read the information and decide whether it touched upon the fraud.  Defendants apparently believe that only quantitative analysis can be used to make this assessment, although they fail to cite any court opinion or academic literature disapproving of qualitative analysis in the context of an event study.[13]  Defendants are wrong.

Courts routinely reject *Daubert* attacks on damages experts based on a disagreement over which events are relevant and should be included in a damage analysis.  For example, in *Omnicom*, the same defense counsel, Latham & Watkins,[14] made a virtually identical argument in their *Daubert* motion to exclude the testimony of the same expert, Dr. Hakala.  *See Omnicom*, hearing transcript at 30, Drosman Decl., Ex. 3 ("What defendants take issue with is Dr. Hakala's application of the event study methodology, specifically . . . the method that Dr. Hakala employed to identify relevant days . . . .").  The court in *Omnicom* dismissed this argument, holding: "***Defendants attack on Dr. Hakala's choice of event and relevant days is unavailing.***"  *Id.*

---

[13]    Indeed, the only two cases defendants do cite – *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) and *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236 (E.D. Wash. 2002) – stand only for the unremarkable proposition that a purely *quantitative* analysis may be based on statistically significant information.  Those toxic tort cases have nothing to do with calculating damages in a securities fraud suit and are inapplicable here, where Dr. Hakala's analysis is *both* quantitative and qualitative.

[14]    Latham & Watkins also unsuccessfully challenged Dr. Hakala's expertise pursuant to *Daubert* in *In re Clarent Corp. Sec. Litig.*, No. C 01-3361 CRB, hearing transcript at 88, Drosman Decl., Ex. 6.

Though Daubert requires from experts "more than subjective belief or unsupported speculation," it does not preclude an expert from relying on his experience and judgment in coming to conclusions. *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) and *RMED International v. Sloan's Supermarkets, Inc.*, 2000 Westlaw 310352 at *8 (S.D.N.Y. March 24, 2000). . . . Relying on public information including a list of probable material events set forth by NASD, Dr. Hakala used his experience and judgment to evaluate the materiality of the disclosures made on each day that he chose to exclude.  Moreover, he did so "blindly," that is, before examining the price changes on those days.  Similarly, ***Dr. Hakala used his expert judgment to determine which relevant days to include in his study relying on both their objective t-statistics and his subjective judgment in doing so***.

*Id*. at 30-31.  The *Omnicom* court concluded: "***The fact that Dr. Hakala performed an event study that relied in part on his exercise of judgment is not a ground for excluding his testimony***."  *Id*. at 31.

Other courts similarly acknowledge the role of judgment in expert analyses of relevant dates in event studies:

> ***[T]he Court notes that even a statistical event study involves subjective elements.  A researcher performing an event study must identify which company-specific events to study, and in the process, categorize those events as fraud or non-fraud related***.  *See* MacKinlay, *supra* note 15, at 14.  This is no different than what Preston did in conducting the Event Analysis. . . .  In making this decision, Preston drew upon her knowledge and experience gained over a two-decade career in the field of security valuation, and upon accepted principles within her field. . . . Because Preston's decision was informed by a detailed factual analysis and grounded on principles generally accepted within the relevant field, her testimony is sufficiently reliable to be admitted.

*RMED*, 2000 WL 310352, at *8 ("Certainly, as in even the most technical scientific disciplines, [plaintiff's expert's] economic analysis included both objective and subjective aspects.").  *Id*.

Just two weeks ago, the court in *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, No. 1:00-CV-2838 WBH (N.D. Ga. Mar. 14, 2008) rejected the defendants' *Daubert* attack on the damages expert in that securities fraud class action, holding:

> Significantly, however, Defendants do not challenge the methodology of using an event study to determine whether the alleged fraud caused significant changes in the share price during the class period; they simply quibble regarding the choice of variables.  The gatekeeping function of the Court must focus on the underlying methodology rather than the application of that methodology.

*Id*. at 6-7, Drosman Decl., Ex. 26.  The *Coke* court concluded, "In any complex statistical analysis, there is the potential for reasonable minds to disagree regarding these choices."  *Id*.

In his expert report, Dr. Hakala explained the flaw in defendants' premise: "Dr. Prowse

1   confuses the concept of setting a threshold for statistical significance for testing overall hypotheses

2   with the choice of variables within a statistical analysis in order to provide the most precise and

3   reliable estimates."  Hakala Rebuttal Report at 3, Drosman Decl., Ex. 12; *see also* Hakala Report at

4   28-29, Drosman Decl., Ex. 2.  Dr. Hakala continued: "[T]he academic literature clearly recognizes

5   that individual variables and/or events need not be statistically significant in order to remain in the

6   study, and the inclusion of variables and events that are not statistically significant can improve the

7   accuracy and 'information' content of the analysis and results in a less biased analysis."  Hakala

8   Rebuttal Report at 3, Drosman Decl., Ex. 12.  Citing to academic authority, Dr. Hakala observed that

9   "the use of reasoned judgment and economic principles in selecting events and performing analyses

10  is a necessary part of a statistical analysis and the interpretation or application of the results of such

11  an analysis. *Id.* at 4.

12      The academic literature, including sources cited in Dr. Hakala's report, confirms that the

13  determination of relevance must be guided by judgment and is ultimately qualitative.[15]  For example,

14  the *Reference Manual on Scientific Evidence*, which defendants cite in their motion, provides:

15  "***There is no specific percentage threshold above which a result is practically significant***.  Practical

16  significance must be evaluated in the context of a particular legal issue."  Reference Guide on

17  Multiple Regression, *Reference Manual on Scientific Evidence*, at 191-92 n.34 (2d ed. 2000)

18  ("Multiple regression results can be interpreted in purely statistical terms, through the use of

19  significance tests, or they can be interpreted in a more practical, nonstatistical manner."), Drosman

20  Decl., Ex. 13.[16]

21

22  ---

[15]   Defendants' expert, Dr. Prowse, makes exactly the same kinds of qualitative judgments
23  throughout his report, including the rather amazing judgment to exclude the ***statistically significant***
    price movement on June 24, 2005 when PETCO failed to timely file its first quarter 2005 Form 10-Q
    and Form 10-K as a result of PETCO's under-accrual of expenses.  *See* Expert Witness Report of
24  Steven D. Prowse, Ph.D., CFA, Drosman Decl., Ex. 5.

[16]   *See* Henry J. Cassidy, *Using Econometrics* at 252-53 (1981) (discussing use of collective
25  (joint) tests for inclusion of groups of intervention variables as a whole, rather than individual
    interventions); Donald A. Berry & Bernard W. Lindgren, *Statistics: Theory and Methods* at 423-27
26  (2d ed. 1996) (arguing against a fixed criteria for statistical significance and for considerations of
    practical significance); Alan Stuart, *et al.*, *Kendall's Advanced Theory of Statistics, Volume 2A:
    Classical Inference & The Linear Model* at 193 (6th ed. 1999); Philip Hans Franses, *Time Series
27  Models For Business and Economic Forecasting* at 128-30, 144 (1998); G. E. P. Box & G. C. Tiao,
    *Intervention Analysis With Applications To Economic and Environmental Problems*, Journal of the
28  American Statistical Assoc. (Mar. 1975); Madge Thorsen, Richard Kaplan & Scott Hakala,

1    Thus, Laurentius Marais, Ph.D., who holds graduate degrees in business administration,

2    mathematics, and statistics from Stanford University and served on the faculties of the University of

3    Chicago and Stanford University, has explained that an element of indeterminacy does ***not*** reduce

4    the validity of any statistical conclusions drawn from it.   *Omnicom*, Declaration of Laurentius

5    Marais, Ph.D. dated July 12, 2007 at 4, Drosman Decl., Ex. 14.  "***Complex analyses often must rely,***

6    ***unavoidably, on some degree of expert judgment for which no unique, unambiguously correct***

7    ***resolution is available***."  *Id.*  Dr. Hakala's event study in this case is no exception.[17]

8    Defendants argue that Dr. Hakala "ignores his own stated statistical significance criteria

9    when actually deciding which days represent 'relevant event' days."  Defs. Mem. at 10.  Defendants,

10   however, are conflating two separate inquiries: whether an event is relevant, and whether an event is

11   material.  As explained above, ***relevance is not merely a matter of statistical significance***.  It is

12   simply a matter of judging whether a particular disclosure is related to the fraud.  The second

13   question of materiality can be demonstrated by, *inter alia*, statistical significance, and on that

14   question Dr. Hakala clearly did not "ignore his own stated significance criteria."  *See* Hakala Depo.

15   Tr. at 99, Drosman Decl., Ex. 21 (distinguishing between information that is "relevant and should be

16   included in the event study" versus information that is "relevant and should be included as part of the

17   damage analysis").

18   Dr. Hakala pointed out that "[w]hen there are multiple relevant events, statistical significance

19

---

20   *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93 (Apr. 2006), Drosman Decl.,
     Exs. 15-20; *see also* Hakala Report at 12 n.16, 24 and 30 n.44, Drosman Decl., Ex. 2; Hakala
21   Rebuttal Report at 7 n.10, Drosman Decl., Ex. 12.

22   [17]   For this reason, Dr. Hakala did not "fail[] to adhere to [his] own stated standard" by
     excluding May 5, 2005, as defendants erroneously insist.  Defs. Mem. at 8-9.  As Dr. Hakala
23   explained during his deposition:

24   **[J]ust because something has T statistic greater than 1 doesn't mean you should**
     **put it in.  You have to have strong prior criteria for why it's relevant.  Is it new**
25   **information?  Does it alter the information previously reported by the company?**
     **Is it related to the issue in the complaint, or is it other things**?  In other words – and
26   so that's a judgment you have to make.  And in this particular case we felt this was
     not-the timing of it was such that these were largely repetitive of what other people
     had said and so we did not expect this to have a significant or material effect on the
     stock price, *a priori*.

27   Hakala Depo. Tr. at 130, Drosman Decl., Ex. 21.

28

1    is determined jointly as a function of all of the selected events (as a group) and is not necessarily

2    chosen at the individual event level." Hakala Rebuttal Report at 5, Drosman Decl., Ex. 12. The

3    following example illustrates why this is the case. *Id.* at 5-6. Assume that corrective information

4    about a company leaks into the market every day for five days. The company's stock price declines

5    each day by 5% relative to market and industry indices. If the standard error for each day's price

6    decline was 5%, then under defendants' analysis there would be no damages because each individual

7    event day is not statistically significant (t-statistic of only 1.0 compared with a threshold of 1.65 for

8    significance at the 5% level in a one-tailed test). Over the entire five-day event window, however,

9    the company's stock lost 22.62% of its value as a result of the corrective disclosures and the overall

10   decline of 22.62% over five days is obviously statistically significant (t-statistic of 2.02 using

11   percentage format and t-statistic of 2.29 using the proper natural log distribution). Thus, defendants'

12   analysis compels the mind-boggling conclusion that the investor did not suffer a single penny in

13   damages even though the company's corrective disclosures caused the investor to lose 22.62% of his

14   investment in a single week. Clearly, the five days viewed jointly (and not individually) is correct as

15   the overall investment loss was statistically significant.

16   　　　For this reason, defendants distort the record when they argue that Dr. Hakala included

17   April 18, 2005 as a as a relevant event despite a t-statistic of only -1.10. Dr. Hakala explained that

18   the decline on this date was part of an event window – running from Friday, April 15, 2005 through

19   Wednesday, April 20, 2005 – that was extremely significant in explaining the movements in

20   PETCO's relative share price (jointly the April 18 and 19, 2005 events caused a relative decline in

21   PETCO's share price of 3.3% with a joint t-statistic of 1.83). *See* Hakala Report at 9 & Ex. B,

22   Drosman Decl., Ex. 2; Hakala Rebuttal Report at 7, Drosman Decl., Ex. 12. Similarly, defendants'

23   claim that Dr. Hakala included May 24, 2005 as a relevant event despite a t-statistic of -.87 is

24   disingenuous. Once again, defendants ignore the fact that the decline on this date was part of an

25   event window – continuing through May 27, 2005 – that was extremely significant in explaining the

26   movements in PETCO's relative share price (a joint t-statistic of 2.24 from May 24 to 26, 2005 and a

27   joint t-statistic of 1.67 even after giving partial credit for the positive event on May 27, 2005). *See*

28   Hakala Report at 10 & Ex. B, Drosman Decl., Ex. 2; Hakala Rebuttal Report at 8-9, Drosman Decl.,

1    Ex. 12.[18]

2         When viewed as part of a group – as events that appear in sequence in connection with

3    significant relevant events must be – *the events identified during the event study period had a joint*

4    *t-statistic of 7.49073 or a confidence level in excess of 99.9%*.  *See* Hakala Report at 29 n.42,

5    Drosman Decl., Ex. 2.  "In effect, the events on approximately one out of every six trade days during

6    the Study Period could explain more than half of the variance in Petco's share price not explained by

7    the Composite Index."  *Id.* at 29.  "Given the relatively low remaining standard error remaining, this

8    is considered an excellent goodness-of-fit and strongly indicative of informational efficiency."  *Id.*

9         Thus, defendants do not disparage the science or acceptance of the event study or even Dr.

10   Hakala's methodology.  Defendants merely disagree with Dr. Hakala's judgment as to what events

11   are relevant to the fraud.  But an attack on Dr. Hakala's judgment in this case fails for the same

12   reason the court in *Omnicom* found it "unavailing": "Dr. Hakala used his expert judgment to

13   determine which 'relevant days' to include in his study relying on both their objective t-statistics and

14   his subjective judgment in doing so.  *The fact that Dr. Hakala performed an event study that relied*

15   *in part on his exercise of judgment is not a ground for excluding his testimony*."  *Omnicom*,

16   hearing transcript at 30-31, Drosman Decl., Ex. 3.  Defendants' arguments go to the weight of Dr.

17   Hakala's testimony, not its admissibility.[19]

18              **2.    Dr. Hakala Properly Considered Whether Price Movements on**
                        **Relevant Days Were Influenced by Non-Fraud Related Factors**
19

20        Defendants argue that Dr. Hakala failed to distinguish between fraud-related and non-fraud-

21   _____
     [18]    Defendants complain that Dr. Hakala included June 13 and 16, 2005 in his damage analysis.
22   *See* Defs. Mem. at 8, 10 n.10.  After performing a qualitative analysis, Dr. Hakala included these
     events because he did an *a priori* review and determined that these events were qualitatively
23   relevant.  Hakala Report at 40, Drosman Decl., Ex. 2.  Defendants do not challenge Dr. Hakala's use
     of the event study methodology or quantitative analysis.  They simply disagree with Dr. Hakala's
     judgment, not the science or methodology that he employed.
24
     [19]    *See RMED Int., Inc. v. Sloan's Supermarkets, Inc.*, 94 Civ. 5587 (PKL)(RLE), 2000 U.S.
25   Dist LEXIS 4892, at *6 (S.D.N.Y. Apr. 17, 2000) (refusing to exclude the testimony of plaintiffs'
     damages expert given that "*every stock pricing model will be subject to some form of statistical*
26   *criticism or unwanted interpretation*"); *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1171
     (E.D.N.Y. 1995) ("*Absolute certainty is not possible in complex economic determinations such as*
27   *quantifying the influence of market factors on a stock's price*."); *Rochez Bros., Inc. v. Rhoades*,
     527 F.2d 891, 895 (3d Cir. 1975) (holding that "the law does not command mathematical preciseness
     from the evidence in finding damages").
28

related influences on material movements in PETCO's stock price on two relevant days following the Class Period: May 25, 2005 and June 24, 2005. However, Dr. Hakala's report makes clear that he did consider – and remove from his analysis – any non-fraud-related information disclosed on *all* relevant event days. *See, e.g.*, Hakala Report at 6, 11 and 23, Drosman Decl., Ex. 2. At best, defendants' argument raises a factual dispute. It provides no grounds for excluding Dr. Hakala's opinion.

The "residual impact" is the impact on PETCO's stock price net of general market factors – *i.e.*, the amount of the price change that was caused by Company-specific news rather than macroeconomic or industry-specific factors. Hakala Report at 13-14, Drosman Decl., Ex. 2. Dr. Hakala used the S&P Consumer Discretionary Index as a proxy for the performance of the overall stock market, PETCO's primary peer, PetsMart, and a peer group of certain retail companies identified as a comparable peer index. *Id.* at 6, 26-27. By conducting a standard regression analysis using these indices, Dr. Hakala was able to determine how much of PETCO's stock price return on a given day was caused by company-specific information, as opposed to market and peer-group factors. *Id.* Dr. Hakala then used a statistical test, called a t-test – a well-accepted peer-reviewed methodology – to determine whether this "residual return" could be explained by random volatility of the market. *Id.* at 23-27. If not, the residual return must have been caused by company-specific information, and formed the basis for Dr. Hakala's damage calculations. *Id.*

With respect to May 25, 2005, Dr. Hakala opined that "a significant and measurable portion of the decline (approximately one-fifth to one-sixth of the reduction)" was a result of the "continuing greater-than-expected Distribution Operation costs reported and the effect the internal and external audits and internal control expenses related to identifying and correcting for the accounting problems previously disclosed." *Id*. at 10, 38-39. Indeed, even defendants concede that "*a small amount of the net decline in PETCO stock was actually attributable to alleged fraud*." Defs. Mem. at 11. This is precisely why Dr. Hakala used only 1/6 of the net decline – and not the entire amount – on May 25, 2005 to calculate damages. *Id.* at 10, 38-39. Thus, Dr. Hakala specifically considered the points raised by defendants – *i.e.*, the causes of the relative price movement on May 25, 2005 – and concluded that 1/6 of the net decline in the stock was attributable to the fraud. Tellingly, defendants

1  fail to cite a single case to support their contention that Dr. Hakala's opinion should be stricken

2  when he disaggregated the effects of fraud-related and non-fraud-related information on each

3  relevant day.  Given this fact, the *Omnicom* court expressly refused to exclude Dr. Hakala's

4  testimony on this basis.  *Omnicom*, hearing transcript at 32, Drosman Decl., Ex. 3.

5         Defendants fare no better with their argument that Dr. Hakala included June 24, 2005 in his

6  damage analysis "even though the listing announcement that he relies upon did not provide any new

7  information, and . . . happened after the stock market closed that day."  Defs. Mem. at 11.  Dr.

8  Hakala explained: "Contrary to [Dr. Prowse's] opinion that no 'new information' regarding

9  PETCO's filing status was revealed, the inability of PETCO to file its Form 10-K and Form 10-Q on

10 June 24, 2005 was obviously new information to investors and is the logical explanation for the

11 jointly significant 2.67% and 1.63% relative declines in PETCO's share price on June 24 and

12 June 27, 2005, respectively."  Hakala Rebuttal Report at 9, Drosman Decl., Ex. 12; *see* Hakala

13 Report at 30, Drosman Decl., Ex. 2.  At his deposition, Dr. Hakala made clear that the market would

14 recognize on June 24, 2005 that PETCO had failed to timely file its Form 10-K with the SEC – and

15 risked delisting from the Nasdaq stock exchange – regardless of whether PETCO issued a press

16 release on that day:

17     Q.    But – but how would the market know whether or not that [Form 10-K] had
             been filed absent, you know, looking at a press release on it?

18
19     A.    It's called federal filing.  There's a monitor.  And basically the more
             sophisticated traders in the large institutions are all going to pick that up.  It's
             a ticker.  If you file your [10]K, it's going to show up; if you don't file your
             [10]K, it's not going to show up.
20

21 Hakala Depo. Tr. at 136:18-25, Drosman Decl., Ex. 21.[20]

22     Defendants' motion repeatedly mischaracterizes Dr. Hakala's opinions and methodology, as

23

24 _____
   [20]    Similarly, defendants fail to cite any academic support or theory for their misguided
   contention that Dr. Hakala incorrectly adjusted for negative constant or "drift" in his analysis.  *See*
   Defs. Mem. at 11 n.11 (relying entirely on *ipse dixit*).  Dr. Hakala, **citing to academic authority**,
25 explained that his adjustment for drift is scientifically valid: "The non-zero constant term must be
   adjusted for in interpreting events in order to correctly measure the relative effect of each identified
   event in a manner consistent with an informationally efficient market for Petco's share price.  This is
26 consistent with ignoring the constant (or 'alpha') in estimating 'beta' and the required rate of return
   in the capital asset pricing model (CAPM) and is widely accepted in the academic literature and in
27 applied finance."  Hakala Rebuttal Report at 11-12 (citing academic authority), Drosman Decl., Ex.
   12.

28

well as the facts underlying his analysis.  At bottom, their motion represents little more than an attempt to have the Court decide, as a matter of law, that defendants' expert, Dr. Prowse, is more credible than Dr. Hakala.  It goes without saying that this is a matter for the jury to resolve and is not a proper subject for a *Daubert* motion.

**E.      The Model Used by Dr. Hakala to Calculate Aggregate Damages Is Reliable and Has Been Accepted By Numerous Courts**

To calculate aggregate damages, Dr. Hakala used a well accepted accelerated trading model that "was conservatively calibrated to closely match the quarterly turnover of institutional shares over time."  *See* Hakala Report at 43-46, Drosman Decl., Ex. 2 (explaining his model and the methodology used to calculate aggregate damages); Hakala Rebuttal Report at 12-14 (same), Drosman Decl., Ex. 12.  Dr. Hakala explained that the rate of error of his model is ***below 5%*** in this case because of the high percentage of institutional holders (more than 95%), the relatively uniform inflation per share during the Class Period and a Class Period length ensuring that estimated turnover is reasonably reliable.  *See* Hakala Report at 45-46, Drosman Decl., Ex. 2; Hakala Rebuttal Report at 13, Drosman Decl., Ex. 12.

Defendants misleadingly assert that "no court has specifically upheld the use of trading models on *Daubert* reliability grounds."  Defs. Mem. at 14.  ***Defendants' assertion is false***.  In *RMED Int'l Inc. v. Sloans Supermarkets, Inc.*, the defendants moved under *Daubert* and Fed. R. Evid. 702 to exclude aggregate damages in a securities case on the grounds that "the computerized 'proportional decay' model which [plaintiff's expert] employed to calculate aggregate class damages does not accurately model the trading patterns of Sloan's common stock." 2000 WL 310352, at *5 n.14.  The *RMED* court rejected this attack, holding:

> [T]he proportional decay model has been accepted by this Court, and [plaintiff's expert] modified the model to account for criticisms in the academic literature.  To the extent that these issues have a bearing on [plaintiff's expert's] damages estimate, the appropriate way to address them is through "vigorous cross examination."

*Id*.

Other courts have similarly rejected challenges to the reliability of models to estimate aggregate damages.  For example, in *In re WorldCom. Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215 (S.D.N.Y. Feb. 17, 2005), the court rejected defendants' *Daubert*

challenges to lead plaintiff's damages expert in that case, Blaine F. Nye, and his use of a multi-trader model to calculate aggregate damages in that securities fraud case. The court held:

> First, [defendant Arthur] Andersen challenges Nye's use of a "proportional trading" model to calculate shareholder damages. As explained by the Lead Plaintiff, Andersen's description of Nye's model fails to capture its complexity. Moreover, his model has survived repeated *Daubert* challenges in other cases. Andersen's motion is denied.

*Id.* at *14; *see Cendant*, 109 F. Supp. 2d at 272 ("The use of trading models is accepted to create an estimate of aggregate damages. The Davidson's have given no other reason to disregard [plaintiffs' expert's] conclusion other than it is based on a model. Their objection is rejected."). Indeed, ***the overwhelming weight of authority favors admission of aggregate damages testimony in securities class actions***.[21]

Defendants' argument concerning aggregate damages – and their suggestion that any damage award be based on the submission of individual proofs of claim – is also squarely at odds with the Supreme Court's decision in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). In *Boeing*, the Supreme Court recognized that a judgment in a class action is a judgment on behalf of the entire class, regardless of whether class members elect to share in that judgment by filing a proof of claim. *Id.* at 480. The purpose of the certification of a class is to permit the collective adjudication of every class member's claim. If plaintiffs prevail at trial, the class as a whole will have obtained a common

---

[21] *See, e.g., Rent-Way*, 218 F.R.D. at 119 ("Plaintiffs have satisfied the Court that they will be able to present a workable framework for determining aggregate damages and price inflation at time of trial through the use of expert witnesses who will extrapolate these figures based on trading data during the class period."); *Hanley v. Warburg Pincus Capital Co., L.P.*, No. CV 96-390 TUC FRZ, slip. op. at 3 (D. Ariz. Dec. 7, 2005) ("The Court finds, based on these arguments and case law presented, including *Dura* . . ., that in the event Plaintiff prevails on the issue of liability, a determination of damages by the jury and an award of an aggregate amount is appropriate in this case."), Drosman Decl., Ex. 22; *In re Texas Int'l Sec. Litig.*, 114 F.R.D. 33, 43 (W.D. Okla. 1987) ("Proof of damages can be demonstrated on a classwide basis by the use of a generalized or formulary approach and, in fact, in similar class actions, various formulas to determine damages have been presented to juries."); *In re Homestore, Inc. Sec. Litig.*, No. CV 01-11115-RSWL, hearing transcript at 10 (C.D. Cal. Nov. 29, 2004) ("[A]s to the motion to exclude the aggregate damage opinions of plaintiff's designated damage expert, Jane Nettesheim, the Court finds Nettesheim's testimony is . . . admissible under Federal Rules of Evidence 702 in that disagreements about such testimony goes to the weight rather than the admissibility."), Drosman Decl., Ex. 23; *Lyons v. Scitex Corp.*, 987 F. Supp. 271, 277-78 (S.D.N.Y. 1997) (finding trading model sufficient to estimate damages); *Crazy Eddie*, 948 F. Supp. at 1171 (finding, at a hearing to determine aggregate damages, that expert's testimony concerning trading model was "credible" and "provided a reasonable basis for calculating the effect of market factors on actual losses"); *In re Melridge, Inc. Sec. Litig.*, No. 87-1426-FR, 1994 U.S. Dist. LEXIS 4536, at *1-*3 (D. Or. Apr. 5, 1994) (damages determined on aggregate basis).

1   fund.  Every class member has a right to collect his or her damages from that common fund.  *Id.* at

2   482 (class members are "at least the equitable owners of their respective shares in the [aggregate]

3   recovery").  This is true even if some members of the class fail to exercise that right.  *Id.* at 480.

4   Defendants' proposal to award damages only to those who submit proofs of claim is thus precisely

5   the "inequity" that the Supreme Court identified and rejected in *Boeing*.  As the Court described it, a

6   defendant's interest in minimizing the Class's ultimate recovery by limiting it to the sum of the

7   claim forms received "may not defeat each class member's equitable obligation to share the

8   expenses of litigation."  *Id.* at 482.

9        The Honorable Charles Brieant rejected a similar "broadside attack on the long existing

10  assumptions and procedures relating to trials of class action litigation generally, and specifically

11  securities fraud class actions."  *Oxford Health Plans*, 244 F. Supp. 2d at 248.  In *Oxford*, as in this

12  case, defendants sought to prevent "an award at trial of aggregate class wide damages in order to

13  create a common fund for the non-party absent class members."  *Id.* at 249.  Judge Brieant rejected

14  defendants' argument and held:

15          Before and after the enactment of the PSLRA, absent class members in
            securities fraud cases have been awarded a common fund of damages computed by
16          the trier of the fact, based usually on expert testimony, while the named Plaintiffs'
            damages have been computed and awarded separately.  *See RMED Int'l, Inc. v.*
17          *Sloan's Supermarkets, Inc.*, 2000 WL 310352 (S.D.N.Y. 2000); *In re Cendant Corp.*
            *Sec. Litig.*, 109 F. Supp. 2d 235, 272 (D.N.J. 2000); *Lyons v. Scitex Corp.*, 987 F.
18          Supp. 271, 277-78 (S.D.N.Y. 1997) . . . .  Apart from the fact [that] this procedure
            has long been standard practice and continues to be so . . ., there are sound prudential
19          reasons for continuity.  These include the need for a final judgment for appellate
            review, which eventuates from the jury's verdict, as well as the fact that the common
20          fund may be a source for funding the litigation expenses of the class representatives,
            and the administration of the claims process.  It is no objection to following prior
21          procedures that certain members of the class may neglect to file proofs of claim.

22  *Id.* at 251.  Thus, defendants' absurd claim that trading models are "unnecessary" – for which they

23  rely on an opinion piece in the *Wall Street Journal* – is belied by Supreme Court precedent.  *See*

24  Defs. Mem. at 15.

25          Moreover, as the leading treatise on class actions has stated, there is no unfairness to the

26  defendants in submitting to the jury evidence of the defendants' aggregate liability:

27          Aggregate proof of the defendant's monetary liability is no more unfair than class
            treatment of other elements of liability.  Under these circumstances, there is no room
28          for the defendant to complain of any litigation unfairness by use of aggregate proofs

1     of the defendant's monetary liability to the class.

2     3 Herbert B. Newberg and Alba Conte, *Newburg on Class Actions* §§10.2-10.3, at 478-79 (4th ed.

3     2002).[22]

4         For this reason, proof of the class's damages should encompass the full damages suffered by

5     every member of the class, undiminished by any factor like defendants suggest. *See In re Melridge,*

6     *Inc. Sec. Litig.*, 837 F. Supp. 1076 (D. Or. 1993) (upholding jury award of Rule 10b-5 damages

7     based upon the model of plaintiffs' expert, which assumed that all of the class members would file

8     claims); Jon Koslow, *Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5*

9     *for Purposes of Settlement*, 59 Fordham L. Rev. 811, 840-41 (1991), Drosman Decl., Ex. 24; *see*

10     *also Crazy Eddie*, 948 F. Supp. at 1172 n.15 (losses reflected in proofs of claim may be "lower than

11     actual losses" of the whole class).

12         Thus, inasmuch as plaintiffs are seeking a judgment on behalf on the entire class, they

13     certainly have a right to offer evidence and seek an award of damages that reflects a recovery by the

14     entire class. Indeed, since, as commentators have observed, the submission of claims by class

15     members is largely a function of the magnitude of a class-wide judgment, the exclusion of aggregate

16     damages evidence would be highly prejudicial to the Class. *See* Barclay & Torchio, *A Comparison*

17     *of Trading Models Used for Calculating Aggregate Damages in Securities Litigation*, 64 Law &

18     Contemp. Prob. at 116, Drosman Decl., Ex. 25. To the extent that defendants disagree with Dr.

---

19     [22]     Defendants attempt to cast doubt on the reliability of aggregate damage calculations by

20     reference to a so-called "study," which defendants themselves admit is "non-peer-reviewed." Defs. Mem. at 16-17. Not only is this paper unscientific, unverified and not peer reviewed, but the authors used incorrect and outdated models and "refuse to produce the underlying data to support their

21     calculations," making it impossible to test their conclusions. *See* Hakala Depo. Tr. at 168-70, Drosman Decl., Ex. 21; Hakala Rebuttal Report at 13-14, Drosman Decl., Ex. 12. Moreover,

22     economists have warned against reliance on specious critiques of aggregate damages models of the sort defendants peddle here:

23         ***The most often cited empirical evidence on the accuracy of the trading models is of***

24         ***highly questionable use***. First, testing trading models with claims data can be misleading and inappropriate. Second, the individual decision of whether to file a claim does not alter the economic fact that a given share was damaged. Moreover,

25         given the fundamental economic distinction between damaged shares and claims filed, the logic of using claims data as a benchmark is flawed in a way that may result in bad public policy.

26

27     *See* Michael Barclay & Frank Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation*, 64 Law & Contemp. Prob. 105, 117 (Spring/Summer 2001), Drosman Decl., Ex. 25.

28

1   Hakala's calculation of aggregate damages, "the appropriate way to address them is through

2   'vigorous cross examination.'" *RMED*, 2000 WL 310352, at *5 n.14 (quoting *Daubert*, 509 U.S. at

3   596).

## III.   CONCLUSION

5        Defendants' *Daubert* motion challenges only certain aspects of Dr. Hakala's report.  It makes

6   no argument directed at Dr. Hakala's qualifications or overall methodology.   In their *Daubert*

7   motion, defendants do not dispute that defendants' April 15, 2005 corrective disclosure caused

8   plaintiffs' losses, that the same disclosure was material to investors or that PETCO's stock traded in

9   an efficient market, as Dr. Hakala opined.  Rather, defendants' motion instead relies upon specific,

10  targeted objections to various conclusions that Dr. Hakala draws in his report.[23]   As the Court in

11  *Daubert* held, these challenges go to the weight, not admissibility, of Dr. Hakala's testimony and

12  may be dealt with through "vigorous cross examination" at trial.  *Daubert*, 509 U.S. at 596.

13  Accordingly, defendants' motion to exclude Dr. Hakala's report and testimony should be denied in

14  its entirety.

15  DATED:  March 31, 2008                         Respectfully submitted,

16                                                 COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
17                                                 PATRICK J. COUGHLIN
                                                   DANIEL S. DROSMAN
18                                                 SCOTT H. SAHAM
                                                   JESSICA T. SHINNEFIELD
19

20
                                                         s/ DANIEL S. DROSMAN
21                                                      DANIEL S. DROSMAN

22                                                 655 West Broadway, Suite 1900
                                                   San Diego, CA  92101
23                                                 Telephone:  619/231-1058
                                                   619/231-7423 (fax)

24

25

---

26  [23]     Hence, even if granted, the motion does not provide grounds for striking Hakala's report or
    testimony in its entirety.  In particular, the *Daubert* motion makes no argument that would prevent
27  Dr. Hakala from presenting his event study to the jury, or from testifying to the fact that the April 15,
    2005 press release was a corrective disclosure that caused a stock drop that harmed investors.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
REGINA M. AMES
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Petco III\BRF00049802-DauHakala.doc

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on March 31, 2008.

9

10                            s/ DANIEL S. DROSMAN
                              DANIEL S. DROSMAN

11                               COUGHLIN STOIA GELLER

12                                  RUDMAN & ROBBINS LLP
                              655 West Broadway, Suite 1900

13                               San Diego, CA  92101-3301
                              Telephone:  619/231-1058

14                               619/231-7423 (fax)

15                               E-mail:  ddrosman@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:05-cv-00823-H-RBB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter H Benzian**
  peter.benzian@lw.com,terri.fife@lw.com

- **Robert J Blair**
  robert.blair@lw.com

- **Daniel S Drosman**
  DanD@csgrr.com,tholindrake@csgrr.com,e_file_sd@csgrr.com

- **Edward M Gergosian**
  ed@gergosian.com,johanna@gergosian.com

- **Lionel Z Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Dennis M. Klein**
  dennis.klein@lw.com,marina.durazo@lw.com

- **Robert G Knaier**
  Robert.Knaier@lw.com

- **Daniel J Lenerz**
  daniel.lenerz@lw.com,theresa.kaiser@lw.com

- **Elizabeth P Lin**
  elin@milberg.com,schang@milberg.com,crosete@milberg.com

- **Gwyn Quillen**
  gquillen@agsk.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Scott H Saham**
  ssaham@csgrr.com,karenc@csgrr.com

- **Jessica Tally Shinnefield**
  jshinnefield@csgrr.com,e_file_sd@csgrr.com

- **Dominique N Thomas**
  dominique.thomas@bingham.com

- **Ryan T Williams**

rwilliams@luce.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`